# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OLGA DEMYANENKO-TODD, Individually and on Behalf of All Others Similarly Situated, | **CIVIL ACTION NO.** _3117-cv-772_ |
| Plaintiffs, | **COMPLAINT – CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| NAVIENT CORPORATION, NAVIENT SOLUTIONS, INC., and NAVIENT SOLUTIONS, LLC, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................2

JURISDICTION AND VENUE ..................................................................8

PARTIES .....................................................................................................9

    PLAINTIFF ...........................................................................................9

    DEFENDANTS ....................................................................................13

FACTUAL ALLEGATIONS .....................................................................18

    BACKGROUND ON FEDERAL STUDENT LOANS ........................18

    NAVIENT'S CONTRACT WITH THE DEPARTMENT OF
    EDUCATION TO SERVICE FEDERAL STUDENT LOANS ...........21

    NAVIENT IMPROPERLY STEERED FEDERAL STUDENT LOAN
    BORROWERS INTO COSTLY FORBEARANCE, RATHER THAN
    COST-EFFECTIVE IDR PLANS ........................................................24

        IDR Plans v. Forbearance ..............................................................25

        Navient Steered Borrowers Into Forbearance, Rather Than IDR
        Plans, To Save Money And Increase Profits....................................28

    NAVIENT FAILED TO PROVIDE NOTICE TO BORROWERS OF
    THEIR DEADLINES FOR RENEWING THEIR ENROLLMENT IN
    IDR PLANS.........................................................................................39

        Navient's Inadequate, Hard-Copy Renewal Notice.........................41

        Navient's Equally Inadequate, Electronic Renewal Notices ..........42

CLASS REPRESENTATIVE ALLEGATIONS........................................45

CLASS ACTION ALLEGATIONS ..........................................................47

    ENROLLMENT CLASS.....................................................................47

    FAILURE-TO-RENEW CLASS .........................................................47

i

NEW YORK ENROLLMENT SUB-CLASS ................................................ 48

NEW YORK FAILURE-TO RENEW SUB-CLASS ................................... 48

CAUSES OF ACTION ........................................................................................ 52

COUNT I – BREACH OF CONTRACT (MASTER PROMISSORY NOTE) ............................................................................................... 52

COUNT II – BREACH OF CONTRACT (MASTER PROMISSORY NOTE) ............................................................................................... 55

COUNT III – BREACH OF CONTRACT (SERVICING CONTRACT) ........................................................................................ 58

COUNT IV – BREACH OF CONTRACT (SERVICING CONTRACT) ........................................................................................ 60

COUNT V – VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT ...................................................................................... 63

COUNT VI – VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349 ............................................................... 68

PRAYER FOR RELIEF ..................................................................................... 70

JURY DEMAND ................................................................................................. 71

Plaintiff Olga Demyanenko-Todd ("Ms. Todd" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendants Navient Corporation ("Navient Corp."), Navient Solutions, Inc., ("NSI"), and Navient Solutions, LLC ("NSL") (collectively, "Navient" or "Defendants"). In short, from January 1, 2010 through the present, Navient breached agreements with the federal government and federal student loan borrowers and violated various state laws in connection with their servicing of federal student loans.

Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of the undersigned counsel. This investigation included, among other things, a review and analysis of: (i) public filings by Navient with the United States Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) Complaints filed against Navient by the Consumer Financial Protection Bureau ("CFPB") and the states of Illinois and Washington,[1] based upon their extensive investigation into Navient, including witness interviews and extensive review of Navient; and (iv) other publicly available material and data

---

[1] *See CFPB v. Navient Corp.*, No. 3:17-cv-00101-RDM (M.D. Pa.) ("CFPB Action"); *Illinois ex rel. Madigan v. Navient Corp.*, No. 17 CH 00761 (Ill. Cir. Ct., Cook Co.) ("Illinois AG Action"); *Washington ex rel. Ferguson v. Navient Corp.*, No. 17-2-01115-1 SEA (Wa. Super. Ct., King Co.) ("Washington AG Action").

1

identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to Navient or are exclusively within its custody or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     Student loan debt in the United States recently surpassed totals for both auto loans and credit cards—reaching a colossal $1.4 trillion.[2]  Even more concerning, of the country's 44 million student debtors, roughly a quarter are either in default or having trouble making their monthly payments.[3]  Federal student loans, as opposed to those issued by private lenders, account for more than 80 percent the country's outstanding student loan debt.[4]

2.     Though the burden of this debt load may weigh most obviously on younger generations, student loan debt can haunt borrowers long after they

---

[2] Jessica Silver-Greenberg and Stacey Cowley, *In Navient Lawsuits, Unsettling Echoes of Past Lending Crisis*, NEW YORK TIMES (Jan. 19, 2017), available at https://www.nytimes.com/2017/01/19/business/dealbook/navient-loans-lawsuit.html (last visited Apr. 28, 2017).

[3] Shahien Nasiripour, *Student Debt Giant Navient to Borrowers: You're on Your Own*, BLOOMBERG (Apr. 3, 2017), available at https://www.bloomberg.com/news/articles/2017-04-03/student-debt-giant-navient-to-borrowers-you-re-on-your-own (last visited Apr. 28, 2017).

[4] *Id.*

graduate.[5]  Indeed, over the last ten years or so, the number of Americans who are age 60 and above and who still carry student loan debt has increased fourfold: from 700,000 people in 2005, to 2.8 million today.[6]

3.     This massive financial weight drags heavily on the country's economy.[7]  Persons of all ages saddled with student loan debt find it near impossible to purchase cars or homes.[8]  And older citizens in default are seeing Social Security benefits garnished to pay for sums past due.[9]

4.     In 2016 alone, 1.1 million borrowers in the federal direct student loan program defaulted—amounting to roughly 3,000 defaults per day.[10]  This staggering default rate, coupled with the vast pool of outstanding loan obligations, prompts comparisons to the mortgage crisis that drove America into recession nearly a decade ago.[11]

---

[5] Jessica Silver-Greenberg and Stacey Cowley, *Student Loan Collector Cheated Millions, Lawsuits Say*, NEW YORK TIMES (Jan. 18, 2017), available at https://www.nytimes.com/2017/01/18/business/dealbook/student-loans-navient-lawsuit.html (last visited Apr. 28, 2017).

[6] *Id.*

[7] The Editorial Board, *The Wrong Move on Student Loans*, NEW YORK TIMES (Apr. 6, 2017), available at https://www.nytimes.com/2017/04/06/opinion/the-wrong-move-on-student-loans.html (last visited Apr. 28, 2017).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Stacey Cowley and Jessica Silver-Greenberg, *Loans 'Designed to Fail': States Say Navient Preyed on Students*, NEW YORK TIMES (Apr. 9, 2017), available at

5.      The student loan crisis, however, could have been—and perhaps still can be—mitigated.  Indeed, the majority of federal student loan debtors are eligible for income-driven repayment plans that could lower default rates.  Enrolling in the programs, however, can be difficult due to the information gap between servicers and borrowers.[12]  People who default often do so because they do not know about income-driven repayment plans that might cost as little as zero dollars per month.[13] And while "[t]he guaranty agencies, which collect defaulted federally guaranteed loans made though banks, share some responsibility . . . . the loan servicers, which collect direct student loans and are supposed to guide people through the repayment process, can be especially destructive."[14]

6.      Navient, formerly known as Sallie Mae, is the largest student loan servicer in the United States.  Navient, a publicly traded company, services the loans of more than 12 million borrowers total and, with respect to federal student loans, over 6 million customer accounts under a contract with the United States

---

https://www.nytimes.com/2017/04/09/business/dealbook/states-say-navient-preyed-on-students.html (last visited Apr. 28, 2017).

[12] Jessica Silver-Greenberg and Stacey Cowley, *In Navient Lawsuits, Unsettling Echoes of Past Lending Crisis*, NEW YORK TIMES (Jan. 19, 2017), available at https://www.nytimes.com/2017/01/19/business/dealbook/navient-loans-lawsuit.html (last visited Apr. 28, 2017).

[13] The Editorial Board, *The Wrong Move on Student Loans*, NEW YORK TIMES (Apr. 6, 2017), available at https://www.nytimes.com/2017/04/06/opinion/the-wrong-move-on-student-loans.html (last visited Apr. 28, 2017).

[14] *Id.*

Department of Education ("Department of Education").   In all, Navient is responsible for servicing more than $300 billion in federal and private student loans—amounting to approximately 25 percent of the value of all outstanding student loans.

7.     As an agent of the Department of Education—per the terms of its servicing contract with the government—and the primary contact and provider of information to federal student loan borrowers, Navient is charged with assisting borrowers in repaying their loans, including providing them with information on alternative repayment options. Navient's principal responsibilities as a servicer include managing borrowers' accounts; processing monthly payments; and communicating directly with borrowers about the repayment of their loans.  An essential part of Navient's mandate from the Department of Education is to assist borrowers to learn about, enroll in, and remain in alternative repayment plans.

8.     During the relevant time period, however, Navient failed to perform these core duties in two ways. **First**, Navient failed to inform struggling borrowers about available repayment options.  During critical times where borrowers could best learn about these options—while on the phone with a Navient representative—Navient incentivized its employees to get off calls quickly by offering the easiest fix to someone unable to pay their loans, *i.e.*, a forbearance plan that did nothing to assist the borrower with long-term repayment issues.

Instead of taking more time to discuss other options with borrowers, such as income-driven repayment plans, Navient saved itself money and cost borrowers tremendous amounts of added interest on their loans by improperly steering them into forbearance. **Second,** for borrowers that were actually able to apply and gain entry into income-driven repayment plans—which often lowered their monthly payments significantly—Navient failed to provide them the appropriate information they needed to stay enrolled in those programs.

9.      Unsurprisingly, "an analysis of the most recent federal figures shows that 30 percent of Navient-serviced borrowers are behind on their payments—the worst rate among the Education Department's loan contractors."[15] Further, "CFPB data also show . . . that Navient ranks seventh on a list of the nation's most recently complained-about financial companies."[16]

10.      By improperly steering borrowers into costly forbearances and failing to provide adequate notice of deadlines for borrowers to recertify their enrollment in income-driven repayment plans, Navient violated (i) federal student loan agreements entered into between the Department of Education, for whom Navient acted as agent, and Plaintiff and those similarly situated; (ii) its contract with the

---

[15] Shahien Nasiripour, *Student Debt Giant Navient to Borrowers: You're on Your Own*, BLOOMBERG (Apr. 3, 2017), available at https://www.bloomberg.com/news/articles/2017-04-03/student-debt-giant-navient-to-borrowers-you-re-on-your-own (last visited Apr. 28, 2017).

[16] *Id.*

Department of Education, to service federal student loans borrowed by Plaintiff and those similarly situated—third-party beneficiaries of that contract; (iii) the Delaware Consumer Fraud Act ("DCFA"), 6 Del. Code Ann. Tit. 6, §§ 2511 *et seq.*; and (iv) the New York General Business Law § 349 ("NYGBL"), N.Y. Gen. Bus. Law § 349.  In doing so, Navient caused Plaintiff, along with those similarly situated, significant damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

11.    These claims come on the heels of wide-reaching lawsuits filed by the CFPB in this Court, the Illinois Attorney General in Illinois state court, and the Washington Attorney General in Washington state court.[17]  The governments' coordinated effort followed an extensive, years-long investigation into Navient's unlawful practices by a coalition of 29 state attorneys general, led by Illinois

---

[17] *See* CFPB Action, ECF No. 1 (Jan. 18, 2017) ("CFPB Complaint"); Illinois AG Action, Complaint (Jan. 18, 2017) ("Illinois AG Complaint"); Washington AG Action, Complaint (Jan. 18, 2017) ("Washington AG Complaint").

7

Attorney General Lisa Madigan.[18]   This investigation obtained "thousands of Navient documents, more than 4,000 consumer complaints, and an unspecified number of recordings of calls."[19]

## JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of proposed classes each in excess of 100 members; the aggregate claims of the Class members exceed $5 million exclusive of interest and costs; and one or more of the members of each Class is a citizen of a different state than one or more Defendants.

13.   This Court has personal jurisdiction over Navient Corp. because it is located in this District; resides in this District; does business in this District; and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

14.   This Court has personal jurisdiction over NSI because it is located in this District; resides in this District; does business in this District; and/or a

---

[18] Shahien Nasiripour, *In Navient Lawsuits, America's Largest Student Loan Firm Abused Borrowers And Broke The Law, Officials Say*, HUFFINGTON POST (Apr. 27, 2016), available at http://www.huffingtonpost.com/entry/state-prosecutors-navient_us_57214218e4b01a5ebde47a02 (last visited Apr. 28, 2017).

[19] *Id.*

substantial part of the events or omissions giving rise to the claims occurred in this District.

15.     This Court has personal jurisdiction over NSL because it is located in this District; resides in this District; does business in this District; and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in this District.     Navient is also currently subject to a related action filed by the CFPB in this District.[20]

## PARTIES

### PLAINTIFF

17.     Plaintiff Olga Demyanenko-Todd ("**Ms. Todd**" or "**Plaintiff**"), is and was, at all relevant times, a citizen of the State of New York residing in Astoria, New York.

18.     In 2006, Plaintiff began taking courses in New York University's night program with the hopes of securing employment in finance.     Plaintiff excelled in her courses and, in 2011, graduated with a Bachelor of Arts, *magna cum laude*, in Economics.

---

[20] *See* CFPB Action.

19.    Plaintiff—a "non-traditional" college student and mother of two—
worked at American Express during her first year of school.  In the wake of the
2008 financial crisis, however, Plaintiff was laid off from that position.
Nonetheless, Plaintiff decided to stay enrolled in NYU; but, to do so, Plaintiff had
to take out several student loans.

20.    Throughout her time at NYU, Plaintiff obtained roughly $80,000 in
student loans to cover the costs of her education—which have since ballooned to a
current balance of nearly $120,000—with over 90 percent of those loans coming in
the form of federal loans.

21.    The amounts of Plaintiff's individual federal loans, the subject of this
lawsuit, vary from a low of $1,312 to a high of $8,000.  Plaintiff took out her last
federal loan, which incidentally proved to be her largest, by way of a form Master
Promissory Note ("MPN") for a Federal Direct Unsubsidized Stafford Loan,
executed on August 31, 2010.[21]

22.    Under the terms of that MPN, Plaintiff received a six-month grace
period on repayment.[22]  That grace period was set to begin the day after Plaintiff
"cease[d] to be enrolled at least half-time at an eligible school."[23]  The MPN
provided, however, that interest would accrue on Plaintiff's Direct Unsubsidized

---

[21] See MPN, attached at Exhibit A.

[22] Id. at 2.

[23] Id.

10

Loan during that grace period and would be capitalized if she did not repay it accordingly.[24]

23.    With respect to repayment itself, Plaintiff was afforded "a choice of repayment plans."[25]  The MPN sets out the details regarding each of those plans in the "Borrower's Rights and Responsibilities Statement" incorporated as a part of the MPN.[26]   Indeed, in Paragraph 15 of that Statement, the Department of Education states that Plaintiff "may choose one of the following repayment plans to repay [her] loan":

- ***Standard Repayment Plan*** – Under this plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period.

- ***Graduated Repayment Plan*** – Under this plan, you will usually make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. No single payment will be more than three times greater than any other payment.

- ***Extended Repayment Plan*** – Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period. You are eligible for this repayment plan only if (1) you have an outstanding balance on Direct Loan Program loans that exceeds $30,000, and (2) you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998 or on the date you obtained a Direct Loan Program loan after October 7, 1998.

- *Income Contingent Repayment Plan* – Under this plan, your monthly payment amount will be based on your annual income (and that of your spouse if you are married), your family size, and the total amount of your Direct Loans. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that has accrued on your loan unless you request a forbearance. As your income changes, your payments may change. If you do not repay your loan after 25 years under this plan, the unpaid portion will be forgiven. You may have to pay income tax on any amount forgiven.

- *Income-Based Repayment Plan (effective July 1, 2009)* - Under this plan, your required monthly payment amount will be based on your income during any period when you have a partial financial hardship. Your monthly payment amount may be adjusted annually. The maximum repayment period under this plan may exceed 10 years. If you meet certain requirements over a 25-year period, you may qualify for cancellation of any outstanding balance on your loans.[27]

The MPN also provides: "If you can show to our satisfaction that the terms and conditions of the above repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan."[28]

---

[27] *Id.* at 6, ¶ 15 (emphasis included in MPN).

[28] *Id.*

12

Further, the MPN states, "[i]f you do not choose a repayment plan, we will place you on the Standard Repayment Plan."[29]   And, lastly, the MPN provides that Plaintiff "may change repayment plans at any time after [she has] begun repaying [her] loan."[30]

24.    In this way, the MPN required the Department of Education—and, thus, Navient as its agent—to provide Plaintiff with the opportunity to choose the repayment plan most appropriate for her financial situation.

**DEFENDANTS**

25.    In 1972, Congress created a government sponsored enterprise ("GSE"), the Student Loan Marketing Association (commonly referred to as "Sallie Mae"), to support the guaranteed student loan program created by the Higher Education Act of 1965 ("HEA").  Sallie Mae later became a publicly-traded company, trading under the ticker symbol SLM, in 1984.  From approximately 1997 to 2004, Sallie Mae transitioned from a GSE into a private company, during which SLM Holding Corporation was incorporated and eventually became SLM Corporation.

26.    Sallie Mae became fully privatized by 2004, with SLM Corporation as the parent company and subsidiary Sallie Mae, Inc. responsible for most of the

---

[29] *Id.*

[30] *Id.*

company's servicing and collections businesses. From 2004 until April 2014, SLM Corporation and its subsidiaries operated through one corporate structure in originating loans issued under the Federal Family Education Loan Program ("FFELP"). SLM developed and implemented lending policies; marketed student loans and loan packages to schools and students; funded and distributed loans; and, finally, serviced and collected loans. In 2014, however, these business activities were split into two separate corporate structures.

27.    In April 2014, the former SLM Corporation separated into two publicly-traded entities: (i) Defendant Navient Corporation ("**Navient Corp.**"), a servicing and debt collection business, and (ii) a new SLM Corporation, a student lending business.

28.    Navient Corp. is a Delaware corporation with its principal executive offices located at 123 Justison Street, Wilmington, Delaware 19801. Navient Corp. is a publicly-traded corporation trading under the symbol NAVI. Navient Corp. is located in this District, resides in this District, and does business in this District—with, among other facilities, a major national call center located in Wilkes-Barre, PA.

29.    Pursuant to the terms of the 2014 split, Navient Corp. assumed responsibility for liabilities resulting from the pre-reorganization conduct of old SLM Corporation and its subsidiaries related to servicing student loans. Navient

Corp. is therefore included in this Complaint for servicing misconduct occurring prior to 2014, as a successor to SLM Corporation, as well as the similar conduct that it engaged in after it was formed as a stand-alone entity.

30.    The 2014 corporate split also provided for the transfer of Sallie Mae, Inc. to Navient Corp. and its subsidiaries. Sallie Mae, Inc. then changed its name to Navient Solutions, Inc. ("**NSI**").

31.    NSI, formerly Sallie Mae, Inc., is a Delaware corporation and a wholly-owned subsidiary of Navient Corp. NSI is located in this District, resides in this District, and does business in this District— with, among other facilities, a major national call center located in Wilkes-Barre, PA.

32.    NSI is the main servicing subsidiary of Navient Corp. Today, NSI services more than $300 billion in student loans for more than 12 million borrowers. Allegations in this Complaint that address conduct of Sallie Mae, Inc. and/or NSI, are attributed herein to NSI.

33.    In connection with an internal corporate reorganization, NSI recently changed its name, effective January 31, 2017, to Navient Solutions, LLC ("**NSL**") (collectively, with Navient Corp. and NSI, "**Navient**" or "**Defendants**").

34.    Since their founding, there has been significant overlap between the corporate governance and management of Navient Corp. and NSI/NSL. Many of

the directors and officers of NSI/NSL have also served as directors or officers of Navient Corp.

35.    Navient Corp. often makes no meaningful distinction between it and its subsidiaries.  Rather, it conflates the entities, naming only "Navient" in at least the following ways:

    a.    Both Navient Corp. and NSI utilize the same website— www.navient.com.  The website is registered to NSI but is identified as Navient Corp.'s website, including in Navient Corp.'s filings with the United States Securities and Exchange Commission ("SEC");

    b.    The company has one publicly available Code of Business Conduct that is addressed generically to "Navient Employee[s]" and refers throughout to all Navient companies, including Navient Corp. and NSI;

    c.    At least certain personnel at Navient Corp. and NSI use "navient.com" email addresses;

    d.    Navient Corp.'s SEC filings repeatedly hold out "Navient" as the "leading loan management, servicing and asset recovery company" rather than NSI or any other Navient Corp. subsidiary.

36.    In public statements, including annual 10-K filings with the SEC, Navient (including its predecessor SLM Corporation) touted its alleged capabilities with respect to student loan servicing, including helping borrowers navigate the path to financial success and select the appropriate payment plan for their circumstances.  Navient Corporation has also indicated that it is responsible for

16

overseeing the strategic direction and business goals of its subsidiaries. For instance, Navient Corporation's 2015 10-K filing includes the following statements:

a.   "Navient [Corporation] is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in education loans, Navient [Corporation] supports the educational and economic achievements of more than 12 million customers."

b.   "Navient [Corporation] services loans for more than 12 million … customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with ED. We help our customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."

c.   "The Navient [Corporation] board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements."

d.   "Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in collaboration with our executive management team and internal risk management partners."

37.   Navient Corp. issues consolidated annual reports and SEC filings which include consolidated financial statements and balance sheets for itself and its subsidiaries.

38.     Navient Corp. owns or leases the offices used by its subsidiaries.

39.     Navient Corp. controls and directs the hiring of employees for its subsidiaries.

40.     Navient Corp. consents to and, with knowledge of, approves of, directs, and controls the policies, practices, and acts of its subsidiaries, including the misconduct described herein.

## FACTUAL ALLEGATIONS

### BACKGROUND ON FEDERAL STUDENT LOANS

41.     Federal student loans are student loans that are either funded or guaranteed by the federal government.

42.     Congress passed the Higher Education Act ("HEA") in 1965. Title IV of the HEA addressed financial assistance to students entering "postsecondary education." Reauthorization of the HEA in 1972, further expanded aid to students entering junior colleges, trade schools, and career colleges.

43.     With these legislative efforts, the federal government sought to ensure that low-income, middle-income, and minority borrowers would have access to quality higher education. This legislation also sought to provide the United States with a competitive advantage in the global economy by creating and fostering a highly-skilled workforce.

18

44.    To further its policy goals, the federal government designed federal student loans with several unique characteristics, including that (i) they are primarily need-based and will be made to borrowers, regardless of credit history, so long as a given borrower meets program requirements; (ii) their interest rate is capped by the federal government; and (iii) they come with a host of helpful repayment options, including those keyed to a borrower's income.

45.    In light of these attributes, borrowers typically take on federal student loans before taking on private student loans.  As a result, federal student loans comprise roughly 90% of the student loan market.

46.    Throughout the years, the way in which the federal government issued student loans has evolved.  Until about 1994, federal student loans were originated and funded almost exclusively by private lenders and those loans were then insured by guaranty agencies.  These guaranty agencies were then, in turn, reinsured by the federal government.    The contours of this public-private partnership were established pursuant to the Federal Family Education Loan Program ("FFELP").  Federal student loans given to borrowers through that program are called "FFELP Loans."

47.    In 1994, with the enactment of the William D. Ford Direct Student Loan Program, the federal government began originating loans directly to borrowers, eliminating private-entity middlemen.  The federal student loans given

19

to borrowers through that program are called "Direct Loans." The ramp-up of the Direct Loan program—and the winding down of FFELP—lasted until approximately 2010, when FFELP loans were eliminated as a loan program. Currently, however, loans made through the prior guarantee (FFELP) system of lending still constitute more than 20% of outstanding loans, or approximately $335 billion.

48.    Federal student loans come to students in two main forms: (i) subsidized loans and (ii) unsubsidized loans. For subsidized loans, the government generally pays the interest while the borrower is in school; for unsubsidized loans, the borrower pays all of the interest.

49.    When borrowers experience financial difficulties and cannot meet their standard monthly payment obligation set pursuant to the original terms of their promissory notes, federal student loans come with an array of repayment options to fit a borrower's short-term and long-term needs. Of particular relevance herein, there are repayment plans based on a borrower's income that cap the monthly payment between 10% and 20% of the borrower's discretionary income. In these repayment plans, depending on the specific plan, the balance of the loan will be forgiven after a borrower has made 20 or 25 years of payments. These types of programs, which will be discussed more fully below, are generally referred to as "income-driven repayment" plans or "IDR" plans.

50.     Although IDR plans and the other distinct attributes of federal student loans offer borrowers significant advantages, the federal government nonetheless retains unique powers in collecting on defaulted federal loans—including garnishing a borrower's wages and federal benefits, such as social security income. Additionally, federal student loans can only be discharged in bankruptcy in extremely limited circumstances.

51.     No matter what kind of federal student loan a borrower has, and no matter the channel by which the government provided the loan to the borrower, the management or "servicing" of federal student loans is administered by private entities, like Navient.

52.     Federal student loan servicers contract with the Department of Education, as here, to handle a multitude of issues for borrowers, including: collecting payments, providing repayment options to borrowers, and facilitating the loan's payoff.

### NAVIENT'S CONTRACT WITH THE DEPARTMENT OF EDUCATION TO SERVICE FEDERAL STUDENT LOANS

53.     The Department of Education awarded SLM Corporation a servicing contract in 2009 ("Servicing Contract").[31]

---

[31] *See* Servicing Contract dated June 17, 2009, as filed in the CFPB Action at ECF No. 29-1, and attached hereto at Exhibit B.

54.    That Servicing Contract continues to be in force to the present, subject to various modifications. As a result of the 2014 corporate reorganization, Navient became the entity responsible for fulfilling the obligations owed the Department of Education pursuant to the Servicing Contract.

55.    Under the subsection "General Description of Scope/Purpose" within the "Statement of Objectives (SOO)" section of the Servicing Contract, Navient acknowledges that the "Federal Student Aid (FSA), an office of the Department [of Education], plays a central and essential role in American's postsecondary education community."[32]   Further, Navient recognizes, "FSA's core mission is to ensure that all eligible individuals benefit from federal financial assistance—grants, loans and work-study programs—for education beyond high school."[33]

56.    In light of the economic and liquidity uncertainties spurred by the 2008 financial crisis, the Servicing Contract goes on to explain, "[r]ecent legislation including the College Cost Reduction Authorization Act of 2008 (CCRAA) (Pub. Law 110-84) and the Ensuring Continued Access to Student Loans Act of 2008 (ECASLA) (Pub. Law 110-227) enabled the Department to accept former Federal Family Education Loan Program (FFELP) loans in the form of additional Direct Loan (DL) capacity, and to purchase FFELP loans as far back

---

[32] *Id.*. at 19.

[33] *Id.*

22

as 2003, in an effort to bring liquidity and stability back to the student loan market."[34] And "[w]ith the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the Title IV student aid servicing vehicles is determined appropriate at this time."[35] For this reason, the Department of Education sought to "[a]cquire efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."[36]

57.   The Servicing Contract further states that "[s]pecific compliance activities for servicing Federal held assets include, but are not limited to, Attachments A-1 through A-3" attached thereto.[37] Attachment A-1 then lays out, in greater detail, the "Unique Client/Lender Requirements for Federal Serviced Portfolio."[38] Critically, in that section, Navient agrees to "provide collection and default aversion activity on loans serviced under this contract as long as the loan remains on the servicer's system."[39] This specification reflects FSA's "core

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at Attachment A-1 at 14.

[39] *Id.* at Attachment A-1 at 15.

mission" to provide eligible individuals with beneficial, cost-effective financial assistance in pursuit of higher education.

### NAVIENT IMPROPERLY STEERED FEDERAL STUDENT LOAN BORROWERS INTO COSTLY FORBEARANCE, RATHER THAN COST-EFFECTIVE IDR PLANS

58.     After a borrower takes out a federal student loan, the borrower's student loan servicer is the main contact regarding her student loan. Among other things, the servicer collects payments, sends bills, informs borrowers if they are late on a payment, and interacts with borrowers over the phone regarding available repayment plans. The servicer's policies and practices can substantially affect the borrower's performance on the loan and the resulting amount the borrower will pay over the life of the loan.

59.     Upon first entering repayment, a federal student loan borrower is assigned to or selects a specific repayment plan. However, that borrower has the right to change her repayment plan assignment or selection at any time, including if she is experiencing financial hardship or distress.

60.     The Department of Education publicly encouraged borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that borrower. In several places on its website, the Department of Education advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance:

24

    a.      "Work with your loan servicer to choose a federal student loan repayment plan that's best for you."[40]

    b.      "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[41]

    c.      "Always contact your loan servicer immediately if you are having trouble making your student loan payment."[42]

61.    These statements inform borrowers that the most effective way to learn about available repayment options is to make live contact with their loan servicer's representatives.

### IDR Plans v. Forbearance

62.    The Department of Education offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make monthly repayment of these loans more affordable. These repayment plans include several income-driven repayment plans, such as Income-Based Repayment ("IBR") and Pay As You Earn Repayment

---

[40] Federal Student Aid, U.S. Department of Education, *Repayment Plans*, available at https://studentaid.ed.gov/sa/repay-loans/understand/plans (last visited Apr. 28, 2017).

[41] Federal Student Aid, U.S. Department of Education, *Income-Driven Repayment Plans*, available at https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited Apr. 28, 2017).

[42] Federal Student Aid, U.S. Department of Education, *Deferment and Forbearance*, available at https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance (last visited Apr. 28, 2017).

("PAYE"). The borrower's monthly payment under an IDR plan (including both IBR and PAYE plans) is based on the borrower's income and family size and is intended to be more affordable for borrowers who would struggle to make the payments under a standard repayment plan. Depending on the borrower's income and family size, a borrower's monthly payment may be as low as $0 per month when enrolled in an IDR plan.

63.     Most IDR plans offer several additional benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship:

      a.    For borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the IDR plan. This interest subsidy can be a significant benefit to such borrowers because they generally have no obligation to ever pay the unpaid interest that accrues during those three years. Because that interest, which is not paid by the borrower, but instead is paid in full by the federal government, it is not added to the principal balance of the loan, or "capitalized."

      b.    Borrowers who are enrolled in an IDR plan can also receive forgiveness of the remaining balance of their federal loan, either after making 20 or 25 years of qualifying payments for most IDR plans or 10 years of qualifying payments while employed in certain public service professions.

64.     Federal student loans are generally also eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a

borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time.

65.    Forbearance is typically not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term. Borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance. These include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan. And in some cases, a loan may be reamortized following a forbearance—which may cause the monthly payments to be recalculated, and thus, lead to an increase in the borrower's monthly payment amount. In light of the above, long-term enrollment in forbearance can dramatically increase the total amount due each month after the forbearance period ends and, also, over the repayment term of a borrower's federal loans.

66.    Because IDR plans enable borrowers to avoid or reduce the costs associated with forbearance, enrolling in an IDR plan is usually a significantly better option than forbearance for borrowers whose financial hardship is neither temporary nor short-term. Indeed, "[b]orrowers who use temporary deferment or forbearance plans are more likely to default on their federal student loans, according to a 2006 Education Department study."[43]   On the other hand, "[i]n

---

[43] Shahien Nasiripour, *In Navient Lawsuits, America's Largest Student Loan Firm*

2014, fewer than 5 percent of loan balances enrolled in the two most popular income-based plans were delinquent, according to a separate Education Department review."[44]   Given the benefits of IDR plans, the Department of Education made its preference for IDR plans over Forbearance very clear in a 2012 presentation to financial aid administrators: "Deferment and Forbearance should not be the first option. Our servicers counsel borrowers on repayment plans before applying a deferment of [sic] forbearance."[45]

### Navient Steered Borrowers Into Forbearance, Rather Than IDR Plans, To Save Money And Increase Profits

67.    Navient is the largest servicer of federal student loans—servicing over $275 billion in federal loan volume.  As a result, its servicing policies, practices, and mechanisms impact federal student loan borrowers across the country.

68.    Navient, as a servicer of federal loans, is charged by the government with the responsibility of assisting borrowers with managing their loans.  As stated on the Department of Education's website:

> A loan servicer is a company that handles the billing and other services on your federal student loan. The loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related

---

*Abused Borrowers And Broke The Law, Officials Say*, HUFFINGTON POST (Apr. 27, 2016), available at http://www.huffingtonpost.com/entry/state-prosecutors-navient_us_57214218e4b01a5ebde47a02 (last visited Apr. 28, 2017).

[44] *Id.*

[45] *Id.*

to your federal student loan. It is important to maintain
contact with your loan servicer. If your circumstances
change at any time during your repayment period, your
loan servicer will be able to help.[46]

69.     From at least 2010 to the present, Navient represented to borrowers

that they should call Navient and, also, that Navient would help them make the

right decision in selecting the appropriate repayment plan.   Indeed, Navient's

website has included the following statements inviting borrowers to contact

Navient for guidance in finding long-term repayment solutions:

> a.     "[I]f you're having trouble, there are options for assistance,
> including   income-driven   repayment   plans,   deferment,
> forbearance, and solutions to help you avoid delinquency and
> prevent default . . . . We can work with you to help you get
> back on track, and are sometimes able to offer new or
> temporarily reduced payment schedules.   Contact us at 800-
> 722-1300 and let us help you make the right decision for your
> situation."[47]

> b.     "If you're experiencing problems making your loans payments,
> please   contact us.   Our representatives can help you by
> identifying options and solutions, so you can make the right
> decision for your situation."[48]

---

[46] Federal Student Aid, U.S. Department of Education, *Loan Servicers*, available at
https://studentaid.ed.gov/sa/repay-loans/understand/servicers (last visited Apr. 28,
2017).

[47] Navient, *If You're Having Trouble*, available at https://www.navient.com/loan-
customers/postponing-payments/if-you-are-having-trouble/ (last visited Apr. 28,
2017).

[48]    Navient,   *Avoiding   Delinquency   and   Default*,   available   at
https://www.navient.com/loan-customers/postponing-payments/avoiding-default/
(last visited Apr. 28, 2017).

  c. "Navient is here to help. We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default."[49]

70. For many years, Navient's website has included other, similar statements, including that it was "committed to giving you the information and tools you need to understand and evaluate your student loan payment options. We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."

71. Jack Remondi, as President and Chief Executive Officer of both NSI/NSL and Navient Corp., echoed and expounded upon these sentiments:

  a. "At Navient, our priority is to help each of our 12 million customers successfully manage their loans in a way that works for their individual circumstances."[50]

  b. "Struggling federal borrowers who engage with their servicers will learn about the options to repay student loans in a way that best fits their individual circumstances. Income-driven repayment programs such as Pay As You Earn and Income-Based Repayment establish a monthly payment based on a percentage of discretionary income that can make short- or long-term financial challenges much more manageable. The Administration's new Revised Pay As You Earn (REPAYE)

---

[49] Navient, *5 Habits of Successful Borrowers*, available at https://www.navient.com/loan-customers/getting-started/successful-student-loan-borrowers/ (last visited Apr. 28, 2017).

[50] Jack Remondi, *What CFPB Consumer Data Prescribes for Student Loans*, MEDIUM (Mar. 20, 2017), available at https://medium.com/@JackRemondi/what-cfpb-consumer-data-prescribes-for-student-loans-ab46b8e62179 (last visited Apr. 28, 2017).

can make monthly payments even more affordable for many borrowers."[51]

c.   "At Navient, we make it a priority to educate our federal borrowers about income-driven options, with more than 170 million communications annually about repayment options. These programs are our primary tool in helping borrowers avoid default. As a result, we are a leader in enrolling borrowers in these programs."[52]

d.   "For some borrowers, student loan debt can be especially daunting. The good news is that borrowers can turn to their student loan servicers for help to navigate the complex repayment options. The key is contact."[53]

e.   "All borrowers, and especially those facing financial strain, should be encouraged to engage directly with their servicers— not driven away from them by misleading and false rhetoric. Together, we can ensure that even those who are anxious about their loans know they have options. Help is a phone call away."[54]

f.   "Default is avoidable, but borrower contact is key. If borrowers are led to believe that calling their servicer is useless, who benefits?"[55]

---

[51] Jack Remondi, *It's Time to Put Students First*, MEDIUM (May 23, 2016), available at https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e (last visited Apr. 28, 2017).

[52] *Id.*

[53] Jack Remondi, *4 ideas for a better student loan program: A common sense recipe for reform*, MEDIUM (Feb. 12, 2017), available at https://medium.com/@JackRemondi/4-ideas-for-a-better-student-loan-program-a-common-sense-recipe-for-reform-521e651d612 (last visited Apr. 28, 2017).

[54] Jack Remondi, *It's Time to Put Students First*, MEDIUM (May 23, 2016), available at https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e (last visited Apr. 28, 2017).

[55] Jack Remondi, *Four Recommendations to Improve Student Loan Success*, MEDIUM (Apr. 12, 2016), available at https://medium.com/@JackRemondi/four-

31

72.     These statements reflect what Remondi told investors at a 2014 Wall Street conference: "that the typical borrower doesn't know the difference between the government's various income-based repayment plans."[56]     Thus, Remondi explained, "[o]ur job as a servicer . . . is to really work with those customers and make sure that they understand the differences and which program best fits their needs."[57]

73.     Notwithstanding the requirements of its Servicing Contract, the information that Navient provided to borrowers on its website, and Jack Remondi's public statements, Navient routinely steered borrowers experiencing long-term financial hardship into costly payment relief designed for borrowers experiencing short-term financial problems, before or instead of affordable long-term repayment options that were more beneficial to them in light of their financial situation. Navient did so despite acknowledging on its website that forbearance is appropriate for borrowers only where they "have a problem making on-time payments due to a temporary financial difficulty" and, further, that "[f]orbearance

---

recommendations-to-improve-student-loan-success-94488bf0bb7f   (last   visited Apr. 28, 2017).

[56] Shahien Nasiripour, *Student Debt Giant Navient to Borrowers: You're on Your Own*,     BLOOMBERG     (Apr.     3,     2017),     available     at https://www.bloomberg.com/news/articles/2017-04-03/student-debt-giant-navient-to-borrowers-you-re-on-your-own (last visited Apr. 28, 2017).

[57] *Id.*

is intended to help you out in times of temporary need."[58]  The reason Navient did

so was to reduce its costs of providing service and increase its profits.

74.    Navient's   compensation   policies   for   its   customer   service

representatives were the bedrock of its cost-saving, profit-increasing strategy.

Indeed, Navient used a comprehensive set of employee incentive compensation

plans for its customer service and pre-default collections employees that rewarded

employees for hastily pushing borrowers into forbearance without adequately

exploring IDR plans and, in some instances, without making any mention of IDR

options whatsoever.

75.    An incentive compensation plan ("ICP") is a reward strategy that uses

a documented plan to compensate employees based on criteria other than salary or

hourly pay for time worked.  An ICP is designed to supplement base pay and drive

behaviors and performance that align the employee with the overall strategy of the

company.

76.    Navient compensated its customer service personnel, in part, based on

average call time. As a result, engaging in detailed conversations with borrowers

about their particular financial situation and trying to determine the IDR plan that

is most appropriate for each borrower would have been financially detrimental for

---

[58]     Navient,   *Deferment   and   Forbearance,*   available   at
https://www.navient.com/loan-customers/postponing-payments/deferment-and-
forbearance/ (last visited Apr. 28, 2017).

those employees. This is especially troublesome because a live conversation about alternative repayment plans and the borrower's financial situation is usually time-consuming, in light of the number of repayment options available for federal loans.

77.     Moreover, since a borrower is required to submit a paper or online application, along with certain income tax documentation, to enroll in an IDR plan, the process of enrolling a borrower in such plans sometimes requires multiple, lengthy conversations. This is particularly true considering that more than half of Navient borrowers who attempt to enroll in IDR plans for the first time report that they could not navigate the application process on their own.

78.     On top of the paperwork required to enroll a borrower in an IDR plan, borrowers enrolled in such plans must also complete an annual recertification form each year to document their current income and family size, which is then used to adjust the borrower's payment amount. Processing this renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in IDR plans.

79.     In short, counseling borrowers about, and enrolling those borrowers in an IDR plan, is costly for Navient and its employees. Enrollment in forbearance, on the other hand, can often be completed over the phone in a matter of minutes and generally without the submission of any paperwork.

80.    When compared to the staff resources and time expenditure required to enroll and renew borrowers in IDR plans, enrolling borrowers in forbearance is financially beneficial for its employees and substantially less expensive for Navient.    As a result of the misaligned incentives imposed by Navient's compensation policies, Navient employees routinely failed to invest the time and effort necessary to help financially distressed borrowers identify and enroll in affordable repayment plans most appropriate for their financial situation.    In fact, a 2016 analysis based on Google search patterns suggests that Navient employees did not even know IDR plan basics: "[Navient] has a major call center in Fishers, Indiana.  People in no city in America search more often for the term 'ibr' — short for the government's Income-Based Repayment plan — than folks in Fishers."[59]

81.    Between January 2010 and March 2015, the number of borrowers that Navient enrolled in forbearance generally exceeded the number of borrowers enrolled in IDR plans.  For example, in December 2010, around 9% of borrowers with FFELP loans held and serviced by Navient were enrolled in voluntary forbearance; meanwhile, less than 1% of borrowers with the same loan type were enrolled in IDR.[60]  Similarly, in December 2012, approximately 7% of Navient

---

[59] Shahien Nasiripour, *In Navient Lawsuits, America's Largest Student Loan Firm Abused Borrowers And Broke The Law, Officials Say*, HUFFINGTON POST (Apr. 27, 2016), available at http://www.huffingtonpost.com/entry/state-prosecutors-navient_us_57214218e4b01a5ebde47a02 (last visited Apr. 28, 2017).

[60] *See* CFPB Complaint ¶ 50; Illinois AG Complaint ¶ 282.

borrowers with FFELP loans held and serviced by Navient were enrolled in voluntary forbearance, while just 2% of borrowers with the same loan type were enrolled in IDR.[61]

82.     Navient representatives sometimes initially responded to borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available IDR plans, even though it is likely that a large number of those borrowers would have qualified for a $0 payment in an IDR plan at that time.   Indeed, over 50% of Navient borrowers who need payment relief, and meet the eligibility criteria for income-driven repayment plans, qualify for a $0 monthly payment.[62]   This indicates that the substantial prevalence of forbearance versus IDR noted above is the direct result of Navient's policies.

83.     Between January 1, 2010 and March 31, 2015, nearly 25% of borrowers who ultimately enrolled in an IDR plan with a $0 payment were enrolled in voluntary forbearance within the twelve-month period immediately preceding their enrollment in an IDR plan.[63] Similarly, during that same time period, nearly 16% of borrowers who ultimately enrolled in PAYE with a $0 payment were enrolled in voluntary forbearance within the twelve-month period immediately

---

[61] *See* CFPB Complaint ¶ 50; Illinois AG Complaint ¶ 283.

[62] *See* CFPB Complaint ¶ 51.

[63] *See id.* ¶ 52.

preceding their enrollment in PAYE.[64]   In fact, the majority of these borrowers were enrolled in voluntary forbearance for a period that exceeded three months immediately preceding their enrollment in the income-driven repayment plan.[65] This suggests that forbearance was not merely offered to these borrowers as a three-month waiting period while their application in an IDR plan was pending.

84.   Because they were placed into forbearance before ultimately enrolling in an income-driven repayment plan with a $0 payment, these borrowers had delayed access to the benefits of the income-driven repayment plan. They were also subject to the negative consequences of forbearance, including the addition of interest to the principal balance of the loan, which they potentially could have avoided had they been enrolled in the IDR plan from the start.

85.   Navient also enrolled many borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans.  Between January 1, 2010 and March 31, 2015, Navient enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling twelve months or longer.[66]   For borrowers enrolled in three or more consecutive forbearances, each forbearance period lasted for six months on average. Therefore, hundreds of thousands of consumers were continuously enrolled in forbearance for

---

[64] *See id.*

[65] *See id.*

[66] *See id.* ¶ 53.

a period of two or three years, or more. Regardless of why these borrowers did not enroll in an IDR plan from the start, their long-term inability to repay was increasingly clear as each forbearance period expired. Yet Navient representatives continued to enroll them in forbearance again and again, rather than an IDR plan that would have been beneficial for many of them.

86.    By enrolling these borrowers in multiple consecutive forbearances, and failing to inform them about IDR plans at the time of live contact, Navient imposed a staggering financial cost on this group.  Indeed, at the conclusion of those forbearances, Navient had added nearly **four billion dollars of unpaid interest to the principal balance of their loans.**[67]

87.    Had Navient talked to those borrowers about getting on an affordable payment plan, as it was required to under both the MPN and Servicing Contract— and promised to in a variety of public statements/representations—those borrowers would not have incurred those costs.

88.    For many of these borrowers, had they been enrolled in an income-driven repayment plan, they would have avoided the addition of substantial interest charges to their loan accounts because the government would have paid the unpaid interest on their subsidized loans in full during the first three years of IDR enrollment.

---

[67] *See* CFPB Complaint ¶ 54; Illinois AG Complaint ¶ 293.

89.    Navient, a student loan servicer tasked with the responsibility to inform struggling borrowers about the available repayment options, including IDR options, cut its costs at the critical moment of live borrower contact by incentivizing its employees to offer the easiest fix to someone unable to pay their loans—a forbearance.  This approach saved Navient money, but proved very costly for borrowers.

### NAVIENT FAILED TO PROVIDE NOTICE TO BORROWERS OF THEIR DEADLINES FOR RENEWING THEIR ENROLLMENT IN IDR PLANS

90.    As mentioned above, a federal student loan borrower who is enrolled in an IDR plan must certify his/her income and family size to qualify for an affordable payment amount, which applies for a period of twelve months. The affordable payment amount will then expire unless the borrower "recertifies" his or her income and family size by submitting updated information and documentation.

91.    If the borrower does not timely recertify income and family size, negative consequences are likely to occur, including:

a.    The borrower's monthly payment will immediately increase from a low affordable amount to the amount dictated by a "standard" repayment plan;

b.    The addition and capitalization of unpaid interest into the principal balance of the loan;

c.    For subsidized loans in the first three years of enrollment in an IDR plan, the loss of an interest subsidy from the federal government for each month until the borrower renews her enrollment; and

39

       d.    Delayed progress towards loan forgiveness for borrowers who enrolled in forbearance when the twelve-month period expired—as those borrowers would not be making qualifying payments counting towards loan forgiveness.

92.    These consequences are all irreversible.

93.    At the time of enrollment in an IDR plan, Navient sent borrowers an "initial disclosure notice" that identified the beginning and end dates of the initial enrollment in the repayment plan.[68] That notice has also advised consumers: "You'll be notified in advance when your loan(s) is up for renewal for the [income-driven repayment] plan. At that time, you'll be provided with a date to submit a new application."[69] However, the notice failed to indicate a specific renewal deadline.[70]

94.    The "initial disclosure notice" also outlined certain consequences that might result if the borrower "chooses not to renew" or "requests to leave the plan," including the recalculation of the borrower's monthly payment amount and the addition of unpaid interest to the principal balance of the loan. This indicates that these consequences will result only if the borrower either "chooses not to renew" or "requests to leave the plan." The notice does not identify any consequences that

---

[68] *See* CFPB Complaint ¶ 58.

[69] *See* CFPB Complaint ¶ 58; Illinois AG Complaint ¶ 306; Washington AG Complaint ¶ 5.169.

[70] *See* CFPB Complaint ¶ 58; Washington AG Complaint ¶ 5.169.

might result if the borrower chooses to renew by submitting a renewal application, but the application is incorrect or incomplete in some respect or is not submitted in a timely manner.[71]

95.    Since at least January 1, 2010, federal student loan servicers, including Navient, have been required to send at least one written notice concerning the annual renewal requirements to borrowers in advance of their renewal deadline.

### Navient's Inadequate, Hard-Copy Renewal Notice

96.    From at least January 1, 2010 until December 2012, Navient sent hard-copy annual renewal notices for IDR plans, through United States mail, that failed to inform borrowers of the actual date by which they had to submit the renewal application, including documentation of income, to avoid expiration of the twelve-month period—as Navient's initial disclosure notice promised to do.

97.    Instead, Navient's pre-December 2012 notices stated vaguely that the borrower's income-based repayment period would "expire in approximately 90 days" and that the "renewal process may take at least 30 days."[72]

98.    Reasonable borrowers cannot, based on this notice, determine the deadline by which they must submit the required package in order to timely renew

---

[71] *See* CFPB Complaint ¶ 59; Washington AG Complaint ¶ 5.170.

[72] *See* CFPB Complaint ¶ 62; Illinois AG Complaint ¶ 308; Washington AG Complaint ¶ 5.171.

enrollment in IDR.  First, the statement that the "renewal process may take at least 30 days" says nothing about how long the renewal process will actually take or even the maximum number of days the renewal process could take.  Second, by saying that the plan would expire in "approximately 90 days," Navient provided no date by which the borrower could count backwards to calculate the deadline—even if Navient had told the borrower how many days to count (which it did not). Lastly, the notice failed to advise borrowers of the likely consequences if they failed to timely submit their renewal application.

### *Navient's Equally Inadequate, Electronic Renewal Notices*

99.   For borrowers who have consented to receiving electronic communications, Navient sent electronic renewal notices rather than hard-copy notices by mail.  More than 75% of Navient's federal student loan borrowers have consented to receiving electronic communications.

100.  Between at least mid-2010 and March 2015, Navient advised borrowers of the availability of the electronic renewal notice by sending them an email with a hyperlink to its website.  These borrowers then had to log in to Navient's secure website with their user ID and password to view the contents of the electronic renewal notice.

101.  However, neither the subject line of the email Navient sent borrowers nor its contents provided any indication of the purpose of the notice. From at least

42

January 1, 2010 through November 15, 2012, the subject line of the email simply read: "Your Sallie Mae Account Information."[73]   Likewise, from at least November 16, 2012 through March 18, 2015, the subject line of the email was: "New Document Ready to View."[74]

102.   The body of the email did not provide any greater detail. Until mid-2015, the body of the email stated only that "a new education loan document is available. Please log in to your account to view it."[75] In stark contrast, during the same time period, other emails sent by Navient described the content or purpose of the referenced document.[76] For example, the subject line of one such email was "Your Sallie Mae – Department of Education Statement is Available," and the body of the email stated "Your monthly statement is now available. Please log in to your account at Sallie Mae.com to view and pay your bill."[77] Another email regarding loan terms had a subject line that read "Change in Loan Terms," and the

---

[73] *See* CFPB Complaint ¶ 69; Illinois AG Complaint ¶ 317; Washington AG Complaint ¶ 5.175.

[74] *See* CFPB Complaint ¶ 69; Illinois AG Complaint ¶ 318; Washington AG Complaint ¶ 5.175.

[75] *See* CFPB Complaint ¶ 70; Illinois AG Complaint ¶ 319; Washington AG Complaint ¶ 5.175.

[76] *See* CFPB Complaint ¶ 71; Illinois AG Complaint ¶ 320; Washington AG Complaint ¶ 5.176.

[77] *See* CFPB Complaint ¶ 71; Illinois AG Complaint ¶ 320; Washington AG Complaint ¶ 5.176.

text of which stated "The payment term for your loan(s) has changed. Please log in to your account to view the document with your updated payment schedule."[78]

103.   Navient tracks the number of borrowers who click on the hyperlink in the emails that Navient sends.  Between at least July 21, 2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in income-driven repayment plans regularly exceeded 60%.[79]

104.   Despite knowing the grave consequences and potentially irreversible financial harm that failing to recertify would cause a borrower, and also knowing that a substantial majority of persons in IDR plans were not renewing in a timely fashion, Navient did not make significant changes to its emails regarding electronic renewal notices until in or around March 2015.

105.   At that time, Navient made several enhancements to its emails. It changed the subject line to read "Your Payment Will Increase Soon!" and the text of the email now states: "[I]n order to keep your lower payment amount, it's important that you apply soon to renew your repayment plan."[80]

---

[78] *See* CFPB Complaint ¶ 71; Illinois AG Complaint ¶ 321; Washington AG Complaint ¶ 5.176.

[79] *See* CFPB Complaint ¶ 73; Illinois AG Complaint ¶ 322.

[80] *See* CFPB Complaint ¶ 75; Illinois AG Complaint ¶ 324; Washington AG Complaint ¶ 5.179.

106.   Since Navient made these enhancements to its electronic notices, the renewal rate has more than doubled.[81]

## CLASS REPRESENTATIVE ALLEGATIONS

107.   As stated above, Plaintiff entered into a form MPN, on August 31, 2010, for a Federal Direct Unsubsidized Stafford Loan in the amount of $8,000. This loan was the last, and largest, of the federal student loans—totaling nearly $80,000—obtained by Plaintiff to finance her NYU education.

108.   In 2011, Plaintiff graduated from NYU and, on November 18 of that year, Plaintiff's Federal Direct Unsubsidized Stafford Loan entered repayment. At that time, Plaintiff was placed into the Standard Repayment Plan.

109.   Following graduation, however, Plaintiff could only obtain positions of temporary employment. Oftentimes, Plaintiff could not find any work at all. Not until 2015, was Plaintiff finally able to secure a steady employment, and not until 2016, did that role become full-time.

110.   Plaintiff's sporadic employment since graduation caused her and her family significant financial strain. On several occasions, Plaintiff informed Sallie Mae and Navient—who acted as servicers, and agents of the Department of Education, for Plaintiff's federal student loans—of her difficulty in making the required monthly payments on her federal student loans. Not once during any of

---

[81] *See* CFPB Complaint ¶ 76; Illinois AG Complaint ¶ 325; Washington AG Complaint ¶ 5.179.

Plaintiff's phone conversations with Navient representatives, however, was she provided with the opportunity to enter an income-driven repayment plan—as required by the MPN and Servicing Contract—that would have been far more appropriate for her and her family.

111.   Rather than determining the best repayment option for Plaintiff, Navient simply pushed her into a multiple, costly forbearances—on several different occasions.[82]   On one such instance, Navient placed Plaintiff into five consecutive forbearances, with the first beginning on April 30, 2015 and the last starting on September 1, 2016, for a total time in forbearance lasting approximately 16 months.[83]

112.   By eliminating Plaintiff's ability to enroll in an IDR plan, and steering her into several forbearances, Navient caused Plaintiff significant damages, including, but not limited to, (i) the difference in amount Plaintiff would have paid under an income-driven repayment plan versus the amount she paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of Plaintiff's loans along with amounts accrued as a result of the capitalization of same; (iii) Plaintiff's loss of the interest subsidy offered by the federal government

---

[82] *See* Plaintiff's Payment History, from Federal Student Aid, U.S. Department of Education, for the Federal Direct Unsubsidized Stafford Loan issued pursuant to August 31, 2010 MPN, attached at Exhibit C.

[83] *See id.*

for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to Plaintiff not making qualifying payments that would count toward same.

113.  Navient's failure to offer an alternative to forbearance is particularly egregious in this instance.  Indeed, the roughly $80,000 in student loans that Plaintiff originally took out has since ballooned to almost $120,000, with almost $115,000 of that in federal student loans.[84]

## CLASS ACTION ALLEGATIONS

114.  Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), (b)(2), and/or (b)(3) on behalf of the following proposed Classes:

### ENROLLMENT CLASS

All individuals who borrowed money pursuant to federal student loans that were serviced by Navient and/or its predecessors between January 1, 2010 and the present, and who (i) were enrolled in forbearance for a period exceeding 3 months immediately prior to their enrollment in an income-driven repayment plan and/or (ii) were enrolled or are currently enrolled in consecutive forbearances that, in total, exceeded or exceed 12 months.

### FAILURE-TO-RENEW CLASS

All individuals who borrowed money pursuant to federal student loans that were serviced by Navient and/or its

---

[84] *See* Plaintiff's Loan Details, from Navient, for all current student loan balances (both federal and private), attached at Exhibit D.

predecessors and who were enrolled in an IDR plan, but who failed to recertify their enrollment in IDR between January 2010 and March 2015, despite remaining eligible for the income-driven repayment plan in which they were enrolled at that time.

### NEW YORK ENROLLMENT SUB-CLASS

All New York residents who borrowed money pursuant to federal student loans that were serviced by Navient and/or its predecessors between January 1, 2010 and the present, and who (i) were enrolled in forbearance for a period exceeding 3 months immediately prior to their enrollment in an income-driven repayment plan and/or (ii) were enrolled or are currently enrolled in consecutive forbearances that, in total, exceeded or exceed 12 months.

### NEW YORK FAILURE-TO-RENEW SUB-CLASS

All New York residents who borrowed money pursuant to federal student loans that were serviced by Navient and/or its predecessors and who were enrolled in an IDR plan, but who failed to recertify their enrollment in IDR between January 1, 2010 and March 2015, despite remaining eligible for the income-driven repayment plan in which they were enrolled at that time.

115. The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

116. The Classes are composed of tens to hundreds of thousands (if not millions) of individuals and thus are so numerous that joinder of all members is impracticable.

48

117. The Classes can be readily ascertained through the records maintained by Defendants.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

119. Plaintiff's claims are typical of the claims of members of the Classes. As alleged herein, Plaintiff and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct.

120. There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

    a.    Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in forbearance for a period exceeding 3 months immediately prior to their enrollment in an income-driven repayment plan constituted a breach of the MPN;

    b.    Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in forbearance for a period exceeding 3 months immediately prior to their enrollment in an income-driven repayment plan constituted a breach of the Servicing Contract;

    c.    Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in forbearance for a period exceeding 3 months immediately prior to their enrollment in an income-driven repayment plan constituted a violation of the DCFA;

    d.    Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in forbearance for a period exceeding 3 months immediately prior

49

to their enrollment in an income-driven repayment plan constituted a violation of the NYGBL;

e.   Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in consecutive forbearances that, in total, exceeded or exceed 12 months constituted a breach of the MPN;

f.   Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in consecutive forbearances that, in total, exceeded or exceed 12 months constituted a breach of the Servicing Contract;

g.   Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in consecutive forbearances that, in total, exceeded or exceed 12 months constituted a violation of the DCFA;

h.   Whether Navient's enrollment of federal student loan borrowers who, between January 2010 and the present, were in consecutive forbearances that, in total, exceeded or exceed 12 months constituted a violation of the NYGBL;

i.   Whether Navient breached the MPN by failing to provide adequate notice of upcoming deadlines to federal student loan borrowers who, between January 2010 and March 2015, failed to recertify their enrollment in an IDR plan, despite remaining eligible for the income-driven repayment plan in which they were enrolled at that time;

j.   Whether Navient breached the Servicing Contract by failing to provide adequate notice of upcoming deadlines to federal student loan borrowers who, between January 2010 and March 2015, failed to recertify their enrollment in an IDR plan, despite remaining eligible for the income-driven repayment plan in which they were enrolled at that time;

k.   Whether Navient violated the DCFA by failing to provide adequate notice of upcoming deadlines to federal student loan borrowers who, between January 2010 and March 2015, failed to recertify their enrollment in an IDR plan, despite remaining

eligible for the income-driven repayment plan in which they were enrolled at that time; and

l. Whether Navient violated the NYGBL by failing to provide adequate notice of upcoming deadlines to federal student loan borrowers who, between January 2010 and March 2015, failed to recertify their enrollment in an IDR plan, despite remaining eligible for the income-driven repayment plan in which they were enrolled at that time.

121. These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual class members.

122. Plaintiff will fairly and adequately represent and protect the interests of members of the Classes. Plaintiff has no claims antagonistic to those of members of the Classes. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of members of the Classes.

123. Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

124.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

125.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

126.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
**(Plaintiff and the Enrollment Class against Defendants for Breach
of the Master Promissory Note)**

127.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

128.   Plaintiff brings this Count on behalf of members of the nationwide Enrollment Class.

129.   At all relevant times, Navient acted as an agent of the Department of Education in servicing federal student loans borrowed by Plaintiff and members of the nationwide Enrollment Class.

130.   Pursuant to the terms of the MPN, the Department of Education—and, thus, Navient as its agent—is required to afford Plaintiff and members of the Enrollment Class with the opportunity to enroll in an income-driven repayment plan.   During live phone conversations, however, Navient representatives systematically steered Plaintiff and members of the Enrollment Class into costly forbearance programs and, in doing so, failed to present them with more appropriate IDR plan options.  In this way, Navient impeded Plaintiff and members of the Enrollment Class from taking advantage of more cost-effective repayment options contemplated by the MPN.

131.   Given the importance of live phone consults to borrowers' abilities to navigate complex repayment options, Navient effectively eliminated the opportunity that Plaintiff and members of the Enrollment Class may have had to enroll in an IDR plan—as promised by the MPN.  Navient engaged in this breach knowingly, as enrolling borrowers in forbearance is substantially less expensive for

Navient in light of the greater staff resources and time expenditure needed to enroll in IDR plans.

132.   As a result of Navient's breach of the express terms of the MPN, Plaintiff and members of the Enrollment Class have suffered substantial damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

133.   Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the MPN, Navient's steering of Plaintiff and members of the Enrollment Class into forbearance—rather than IDR—nonetheless constituted a breach of covenant of good faith and fair dealing implied in the MPN. And, as a result of this breach, Plaintiff and members of the Enrollment Class suffered the same sizeable damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of

54

the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

### COUNT II – BREACH OF CONTRACT
**(Plaintiff and the Failure-To-Renew Class against Defendants for Breach of the Master Promissory Note)**

134.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

135.  Plaintiff brings this Count on behalf of members of the nationwide Failure-to-Renew Class.

136.  At all relevant times, Navient acted as an agent of the Department of Education in servicing federal student loans borrowed by Plaintiff and members of the nationwide Failure-to-Renew Class.

137.  Pursuant to the terms of the MPN, Navient agreed to provide Plaintiff and members of the Failure-to-Renew Class with the opportunity to enroll in an income-driven repayment plan.  Once enrolled, Navient was required to provide Plaintiff and members of the Failure-to-Renew Class with a meaningful opportunity to re-enroll, or recertify their enrollment, in that IDR plan the following year.

138.   Navient, however, failed to provide Plaintiff and members of the Failure-to-Renew Class with adequate notice of their deadlines to recertify their enrollment in IDR plans, despite their remaining eligible for same.  Indeed, from at least January 1, 2010 until December 2012, Navient sent hard-copy annual renewal notices for IDR plans, through United States mail, that failed to inform borrowers of the actual date by which they had to submit the renewal application, including documentation of income, to avoid expiration of the twelve-month period—as Navient's initial disclosure notice promised to do.  Likewise, electronic notices sent out by Navient between at least mid-2010 and March 2015 proved equally deficient in providing notice of the actual date by which borrowers had to submit their applications for renewal.

139.   Navient thus impeded Plaintiff and members of the Failure-to-Renew Class from taking advantage of more cost-effective repayment options contemplated by the MPN.  In light of the critical deadline information that Navient promised—but ultimately failed to—provide, Navient effectively eliminated the opportunity that Plaintiff and members of the Failure-to-Renew Class had to re-enroll in an IDR plan for which they remained eligible

140.   As a result of Navient's breach of the express terms of the MPN, Plaintiff and members of the Failure-to-Renew Class have suffered substantial damages, including, but not limited to, (i) the difference in amount paid under an

income-driven repayment plan versus the amount paid when re-enrolled back in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

141.   Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the MPN, Navient's failure to provide Plaintiff and members of the Failure-to-Renew Class with adequate notice of their renewal deadlines nonetheless constituted a breach of covenant of good faith and fair dealing implied in the MPN.  And, as a result of this breach, Plaintiff and members of the Failure-to-Renew Class suffered the same sizeable damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when re-enrolled back in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

### COUNT III – BREACH OF CONTRACT
**(Plaintiff and the Enrollment Class against Defendants for Breach
of the Servicing Contract)**

142.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

143.  Plaintiff brings this Count on behalf of members of the nationwide Enrollment Class.

144.  At all relevant times, Plaintiff and members of the nationwide Enrollment Class were third-party beneficiaries of the Servicing Contract entered into between Navient the Department of Education.

145.  As laid out in the Servicing Contract, "FSA's core mission is to ensure that all eligible individuals benefit from federal financial assistance—grants, loans and work-study programs—for education beyond high school." As such, under the "Unique Client/Lender Requirements for Federal Serviced Portfolio" section of the Servicing Contract, Navient is required to "provide collection and default aversion activity on loans serviced under this contract as long as the loan remains on the servicer's system."

146.  Despite this, Navient representatives systematically steered Plaintiff and members of the Enrollment Class into costly forbearance programs and, in doing so, failed to present them with more appropriate IDR plan options.  In this way, Navient impeded Plaintiff and members of the Enrollment Class from taking

advantage of more cost-effective repayment options that would allow federal student borrowers to avoid default. Navient did so, in violation of its Servicing Contract with the Department of Education, solely because enrolling borrowers in forbearance is substantially less expensive for Navient, in light of the greater staff resources and time expenditure needed to enroll and renew borrowers in IDR plans.

147. As a result of Navient's breach of the express terms of the Servicing Contract, Plaintiff and members of the Enrollment Class, as third-party beneficiaries of that agreement, have suffered substantial damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

148. Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the Servicing Contract, Navient's steering of Plaintiff and members of the Enrollment Class into forbearance—rather than IDR—nonetheless constituted a breach of covenant of good faith and fair

dealing implied in the Servicing Contract.  And, as a result of this breach, Plaintiff and members of the Enrollment Class suffered the same sizeable damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

### COUNT IV – BREACH OF CONTRACT
**(Plaintiff and the Failure-To-Renew Class against Defendants for Breach of the Servicing Contract)**

149.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

150.  Plaintiff brings this Count on behalf of members of the nationwide Failure-to-Renew Class.

151.  At all relevant times, Plaintiff and members of the nationwide Failure-to-Renew Class were third-party beneficiaries of the Servicing Contract entered into between Navient and the Department of Education.

152.  As laid out in the Servicing Contract, "FSA's core mission is to ensure that all eligible individuals benefit from federal financial assistance—

60

grants, loans and work-study programs—for education beyond high school." As such, under the "Unique Client/Lender Requirements for Federal Serviced Portfolio" section of the Servicing Contract, Navient is required to "provide collection and default aversion activity on loans serviced under this contract as long as the loan remains on the servicer's system."

153. Instead, Navient raised Plaintiff's and the members of Failure-to-Renew Class's risk of default by failing to provide them with adequate notice deadlines necessary to submit their applications for re-enrollment in IDR plans, despite their remaining eligible for same. Indeed, from at least January 1, 2010 until December 2012, Navient sent hard-copy annual renewal notices for IDR plans, through United States mail, that failed to inform borrowers of the actual date by which they had to submit the renewal application, including documentation of income, to avoid expiration of the twelve-month period—as Navient's initial disclosure notice promised to do. Likewise, electronic notices sent out by Navient between at least mid-2010 and March 2015 proved equally deficient in providing notice of the actual date by which borrowers had to submit their applications for renewal.

154. Navient thus impeded Plaintiff and members of the Failure-to-Renew Class from taking advantage of more cost-effective repayment options, for which they remained eligible, as contemplated by the Servicing Contract. In light of the

critical deadline information that Navient promised—but ultimately failed to—provide, Navient effectively eliminated the opportunity that Plaintiff and members of the Failure-to-Renew Class had to re-enroll in an IDR plan.

155.  As a result of Navient's breach of the express terms of the Servicing Contract, Plaintiff and members of the Failure-to-Renew Class have suffered substantial damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when re-enrolled back in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

156.  Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the Servicing Contract, Navient's failure to provide Plaintiff and members of the Failure-to-Renew Class with adequate notice of their renewal deadlines nonetheless constituted a breach of covenant of good faith and fair dealing implied in the Servicing Contract.  And, as a result of this breach, Plaintiff and members of the Failure-to-Renew Class suffered the same sizeable damages, including, but not limited to, (i) the difference

62

in amount paid under an income-driven repayment plan versus the amount paid when re-enrolled back in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

### COUNT V – VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT ("DFCA"), 6 Del. Code Ann. Tit. 6, §§ 2511 *et seq.* (Plaintiff, Enrollment, And Failure-To-Renew Classes Against Defendants)

157.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

158.   Plaintiff brings this Count on behalf of members of the nationwide Enrollment and Failure-to-Renew Classes.

159.   Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

160.   The Delaware Consumer Fraud Act ("CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or

not any person has in fact been misled, deceived or damaged thereby." 6 Del.

Code § 2513(a).

161. In the course of their business, Navient commits, or committed, the

following unfair and/or deceptive acts or practices:

    a.    Misrepresenting the federal loan repayment options that are available to borrowers struggling with their payments;

    b.    Failing to disclose to borrowers struggling to make their payments that the federal government offers income-driven repayment plans to help borrowers avoid default;

    c.    Misrepresenting that Navient "make[s] it a priority to educate our federal borrowers about income-driven options," that "borrowers can turn to their student loan servicers for help to navigate the complex repayment options," and that "[h]elp is a phone call away."

    d.    Deceptively offering forbearances to borrowers who express a long-term inability to repay, when in fact a forbearance is intended for a temporary hardship;

    e.    Failing to disclose a date certain by which a borrower must submit materials to recertify an IDR plan;

    f.    Representing that Navient will provide a date certain by which a borrower must submit materials to recertify an income-driven repayment plan, when in fact, no such date is provided; and

    g.    Unfairly failing to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice because the email it sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

162. Plaintiff and the Class members had no way of discerning that

Navient's representations and practices were false and misleading because, as

Navient admits, its job was and is to work with borrowers to navigate the complex process for repaying federal student loans.

163.   Navient thus violated the DCFA by, at minimum, employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression and/or omission of material facts with intent that others rely upon such concealment, suppression and/or omission in connection with its student loan servicing practices.

164.   Navient engaged in misleading, false, unfair or deceptive acts or practices that violated the DCFA by steering borrowers into forbearance, rather than IDR, and failing to provide borrowers enrolled in IDR with reasonable notice of their renewal deadlines.

165.   Navient knew it was responsible for educating borrowers on the most appropriate and cost-effective repayment plans and, also, assisting borrowers in maintaining their enrollment in same. But, Navient intentionally and knowingly misrepresented such material facts with intent to mislead Plaintiff and members of the Classes.

166.   Navient knew or should have known that their conduct violated the DCFA.

65

167.   Navient owed Plaintiff and members of the Classes a duty to disclose the material facts that they concealed from Plaintiff and members of the Classes because they:

a.   possessed exclusive knowledge regarding income-driven repayment options and key deadlines for recertifying enrollment in same;

b.   intentionally concealed the foregoing from Plaintiff and Class members; and/or

c.   made incomplete representations concerning the appropriate repayment plans for Plaintiff and members of the Classes and, also, critical deadlines for recertification for those already enrolled in same.

168.   Navient's misrepresentations regarding, and concealment of information pertaining to, repayment plans available to federal student loan borrowers and key renewal deadlines for those already enrolled in same were material to Plaintiffs and members of the Classes.

169.   Navient's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the Classes, about the federal student loan repayment plan most appropriate for their situation and, also, the deadlines necessary for those already enrolled in IDR plans to recertify their enrollment in same.

170.   Plaintiff and members of the Classes suffered ascertainable loss and actual damages as a direct and proximate result of Navient's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and

the Class members suffered significant damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

171.   Navient had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the DCFA. All borrowers of federal student loans serviced by Navient suffered ascertainable loss in that they did not receive the benefit of their bargain as a result of Navient's deceptive and unfair acts and practices made in the course of Navient's business.

172.   Navient's violations present a continuing risk for financial harm to Plaintiff, members of the Classes, and the general public.  Navient's unlawful acts and practices complained of herein affect the public interest.

173.   As a direct and proximate result of Navient's violations of the DCFA, Plaintiff and members of the Classes have suffered injury-in-fact and/or actual damage.

174.   Plaintiff and members of the Classes seek damages under the DCFA for injury resulting from the direct and natural consequences of Navient unlawful conduct.

175.   Plaintiff and members of the Classes also seek an order enjoining Navient's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the DCFA.

176.   Navient engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

### COUNT VI – VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349 ("NYGBL"), N.Y. Gen. Bus. Law § 349
### (Plaintiff, New York Enrollment, and New York Failure-to-Renew Sub-Classes against Defendants)

177.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

178.   Plaintiff brings this Count on behalf of members of the New York Enrollment and New York Failure-to-Renew Sub-Classes (the "New York Sub-Class").

179.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

180.   In the course of Navient's business, as further detailed above, it willfully failed to disclose and actively concealed the availability of more cost-effective income-driven repayment plans from federal student loan borrowers and,

also, obscured the deadlines necessary for those already enrolled in IDR plans to recertify their enrollment in same.

181. In this way, Navient frustrated borrowers" ability to enroll or re-enroll in more economical IDR plans, despite making representations that they would work to enroll borrowers, and keep them enrolled, in the repayment plans best for them. Navient engaged in this misconduct because enrolling borrowers in forbearance allowed them to save time and labor costs and, therefore, increase profits.

182. Accordingly, Navient engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

183. Navient's actions as set forth above occurred in the conduct of trade or commerce.

184. Because Navient's deception takes place within the context of the student loan industry, its deception affects the public interest. Further, Navient's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

185. Navient's conduct proximately caused injuries to Plaintiff and the New York Sub-Class members.

69

186.   Plaintiff and the other New York Sub-Class members were injured as a result of Navient's conduct in that Plaintiffs and the other New York Sub-Class members suffered significant damages, including, but not limited to, (i) the difference in amount paid under an income-driven repayment plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; and (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

187.   These injuries are the direct and natural consequence of Navient's misrepresentations, omissions, and campaign to frustrate borrowers' ability to enroll in, and stay enrolled in, economical income-driven repayment plans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff:

A.   Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Classes and Plaintiff's counsel as counsel for the Classes;

B.   Declaring, adjudging, and decreeing the conduct alleged herein as unlawful including, but not limited to, Defendants' improper steering of Plaintiff and members of the Enrollment Classes into forbearance,

70

rather than income-driven repayment plans, and providing Plaintiff and members of the Failure-to-Renew Classes with inadequate notice regarding borrowers' deadline for recertifying their enrollment in income-driven repayment plans;

C. Enjoining Defendants from continuing to improperly steer federal student loan borrowers into forbearance, rather than income-driven repayment plans;

D. Awarding compensatory and punitive damages along with pre- and post-judgment interest;

E. Granting Plaintiff the costs of suit, including reasonable attorneys' fees and expenses; and

F. Affording Plaintiff with such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 1, 2017

/s/ Robert D. Schaub
Robert D. Schaub (PA 42466)
**ROSENN JENKINS &**
**GREENWALD, LLP**
15 South Franklin St.
Wilkes-Barre, PA 18711
Tel: (570) 826-5600
Fax: (570) 826-5640
Email: rschaub@rjglaw.com

*Liaison Counsel for Plaintiff,*
*Olga Demyanenko-Todd*
*and the Classes*

*/s/  Geoffrey C. Jarvis*
Joseph H. Meltzer* (PA 80136)
Edward W. Ciolko* (NJ 005462002)
Geoffrey C. Jarvis (PA 75473)
Meredith L. Lambert* (PA 309479)
Zachary Arbitman (PA 314274)
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: jmeltzer@ktmc.com
Email: eciolko@ktmc.com
Email: gjarvis@ktmc.com
Email: mlambert@ktmc.com
Email: zarbitman@ktmc.com

*Lead Counsel for Plaintiff,*
*Olga Demyanenko-Todd*
*and the Classes*

*\*Petitions for Special Admission (Pro Hac*
*Vice) forthcoming*

72