## APPENDIX OF UNPUBLISHED OPINIONS

1.   *Anderson v. SeaWorld Parks & Entm't, Inc.,*
       No. 15-cv-2172, 2016 WL 8929295 (N.D. Cal. Nov. 7, 2016)

2.   *Bank of America, N.A. v. Zaskey,*
       No. 15-cv-81325, 2016 WL 2897410 (S.D. Fla. May 18, 2016)

3.   *Genna v. Sallie Mae, Inc.,*
       No. 11-cv-7371, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012)

4.   *Greene v. Gerber Prods. Co.,*
       No. 16-cv-1153, 2017 WL 3327583 (E.D.N.Y. Aug. 2, 2017)

5.   *Harte v. Ocwen Fin. Corp.,*
       No. 13-cv-5410, 2014 WL 4677120 (E.D.N.Y. Sept. 19, 2014)

6.   *Indianapolis Life Ins. Co. v. Hentz,*
       No. 06-cv-2152, 2008 WL 4453223 (M.D. Pa. Sept. 30, 2008)

7.   *Kerr v. American Independent Ins. Co.,*
       C.A. No. 06C-06-012, 2007 WL 642072 (Del. Super. Ct. Feb. 28, 2007)

8.   *Martorella v. Deutsche Bank Nat'l Tr. Co.,*
       No. 12-cv-80372, 2015 WL 10857441 (S.D. Fla. Nov. 9, 2015)

9.   *Mazonas v. Nationstar Mortg. LLC,*
       No. 16-cv-660, 2016 WL 2344196 (N.D. Cal. May 4, 2016)

10.  *Plumlee v. Pfizer, Inc.,*
       No. 13-cv-0414, 2014 WL 4275519 (N.D. Cal. Aug. 29, 2014)

11.  *Pom Wonderful LLC v. Welch Foods, Inc.,*
       No. 09-cv-567, 2009 WL 5184422 (C.D. Cal. Dec. 21, 2009)

12.  *Russ v. Apollo Grp., Inc.,*
       No. 09-cv-904, 2009 WL 10674112 (C.D. Cal. Sept. 23, 2009)

13.  *Sammons v. Hartford Underwriters Ins. Co.,*
       No. C.A. S09C-12-026, 2010 WL 1267222 (Del. Sup. Ct. Apr. 1,
       2010)

14.  *Schwartz v. Lights of Am.,*
       No. 11-cv-1712, 2012 WL 4497398 (C.D. Cal. Aug. 31, 2012)

15.  *T-Jat Sys. 2006 Ltd. v. Expedia, Inc. (DE),*
       C.A. No. 16-581, 2017 WL 896988 (D. Del. Mar. 7, 2017)

16.  *United States v. Gorski,*
       No. 11-4252, 2012 WL 12886823 (C.D. Cal. Mar. 22, 2012)

17.  *United States v. Payment Processing Ctr., LLC,*
       No. 06-cv-0725, 2006 WL 2990392 (E.D. Pa. Oct. 18, 2006)

1

Case 3:17-cv-00772-RDM Document 31-4 Filed 10/20/17 Page 4 of 100

2016 WL 8929295
Only the Westlaw citation is currently available.
**NOT FOR CITATION**
United States District Court,
N.D. California.

Marc ANDERSON, et al., Plaintiffs,
v.
SEAWORLD PARKS AND
ENTERTAINMENT, INC., Defendant.

Case No. 15-cv-02172-JSW
|
Signed 11/07/2016

**Attorneys and Law Firms**

Christine Saunders Haskett, Lindsey Catherine Barnhart, Tracy Olivia Zinsou, Covington & Burling LLP, San Francisco, CA, Udit Sood, Covington Burling LLP, for Plaintiffs.

John Morgan Simpson, Michelle C. Pardo, Rebecca E. Bazan, Norton Rose Fulbright US LLP, Washington, DC, Lawrence Yale Iser, Gregory Steven Gabriel, Kristen Louise Spanier, Kinsella Weitzman Iser Kump & Aldisert LLP, Santa Monica, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND SETTING CASE MANAGEMENT CONFERENCE**

Re: Dkt. No. 82

JEFFREY S. WHITE, United States District Judge

**\*1** Now before the Court for consideration is the motion to dismiss, filed by Defendant SeaWorld Parks and Entertainment, Inc. ("SeaWorld"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court HEREBY GRANTS, IN PART, AND DENIES, IN PART, Sea World's motion.

**BACKGROUND**

**A. Procedural History.**

This is the fourth iteration of Plaintiffs' complaint. On April 13, 2015, Marc Anderson ("Anderson") and Ellexa Conway ("Conway") filed their original complaint in the Superior Court of the State of California for the City and County of San Francisco. (Dkt. No. 1-1, Complaint.) On May 11, 2015, Anderson and Conway filed a First Amended Complaint (the "FAC"). (Dkt. No. 9-1, FAC.) On May 14, 2015, SeaWorld removed to this Court. (Dkt. No. 1, Notice of Removal.)

On May 29, 2015, Anderson and Conway moved to remand, and on September 18, 2015, SeaWorld moved to dismiss the FAC. (Dkt. Nos. 15, 43.) On September 24, 2015, the Court denied the motion to remand, and it granted, in part, and denied, in part, their motion for reconsideration on January 12, 2016. (Dkt. Nos. 46, 65.) On April 7, 2016, Anderson and Conway sought leave to file a second amended complaint to add two new plaintiffs, Kelly Nelson ("Nelson") and Juliette Morizur ("Morizur"), and to supplement the factual allegations in the FAC. (Dkt. No. 69.)

Because SeaWorld's motion to dismiss was ripe, the Court considered that motion in the first instance, and it considered the proposed second amended complaint to determine whether leave to amend would be futile. On August 1, 2016, the Court granted, in part, and denied, in part, SeaWorld's motion to dismiss and denied the motion for leave to amend as moot. Although the Court found that the proposed second amended complaint did not adequately plead certain claims, it gave leave to include Morizur and Nelson as plaintiffs and gave Plaintiffs a further opportunity to amend the claims. *See Anderson v. SeaWorld Parks and Entertainment*, No. 15-cv-2172-JSW, 2016 WL 4076097, at \*8-11 (N.D. Cal. Aug. 1, 2016).

**B. Factual Background.**

Plaintiffs allege that "[a]s part of a marketing campaign to induce ticket and souvenir purchases, SeaWorld has made, continues to make, and profits off of false and misleading statements concerning the welfare of [its] captive orcas." (Second Amended Complaint ("SAC") ¶ 1.) According to Plaintiffs, "SeaWorld has engaged in a pervasive, long-term advertising campaign to mislead the public about its care for captive orcas and conceal the detrimental health effects that captivity has on orcas." (*Id.* ¶ 4.)

Plaintiffs allege that SeaWorld affirmatively misrepresents represents that: (1) orca lifespans in captivity are equivalent to life spans in the wild; (2) collapsed dorsal fins are normal; (3) it does not separate orca calves from mothers; and (4) captivity does not harm orcas. (*Id.* ¶¶ 25-39.) In sum, Plaintiffs allege that

> SeaWorld's advertising misleadingly creates the perception that orcas as a species are generally benefited by SeaWorld's rehabilitative programs, scientific studies, and educational activities, and that the individual orcas it holds in captivity are as healthy and as stimulated as their wild counterparts. ...

**\*2**   (*Id.* ¶ 7.)

Plaintiffs allege they were exposed to these representations in a variety of ways and allege they either relied on SeaWorld's advertising campaign or alleged they relied on four specific representations before they purchased admission to SeaWorld or before they purchased a plush toy orca (the "Shamu Plush"). (*Id.* ¶¶ 18-21.) Plaintiffs also allege that

> [a]lthough SeaWorld continues to make these representations, on or around March 17, 2016, SeaWorld announced that it will end all orca breeding programs, and that the orcas SeaWorld currently has in captivity will be the last generation of orcas in SeaWorld's care. SeaWorld also announced around the same time that it will phase out its theatrical orca whale shows across all of its parks. Plaintiffs' inability to rely on the accuracy of these statements presents a continuing injury to them.

(*Id.* ¶ 39.)

Based on these and other allegations, which the Court shall address as necessary, Plaintiffs assert claims for: (1) violations of California's false advertising law, Business and Professions Code sections 17500, *et seq.* (the "FAL claim"); (2) violations of California's unfair competition law, Business and Professions Code sections 17200, *et seq.* (the "UCL claim"); and (3) violation of California's Consumer Legal Remedies Act, California Civil Code section 1750, *et seq.* (the "CLRA claim").

## ANALYSIS

SeaWorld argues that: (1) Plaintiffs fail to allege facts to show they have standing to seek injunctive relief under Article III of the United States Constitution; (2) Plaintiffs fail to state claims based on the alleged long-term advertising campaign; (3) Plaintiffs fail to state a claim under the CLRA and failed to provide the required statutory notice for restitution claims; (4) Anderson lacks statutory standing to pursue the FAL and UCL claims to the extent those claims are premised on his purchase of tickets to SeaWorld; and (5) Morizur's claim under the FAL fail to the extent that claims rest on statements a SeaWorld trainer made to her, and it alleges her UCL claim fails for this reason as well.

**A. Applicable Legal Standards.**

**1. Federal Rule of Civil Procedure 12(b)(1).**
SeaWorld moves to dismiss for lack of Article III standing, pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A motion to dismiss under Rule 12(b)(1) may be "facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where, as here, a defendant makes a facial attack on jurisdiction, a court takes the factual allegations of the complaint as true. *Federation of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion dismiss, [courts] presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal citation and quotations omitted). The plaintiff is then entitled to have those facts construed in the light most favorable to him or her. *Federation of African Am. Contractors*, 96 F.3d at 1207.

**2. Federal Rule of Civil Procedure 12(b)(6).**

Anderson v. SeaWorld Parks and Entertainment, Inc., Slip Copy (2016)
2016 WL 8929295
Case 3:17-cv-00772-RDM   Document 31-4   Filed 10/20/17   Page 6 of 100

*3 SeaWorld also moves to dismiss for failure to state a claim and for lack of statutory standing. A "lack of statutory standing requires dismissal for failure to state a claim" and is evaluated under Rule 12(b)(6). *Maya*, 658 F.3d at 1067 (emphasis omitted). Under Rule 12(b)(6), the Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Even under the liberal pleadings standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a claim for relief will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not allege conduct that is conceivable but must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### 3. Federal Rule of Civil Procedure 9(b).

Claims sounding in fraud or mistake are subject heightened pleading requirements, which require that a plaintiff claiming fraud "must state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b). In addition, a claim "grounded in fraud" may be subject to Rule 9(b)'s heightened pleading requirements. A claim is "grounded in fraud" if the plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of his or her claim. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003).

Rule 9(b)'s particularity requirements must be read in harmony with Federal Rule of Civil Procedure 8, which requires a "short and plain" statement of the claim. The particularity requirement is satisfied if the complaint "identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also Vess*, 317 F.3d at 1106. Accordingly, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of

the misconduct charged." *Vess*, 317 F.3d at 1107 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

### 4. Leave to Amend.

In general, if the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See, e.g. Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990). If a court has granted plaintiff leave to amend, and if the plaintiff has failed to correct deficiencies identified by the court, the court has "particularly broad" discretion to deny leave to amend. *See, e.g., Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

### B. Plaintiffs Allege They Have Article III Standing to Seek Injunctive Relief.

SeaWorld renews its argument that Plaintiffs lack Article III standing to seek injunctive relief. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements" for standing. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007); *cf. Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Where, as here, a plaintiff seeks relief on behalf of a class, "[u]nless the named plaintiffs themselves are entitled to seek injunctive relief, they may not represent a class seeking that relief."). "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). Therefore, in order to satisfy the pleading requirements for standing to seek prospective injunctive relief on behalf of class, at least one of the Plaintiffs must allege facts to show he or she faces a " 'real or immediate threat ... that [he or she] will again be harmed in a similar way.' " *Id.* (quoting *City of Los Angeles v. Lyons*, 465 U.S. 95, 111 (1983)) ("*Lyons*"); *see also Lyons*, 465 U.S. at 109 (plaintiff must show he or she is "realistically threatened by a repetition" of the violation to have standing to seek injunctive relief); *Bates*, 511 F.3d at 985.

*4 The Court previously stated that the Ninth Circuit had not ruled on the issue of what is necessary to allege standing for prospective injunctive relief in a case involving misleading advertising. *Anderson*, 2016 WL 4076097, at *6. SeaWorld argues that the Ninth

Anderson v. SeaWorld Parks and Entertainment, Not Reported in... (2016)
2016 WL 8929295
Case 3:17-cv-00722-RDM   Document 31-4   Filed 10/20/17   Page 7 of 100

Circuit has definitively resolved the issue, citing *Luman v. Theisman*, 647 Fed. Appx. 804 (9th Cir. 2016). [1] In *Luman*, the court stated that "[b]ecause [p]laintiffs do not allege that they intend to purchase" the defendant's product "in the future, they cannot demonstrate a likelihood of future injury." *Id.* at 807. It therefore affirmed the district court's finding that the plaintiffs lacked standing. *Id.* This Court likewise concluded that a plaintiff must allege facts showing an intent to purchase a product in the future, in order to show he or she has standing to seek injunctive relief. That ruling is consistent with *Luman. See Anderson*, 2016 WL 4076097, at *6.

[1]   The Ninth Circuit decided *Luman* before the Court ruled on SeaWorld's first motion to dismiss. SeaWorld did not seek leave to bring the case to the Court's attention. In addition, *Luman* is an unpublished opinion and, in the context of this case, is not precedential. *See* Ninth Circuit Rule 36-3(a).

SeaWorld argues that Plaintiffs' allegations that they "may consider" or "would consider" purchasing admission to SeaWorld or a Shamu Plush in the future are insufficient under *Luman*. However, the *Luman* court did not specify the exact nature of the plaintiffs' allegations. *Id.* Thus, it is not clear that the court addressed the precise issue presented here, *i.e.* what factual allegations would be sufficient to allege the requisite intent. For the reasons stated in its prior order, the Court concludes that Plaintiffs' allegations are sufficient to show an intent to purchase tickets or a product from SeaWorld in the future. *See, e.g., Lilly v. Jamba Juice Company*, No. 13-cv-02998-JST, 2015 WL 1248027, at *3-*5 (N.D. Cal. Mar. 18, 2015).

In addition, when it determined that Conway, Morizur, and Nelson had included sufficient facts into the proposed SAC to allege standing, the Court took into account the allegations that SeaWorld had announced certain changes in its practices on orca breeding and the orca shows to be significant. The Court reasoned that those allegations demonstrated that the product or service at issue might be changing to a product or service the Plaintiffs would want if they could rely on SeaWorld's advertising. On that basis, the Court distinguished the facts in this case from the facts in *Duran v. Hampton Creek*, No. 15-cv-05497-LB, 2016 WL 1191685, at *6-*7 (N.D. Cal. Mar. 28, 2016). In *Luman*, unlike here, there was no suggestion that the product at issue would be changed. For these reasons, the Court concludes that the Ninth Circuit's opinion in *Luman*

does not require it to revisit its finding that Conway, Nelson, and Morizur have sufficiently alleged facts to show standing to seek injunctive relief.

SeaWorld also asks the Court to reconsider its ruling about the plausibility of Plaintiffs' allegations. Specifically, SeaWorld argues that Plaintiffs have alleged that they believe captivity is necessarily harmful to orcas and do not seek relief that would require SeaWorld to alter its practices. As noted, SeaWorld's practices may be evolving. "At the pleadings phase, the Court is unwilling to make" the conclusion that a plaintiff could not plausibly allege that he or she would consider purchasing a product if the plaintiff previously alleged the product was not wanted." *Anderson*, 2016 WL 4076097, at *7. The Court still is "unwilling to hold, as a matter of law, that a plaintiff could never pursue a claim for prospective injunctive relief merely because the plaintiff now knows the truth about the alleged misrepresentation. As the *Duran* court noted, it may be difficult for a plaintiff to plausibly allege facts to show he or she would be deceived in the future, but at the pleadings phase, the Court cannot say it would be impossible." *Id.*

 **5**   Accordingly, for these reasons, the Court denies, in part, SeaWorld's motion to dismiss.

## C. The Court Dismisses the Claims Based on SeaWorld's Alleged Advertising Campaign.

Anderson, Conway, and Nelson allege they relied on SeaWorld's representations that captivity does not harm orcas, before they purchased admission to SeaWorld. According to Plaintiffs, those statements were made as part of a "long-term" advertising campaign. (SAC ¶¶ 18-20, 32.) Morizur also suggests that she relied on statements made during that campaign before she purchased a Shamu Plush. (*Id.* ¶ 21.) SeaWorld renews its motion to dismiss the claims based on these representations.

In order to show they have statutory standing to pursue their claims, Plaintiffs must allege facts to show they relied on the alleged misrepresentations. *In re Tobacco II Cases*, 46 Cal. 4th 289, 326 (2009) ( "*Tobacco II*"). However, in *Tobacco II*, the court also held that a plaintiff "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where ... those misrepresentations and

false statements were part of an extensive and long-term advertising campaign." *Id.*, 46 Cal. 4th at 328.

The Court granted SeaWorld's first motion to dismiss to the extent Plaintiffs' claims were based on the alleged advertising campaign, because the allegations did not satisfy Rule 9(b). *Anderson*, 2016 WL 4076097, at *9. The Court also found that Plaintiffs failed to adequately allege reliance, because they had "not adequately alleged sufficient facts to show that SeaWorld's advertising and public relations campaign was sufficiently similar to the campaign at issue in" *Tobacco II. Anderson*, 2016 WL 4076097, at *10-11.

SeaWorld argues that Plaintiffs allegations still are insufficient and argues that *Tobacco II* cannot supplant Rule 9(b)'s pleading requirements. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). In *Kearns*, the court rejected the plaintiff's argument that Rule 9(b) did not apply to California's consumer protection statutes. 567 F.3d at 1125. Plaintiffs do not dispute that proposition of law. The *Kearns* court also concluded that the plaintiff had failed to plead his fraud-based claims with particularity, because "he did not specify what the television advertisements or other sales material specifically stated. Nor did Kearns specify when he was exposed to them or which ones he found material. Kearns also failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle." *Id.* at 1126. SeaWorld argues that the Court must follow *Kearns* and conclude that Plaintiffs' allegations are deficient.

The Court concludes that *Tobacco II* can be reconciled with *Kearns*, if a plaintiff's allegations about an alleged "long-term advertising campaign" are sufficiently particular. In addition, a plaintiff must allege facts about the campaign to show, in terms of "breadth and content," it would be not be "unreasonable to presume that all [putative] class members were exposed to" to the allegedly misleading representations and to show that it would be unrealistic for a plaintiff to prove reliance on a particular advertisement. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (addressing *Tobacco II* in context of motion for class certification); *cf. Yastrab v. Apple, Inc.*, 173 F. Supp. 3d 972, 980 (N.D. Cal. 2016) (accepting that "under appropriate factual circumstances, ... a representative consumer plaintiff may not be able to pinpoint the exact portion of a long-standing, widespread advertising campaign he or she

relied on when purchasing a product," but finding that *Tobacco II* "does not, and indeed could not, supplant a federal plaintiff's obligation to describe that campaign with the particularity prescribed by Rule 9(b)").

**\*6** Plaintiffs argue that they have cured the deficiencies identified in the Court's prior order and rely on *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962 (N.D. Cal. 2015). In *Opperman*, the court found that the plaintiffs had sufficiently alleged claims under the FAL, CAL and the CLRA based on a *Tobacco II* theory of reliance. *Id.* at 978-83. In reaching this conclusion, the court set forth "six factors ... that bear on whether a plaintiff has pleaded an advertising campaign in accordance with" *Tobacco II. Id.* at 976. [2]

> First, a plaintiff must allege that she actually saw or heard the defendant's advertising campaign. Second the advertising campaign must be sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require the plaintiff to plead each misrepresentation she saw and relied upon. Third, the plaintiff must describe in the complaint, and preferably attach to it, a representative sample of the advertisements at issue so as to adequately notify the defendant of the precise nature of the misrepresentation claim—what, in particular, the defendant is alleged to have said and how it is misleading. Fourth, the plaintiff must allege, and the court must evaluate, the degree to which the alleged misrepresentations contained within the advertising campaign are similar to each other. Fifth, each plaintiff must plead with particularity, and separately, when and how they were exposed to the advertising campaign, so as to ensure the advertisements were representations consumers were likely to have viewed, rather than representations that were isolated or more narrowly

disseminated. And, finally, sixth, the court must be able to determine when a plaintiff made his or her purchase or otherwise relied on a defendant's advertising campaign, so as to determine which portion of that campaign is relevant.

84 F. Supp. 3d at 976-77.

2    The case law from which the *Opperman* court derived these factors is set forth in detail in the court's order granting an earlier motion to dismiss. *See Opperman v. Path, Inc.*, No. 14-cv-353-JST, Dkt. No. 471 at ECF pages 28-35.

The *Opperman* court concluded that the plaintiffs' allegations were sufficient to rely on a *Tobacco II* theory. In that case, the plaintiffs alleged that the campaign lasted for over five years, alleged they "viewed, heard, or read" the advertisements or statements at issue and provided examples of the advertising campaign that spanned "eighteen pages of" the complaint. The court also found it significant that the allegations showed that the advertising campaign presented a "unified and consistent message." *Id.* at 978-80.

In contrast, in *Haskins v. Symantec Corp.*, the court found the plaintiff's allegations were not sufficient to proceed on a *Tobacco II* theory. No. 13-cv-01834-JST, 2014 WL 2450996, at *2 (N.D. Cal. June 2, 2014) ("*Haskins II*"), *aff'd*, ⎯ Fed. Appx. ⎯, 2016 WL 3391237 (9th Cir. June 20, 2016). In that case, the plaintiff purchased antivirus software from the defendant, and she alleged that before she purchased the product, defendant's source code had been stolen. According to the plaintiff, the defendant failed to disclose that fact. *See, e.g., Haskins v. Symantec Corp.*, No. 13-CV-01834-JST, 2013 WL 6234610, at *1 (N.D. Cal. Dec. 2, 2013) ("*Haskins I*"); *Haskins II*, 2014 WL 2450996, at *1. The court found that the first and third *Opperman* factors weighed in plaintiff's favor, but it concluded that the remaining factors weighed against her. For example, the plaintiff alleged the defendant's advertising became misleading shortly after the theft of the source code and about a year before she purchased the product at issue. The court stated that the time period at issue fell "well short of the 'decades-long' campaign in *Tobacco II.*" *Haskins II*, 2014 WL 2450996, at *2.

*7 It also found that many of the alleged misrepresentations were contained "in press releases or industry documents that an average consumer would be unlikely to read." *Id.* at *2. The plaintiff did allege the defendant made representations in magazines and on websites. However, the court distinguished *Tobacco II* on the basis that, in that case, the plaintiffs alleged that the defendants "made demonstrably false statements about the health and safety of cigarettes in their advertising." *Id.* In contrast, the plaintiff in *Haskins* failed to identify how the alleged representations were "rendered misleading by the source code theft." *Id.* The court therefore dismissed her claims under the UCL and the CLRA.

The plaintiffs in the *Hall* case also attempted to plead their claims based on a *Tobacco II* theory. The *Hall* court rejected those claims, because the plaintiffs did not allege "any advertising or other statements by SeaWorld from before 2013." *Hall*, 2015 WL 9659911, at *4. The court also found that the statements at issue "were not even made in advertisements, let alone as part of a pervasive advertising campaign of the sort at issue in *Tobacco II.*" *Id.*; *see also id.* at *4 n.5 (stating that court need not fully resolve tension between *Kearns* and *Tobacco II*, "because the FAC fails to adequately allege an advertising campaign that would implicate any lessened pleading requirements").

Although *Opperman* is not binding, the Court finds the case provides a useful and reasoned framework to determine whether a plaintiff's allegations are sufficient to proceed on a *Tobacco II* theory. Here, each Plaintiff alleges that he or she was "exposed" to the advertising campaign regarding the "health and happiness of [SeaWorld's] captive orcas," in television commercials, print advertisements, the Internet and/or other media outlets. (SAC ¶¶ 18-21.) These allegations are similar to the allegations in *Opperman* that the plaintiffs "viewed, heard, or read [defendant]s advertisements, or statements, in news reports, articles, blogs, ... and/or received emails or other communications" from the defendant. These allegations are sufficient to satisfy the first *Opperman* factor. 84 F. Supp. 3d at 978.

However, only Anderson and Nelson include allegations about when they were exposed to the campaign. For example, Anderson alleges that he has been exposed to the campaign, "since he was a teenager," but there are

no facts in the SAC regarding his current age and he does not provide details of the year he was exposed to the campaign. (SAC ¶ 18.) Nelson alleges that she has been "familiar" with SeaWorld from the early 1990's and has been exposed to the alleged advertising campaign "for decades." She also alleges her exposure "became more frequent," when she moved to San Clemente, California in 2008. (SAC ¶ 20.) In the *Opperman* case, the court found that the failure to "allege specific dates, or even timeframes, during which [the plaintiffs] were exposed to the campaign," weighed against a finding that the allegations satisfied *Tobacco II.* 84 F. Supp. 3d at 982. The Court finds the allegations are too vague to satisfy this *Opperman* factor.

Plaintiffs do allege that the alleged campaign started in 1965 and lasted "[o]ver at least the last four decades." (SAC ¶ 32.) Plaintiffs therefore allege facts that show the duration of the campaign was akin to the duration of the campaign at issue in *Tobacco II.* In comparison, other courts have found campaigns that lasted over a period of months or which began shortly before a plaintiff purchased a product are insufficient in duration to give rise to a *Tobacco II* type of campaign. *See, e.g, Haskins II,* 2014 WL 2450996, at *2; *Bronson v. Johnson & Johnson, Inc.*, No. 12-cv-04184-CRB, 2013 WL 1629191, at *3 (N.D. Cal. Apr. 16, 2013) (granting motion to dismiss for lack of standing and rejecting plaintiffs' reliance on *Tobacco II*, on the basis that "[a]t best, Defendants' marketing campaign began in 2012, which is substantially less than the 'long-term' campaign at issue in *Tobacco II* that lasted at least seven years"). As to the duration of the campaign, the facts alleged would satisfy the second *Opperman* factor.

 **\*8** Plaintiffs also that SeaWorld "disseminated this public relations and marketing campaign via public statements by employees, television shows, television commercials, a telephone information line, print brochures, books, statements made to visitors at SeaWorld's parks, and the Internet." (*Id.* ¶ 32.) However, Plaintiffs do not provide more specific detail about the frequency with which the alleged representations were made, *i.e.*, the SAC does not include particular details about the extent and pervasiveness of the advertising campaign. *Cf. Committee on Children's Television v. General Foods Corp.*, 35 Cal. 3d 197, 205-07 (1983), *superseded by statute on other grounds* (describing an advertising campaign that was televised daily).

The third and fourth *Opperman* factors relate to the content of the advertising at issue, which permits a court to evaluate the similarity of the alleged misrepresentations. 84 F. Supp. 3d at 976. Here, in contrast to the *Opperman* case, in which the alleged examples spanned eighteen pages of the complaint, Plaintiffs, in one paragraph, provide six examples of the "types of statements made by SeaWorld over the course of this decades-long campaign...." (SAC ¶ 32.) The examples provided in paragraph 32 are consistent with Plaintiffs' contention that SeaWorld has misrepresented that captivity is not harmful to orcas. Yet, only one of Plaintiffs' examples is taken from a print advertisement and that example states only that it was for an exhibit called "Shamu's Happy Harbor." None of the other examples are from a billboard, a television commercial, a radio commercial, or other print advertisements, which are the types of media upon which Plaintiffs allege they relied. (*Compare* SAC ¶¶ 18-21 *with* SAC ¶ 32.) *Cf. Hall*, 2015 WL 9659911, at *4 (concluding that plaintiffs had failed to allege facts show to reliance, and noting that many of the statements "were not even made in advertisements, let alone as part of a pervasive advertising campaign of the sort at issue in" *Tobacco II*). This lack of detail prevents the Court from evaluating whether "the advertisements were representations consumers were likely to have viewed, rather than representations that were isolated or more narrowly disseminated." *Opperman*, 84 Fed. Supp. at 976-77.

The Court has considered the *Opperman* factors, and it finds the allegations in this case are closer to the allegations in *Haskins* than to the allegations in *Opperman*. The Court concludes that Plaintiffs have not alleged facts about SeaWorld's advertising campaign to show that in terms of breadth, content, and pervasiveness it would be appropriate to apply *Tobacco II* in this case.

Accordingly, the Court grants, in part, SeaWorld's motion to dismiss each of Plaintiffs' claims to the extent they are premised on the general representation that captivity is not harmful to orcas. For the reasons set forth below in Section G, the Court dismisses, with prejudice, this aspect of the UCL, FAL, and CLRA claims.

### D. The Court Dismisses, in Part, the CLRA Claim.

#### 1. Failure to State a Claim.

SeaWorld argues that Plaintiffs fail to state a claim under the CLRA. The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760. However, it "is not an otherwise applicable general law.... Rather than applying to all businesses, or to business transactions in general, the [CLRA] applies only to transactions for the sale or lease of consumer 'goods' or 'services' as those terms are defined in the act." *Fairbanks v. Superior Court,* 46 Cal. 4th 56, 65 (2009).

**\*9** The CLRA provides, in pertinent part, that:

[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(5) [r]epresenting that goods or services have ... characteristics ... uses, [or] benefits, ... which they do not have ...;

(7) [r]epresenting that good or services are of a particular ... quality ... if they are of another; and

(9) [a]dvertising goods or services with intent not to sell them as advertised[.]

Cal. Civ. Code §§ 1770(a)(5), (7), (9).

The term "goods" means "tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a party of real property, whether or not severable from the real property." Cal. Civ. Code § 1761(a). The term "services" means "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b).

### a. Claims Based on the Purchase of a Shamu Plush.

Anderson and Morizur base their CLRA claim, in part, on purchases of the Shamu Plush. (SAC ¶¶ 18, 21.) SeaWorld

does not dispute that the Shamu Plush is a good. It argues that Plaintiffs fail to state a claim under the CLRA, because they do not allege any misrepresentations that relate to the uses, benefits, nature, or qualities of the Shamu Plush. The Court agrees.

Anderson and Morizur allege the Shamu Plush has "little utility other than serving as memorabilia of SeaWorld's entertainment and educational services. ... By deceiving its customers as to the health and happiness of its captive orcas, SeaWorld is able to unfairly extract a higher price for the Shamu Plush and/or sell a greater number of these goods. SeaWorld's misrepresentations, therefore, constitute a misrepresentation of the characteristics, uses, benefits and qualities of the Shamu Plush." (SAC ¶¶ 78, 80.) In their opposition, Plaintiffs also focus on SeaWorld's alleged promotion of the Shamu Plush as a "symbol of the precious memories created at SeaWorld." (Opp. Br. at 9:17-19, citing SAC ¶ 78.)

Anderson and Morizur do not, however, allege they relied on the promotion of the Shamu Plush as a symbol when they made their purchases. Anderson alleges that he purchased the Shamu Plush based on the representation that orca lifespans in captivity are equivalent to lifespans in the wild and on the representation that SeaWorld does not separate orca calves from their mothers. (SAC ¶ 18.) Morizur alleges that she purchased a Shamu Plush based on the representations that collapsed dorsal fins are normal. (SAC ¶ 21.) These alleged misrepresentations do not relate to "the characteristics, uses, benefits" or the qualities of the Shamu Plush.

Accordingly, the Court grants, in part, SeaWorld's motion to dismiss the CLRA claim. For the reasons set forth below in Section G, the Court dismisses, with prejudice, claims under the CLRA based on the purchase of a Shamu Plush.

### b. Claims Based on Admission to SeaWorld.

**\*10** Plaintiffs allege SeaWorld provides "educational and entertainment services," and they allege "[i]n order for consumers to avail themselves of" those services, "they are required to purchase admission tickets." (SAC ¶ 1.) The parties dispute whether the alleged "entertainment and educational services" fall within the CLRA's definition of the term "services."[3]

3    Plaintiffs argue that "courts have recognized that CLRA claims may be brought for entertainment services." (Opp. Br. at 8:12-13.) To support this argument, they on *Princess Cruise Lines, Ltd. v. Superior Court*, 179 Cal. App. 4th 36 (2009) and *Harris v. Las Vegas Sands, LLC*, No. 12-cv-10858-DMG, 2013 WL 5291142 (C.D. Cal. Aug. 16, 2013). In *Princess Cruise Lines*, the plaintiffs sued about representations made regarding charges added to the price of shore excursions during a cruise. 179 Cal. App. 4th at 38-39. The issues in that case related to whether the plaintiffs were required to and had demonstrated reliance. *Id.* at 42-46. In *Harris*, the plaintiff alleged the defendant failed to disclose that additional fees charged for hotel rooms. 2013 WL 5291142, at * 2-3. The court dismissed the CLRA claim, because it found the alleged misrepresentation was not misleading. The courts in those cases were not called upon to address the issue here, whether the plaintiffs alleged that they purchased "goods" or "services," as the terms are defined in the CLRA. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not be to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

The parties in the *Hall* case addressed the issue of whether the plaintiffs stated a CLRA claim based on ticket purchases. There, the plaintiffs argued, as Plaintiffs do here, that "SeaWorld's amusement park products are plainly entertainment services." *Hall*, 2015 WL 9659911, at *14 (internal quotations and citations omitted). The *Hall* court rejected that argument, noted the lack of authority on this issue, and relied on two cases that addressed whether timeshare points qualified as services under the CLRA. *Id.*, 2015 WL 9659911, at *15 (citing *Kissling v. Wyndham Vacation Resorts, Inc.*, No. 15-cv-04004-EMC, 2015 WL 7283038, at *5 (N.D. Cal. Nov. 18, 2015) and *Wixon v. Wyndham Resort Dev. Corp.*, NO. 07-cv-02361, 2008 WL 1777590, at *4 (N.D. Cal. Apr. 18, 2008)). The court reasoned that "to hold that the tickets, or more specifically the admission to the parks that the tickets provide, constitute a service requires a strained and unnatural construction of the term," and it dismissed the CLRA claim with prejudice. *Id.* Although SeaWorld urges the Court to follow *Hall*, the Court disagrees, respectfully with its reasoning and conclusion.

The California Supreme Court has not addressed whether admission to a theme park like SeaWorld is a "service." This Court must apply "California law as [it believes] the California Supreme Court would apply it." *In re KF Dairies, Inc. & Affiliates*, 224 F.3d 922, 924 (9th Cir. 2000). Because this dispute involves the proper interpretation of a statute, the Court begins, as it must, "with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). The term "services" means "work, labor, and services for other than a commercial or business use, in connection with the sale or repair of goods." The dispute centers on whether the alleged "entertainment and education services" fall within the scope of the phrase "services for other than a commercial or business use." [4] Based on the plain language of the statute, the Court finds that phrase is broad enough to encompass "educational and entertainment" services.

4    Plaintiffs do not argue that SeaWorld sold them services "in connection with the sale or repair of goods." They do argue that by providing "educational and entertainment services," SeaWorld sells "work" and "labor" to consumers. (Opp. Br. at 7:16-17.) The *Fairbanks* court rejected a similar argument and found that the "work or labor of insurance agents and other insurance companies in helping consumers select policies and meet their needs" were not services that were "sufficient to bring life insurance within the reach" of the CLRA. 46 Cal. 4th at 65. The Court similarly concludes that any "work" or "labor" at issue would be ancillary to the core services at issue, which are SeaWorld's "entertainment and educational services."

**\*11** SeaWorld argues, however, that the legislative history shows that the legislature did not intend to include "education" or "entertainment" as services covered by the CLRA, and it relies on *Fairbanks* to support this argument. In *Fairbanks*, the California Supreme Court held life insurance was not a "service," because an "insurer's contractual obligation to pay money under a life insurance policy is not work or labor, nor is it related to the sale or repair of any tangible chattel." 46 Cal. 4th at 61. As is evident, the *Fairbanks* court neither expressly addressed nor analyzed the phrase "services for other than a commercial or business use." The Court "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade*

Anderson v. SeaWorld Parks and Entertainment, Inc., Slip Copy (2016)
2016 WL 8929295
Case 3:17-cv-00772-RDM   Document 31-4   Filed 10/20/17   Page 13 of 100

*Corp. v. U.S. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991); *see also California Ass'n of Psychology Providers v. Rank*, 51 Cal. 3d 1, 11 (1991) ("*Rank*"). Because the *Fairbanks* court did not clearly interpret this phrase, out of an "abundance of caution" the Court will examine the legislative history of the CLRA. *See id.* at 61.

The legislative history demonstrates that the CLRA was intended to affect "only those transactions between sellers and consumers of goods or services. It is not intended to affect transactions between businessmen." (Dkt. No. 87-1, Declaration of Lindsey Barnhart, Ex. F, Legislative History of CLRA, Governor's Chaptered Bill File at p. 9 (ECF p. 69)). This statement gives meaning to the phrase "services for other than a commercial or business use," in that it explains the term "services" was not intended to cover transactions between businessmen.

In support of its construction of the term "services," SeaWorld also relies on the fact that the CLRA was "adapted" from a model National Consumer Act. *See Fairbanks*, 46 Cal. 4th at 61. The model act defined "services" as "(a) work, labor, and other personal services, (b) privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery, accommodations, and the like and (c) insurance." *Id.* (quoting National Consumer Act (Nat. Consumer L. Center 1970) § 1.301, subd. (37), pp. 23-24, emphasis in *Fairbanks* omitted). In *Fairbanks*, the court noted that the legislature excluded the term "insurance" from the definition of services, which demonstrated an "intent *not* to treat all insurance as a service under" the CLRA. *Id.* (emphasis in original).

In reaching this conclusion, the *Fairbanks* relied on the principle that "[t]he rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." *Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224, 230 (2007); *see also Hughes Electronics Corp. v. Citibank Delaware*, 120 Cal. App. 4th 251, 268 (2004) ( "Typically, when a Legislature models a statute after a uniform act, but does not adopt the particular language of that act, courts conclude the deviation was deliberate and that the policy of the uniform act was rejected.").

SeaWorld argues that a similar result should follow here. Because the legislature excluded subsection (b) of the model act from the CLRA, it did not intend for "privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery, accommodations, and the like," to fall within the CLRA's definition of "services." The Court is not persuaded. The principle on which SeaWorld relies will not apply if, for example, "the specific language is replaced by general language that includes the specific instance." *Rank*, 51 Cal. 3d at 17-18. The Legislature not only omitted subsection (b) of the model act, it also omitted the term "personal services," and substituted the phrase "services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." The latter phrase comprises general language that could encompass the specific instances described in subsection (b) of the model act. *Cf. Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1089 (N.D. Cal. 2011) (health services provided by skilled nursing facilities fall within CLRA's definition of "services").

**\*12** The *Fairbanks* court also did not rely solely on this principle of statutory construction to reach its conclusion that insurance is not a "service" under the CLRA. It found the legislative intent to exclude insurance from the CLRA's coverage was "further confirmed by comparing the [CLRA's] definition of 'services' with the definition of the same word in the Unruh Act (Civ. Code § 1801 et seq.)." 46 Cal. 4th at 62. The Unruh Act defined services as "work, labor and services, for other than a commercial or business use, including services furnished in connection with the sale or repair of goods as defined in Section 1802.1 ... *or the providing of insurance.*" *Id.* (citing Cal. Civ. Code § 1802.2) (emphasis added). The *Fairbanks* court relied on the principle of statutory construction that "[t]he use of differing language in otherwise parallel provisions supports an inference that a difference in meaning was intended." *Id.* Here, there is no language in the pertinent portions of the CLRA and the Unruh Act that might lead to a conclusion that the legislature did not intend the CLRA to cover "entertainment" or "education" as "services."

Accordingly, the Court concludes that the term "services" encompasses the "educational and entertainment services" Nelson alleges she purchased from SeaWorld. [5]

Nelson alleges that, before she purchased admission to SeaWorld, she saw and relied on the representations that SeaWorld did not separate calves from their mothers and that captive orcas had similar lifespans to orcas in the wild." (*Id.* ¶ 20.) Nelson alleges these representations are false, because captive orcas have higher mortality rates and because SeaWorld does separate calves from mothers. (*Id.* ¶¶ 25, 30-31.) Nelson alleges these statements mislead "reasonable consumers to believe that" SeaWorld's education and entertainment services, "including the orca exhibitions and shows, feature happy, healthy orcas," and, as a result, "deceive consumers regarding the true nature of the entertainment and educational services SeaWorld sells." (*Id.* ¶ 77.) The Court concludes that these allegations are sufficient to allege that SeaWorld represented that its entertainment services had characteristics that it did not have. *See* Cal. Civ. Code § 1770(a)(5).

5   Because the Court has disposed of the CLRA claim to the extent it is based on the alleged advertising campaign, Nelson is the only Plaintiff left with a CLRA claim based admission to SeaWorld.

Accordingly, the Court denies, in part, SeaWorld's motion to dismiss Nelson's CLRA claim.

**2. Pre-Suit Notice.**

Sea World also argues that the Court must dismiss Nelson's claims for restitution under the CLRA, because she failed to comply with the pre-suit notice requirements of California Civil Code sections 1782(a)(1) and 1782(a)(2). (*See* Declaration of Lawrence Y. Iser, ¶¶ 2-3, Exs. A-B (letters referencing Anderson and Conway only).) Nelson responds that this argument is premature, because she has not included any claims for restitution under the CLRA in the SAC. Nelson asserts she will file a third amended complaint, once the thirty-day notice period has run. As of the date of this Order, the thirty-day notice period has elapsed, and Nelson has not filed a third-amended complaint. Because none of the Plaintiffs have asserted a request for restitution under the CLRA, the Court denies, without prejudice, SeaWorld's motion to dismiss Nelson's CLRA claim on this basis. (*See* SAC ¶ I.) If Nelson asserts a claim for restitution in a third amended complaint, SeaWorld may argue the sufficiency of the notice in a subsequent motion to dismiss.

**E. The Court Dismisses, in Part, Anderson's UCL and FAL Claims.**

SeaWorld also argues that Anderson does not have standing to pursue a UCL or an FAL claim based on allegations that he purchased his tickets in reliance on the statements that orca lifespans in captivity are equivalent to life spans in the wild and that SeaWorld does not separate calves from its mothers. Anderson does not dispute that he did not purchase his tickets in reliance on those statements. (*See* SAC ¶ 18; Dkt. No. 87, Opp. Br. at 14 n.9.) Therefore, he lacks statutory standing to pursue these claims.

**\*13** Accordingly, the Court GRANTS, IN PART, SeaWorld's motion to dismiss on that limited basis. However, Anderson's UCL and FAL claims may proceed to the extent they are based on his purchase of a Shamu Plush.

**F. The Court Dismisses, in Part, Morizur's FAL and UCL Claims.**

SeaWorld moves to dismiss Ms. Morizur's FAL and UCL claims to the extent they are based on her allegation that she asked "SeaWorld's trainers questions about their captive orca's collapsed dorsal fins." (SAC ¶ 21.) Ms. Morizur alleges that the trainers told her that the collapsed dorsal fins were "normal, and also equally common in the wild. They also told Ms. Morizur that captivity in general does not harm orcas." (*Id.*) SeaWorld argues that these statements do not qualify as advertisements and, thus, cannot support a claim under the FAL. SeaWorld also argues that to the extent Ms. Morizur's UCL claim is premised on this alleged violation of the FAL, the claim cannot succeed. In its prior order, the Court found Ms. Morizur had sufficiently alleged standing to pursue these claims based on her reliance on those statements. However, SeaWorld did not raise the issue presented here, namely whether these allegations would be sufficient to state a claim under the FAL.

"An actionable statement under FAL requires that a statement must be (1) widely disseminated to the public and (2) for the purpose of influencing consumers to purchases goods or services." *See, e.g., In re Jamster Mktg. Litig.*, No. 05-cv-0819JM (CAB), 2009 WL 1456632, at \*9 (S.D. Cal. May 22, 2009); Cal. Bus. & Prof. Code § 17500 ("It is unlawful for any ... corporation ..., or any employee thereof with intent directly or indirectly to

dispose of real or personal property or to perform services, professional or otherwise, ... to make or disseminate or cause to be made or disseminated before the public in this state, ..., in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, ... any statement, concerning that real or personal property or those services, professional or otherwise ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."). The Court concludes that Ms. Morizur has not alleged sufficient facts to show that the statements at issue were "widely disseminated to the public."

Accordingly, the Court grants, in part, SeaWorld's motion to dismiss on this basis. For the reasons set forth in Section G, the Court denies Ms. Morizur a further opportunity to amend these claims.

**G. The Court Denies Plaintiffs Leave to File a Third Amended Complaint.**

As stated at the outset of this Order, the SAC is the fourth iteration of Plaintiffs' complaint. In general the Court should grant leave to amend liberally. However, Plaintiffs amended their claims once as a matter of right. Plaintiffs submitted a proposed second amended complaint, which the Court considered in connection with SeaWorld's first motion to dismiss. The Court found the proposed SAC did not cure many of the deficiencies identified by SeaWorld in its motion, including the allegations regarding reliance

SeaWorld's advertising campaign. The Court has found that Plaintiffs have not cured those deficiencies. The Court also stated that it had serious concerns about the viability of Plaintiffs' claims under the CLRA, and it has now dismissed a large portion of that claim. For these reasons, except as otherwise noted with regard Ms. Nelson's potential claim for restitution under the CLRA, the Court denies Plaintiffs a further opportunity to amend.

## CONCLUSION

**\*14**  For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART, SeaWorld's motion to dismiss. Mr. Anderson and Ms. Nelson may pursue the claims under the FAL and the UCL Ms. Morizur may pursue the UCL claim to the extent it is premised on the "unfair" prong of that statute. Finally, Ms. Nelson may pursue the claim under the CLRA. The parties shall appear for an initial case management conference on December 9, 2016 at 11:00 a.m., and they shall file a joint case management statement on December 2, 2016.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 8929295

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**2**

2016 WL 2897410
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Bank of America, N.A., Successor by Merger
to Bac Home Loans Servicing, LP, f/k/a
Countrywide Home Loans Servicing, Plaintiff,
v.
Gary L. Zaskey A/k/a Gary Lynn Zaskey;
Lori a. Zaskey a/k/a Lori Ann Zaskey;
and Brenda Lynn Zaskey, Defendants.
Gary L. Zaskey and Lori A. Zaskey,
Counter-Plaintiffs/Third-Party Plaintiffs,
v.
Bank of America, N.a., Counter-Defendant,
Green Tree Servicing, LLC; Harbor Land
Title, L.C., and Old Republic National Title
Insurance Company, Third-Party Defendants.

CASE NO. 9:15-cv-81325-ROSENBERG/HOPKINS
|
Signed 05/18/2016

**Attorneys and Law Firms**

Daniel Cardenal, Liebler Gonzalez , Portuondo, LLP,
Angela Marie Brenwalt, Miami, FL, for Plaintiff.

Faequa Asma Khan, Robert F. Cooke, Cooke Law
Group, Miami, FL, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART BANK OF AMERICA AND GREEN TREE'S MOTIONS TO DISMISS

ROBIN L. ROSENBERG, UNITED STATES
DISTRICT JUDGE

**THIS CAUSE** is before the Court on Bank of America's
Motion to Dismiss Counter-Plaintiffs' Third Amended
Counterclaim [DE 81] and Green Tree Servicing, LLC's
Motion to Dismiss Third Amended Counterclaim [DE
85].

# I. BACKGROUND

The operative pleading at issue, the Third Amended
Counterclaim filed by Gary and Lori Zaskey, alleges the
following. Bank of America obtained a mortgage on a
piece of Florida property owned by the Zaskeys. *See* DE
80 at ¶ 9. In March 2012, after the Zaskeys fell behind on
their payments, Bank of America approved a short sale of
the property. *Id.* at ¶¶ 10, 11. Bank of America laid out
the terms of the short sale in two letters, which the parties
now refer to as the Short Sale Agreement. *See* DE 80-2 at
24-27.

Harbor Title acted as the closing agent for the sale. *See*
DE 80 at ¶ 12. The closing took place on April 26, 2012. *Id.*
at ¶ 16. However, Harbor Title failed to successfully wire
the short sale proceeds to Bank of America until August 9,
2012. *Id.* at ¶¶ 18-19. Bank of America returned the short
sale proceeds to Harbor Title on August 16, 2012. *Id.* at
¶ 19.

Bank of America and Green Tree Servicing, LLC, which
began servicing the loan in May 2013, began collection
activity against the Zaskeys. *Id.* at ¶¶ 24-29. In September
2012, Bank of America filed a foreclosure action against
the Zaskeys in the Florida Fifteenth Judicial Circuit Court
in and for Palm Beach County. *Id.* at ¶ 28(g). Although
Bank of America voluntarily dismissed its foreclosure
claim, the Zaskeys filed counterclaims against Bank of
America, as well as third-party claims against Harbor
Title, Green Tree, and Old Republic National Title
Insurance Company. Green Tree removed the Zaskeys'
claims to this Court. *See* DE 1.

The Zaskeys currently bring the following claims against
Bank of America and Green Tree: (1) breach of contract
(the Short Sale Agreement) against Bank of America;
(2) breach of the implied covenant of good faith and
fair dealing (in the promissory note and mortgage)
against Bank of America, Green Tree, and Harbor
Title; (3) malicious prosecution against Bank of America;
(4) violation of the Florida Deceptive and Unfair
Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201,
against Green Tree; (5) violation of Florida's Consumer
Collection Practices Act ("FCCPA"), Fla. Stat. § 559.72,
against Bank of America and Green Tree; (6) violation
of the Fair Debt Collection Practices Act ("FDCPA"), 15
U.S.C. § 1692, against Bank of America and Green Tree;

(7) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), against Green Tree; (8) negligence against Bank of America and Green Tree; (9) negligence against Harbor Title. *See* DE 80. Bank of America and Green Tree have moved to dismiss the claims against them. *See* DE 81-82, 85.

## II. LEGAL STANDARD

**\*2** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,'...it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556).

## III. ANALYSIS

The Court's jurisdiction in this case is premised on the Zaskeys' claims sounding in federal law, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446. *See* DE 1 (notice of removal). Accordingly, the Court will first address the Zaskeys' federal causes of action. If those counts fail to state a claim, the Court may decline to exercise supplemental jurisdiction over the claims sounding in Florida law.

### A. Claims Based on Federal Law

#### 1. Count 6: FDCPA Violation against Bank of America
Bank of America argues that Count 6 fails to state a claim because the allegations in the Third Amended

Counterclaim show that Bank of America obtained the loan prior to default. *See* DE 81 at 31-35. A defendant is not a "debt collector" under the FDCPA if the collection activity "concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6) (F)(iii). Thus, "creditors and loan servicers are not 'debt collectors' for purposes of the FDCPA if they acquired or began servicing a loan prior to the debtor defaulting." *Diaz v. First Marblehead Corp.*, No. 14-15797, 2016 WL 736361, at \*1 (11th Cir. Feb. 25, 2016).

The Third Amended Counterclaim alleges that the Zaskeys refinanced the property in December 2006 through another lender, and that "[t]he loan was subsequently transferred to Bank of America." DE 80 at ¶ 9. The next paragraph alleges, "After moving to Green Bay, Wisconsin, and experiencing financial difficulties, the Zaskeys inquired with Bank of America about options to avoid foreclosure" and "ultimately...agreed to enter into a short sale of their Green Acres, FL Property." *Id.* at ¶ 10; *see also id.* at ¶ 8 ("While owners of the Property, the Zaskeys moved to Green Bay Wisconsin. *Soon thereafter*, the Zaskeys fell behind on their mortgage payments and contacted Bank of America concerning options to avoid foreclosure[.]") (emphasis added). The clear import of these allegations is that the Zaskeys' debt was not in default when Bank of America obtained it. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (noting, "[w]e must make reasonable inferences in Plaintiffs' favor, but we are not required to draw Plaintiffs' inferences" and finding it was "unreasonable to infer, based on the facts alleged here" what the Plaintiffs argued).

The Zaskeys assert that whether they were in default presents a triable issue of fact. *See* DE 92 at 24. They argue that "any evidence that...the Zaskeys were behind on their monthly payments, or [were]...late on their payments prior to or at the time of transfer, would render the Zaskeys in 'default' under the terms of their Note" and that "[t]he evidence in this case, whether presented at summary judgment or at trial, will reveal that the Zaskey loan was in 'default,' as that term is defined by the Note, since December 2010," prior to Bank of America obtaining the loan. *Id.* at ¶ 25. Even assuming *arguendo* that the Zaskeys' broad definition of default is applicable in interpreting this provision of the FDCPA, there are no facts pled in the Third Amended Counterclaim to suggest that the Zaskeys were behind or late on their monthly payments when Bank

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    2

of America acquired the loan. *See generally Davidson v. Capital One Bank ( USA ), N.A.*, 797 F.3d 1309, 1313 (11th Cir. 2015) ("in order to survive Capital One's motion to dismiss, Davidson must plead 'factual content that allows the court to draw the reasonable inference that' Capital One is a 'debt collector' under the FDCPA and therefore liable for the misconduct alleged"). Moreover, the Zaskeys do not explain what factual allegations or evidence would support the notion that the loan had been in default since December 2010. *Cf. Aldana*, 416 F.3d at 1248 (" 'Bald assertions' will not overcome a Rule 12(b)(6) motion.")

**\*3** The Court notes that this is the fourth iteration of the Zaskeys' counterclaim. The Zaskeys have been on notice of this issue since at least December 2015, when Green Tree moved to dismiss the FDCPA claim against it on identical grounds. *See* DE 9 at 19-20 (motion to dismiss arguing that the counterclaim was bereft of facts showing that the loan was in default at the time it was assigned to Green Tree). The Zaskeys added an allegation that *Green Tree* obtained the loan after default, but added no such allegation as to *Bank of America*. *See* DE 80 at ¶ 118. Furthermore, the amended pleadings deadline in this case passed on December 28, 2015, and the Court previously warned the Zaskeys that it did not anticipate permitting any further amendments to the counterclaim. *See* DE 79. Accordingly, the Court finds that the Zaskeys cannot state a claim for a violation of the FDCPA against Bank of America, and this claim is dismissed with prejudice.

### 2. Count 6: FDCPA Claim against Green Tree

Green Tree argues that the FDCPA claim against it should be dismissed as time-barred under the one-year statute of limitations set forth in 15 U.S.C. § 1692k(d). Because a statute of limitations bar is an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint, a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). The Eleventh Circuit has held that, where an FDCPA claim is based on a collection letter, the one-year period in 15 U.S.C. § 1692k(d) begins to run on the day after the letter is mailed. *See Maloy v. Phillips*, 64 F.3d 607, 608 (11th Cir. 1995).

The Third Amended Counterclaim alleges that Bank of America transferred servicing rights to the Zaskeys' loan to Green Tree effective May 1, 2013. *See* DE 80 at ¶ 29(b).

In the "General Allegations" section, it lists letters sent by Green Tree between May 2013 and August 2014, *id.* at ¶ 29(g), (i), (m)-(o), as well as phone calls the Zaskeys received from Green Tree in June, July, November, and October 2013, *id.* at ¶ 29(h), (k)-(*l*), and generally alleges: "from May 2013 through *at least the end of 2014*, Green Tree engaged in a pattern of repeated telephone calls and written demand letters to the Zaskeys [.]" *Id.* at ¶ 30 (emphasis added). In the FDCPA claim, which is brought against both Bank of America and Green Tree, the Zaskeys allege:

> [F]rom June 2012 *through July 2015*, BANK OF AMERICA, through its predecessors in interest, its own representatives, and other debt collectors it retained as its agents (including GREEN TREE), sent numerous written demands for payment, and made dozens of telephone calls to the ZASKEYS' home, in an attempt to collect and enforce a debt...
>
> ...From *May 2013 and onward*, GREEN TREE joined in these debt collection activities.

DE 80 at ¶¶ 112, 114 (emphasis added).

Green Tree contends that the Zaskeys' FDCPA claims are time-barred because none of the collection activity specified occurred within 12 months of August 24, 2015, the date on which the Zaskeys served Green Tree with the third party complaint filed in state court. *See* DE 85 at 13 (motion to dismiss); DE 107 at 16 (reply); DE 1 at 2 ¶ 5 (notice of removal). Assuming that August 24, 2015 is the relevant date for statute of limitations purposes, [1] when the Court reads the Third Amended Counterclaim as a whole and draws all inferences in the Zaskeys' favor, as the Court is required to do on a motion to dismiss, it is not apparent from the face of the counterclaim that the FDCPA claims against Green Tree are barred by the statute of limitations. The Zaskeys allege collection activity as late as July 2015. Although it is not clear precisely whether it was actions by Green Tree or actions by Bank of America that continue into July 2015, since the FDCPA count lumps Bank of America and Green Tree together, the Court finds it is sufficient to survive a motion to dismiss on statute of limitations grounds. Green Tree may raise this argument as an affirmative defense. [2] Accordingly, Green Tree's Motion to Dismiss Count 6 is denied.

1   Neither party addresses whether the Zaskeys' third-party claim against Green Tree would relate back to its originally filed counterclaim against Bank of America under Federal Rule of Civil Procedure 15. *See* DE 93 at 19 (Zaskey's response, arguing: "Putting aside the applicability of the relation back doctrine, Fed R. Civ. P. 15(c), Green Tree is at a minimum liable for debt collection activities that occurred one year prior to that date" when Green Tree was added to the case). *See generally Williams v. Grieg Shipping A/S*, 219 F.R.D. 537, 538 (S.D. Ala. 2003) (laying out the three-part test that an amendment adding a new party must meet to relate back to the original pleading, for statute of limitations purposes). The original counterclaim against Bank of America was filed on August 13, 2013. *See* DE 1 at 2 ¶ 2. Given the Court's holding that the Zaskeys' claims are not time-barred on the face of the counterclaim, the Court leaves this issue to be fleshed out at a later stage in the proceedings.

2   Because the Court concludes that the FDCPA claims against Green Tree are not, on their face, barred by the statute of limitations, the Court finds it unnecessary to reach Green Tree's argument that the August 2014 communications at issue were "loss mitigation options" that do not count as debt collection activity under the FDCPA.

### 3. Count 7: RESPA Claim against Green Tree

**\*4** RESPA imposes certain disclosure obligations on loan servicers who transfer or assume the servicing of a federally related mortgage loan, including the obligation to respond to a Qualified Written Request ("QWR") submitted by a borrower. *Williams v. America's Serv. Co.*, No. 2:09-cv-775-FtM-29DNF, 2011 WL 1060652, at \*1 (M.D. Fla. Mar. 22, 2011). RESPA defines a QWR as follows:

**(B) Qualified written request**

For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

**(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

**(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account

is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2695(e)(1)(B). A servicer must generally acknowledge receipt of the correspondence within 5 days and take action to correct the account or investigate the error within 30 days. *See* 12 U.S.C. § 2605(e)(1) (A), (e)(2). "[T]o state a claim for violation of RESPA § 2605(e), plaintiffs must allege facts to support that: (1) defendant is a loan servicer, (2) plaintiffs sent defendant a valid QWR, (3) defendant failed to adequately respond within the...statutory period, and (4) plaintiffs are entitled to actual or statutory damages." *Williams*, 2011 WL 1060652, at \*2.

The alleged QWRs are attached to the Third Amended Counterclaim. They consist of letters Green Tree sent to the Zaskeys, on which Mr. Zaskey hand-wrote notes. The first note states: "This property was sold thru [sic] a Bank of America short sale 4-26-12. I owe nothing on this loan." DE 80-4 at 6. The second note states: "Attn: Mario [the sender of the Green Tree letter.] Please check your records. This property was sold via a Bank of America Short Sale 4-26-2012[.]" DE 80-4 at 9. The Third Amended Counterclaim alleges that Mr. Zaskey then returned these letters to Green Tree, which "failed to investigate, and ultimately failed to take corrective action within 60 business days." DE 80 at ¶¶ 135-38.

Green Tree argues these allegations are insufficient, first, because the Zaskeys have not pled facts showing that the QWR "was actually mailed on a specific date." DE 85 at 14. However, it is a fair inference from the counterclaim that the letters were mailed in May 2013, shortly after the Zaskeys received the letters, which are dated May 4 and May 11, 2013. Furthermore, the RESPA claims at issue in the cases Green Tree cites were far more deficient. *See Williams,* 2011 WL 1060652, at \*3 (finding plaintiffs did "not allege when they sent the QWR *and* whether defendant failed to adequately respond within the statutory timeframe," and further "failed to allege that the QWR contained sufficient information to enable defendant to determine 'the name and account of the borrower' ") (emphasis added); *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1073-74 (E.D. Cal. 2012) (finding plaintiffs failed to allege a particular RESPA statute which was violated and failed to show that plaintiffs sent a legitimate QWR identifying grounds that the loan or account was defective or in error).

**\*5** Green Tree argues, second, that the Zaskeys' allegations fail to show a causal link between their claimed damages and the alleged RESPA violation. DE 85 at 15. Citing the Zaskeys' negligence claim against Harbor Title, Green Tree argues, "By their own admission, but for Harbor Title's failure to timely disburse the short-sale proceeds, 'the Zaskeys would not have sustained the damages complained of herein.' " *Id.* (citing DE 80 at ¶ 156). The RESPA claim in the Third Amended Counterclaim alleges that the Zaskeys were injured by Green Tree's failure to investigate and respond to their QWRs because "they have endured harassing collection efforts for a debt obligation for which they had no financial responsibility, and suffered the effects of GREEN TREE's negative credit entries on the ZASKEYS' credit reports." DE 80 at ¶ 139. The claims at issue in the cases Green Tree cites did not include such detailed factual allegations. *See Jenkins v. BAC Home Loan Servicing, LP,* 822 F. Supp. 2d 1369, 1377 (M.D. Ga. 2011) (dismissing claim that simply stated that, as a result of the RESPA violations, the plaintiff suffered damages); *Habib v. Bank of America Corp.*, No. 10–04079, 2011 WL 2580971, at \*4 (N.D. Ga. Mar. 15, 2011) ("Plaintiff's allegations fail to put Bank of America on notice as to how any purported RESPA violations harmed her. Indeed, '[t]he [c]omplaint does not allege any facts to support a finding that...untimely response to the [plaintiff's QWR], if any, caused the [plaintiff] to suffer any type of monetary loss.' ").

The Court finds the Zaskeys' allegations regarding damages are sufficient to state a claim under RESPA. Accordingly, Green Tree's Motion to Dismiss Count 7 is denied.

**B. Claims Based on Florida Law**

Because claims based on federal law remain pending, the Court may exercise supplemental jurisdiction over the Zaskeys' claims that are based in Florida law. *See generally* 28 U.S.C. § 1441. The Court therefore turns its attention to Bank of America and Green Tree's arguments for dismissal of these claims.

**1. Count 1: Breach of Contract (the Short Sale Agreement) against Bank of America**

The Third Amended Counterclaim alleges that Bank of America breached the Short Sale Agreement by: (1) rejecting the short sale proceeds wired in August 2012;

(2) failing to investigate after Harbor Title and Mr. Zaskey informed Bank of America that the short sale had closed; (3) failing to develop or follow internal procedures to ensure successful short sale; (4) failing to develop and follow internal procedures to respond to borrower complaints and properly credit short sale proceeds; and (5) "harassing and abusing" the Zaskeys through unwarranted debt collection activity. *See* DE 80 at ¶ 60(a)-(j).

The two letters from Bank of America that comprise the Short Sale Agreement are attached to the Third Amended Counterclaim. *See* DE 80-2 at 24-27. The initial letter states:

5. Closing must take place no later than April 30, 2012 *or this approval is void.* If an extension is requested and/or approved, interest on the loan will be charged per day through closing.

...

14. All funds must be wired. Please be advised that any other form of payment of funds will be returned. *Payoff funds must be received within 48 business hours of the HUD-1 settlement date.*
DE 80-2 at 25 (emphasis added). The second letter states that the Zaskeys were eligible to receive up to $5,000 in relocation assistance if the short sale closed by August 31, 2012. *See* DE 80-2 at 27. The letter also states: "The terms and conditions of your short sale agreement have not changed." *Id.*

**a. Whether the failure to timely wire the funds was breach of a condition precedent in the Short Sale Agreement**

Bank of America argues that, because it did not receive the payoff funds until more than 48 hours after the settlement date, the Zaskeys breached a condition precedent for the short sale and thereby voided the Short Sale Agreement. *See* DE 81 at 6-9. Thus, Bank of America argues, its subsequent actions cannot form the basis of a breach of contract claim. *Id.* The Zaskeys dispute whether the 48-hour provision was a condition precedent. *See* DE 92 at 11. They argue that only a failure to timely conduct the closing would have voided the contract, not a failure to timely wire the funds. *Id.* The Zaskeys also appear to argue

that the second letter extended the closing deadline to August 31, 2012. *Id.* at 4.

**\*6** "Contract interpretation is typically inappropriate at the motion to dismiss stage" unless "the contract...terms are unambiguous[.]" *Alhassid v. Bank of Am., N.A.*, 60 F. Supp 3d 1302, 1312 (S.D. Fla. 2014). In other words, where the interpretation of a contract is reasonably susceptible to more than one interpretation, the issue should be decided at the summary judgment stage rather than on a motion to dismiss. *See, e.g., Managed Care Solutions, Inc. v. Community Health Systems, Inc.*, No. 10-60170-CIV, 2011 WL 6024572, at \*6 (S.D. Fla. Dec. 2, 2011); *Larach v. Standard Chartered Bank Intern. (Ams.), Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010) ("The parties' differing interpretations of their respective obligations under the pledge agreement demonstrate that this issue is not ripe for decision at the motion to dismiss stage."). In the present case, the Court finds that the Short Sale Agreement is ambiguous on the point disputed by the parties. *See generally Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) ("Under Florida law, failure to make a payment on time does not constitute *per se* a material breach of contract. Rather, to constitute a material breach, the late payment must occur where time is of the essence....Time is of the essence under Florida law when (1) the agreement explicitly so specifies; or (2) such may be determined from the subject matter of the contract; or (3) treating time as non-essential would produce a hardship; or (4) notice has been given to the defaulting party requesting performance within a reasonable time."). The parties' dispute as to the interpretation of the Short Sale Agreement therefore is not ripe for decision at the motion to dismiss stage.

**b. Whether there are sufficient factual allegations to show that Harbor Title was acting as Bank of America's agent**

Bank of America also argues that the breach of contract claim, as well as the breach of implied covenant claim discussed *infra*, fail to state a claim because they are based on the actions of Harbor Title, and the Zaskeys have pled insufficient facts showing that Harbor Title was acting as Bank of America's agent during the closing. *See* DE 81 at 4-6. The Zaskeys respond that "the conduct of Harbor Title, as an agent of Bank of America, involves just one of several different breaches of the short sale agreement and the implied obligations therein." DE 92 at 9. The Court

agrees with the Zaskeys, as many of the alleged breaches occurred after the short sale closing and concern Bank of America's continuation of debt collection activity in the face of the Zaskeys' protestations. *See* DE 80 at ¶ 60(a)-(j). Bank of America does not address this issue or attempt to explain which parts of Counts 1 and 2 it believes are predicated on the agency relationship. *See* DE 102 at 2-4 (reply).

To the extent the claims *are* predicated on an agency relationship, the Third Amended Counterclaim alleges that Mr. Pino, the real estate agent who handled the short sale and represented himself as Bank of America's agent, recruited Harbor Title as closing agent, and that Harbor Title was engaged upon his recommendation. *See* DE 80 at ¶¶ 11, 152. The Court finds these allegations sufficient to survive a motion to dismiss. *See Larach*, 724 F. Supp. 2d at 1239 (finding that fact-intensive inquiries, such as whether plaintiffs have alleged facts establishing that a fiduciary or agency relationship existed, are inappropriate for consideration at the motion to dismiss stage, and denying the motion to dismiss with leave to renew at the summary judgment stage). Accordingly, as to Count 1, Bank of America's Motion to Dismiss is denied.

**2. Count 2: Breach of the Implied Covenant of Good Faith and Fair Dealing (in the Promissory Note and Mortgage) against Bank of America, Green Tree, and Harbor Title** [3]

[3] Harbor Title has not filed a motion to dismiss.

**a. Whether Count 2 fails to state a claim against Green Tree because there are insufficient allegations of privity between Green Tree and the Zaskeys**

Green Tree argues that the breach of implied covenant claim should be dismissed with prejudice as to Green Tree because the Zaskeys have failed to allege any facts showing they are in privity with Green Tree for purposes of the note and mortgage; Green Tree argues that its status as the loan servicer does not satisfy this privity requirement. *See* DE 85 at 7-8. In *James v. Litton Loan Servicing, L.P.*, No. 4:09-CV-147 CDL, 2011 WL 59737 (M.D. Ga. Jan. 4, 2011), the district court granted summary judgment to the defendant servicer on the borrower's breach of contract claim, finding:

**\*7** Plaintiffs did not...allege that they had a contract with Litton, nor did they point to any evidence of such contract. As a loan servicer, Litton is not a party to or an assignee of the Note itself. In the absence of evidence of a contract between Plaintiffs and Litton, Plaintiffs' breach of contract claim fails.

(*Id.* at \*11); *see also Edwards v. Ocwen Loan Serv., LLC*, 24 F. Supp. 3d 21, 28 (D.D.C. 2014) (dismissing borrower's breach of contract and breach of implied covenant claims against servicer, finding they were insufficient as a matter of law and noting: "Judges around the country— including at least two of my colleagues—have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract.").

The Zaskeys respond that Green Tree is liable for breach of the mortgage, note, and Short Sale Agreement "to the extent that Bank of America assigned certain obligations to Green Tree" and to the extent "certain obligations were ultimately the responsibility of Green Tree, rather than Bank of America[.]" DE 93 at 9-10. The Zaskeys do not identify what those responsibilities are, and the Third Amended Counterclaim does not allege any supporting facts, other than the lender-servicer relationship between Bank of America and Green Tree. The Zaskeys protest that they "are not required at this stage of the proceedings to precisely identify the legal theory that may ultimately hold Green Tree liable" as long as "*any set of facts* consistent with the complaint would give him a right to recover[.]" DE 93 at 10 (emphasis added).

The Court disagrees. The Zaskeys are required to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft*, 556 U.S. at 678; *see also Bell*, 550 U.S. at 562-63 (rejecting "no set of facts" language from prior case law as a pleading standard). They have not pled facts demonstrating that they are in privity with Green Tree. Given that this is the fourth iteration of the counterclaim and the amended pleadings deadline is many months past, Count 2 against Green Tree is dismissed with prejudice.

### b. Whether Count 2 fails to state a claim against Bank of America because the breach of good faith claim does not attach to the performance of a specific contractual obligation

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.* "[A] claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Id.* at 1152. Such a claim "ordinarily arises when: 1.) the contract is ambiguous about the permissibility of the conduct, or 2.) when the conduct is undertaken pursuant to a grant of discretion and the scope of that discretion has not been designated." *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1318 (M.D. Fla. 2000).

**\*8** Bank of America argues that Count 2 should be dismissed because none of the alleged breaches of good faith attach to a specific term of the note and mortgage. *See* DE 81 at 9. Count 2 alleges that Bank of America "owed the ZASKEYS an implied covenant of good faith and fair dealing with respect to the application of payments and the satisfaction of the ZASKEYS' Mortgage, as set forth in the parties' promissory Note and Mortgage." DE 80 at ¶ 63. In their response to Bank of America's motion to dismiss, the Zaskeys point to several uniform covenants in the mortgage governing application of payments and grievance notices. *See* DE at 12-13. However, as Bank of America points out, these covenants govern acceptance of regular payments towards interest and principal, and what the Zaskeys are really complaining about is the acceptance (or rather, the non-acceptance) of a payment under the Short Sale Agreement, which is a separate agreement to forbear enforcing the full amount of the debt.

Alternatively, the Zaskeys argue that they are not required to "specifically identify the provision of the mortgage giving rise to their claim," citing *Karp v. Bank of America, N.A.*, No. 8:12-cv-1700-T-17MAP, 2013 U.S.

Dist. LEXIS 36838, *10, 2013 WL 1121256 (M.D. Fla. Mar. 18, 2013). The Zaskeys read *Karp* too broadly. There, the borrower argued that the lender had exercised its right to "force-place" insurance on the property in bad faith by, *inter alia*, failing to maintain the borrower's existing insurance and instead force-placing insurance for providers of the lender's choice with higher premiums. *Id.* at *8-9. Although the court stated it "reject[ed]" the lender's argument that the breach of good faith claim should be dismissed for failure to identify a specific provision of the mortgage, the court continued: "Although Plaintiff did not identify a specific section of the Mortgage by number or title, Plaintiff refers to the provision contained in the Mortgage that permits Defendant to 'force-place' insurance or to buy more insurance to cover the mortgaged property." *Id.* at *10.

The Zaskeys have failed to identify an express breach of the note and mortgage, which is required under Florida law to state a claim for breach of the implied covenant of good faith and fair dealing arising from the note and mortgage. For the aforementioned reasons, Count 2 against Bank of America is dismissed with prejudice.

### 3. Count 3: Malicious Prosecution against Bank of America

The Zaskeys' malicious prosecution claim is based on the foreclosure proceedings Bank of America filed against them in September 2012. *See* DE 80 at ¶¶ 65-76. To maintain a claim for malicious prosecution under Florida law, the Zaskeys must demonstrate, *inter alia*, that "there was an absence of probable cause for the original proceeding" and "there was malice on the part of the present defendant." *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994). "In the context of a claim for malicious prosecution, malice means without reasonable cause, out of ill will, animosity and with a desire to do harm for harm's sake," "may be inferred entirely from a lack of probable cause," and "may be alleged generally." *Rivas v. Figueroa*, No. 11-23195-CIV, 2012 WL 1343949, at *4 (S.D. Fla. Apr. 18, 2012) (quoting *Adams v. Whitfield*, 290 So. 2d 49, 51 (Fla. 1974) and Federal Rule of Civil Procedure 9(b)).

Bank of America argues that the Zaskeys cannot demonstrate malice or lack of probable cause because the short sale contract had been voided when the short sale funds were not transferred to it within 48 hours of closing. *See* DE 81 at 10-1. As discussed *supra* regarding the breach

of contract claim, this is a disputed issue in the case that is not yet ripe for determination. Accordingly, as to Count 3, Bank of America's Motion to Dismiss is denied.

### 4. Count 4: FDUTPA Claim against Green Tree

Count 4 of the Third Amended Counterclaim alleges that Green Tree violated FDUTPA by: (1) obtaining lender-placed insurance in the Zaskeys' name on the property that they no longer owned after the short sale; and (2) as part of collection activities against the Zaskeys, acknowledging receipt of a non-existent loan modification application, acknowledging approval of a non-exist short sale offer on the property no longer owned by the Zaskeys, and threatening to file an unwarranted foreclosure action against the Zaskeys. *See* DE 80 at ¶ 84.

#### a. Whether the Zaskeys can bring a claim under FDUTPA even though they live outside Florida

**\*9** Green Tree argues that the Zaskeys cannot invoke FDUTPA because they were living outside of Florida when the alleged FDUTPA violations occurred. *See* DE 85 at 11-12. Nothing in the plain language of FDUTPA limits its application to injuries occurring in Florida. *See* Fla. Stat. §§ 501.201, *et seq.* However, "the law in Florida on FDUTPA's applicability to out-of-state consumers is somewhat unclear." *F.T.C. v. Info. Mgmt. Forum, Inc.*, Case No. 6:12-cv-986-orl-31 KRS, 2013 WL 3323635, *7 (M.D. Fla. June 28, 2013); *see also 2P Commercial Agency S.R.O. v. Familant*, No. 2:11-CV-652-FTM-29, 2012 WL 6615889, at *4 (M.D. Fla. Dec. 19, 2012) ("Florida courts are split on whether the protections of FDUTPA extend to out-of-state consumers.").

Some Florida case law holds that FDUTPA should be applied only to in-state consumers, as they were FDUTPA's intended beneficiaries. *See Coastal Physician Servs. of Broward Cty., Inc. v. Ortiz*, 764 So. 2d 7, 8 (Fla. 4th DCA 1999) (in class action based on debt collection activity by Florida physician's office, limiting discovery to debt collection materials sent to in-state consumers); *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So. 2d 1037, 1042 (Fla. 2d DCA 2000) (reversing order certifying nationwide class under FDUTPA because "only in-state consumers can pursue a valid claim" under FDUTPA). However, in *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*,

*Department of Legal Affairs, State of Florida*, 761 So. 2d 1256 (Fla. 3d DCA 2000), the court found that a FDUTPA claim could be based on communications to out-of-state consumers "where the allegations in this case reflect that the offending conduct occurred entirely within this state[.]" *Id.* at 1262; *see also Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1094 (Fla. 4th DCA 2003) (reaffirming *Coastal*, because there the injuries were alleged to have occurred both within and outside Florida; but distinguishing *Coastal* from cases where "the common injury occurred in Florida").

It appears that all of the federal courts in the Southern District of Florida that have considered this issue have followed *Millennium* and held that "FDUTPA applies to non-Florida residents if the offending conduct took place predominantly or entirely in Florida." *Karhu v. Vital Pharma., Inc.*, Case No. 13-60768-CIV, 2013 WL 4047016 (S.D. Fla. Aug. 9, 2013) ("The Court finds that the reasoning in *Millennium* and its progeny provides the fairest reading of FDUTPA's text and stated purpose. Nothing in the language of the statute suggests that it is limited to transactions involving Florida consumers."); *see also Barnext Offshore, Ltd. v. Ferretti Group, USA, Inc.*, Case No. 10-23869-CIV, 2012 WL 1570057, *6 (S.D. Fla. May 2, 2012) ("The Court is unpersuaded that the FDUTPA provides relief only to Florida consumers.... [N]othing in *Millennium* suggests that the FDUTPA applies *only* when conduct occurs entirely within Florida."). Federal courts in the Middle District of Florida agree. *See Info Mgmt. Forum*, 2013 WL 3323635, at *6 ("I am persuaded that, among this varying case law, the facts of *Millennium* are the most analogous to this case and, thus, that the rationale of *Millennium* is applicable to this case."); *2P Commercial*, 2012 WL 6615889 ("The Court finds that *Millennium* ...more appropriately reflects both the text of FDUTPA and its enumerated purpose."). This Court agrees with and adopts the reasoning of these federal decisions.

**\*10** The Zaskeys' Third Amended Counterclaim alleges that Green Tree "was and is a Florida corporation, licensed by the State of Florida, and conducted business within the State of Florida, including Palm Beach County, during the periods relevant to this action." DE 80 at ¶ 5. It also alleges that, during the relevant time period, the Zaskeys were living in Wisconsin. *Id.* at ¶¶ 10, 14. The FDUTPA claim is based on communications Green Tree had with the Zaskeys regarding their mortgage

on a property located in Florida. *Id.* at ¶ 84. Given the allegation that Green Tree was conducting business in Florida during the relevant time period, it is a fair inference that these communications originated in Florida. The FDUTPA claim is also based on Green Tree obtaining lender-placed insurance in the Zaskeys' name on the Florida property. *Id.* at ¶ 84.

The Court finds these allegations analogous to cases where courts have allowed FDUTPA claims to proceed. For example, in *Millennium*, where the Florida court concluded that "the offending conduct occurred entirely within the state," the FDUTPA claim was based on allegedly misleading postcards that a Florida corporation mailed around the country, as well as misleading representations made by that corporation over the phone. 761 So. 2d at 1258. Similarly, in *Karhu*, the federal district court concluded it was "reasonable to infer that all of Defendant's alleged misconduct took place in Florida" where "Plaintiff alleges that Defendant is a Florida corporation" with "its principal place of business is located in Davie, Florida," and where the FDUTPA claims were "based on Defendant's alleged misrepresentations that it made on its own website and on the label of its product." 2013 WL 4047016, at *10 (noting that, "While Plaintiff is a New York resident and may have been injured in New York, 'the place of injury is less significant in the case of fraudulent misrepresentations.' "). Accordingly, to the extent Green Tree argues the FDUTPA claims should be dismissed because the Zaskeys live outside of Florida, its motion to dismiss is denied.

### b. Whether the Third Amended Counterclaim alleges that Green Tree engaged in "trade or commerce" under the FDUTPA

Green Tree also argues its complained-of behavior is not covered by FDUTPA because it was not in connection with "trade or commerce." *See* DE 85 at 12. FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices *in the conduct of any trade or commerce*[.]" Fla. Stat. § 501.204(1) (emphasis added). The statute defines "trade or commerce" as, in relevant part: "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever

situated." Fla. Stat. § 501.203(8). "[T]he 'trade and commerce' requirement is often not met in cases dealing with borrowers alleging FDUTPA violations against mortgage servicers." *Benjamin v. CitiMortgage, Inc.*, Case No. 12-32291-CIV, 2013 WL 1891284, *4 (S.D. Fla. May 6, 2013). Many courts have held that a servicer's attempts to enforce a mortgage are not actionable under FDUTPA. *See id.* at *5; *Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1322 (S.D. Fla. 2012) ("[T]he Court agrees with the other courts that have addressed debt collection and finds that Nationwide's debt collection activities do not give rise to a FDUTPA claim."); *Acosta v. James A. Gustino, P.A.*, No. 6:11-CV-1266-ORL-31, 2012 WL 4052245, at *1 (M.D. Fla. Sept. 13, 2012) ("An attempt to collect a debt by exercising one's legal remedies does not constitute 'advertising, soliciting, providing, offering, or distributing' as those terms are used in Fla. Stat. § 501.203(8).").

**\*11** The Zaskeys argue, however, that their "allegations are far removed from the narrow debt collection allegations" in the cases cited *supra*, because they allege that Green Tree sought and obtained lender-placed insurance on the property in the Zaskeys' name. *See* DE 93 at 15-16 (response); *see* DE 80 at ¶¶ 29(i), 29(o), 82 (Third Amended Counterclaim). In *Martorella v. Deutsche Bank National Trust Co.*, 931 F. Supp. 2d 1218 (S.D. Fla. 2013), the court found that FDUTPA claims against a mortgage lender and servicer fell "squarely within [FDUTPA's] broad definition of 'trade or commerce' " where the plaintiff alleged that "the lenders/servicers have charged excessive and/or unreasonable amounts for force-placed insurance, for which they were paid commissions or other remunerations[.]" *Id.* at 1224. Although the Zaskeys' claims in this case are not precisely the same as in *Martorella*, they are analogous. The Zaskeys allege that Green Tree wrongfully demanded they purchase the insurance in order "to confuse and frustrate the ZASKEYS' efforts to resolve the error committed by the Counter-Defendants, and, finally, to otherwise force the ZASKEYS to expend additional and unnecessary sums in order to resolve the ZASKEYS' ongoing dispute with BANK OF AMERICA and GREEN TREE." DE 80 at ¶ 85.

Accordingly, to the extent the Zaskeys' FDUTPA claim is based on the force-placement of insurance on the property, Green Tree's motion to dismiss is denied. To the extent the Zaskeys' FDUTPA claim is based on other

behavior, the Court finds that this is debt collection activity not actionable under FDUTPA, and Green Tree's motion to dismiss is granted.

### 5. Count 5: FCCPA claims against Bank of America and Green Tree

Count 5 alleges that Bank of America and Green Tree violated the FCCPA in three ways: first, by threatening to and actually disclosing the debt to credit reporting bureaus without disclosing the disputed nature of the debt, *see* Fla. Stat. § 559.72(3) and (6); DE 80 at ¶ 102; second, by willfully engaging in conduct that could be reasonably expected to harass or abuse the Zaskeys, namely: undertaking collecting efforts via mail and the phone; disregarding Mr. Zaskey's attempts to explain about the short sale; threatening legal proceedings; reporting negative information to credit bureaus; and serving the Zaskeys with process while they were hosting a party at their home, *see* Fla. Stat. § 559.72(7); DE 80 at ¶ 103; and third, attempting to collect a debt "with knowledge or constructive knowledge" that the debt was not legitimate. *See* Fla. Stat. § 559.72(9); DE 80 at ¶¶ 104, 105.

#### a. FCCPA Claim against Green Tree

Green Tree argues that Count 5 fails to state a claim because, like FDUTPA, the FCCPA does not protect consumers living outside of Florida. *See* DE 85 at 12-13. Apart from *Coastal*, which is discussed *supra* in relation to the Zaskeys' FDUTPA claim, none of the case law Green Tree cites explicitly holds that FCCPA claims can only be brought by Florida residents. *Id.* Given the Court's holding that the Zaskeys may bring a FDUTPA claim, Green Tree's motion to dismiss the FCCPA on this ground is also denied.

#### b. FCCPA Claim against Bank of America

Bank of America argues that Count 5 under the FCCPA fails to state a claim against it for four reasons. Each is briefly addressed below.

**i. Whether the FCCPA claim fails to state a claim because the short sale contract was void**

First, Bank of America argues that, because the short sale contract was voided when Harbor Title's failure to wire the funds within 48 hours, Bank of America's attempts to collect the debt were legitimate under Fla. Stat. § 559.72(9) and it was not required to report the dispute to credit reporting agencies under Fla. Stat. § 559.72(3) and (6). *See* DE 81 at 14-15. As discussed *supra* in section III.A.1, this issue of contract interpretation is not ripe at this stage of the proceedings. Accordingly, Bank of America's motion to dismiss the FCCPA claim on this ground is denied.

**ii. Whether the filing of a foreclosure action is debt collection actionable under the FCCPA**

Second, Bank of America argues that, to the extent the claim is based on the filing of a foreclosure action, this is not actionable under the FCCPA. *See* DE 81 at 12-13. Generally, "filing a foreclosure lawsuit is not a debt collection practice under § 559.72 of the FCCPA." *Trent v. Mortgage Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1361 (M.D. Fla. 2007), *aff'd,* 288 Fed.Appx. 571 (11th Cir. 2008). However, the Zaskeys argue this is actionable because the foreclosure lawsuit sought a deficiency judgment. *See* DE 92 at 19 (response); DE 80 at 82-85 (foreclosure complaint, Ex. C of Third Amended Counterclaim). They point to cases interpreting the federal FDCPA, which have held that "[a] mortgage foreclosure action that *also seeks payment on the underlying promissory note* is debt collection for the purposes of the FDCPA." *Roban v. Marinosci Law Group*, 34 F. Supp. 3d 1252, 1254 (S.D. Fla. 2014) (emphasis added); *see also Freire v. Aldridge Connors, LLP*, 994 F. Supp. 2d 1284, 1288 (S.D. Fla. 2014) (same); *Rotenberg v. MLG, P.A.*, No. 13-CV-22624-UU, 2013 WL 5664886, at *2 (S.D. Fla. Oct. 17, 2013) (same). Although none of this case law specifically addresses the FCCPA, the FCCPA explicitly provides that, "[i]n applying and construing this section, due consideration and great weight should be given to the interpretations of...the federal courts relating to the federal Fair Debt Collection Practices Act." Fla. Stat. § 559.77(5). Moreover, Bank of America makes no attempt to distinguish this case law in its reply. *See* DE 102. Accordingly, Bank of America's motion to dismiss the FCCPA claim on this ground is denied.

**iii. Whether the filing of a foreclosure action is protected by Florida's common law litigation privilege and therefore cannot be actionable under the FCCPA**

**\*12** Third, Bank of America argues that, to the extent the FCCPA claim is premised on the filing of the foreclosure action, this is barred by Florida's common law litigation privilege. *See* DE 81 at 13. The Zaskeys argue that their claim is based on "events and conduct that occurred *before* any litigation was initiated[.]" DE 92 at 20. [4]

| 4 | To the extent the Zaskeys argue that Bank of America's post-foreclosure debt collection proceedings are actionable as a violation of Florida Statute § 559.72(18), this theory is not pled in the Zaskeys' Third Amended Counterclaim and therefore will not be considered by the Court. |
|---|---|

The FCCPA claim does appear to be based, at least in part, on the initiation of foreclosure proceedings. *See* DE 80 at ¶ 93 (Third Amended Counterclaim, alleging that "between June 2012 through July 2015, BANK OF AMERICA...pursued and threatened to pursue an unwarranted foreclosure action"). This is barred by Florida's litigation privilege. *See Echevarria. McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 384 (Fla. 2007) ("The litigation privilege applies across the board to actions in Florida, both to common-law causes of action, those initiated pursuant to a statute, or of some other origin."); *Trent*, 618 F. Supp. 2d at 1360 ("The *Echevarria* holding precludes communications attached to or made part of a foreclosure complaint from forming the basis of a FCCPA or FDUTPA claim."). However, to the extent the FCCPA claim is based on communications that did not occur during the course of the judicial proceeding, it is not barred by the litigation privilege. *Trent*, 618 F. Supp. 2d at 1360 ("After detailed review of the *Echevarria* decision and the unsettled state of Florida law on this issue, this Court is unprepared to extend the litigation privilege to pre-suit communications....").

Accordingly, Count 5 is dismissed with prejudice to the extent it is based on the filing of the foreclosure action. The Zaskeys should file a Fourth Amended Counterclaim consistent with this ruling.

**iv. Whether the Zaskeys fail to plead the required scienter for an FCCPA claim under Florida Statute § 559.72(9)**

Fourth, Bank of America argues that with regard to the claim under Florida Statute § 559.72(9), the Zaskeys are required to plead that Bank of America had actual knowledge that the right to enforce the debt is not legitimate, and the Zaskeys have pled only that Bank of America "knew or should have known." DE 81 at 14. Section 559.72(9) provides that, in collecting consumer debts, no person shall "[c]laim, attempt, or threaten to enforce a debt when such person *knows* that the debt is not legitimate, or assert the existence of some other legal right when such person *knows* that the right does not exist." (Emphasis added.) Bank of America is correct that, to prove liability, the Zaskeys will have to show that Bank of America had actual knowledge that the debt was invalid, not merely that Bank of America "should have known." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 n.12 (11th Cir. 2010) ("In contrast to the FDCPA, Section 559.72(9) of the FCCPA requires a plaintiff to demonstrate that the debt collector defendant possessed *actual knowledge* that the threatened means of enforcing the debt was unavailable."); *see also Kaplan v. Assetcare, Inc.*, 88 F. Supp. 2d 1355, 1363 (S.D. Fla. 2000) ("It is clear that the FCCPA requires an allegation of knowledge or intent by the debt collector in order to state a cause of action.").

**\*13** The Court finds that the Zaskeys have pled sufficient facts that, taken as true, could demonstrate that Bank of America had actual knowledge of the debt's invalidity. *See* DE 80 at ¶ 94 (alleging that Mr. Zaskey advised Bank of America representatives that the short sale had closed). Thus, the correct remedy for this incorrect pleading in the alternative is not to dismiss the claim but rather to strike the "should have known" language from the Third Amended Counterclaim. *See, e.g., Williams v. Streeps Music, Co., Inc.*, 333 So. 2d 65, 67 (Fla. 4th DCA 1976) ("Since the trial judge did not state his reasons for dismissing the complaint, it may be that the dismissal resulted from the allegation that appellee knew 'or should have known' that the claim was not legitimate. Section 559.72(9) F.S. requires that the person against whom recovery is sought 'know' the claim is not legitimate. On remand the allegation 'or should have known' should be stricken."). Accordingly, the motion to dismiss Count 5 under the FCCPA is denied, but the Zaskeys should file a

Fourth Amended Counterclaim striking the "should have known" language from this count.

**6. Count 8: Negligence versus Bank of America and Green Tree**

The Zaskeys' negligence claim against Bank of America and Green Tree is pled "in the alternative, in the event the Court finds there is no enforceable contract between the parties governing the short sale agreement between the Zaskeys and Bank of America and/or Green Tree." DE 80 at ¶ 144. The Zaskeys allege that Bank of America and Green Tree, as servicers and holders of the note and mortgage, had a duty to exercise reasonable care and skill

> [1] to maintain proper and accurate loan records; [2] to discharge the debt upon receipt of payment from the short sale; as well as [3] take such other actions concerning the accounting and servicing of the underlying loan. These actions include, but not limited to, [4] ensuring the accurate receipt and crediting of the short sale proceeds wired to BANK OF AMERICA by HARBOR TITLE, and if such funds were not received pursuant to the short sale agreement, communicating with its assigned Re/Max realtor, Tony Pino, and HARBOR TITLE, its closing agent, and conducting an investigation as to whether the short sale actually closed, and the location of the short sale proceeds.

*Id.* at ¶ 145. The Zaskeys allege that Bank of America and Green Tree violated these duties by "refusing to take any correct action after learning" that the short sale had taken place, *id.* at ¶ 147, and by:

> (a) failing to properly and accurately credit payments made; (b) preparing and filing false documents alleging a false debt; (c) engaging in harassing and abusive collection efforts and continuing to pursue a debt for which the ZASKEYS were no longer financially responsible;

(d) communicating false credit information to various credit reporting bureaus; (e) failing to properly investigate the issues raised by the ZASKEYS concerning the finalized short sale; (f) refusing to accept the wire transfer and attempted wire transfer of the short sale proceeds from HARBOR TITLE; (g) filing this foreclosure action without having the legal authority to do so, as BANK OF AMERICA and GREEN TREE knew or should have known the ZASKEYS were no longer financially responsible for the underlying debt which forms the basis of this earlier filed and subsequently dismissed foreclosure action; and (h) executing service of process against the ZASKEYS while they were hosting a social event at their home in front of all their guests, causing the ZASKEYS to suffer the expense, stress, anxiety, embarrassment, emotional distress, and inconvenience of addressing these matters.

*Id.* at ¶ 148.

Bank of America and Green Tree dispute whether they owed any common law duty of care to the Zaskeys, apart from any duties arising under the note, mortgage, or short sale agreement. DE 81 at 18. Notably, the Zaskeys have cited no case from Florida or any other jurisdiction establishing that a lender or servicer owes a borrower a common law duty of care in the servicing of a mortgage loan. In *Burdick v. Bank of America, N.A.*, 99 F. Supp. 3d 1372 (S.D. Fla. 2015), the plaintiff alleged that Bank of America and Green Tree wrongfully charged the plaintiff for force-placed insurance and improperly filed a foreclosure action. *Id.* at 1375. The court dismissed the plaintiff's negligence claims, holding that the claims "should have been brought in contract rather than in Negligence." *Id.* at 1378. The court noted that, for purposes of a negligence claim "the alleged duty cannot stem from a contractual relationship between the parties," and it is "only when the breach of contract action is attended by some additional conduct which amounts to

an independent tort that such a breach can constitute negligence." *Id.* (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408-09 (Fla. 2013)). [5]

[5]   Other jurisdictions have also rejected the claim that a lender or servicer owes a common law duty of care to a borrower. *See Smith-Tyler v. Bank of Am., N.A.*, 992 F. Supp. 2d 1277, 1284 (N.D. Ga. 2014) (granting summary judgment for Defendant under Georgia law because "Plaintiff has not established a legal duty that was breached by the act of collecting on a satisfied debt. There is no confidential relationship giving rise to a duty between a lender and a borrower"); *Lawrence v. Aurora Loan Servs. LLC*, No. CV F 09-1598 LJO DLB, 2010 WL 364276, at *9 (E.D. Cal. Jan. 25, 2010) (finding that, under California law, "[a]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money," and finding that the complaint "lacks facts of special circumstances to impose duties on" the servicer).

**\*14**   The Zaskeys contend that the alleged duty arose "based on the unique facts of this case," that is, that the Zaskeys are alleged to have repeatedly told Bank of America and Green Tree that a short sale had been approved and concluded. *See* DE 92 at 26. These allegations are not sufficient to establish additional conduct that amounts to an independent tort. *Burdick*, 99 F. Supp. 3d at 1372. The Zaskeys also contend that "it is premature to dismiss the negligence count until the parties brief, and this Court decides, the respective contractual obligations between the Zaskeys, Bank of America, and Green Tree." DE 93 at 23-24. The Court disagrees. Regardless of which party bore the duty to follow-up with Harbor Title after it failed to timely wire the short sale proceeds to Bank of America – which is the gravamen of the parties' contractual dispute – this duty arises from and is governed by the parties' contractual relationship and does not give rise to an independent cause of action for negligence. Accordingly, this claim fails to state a claim as a matter of law and is therefore dismissed with prejudice.

## IV. CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED**:

1. Bank of America's Motion to Dismiss Counter-Plaintiffs' Third Amended Counterclaim [DE 81] is **GRANTED IN PART** and **DENIED IN PART**.

2. Green Tree Servicing, LLC's Motion to Dismiss Third Amended Counterclaim [DE 85] is **GRANTED IN PART** and **DENIED IN PART**.

3. Count 2 for breach of the implied duty of good faith and fair dealing is **DISMISSED WITH PREJUDICE** as to both Bank of America and Green Tree.

4. Count 6 for violations of the FDCPA is **DISMISSED WITH PREJUDICE** as to Bank of America, but Count 6 remains pending against Green Tree.

5. Count 8 for negligence is **DISMISSED WITH PREJUDICE** as to both Bank of America and Green Tree.

6. The following claims remain pending against Bank of America and Green Tree: Count 1 for breach of the short sale agreement against Bank of America; Count 3 for malicious prosecution against Bank of America; Count 4 for violations of FDUTPA against Green Tree; Count 5 for violations of the FCCPA against Bank of America and Green Tree, provided the Zaskeys can amend the claim

consistent with this Order; Count 6 for violations of the FDCPA against Green Tree; and Count 7 for violations of RESPA against Green Tree. [6]

[6]    Count 9 against Harbor Title and Counts 10 and 11 against Old Republic also remain pending. Harbor Title has not moved to dismiss any of the claims against it. The Court will address Old Republic's motion to dismiss in a separate order.

7. On or before **Friday, May 20, 2016**, the Zaskeys should file a Fourth Amended Counterclaim that is consistent with this Order. That is, the counterclaim should: delete the counts that have been dismissed with prejudice; amend Count 5 to avoid relying on the filing of the foreclosure action; and amend Count 5 to delete the "should have known" language related to the claim under Florida Statute § 559.72(9).

8. Bank of America and Green Tree should file an Answer to the Fourth Amended Counterclaim no later than **Tuesday, May 31, 2016**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 18th day of May, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 2897410

---

**3**

2012 WL 1339482
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard GENNA, Plaintiff,
v.
SALLIE MAE, INC., Defendant.

No. 11 Civ. 7371(LBS).
|
April 17, 2012.

*MEMORANDUM & ORDER*

SAND, District Judge.

**\*1** In this action. Plaintiff Richard Genna ("Genna")
asserts various claims against Defendant Sallie Mae,
Inc. ("Sallie Mae"), a third-party loan servicer. Genna
alleges that Sallie Mae committed, *inter alia,* fraudulent
misrepresentation, breach of fiduciary duty, and breach
of contract in relation to its servicing of Genna's student
loans.

Sallie Mae has moved to dismiss Genna's Complaint. For
the following reasons we grant in part and deny in part
Sallie Mae's motion.

**I. Background** [1]

[1]     The following facts are based on Genna's allegations
        in the Complaint ("Compl."), filed September 26,
        2011.

In 2007, Genna borrowed $22,595 in student loans from
Citibank, N .A.; in 2010, he initiated auto-debit payments
with Citibank; and in 2011, Citibank sold Genna's loan
to Sallie Mae. This is where Genna's problems began.
Citibank, in a July 2011 letter to Genna informing him of
the sale of his loan to Sallie Mae, reassured Genna that
informed him that "nothing about the servicing would
change"—and, specifically, that "any active auto-debits ...
would continue uninterrupted." Compl. ¶ 7. On July 22,
2011, Genna received an email from Sallie Mae informing
him of its acquisition of his loan and stating:

If you're currently enrolled in
Citibank's auto-debit payment
program, your monthly payment
withdrawals will continue with
Sallie Mae without interruption
using the checking or savings
account information you previously
provided. If you prefer to not
have your payments automatically
debited by Sallie Mae, please contact
Citibank ... as soon as possible.
However, please note that you may
lose eligibility for an interest rate
reduction benefit if you terminate
your participation in the auto-debit
program.

Compl. ¶ 8. Despite Sallie Mae's statement that
Genna's auto-debit payments would continue without
interruption, Genna discovered on September 5, 2011,
that not only was he not enrolled in auto-debit, but that his
loan was in default. Genna immediately set up auto-debit
via Sallie Mae's website—successfully, he believed, since
he soon received an email confirming that his "request
for auto-debit was submitted ... and [was] currently being
reviewed." The email further noted that his "request
[could] take up to 10 business days to be reflected on [his]
account ." Compl. ¶¶ 9–13.

As a precaution, Genna telephoned Sallie Mae two days
later to confirm that his request for auto-debit had gone
through and to inquire about the status of his loan. In
what, it seems, would become a familiar pattern, Sallie
Mae informed him that not only was his loan still in
default but, despite the confirmation email he had received
two days prior, no auto-debit enrollment was pending.
Genna explained the foregoing history to a customer
service representative who assured him that he "was being
issues [*sic* ] a 60 day forbearance, during which time no
payment would be due, and that his representative would
now submit his request for enrollment in the auto-debit
program." Compl. ¶¶ 14–16.

Notwithstanding this conversation, Genna received an
email from Sallie Mae on September 25, 2011 with a
hyperlink to his statement. The latter revealed that despite
Sallie Mae's explicit statements, Genna had been granted
no forbearance, his loan remained in default, and he was

Genna v. Sallie Mae, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1339482

now two months in arrears. Sallie Mae had, moreover, taken the extra step of reporting his alleged default to the credit reporting agencies. Compl. ¶¶ 18–19.

**\*2** Genna responded by hiring counsel, who contacted Sallie Mae and attempted to enroll Genna into auto-debit and to have Sallie Mae credit Gennas past-due balance. After speaking to three different representatives, Gennas counsel reached a so-called "floor supervisor" named Alex, who, while admitting fault, stated that he was personally unable to oblige Genna's requests, but that Sallie Mae's Consumer Advocate Department would be able to assist him. Compl. ¶¶ 20–22. No such assistance was forthcoming. Genna's counsel was told by a representative—who refused to provide her name or other identifying information—to set up auto-debit through Sallie Mae's website and, in the meanwhile, to make month-to-month payments. Upon being advised by Gennas counsel that Sallie Mae had breached its promises and thereby, among other things, damaged Gennas credit, Sallie Mae declined further cooperation and expressly invited Genna to bring suit. Compl. ¶¶ 25–29.

## II. Standard of Review

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999). "To survive dismissal, the plaintiff must provide the grounds upon which his claims rests through 'factual allegations sufficient to raise a right to relief above the speculative level.' " *ATSI Communs., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 93 (2d Cir.2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Rather, the plaintiffs complaint must include "enough facts to state a claim of relief that is plausible on its face." *Id.* at 1940 (citing *Twombly,* 550 U.S. at 570). Plausibility, in turn, requires that the allegations in the complaint "raise a reasonable expectation that discovery will reveal evidence" in support of the claim. *Twombly,* 550 U.S. at 556.

On a motion to dismiss, a court is not limited to the four corners of the complaint. A court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial

notice may be taken, or ... documents either in the plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

## III. Discussion

### a. Breach of Implied Covenant of Good Faith and Fair Dealing (Counts 1 and 5)

Genna's first and fifth causes of action are that Sallie Mae breached the implied covenant of good faith and fair dealing. Sallie Mae rejoins that "New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accidental Ins., Co.,* 310 F.3d 73, 81 (2d Cir.2002). This is generally true, except in cases where the good faith and fair dealing claim is "based on allegations different than those underlying the accompanying breach of contract claim." *Siradas v. Chase Lincoln First Bank, N.A.,* No. 98 Civ. 4028, 1999 U.S. Dist. LEXIS 15593, at \*19, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999). Put differently, a "claim for breach of implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–244 (S.D.N.Y.1997) (citations and quotations marks omitted).

**\*3** This is not the case here. Genna's breach of contract claim, *see infra,* alleges that Sallie Mae breached the loan agreement by refusing to accept payment, which Genna claims to have offered on multiple occasions in accordance with Sallie Maes terms. In contrast, Genna's claim asserting breach of the implied covenant of good faith and fair dealing is based on Sallie Mae's statements that it was granting Genna a 60–day forbearance, servicing his loan in the same manner as had Citibank, and enrolling him in auto-debit. While broadly related insofar as they emerge from the same transaction and occurrence, the allegations nonetheless assert distinct potentially culpable behavior by Sallie Mae. Indeed, Sallie Mae concedes as much when it argues that "[t]here is no language in the contract requiring Sallie Mae to accept payment in any particular manner, or providing any terms regarding the method of payment." Mem. Supp. Def.'s Mot. Dismiss ("Sallie Mae Brief") 5.

Sallie Mae's motion to dismiss Counts 1 and 5 is hereby
denied.

**b. Fraudulent Misrepresentation (Count 2)**
Genna's second count alleges that Sallie Mae committed
fraud when it falsely stated that it was granting Genna a
60–day forbearance, servicing his loan in the same manner
as had Citibank, and enrolling him in auto-debit. Sallie
Mae responds, as it did in Counts 1 and 5, by arguing
that Genna's breach of contract claim subsumes his fraud
claim.

Under New York law, a fraud claim will generally
not lie if it arises "out of the same facts as plaintiffs
breach of contract claim," *Telecom Int'l Am., Ltd. v.
AT & T Corp.,* 20 F.3d 175, 196 (2d Cir.2001), unless
a plaintiff successfully alleges "(1) a legal duty separate
and apart from the contractual duty to perform ... (2) a
fraudulent representation collateral or extraneous to the
contract ... or (3) special damages proximately caused
by the fraudulent representation that are not recoverable
under the contract measure of damages." *Papa's–June
Music v. McLean,* 921 F.Supp. 1154, 1161 (S.D.N.Y.1996)
(citations omitted).

"For a fraudulent misrepresentation to be collateral
or extraneous to a contract, it must be a promise to
do something other than what is expressly required
by the contract." *W.B. David & Co. Inc. v. DWA
Communications, Inc.,* No. 02 Civ. 8479, 2004 U.S. Dist.
LEXIS 2954, at *14, 2004 WL 369147 (S.D.N.Y. Feb. 26,
2004); *see also Grappo v. Alitalia Linee Aeree Italiane,* 56
F.3d 427, 434 (2d Cir.1995) ("A fraud action is permitted,
however, where the plaintiff alleges that the defendant
engaged in other fraudulent conduct besides entering the
contract with no intention to perform."). Under this
definition, it is clear that Sallie Mae's statements were
collateral or extraneous, a fact that, again, Sallie Mae itself
concedes by averring that "[t]here is no language in the
contract requiring Sallie Mae to accept payment in any
particular manner, or providing any terms regarding the
method of payment." Mem. Supp. Def.'s Mot. Dismiss 5.
Regardless, Genna has alleged sufficient facts to make it
plausible to infer that, by representing that it was granting
Genna a 60–say forbearance and enrolling him auto-debit,
Sallie Mae engaged in "other fraudulent conduct besides
entering the contract with no intention to perform," since
these statements postdate the contract. *Grappo,* 56 F.3d at
434.

**\*4** Sallie Mae further argues that Genna's fraud claim is
barred by the economic loss rule. Sallie Mae Brief at 10.
Courts in this district are divided, however, as to whether
the economic loss rule applies to fraud claims. *See Sofi
Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 246
(S.D.N.Y.2006) (collecting cases). The Court of Appeals
for the Second Circuit has not squarely addressed the
applicability of the economic loss rule to fraud claims, but
the cases make clear that the economic loss rule will not
apply where the damages sought are for a "harm distinct"
from the contract. *Hydro Investors, Inc. v. Trafalgar
Power, Inc.,* 227 F.3d 8, 17 (2d Cir.2000). Under this test
it is clear that the economic loss rule does not apply to
Genna's fraud claim. The distinct harm in this case is the
combination of, first, Sallie Mae's unfulfilled statements
that it was granting Genna a forbearance, transferring
the conditions of his servicing, and enrolling him in auto-
debit, which together arguably caused Genna to default
on his loans; and second, Sallie Mae's reporting the default
to credit reporting agencies, thereby damaging Genna's
credit score. Put differently, the harm that Genna asserts
is not simply that Sallie Mae's conduct deprived him of
the benefit of his bargain, but, additionally, that Sallie
Mae's conduct damaged his credit score—and, to this end,
Genna seeks more than merely contractual damages. [2]
*See Fort Howard Paper Co. v. Willliam D. Witter, Inc.,*
787 F.2d 784, 794 (2d Cir.1986) (declining to apply the
economic loss rule to fraud claim where plaintiff sought to
recover more than just contractual damages).

[2]     In its reply brief, Sallie Mae states, without providing
        any support, that Genna's claim is preempted by the
        Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §
        1681(a) *et seq.* Reply Mem. Further Supp. Def.'s Mot.
        Dismiss 4. We disagree. The FCRA imposes duties
        on consumer reporting agencies, users of consumer
        reports, and furnishers of information to consumer
        reporting agencies. *See Kane v. Guar. Residential
        Lending, Inc.,* No. 04 Civ. 4847, 2005 U.S. Dist.
        LEXIS 17052, at *6, 2005 WL 1153623 (E.D.N.Y.
        May 9, 2005). With respect to the furnishers' duty—
        the only duty arguably applicable here—15 U.S.C.
        §§ 1681s–2(a) and (b) require that furnishers "report
        accurate information and ... correct inaccurate
        information" as well take certain steps once a
        credit reporting agency notifies furnishers that there
        is a dispute as to the information provided. The
        claims here, while certainly encompassing consumer
        protection writ large, are not covered by 15 U .S.C.

§§ 1681s–2(a) and (b), since the issue is not whether the information reported by Sallie Mae was or was not accurate, but rather whether Sallie Mae's conduct contributed to Genna's default, which, in turn, negatively affected Genna's credit score.

Sallie Mae's final argument is that Genna has failed to plead his fraud claim with sufficient particularity is without merit. As is clear from the recitation of facts in Part I of this opinion, *supra,* Genna has specified the fraudulent statements, the date that the statements were made, and—insofar as is reasonably possible in the context of telephonic conversations with customer service representatives—who made the statements.

Sallie Mae's motion to dismiss Count 2 is denied.

### c. Breach of Fiduciary Duty (Count 3)

We dismiss Genna's claim for breach of fiduciary duty, because no such duty generally exists between a lender and a borrower. *See Bank Leumi Trust Co. v. Block 3102 Corp.,* 180 A.D.2d 588, 580 N.Y.S.2d 299 (1st Dep't 1992); *Manufacturer's Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir.1993). *See also* Daniel R. Fisher, *The Economics of Lender Liability,* 99 Yale L.J. 131, 146–147 (1989). Nor has Genna pled facts to suggest that, despite the general rule, there exists in this case a fiduciary relationship "based upon trust or confidence by one person in the integrity and fidelity of another." *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (Sup.Ct.1976).

Count 3 is hereby is dismissed.

### d. Negligent Misrepresentation (Counts 4 and 6)

**\*5** To sustain a negligent misrepresentation claim under New York law—Genna's third count—a plaintiff must prove that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplies in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000). Genna, we conclude, has not adequately pled a "special relationship" in satisfaction of prong (1).

While certainly similar to a fiduciary relationship, a special relationship "need not rise to that same level." *Bombardier Capital, Inc. v. Naske Air GMHB,* No. 02 Civ. 10176, 2003 U.S. Dist. LEXIS 16173, 2003 WL 22137989 (S.D.N.Y. Sept. 17, 2003). Nonetheless, "[s]omething more than the trust and reliance between an ordinary buyer and seller must be established." *St Paul Fire & Marine Ins. Co. v. Health Fielding Ins. Broking,* 976 F.Supp. 198, 200 (S.D.N.Y.1996) (citations omitted).

This court is well aware that "whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage." *Century Pac., Inc. v. Hilton Hotels Corp.,* No. 03 Civ 8258, 2004 U.S. Dist. LEXIS 6904, at *24–25, 2004 WL 868211 (S.D.N.Y Apr. 21, 2004) (citations and quotations marks omitted). But the case law is sufficiently clear and consistent that in New York "an arm's length borrower-lender relationship ... does not support a cause of action for negligent misrepresentation," that we are compelled to dismiss Genna's claims. *Dobroshi v. Bank of Am., N.A.,* 65 A.D.3d 882, 884, 886 N.Y.S.2d 106, 109 (1st Dep't 2009) (collecting cases); *Interallianz Bank AG v. Nycal Corp.,* No. 93 Civ. 5024, 1994 WL 177745, at *6 (S.D.N.Y. May 6, 1994).

Sallie Mae's motion to dismiss Counts 4 and 6 is granted.

### e. Breach of Contract and Promissory Estoppel (Count 7)

To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove the existence of a contract, a breach of that contract, and damages resulting from the breach. *RIJ Pharm. Corp. v. Ivax Pharms., Inc.,* 322 F.Supp.2d 406, 412 (S.D.N.Y.2004). As Genna frames his claim, Sallie Mae breached the loan agreement "by failing to accept [Genna's] payment, which payment was duly offered on four distinct occasions, in accordance with the terms provided by [Sallie Mae]." Compl. ¶ 50.

Genna's claim does not withstand scrutiny. Genna has simply failed to plead any facts that suggest that he offered to pay "on four distinct occasions." Genna, it is true, repeatedly attempted to enroll in auto-debit, but this is not the same as offering to make payments, since—as Genna himself concedes—he was able to pay manually. Compl. ¶ 26. Without allegations that Sallie Mae refused payment altogether—an entirely different claim that might warrant

a different outcome—Genna's breach of contract claim fails. We now turn to Genna's promissory estoppel claim,

**\*6** Under New York law, it is "impermissible to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties," *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987). In other words, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Altomare v. Wells Fargo Sec., LLC,* 09 Civ. 9702, 2012 U.S. Dist. LEXIS 19209, at \*34–35, 2012 WL 489200 (S.D.N.Y. Feb. 15, 2012) (citation omitted).

In this case, however, the scope of the contract does not cover this dispute, since—as Sallie Mae itself asserts —"there is no language in the contract requiring Sallie Mae to accept payment in any particular manner, or providing any terms regarding a method for payment." Sallie Mae Brief 5. As such, assuming that Genna meets the three elements for promissory estoppel under New York law he is entitled to proceed on a quasi contract theory.

In New York, a plaintiff asserting promissory estoppel must prove, "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev.,* 47 F.3d 39, 44 (2d Cir.1995) (quotation marks and citations omitted). The injury, moreover, must be "unconscionable," defined by courts in this circuit as "beyond that which flows naturally from the non-performance of the unenforceable agreement." *Merex A.G. v. Fairchild Weston Sys.,* 29 F.3d 821, 826 (2d Cir.1994). For example, where the injury is "lost profits, lost fees, foregone business opportunities, or damage to business reputation," courts in this circuit have rejected as not sufficiently unconscionable promissory estoppel claims. *See, e.g., 720 Lex Acquisition LLC v. Guess? Retail, Inc.,* No. 09 Civ. 7199, 2011 U.S. Dist. LEXIS 123180, at \*11, 2011 WL 5039780 (S.D.N.Y. Oct. 20, 2011).

Sallie Mae's telephonic statement that it was enrolling Genna in auto-debit and granting him a 60–day forbearance was clear and unambiguous. Genna foreseeably relied insofar as he assumed that Sallie Mae would not enforce the repayment of his debt for approximately two months, and that, presumably, his enrollment in auto-debit would serve to settle any outstanding payments accounts. With respect to Genna's injury, this Court found, *supra* III.b., that the damages Genna seeks are more than the merely expectation damages; or, in the language of *720 Lex Acquisitions,* that Genna seeks more than "lost profits, lost fees, foregone business opportunities, or damage to business reputation." Under the *Merex* definition, Genna's injury is deemed unconscionable.

**\*7** Sallie Mae's motion to dismiss Count 7 is denied.

### f. Unfair Practices (Count 8)

"General Business Law § 349 prohibits deceptive and misleading business practices and its scope is broad indeed." *Wilner v. Allstate Inc. Co.,* 71 A.D.3d 155, 893 N.Y.S.2d 208, 212 (2d Dep't 2010). A plaintiff asserting a § 349 claim must prove "that the challenged act or practice was consumer-oriented; ... that it was misleading in a material way; [and] that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 731 N.E.2d 608, 611, 709 N.Y.S.2d 892 (N.Y.2000).

In order to satisfy the first prong, a plaintiff must allege facts suggesting that defendant's conduct has or had a "broad impact on consumers at large." *USAlliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.,* 346 F.Supp.2d 468, 471 (S.D.N.Y.2004). In other words, claims arising from private disputes that are unique to the parties are not actionable. *See FLB, LLC v. 5Linx,* No. 08 Civ. 6463, 2011 U.S. Dist. LEXIS 51975, at \*29, 2011 WL 1871218 (W.D.N.Y. May 13, 2011). Genna alleges that Sallie Mae "deceives the public generally and not just Plaintiff by suggesting that their customers are not entitled to methods of payment stated on their website." Genna Brief 14. Standing alone, however, this statement is conclusory. Absent further facts suggesting that this is more than an isolated event between the parties—that this was in fact a deceptive business practice aimed at the public—we must dismiss Count 8 for failure to state a claim under § 349. *See Corazzini v. Litton Loan Servicing LLP,* No. Civ., 2010

Genna v. Sallie Mae, Inc., Not Reported in F.Supp.2d (2012)
Case 3:17-cv-00772-RDM  Document 31-4  Filed 10/20/17  Page 37 of 100
2012 WL 1339482

U.S. LEXIS 27398, *19–21, 2010 WL 1132683 (N.D.N.Y. Mar. 23, 2010).

Sallie Mae's motion to dismiss Count 8 is granted.

**g. Preemption**

We turn, last, to Sallie Mae's argument that Genna's causes of action in tort and contract are preempted by the Higher Education Act of 1965, 20 U.S.C. §§ 1001–115 ("HEA"). If Sallie Mae is correct, we must dismiss Genna's case.

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Supreme Court, in interpreting that clause, has held that "state laws that conflict with federal law are without effect." *Altria Group, Inc. v. Good,* 555 U.S. 70, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008) (citation and quotations marks omitted). Federal preemption occurs where Congress has "explicitly stated [as much] in the statute's language," where state law "actually conflicts with federal law," or where "federal law so thoroughly occupied a legislative field as to make reasonable inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citations and internal quotation marks omitted). Our inquiry addresses each type in turn.

**1. Field Preemption**

Turning first to the third type of preemption, field preemption, it is clear that there is none. No court in any circuit that has considered the matter—and certainly not the Court of Appeals for the Ninth Circuit, which Sallie Mae cites in support of its argument—has found that field preemption applies to the HEA. *Chae v. SLM Corp.,* 593 F.3d 936, 941–942 (9th Cir.2010) (finding that "field preemption does not apply to the HEA"). *See also Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.,* 168 F.3d 1362, 1369 (D.C.Cir.1999) ("federal education policy regarding [private lending to students] is not so extensive as to occupy the field"). We see no reason to disturb these rulings.[3]

[3]    We are also mindful, in this case, that the loan agreement here contemplates that the HEA should not be interpreted as preempting all state law. It states, in applicable part, that "[t]he terms of this Note

will be interpreted according to the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), other applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in additional to those stated in this Note." Genua Brief Ex. C, at 5.

**2. Express Preemption**

*\*8*  The next question, then, is whether the Higher Education Act expressly preempts the above state common law tort and contract claims against third-party loan servicers. Sallie Mae has not directed this Court to any expressly preemptive statutory language, though the HEA does, in fact, contain language that expressly preempts state law in a limited number of areas, *See, e.g.,* 20 U .S.C. §§ 1078(d), 1091a(a)(2)(b), 1091a(b)(1)-(3), 1095a(a), 1098g. Congress, these sections clarify, intended the HEA to preempt state usury laws, statutes of limitations, limitations on recovering the costs of debt collection, contractual infancy defenses, wage garnishment limitations, and disclosure requirements.

The only statutory section that might conceivably apply to the instant case is § 1098g, which reads that "[l]oans made, insured, or guaranteed pursuant to a program authorized by title VI of the Higher Education Act of 1965 shall not be subject to any disclosure requirements of state law." In *Chae,* the Ninth Circuit found that § 1098g expressly preempted plaintiffs' misrepresentation claims. *Chae,* 593 F.3d at 942–944. The plaintiffs in *Chae* had argued that "Sallie Mae employs 'unfair and 'fraudulent' business practices by using billing statements and coupon books that trick borrowers into thinking that interest is bring calculated via the installment method when Sallie Mae really uses simple daily calculation." *Chae,* 593 F.3d at 943. Plaintiffs allegations, in other words, were that the forms, coupon books, and billing statements used by Sallie Mae misrepresented the truth. The Ninth Circuit reasoned, in finding express preemption, that "[a]t bottom, the plaintiffs' misrepresentations claims are improper-disclosure claims." *Id.* at 942. Because the billing statements, coupon books and standardized forms used by Sallie Mae—and challenged by the plaintiffs—complied with federal regulations governing such instruments, then, *ipso juris,* such billing statements and standardized forms could not "simultaneously be misleading under state law." *Id.* at 942.

The Ninth Circuit's logic is unassailable, but it has no application to the facts of this case. In *Chae,* the plaintiffs challenged written statements that were explicitly regulated and sanctioned by federal law. In contrast, the statements at issue here were neither authorized by the Secretary of Education nor conformed to any explicit dictates of federal law. There is nothing in the HEA that standardizes or coordinates how a customer service representative of a third-party loan servicer like Sallie Mae shall interact with a customer like Genna in the day-to-day servicing of his loan outside of the circumstance of pre-litigation informal collection activity. Sallie Mae has not shown that § 1098g, or anything else in the HEA, expressly preempts Genna's claims.

### 3. Conflict Preemption
We move on to conflict preemption. Conflict preemption of state law occurs "where it is impossible for a private party to comply with both state and federal law" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotations omitted). Under the second inquiry —the "purposes and objectives" inquiry—the question to be asked and answered is "whether the state law interferes with a method the federal law uses to promote its goal." *United States Smokeless Tobacco Mfg. Co., LLC v. City of New York,* 703 F.Supp.2d 329, 334 (S.D.N.Y.2010) (quoting *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)). "[S]tate causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *California v. ARC America Corp.,* 490 U.S. 93, 105, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (internal citations omitted).

**\*9**  Before moving on to Sallie Mae's arguments, an observation. Our conflict preemption analysis is— and, indeed, must be—informed by the well-established principle that, because Genna's claims in tort and contract fall squarely within New York's long-established police power regulations, we review Sallie Mae's arguments in light of the presumption against preemption. *Cipollone,* 505 U.S. at 518. "Congress," the United States Supreme Court has made plain, "does not cavalierly preempt state law." *Medtronic v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In cases like this one, "pre-emption is ordinarily not to be implied absent an actual conflict." *English v. General Elec. Co.,* 496 U.S. 72, 90,

110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (internal quotations marks and citations omitted).

"[W]hen interpreting statutes, context matters." *Shady Grove Orthopedia Assocs., P.A. v. Allstate Ins. Co.,* —— U.S. ——, —— n. 16, 130 S.Ct. 1431, 1457 n. 16, 176 L.Ed.2d 311 (2010). Sallie Mae seizes on the following expansive language, taken from the Federal Register, attributed to Lauro Cavasos, the Secretary of Education at the time, and quoted in *Chae:* "[E]xposure to lawsuits under fifty separate sets of laws and court systems could make lenders reluctant to make new federally-guaranteed student loans." *Chae,* 593 F.3d at 945 (quoting *Brannan v. United States Aid Funds, Inc.,* 94 E3d 1260, 1264 (9th Cir.1996)). Armed with this decontextualized fragment, Sallie Mae argues that state law claims must be preempted lest they interfere with the levers and pulleys of the federal statutory scheme. But this argument cuts too broad a swath. As is clear from examining the source of the citation, Secretary Cavasos was concerned with the effect of state law on "actions to collect loans," on "collection action," and on "collection practices"—not with the effect of state law on loan servicing. 55 FR 40120. To read it more broadly than what is clearly set out in the Federal Register, as Sallie Mae urges us to do, would be, in effect, to find field preemption, which precedent precludes us from doing.

Sallie Mae all but concedes our reading. It cites *Brannan v. United States Aid Funds, Inc.,* 94 F.3d 1260, 1264 (9th Cir.1996), for the proposition that "any state law claim prohibiting, restricting, or imposing burdens on any pre-litigation activity of a third-party debt collector acting pursuant to the guaranteed student loan regulations is preempted by federal law" Sallie Mae Brief 15 (quoting *Brannan,* 94 F.3d at 1266). But *Brannan,* as the above quote makes plain, was a case about debt collection, not loan servicing. These are separate activities, a fact acknowledged by Secretary Cavasos who declared that the scope of preemption was "narrowly tailored" and that it "only applie [d] to action to collect loans" and to nothing else. 55 FR 40120.

Sallie Mae's arguments are without merit: Genna's claims are not preempted by the HEA.

### IV. Conclusion

2012 WL 1339482

For the foregoing reasons, Sallie Mae's motion to dismiss Counts 3, 4, 6, and 8 is GRANTED and its motion to dismiss the remaining Counts is DENIED. [4]

[4]     This Court has considered all of the parties' other arguments and found them to be moot or without merit.

**\*10**  Noting the absence, at this stage of the litigation, of significant factual dispute, we take the additional step of REFERRING this case to Magistrate Judge Frank Maas in the hope that the parties can resolve the dispute consensually.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1339482

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**4**

2017 WL 3327583
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Jeremy GREENE and Cetaria Wilkerson,
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.

GERBER PRODUCTS CO., d/b/a Nestlé
Nutrition, Nestlé Infant Nutrition or Nestlé
Nutrition North America, Defendant.
Wendy Manemeit, on behalf of herself
and all others similarly situated, Plaintiff,
v.

Gerber Products Co., d/b/a Nestlé
Nutrition, Nestlé Infant Nutrition or Nestlé
Nutrition North America, Defendant.

16–CV–1153 (MKB)
|
17–CV–93 (MKB)
|
Signed 08/02/2017

**Attorneys and Law Firms**

Brett H. Cebulash, Kevin S. Landau, Miles Greaves, Taus, Cebulash & Landau, LLP, George Volney Granade, II, Michael Robert Reese, Reese LLP, New York, NY, Eric Lechtzin, Sarah R. Schalman–Bergen, Shanon J. Carson, Berger & Montague, PC, Philadelphia, PA, John A. Yanchunis, Marisa Kendra Glassman, Morgan & Morgan Complex Litigation Group, Tampa, FL, E. Michelle Drake, Berger & Montague PC, Minneapolis, MN, for Plaintiffs.

Geoffrey White Castello, III, Kelley Drye & Warren LLP, Parsippany, NJ, Jaclyn Marie Metzinger, Kelly Drye & Warren LLP, New York, NY, for Defendant.

## MEMORANDUM & ORDER

MARGO K. BRODIE, United States District Judge:

**\*1** Plaintiffs Jeremy Greene and Cetaria Wilkerson (the "Greene Plaintiffs") commenced a putative class action on behalf of themselves and all others similarly situated against Defendant Gerber Products Co., doing business as Nestlé Nutrition, Nestlé Infant Nutrition or Nestlé Nutrition North America on March 8, 2016. (Greene Compl., Docket Entry No. 1.) Several months later, on January 6, 2017, Plaintiff Wendy Manemeit commenced a nearly identical putative class action on behalf of herself and all others similarly situated, and against the same Defendant, Gerber Products Co. (Manemeit Compl., Docket Entry No. 1.)[1] The Greene Plaintiffs allege violations of (1) the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 *et seq.* ("OCSPA"), (2) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. §§ 4165.01 *et seq.* ("ODTPA"), and (3) the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. §§ 75–1.1 *et seq.* ("NCDTPA"). (Greene Compl. ¶ 14.) Manemeit alleges violations of sections 349 and 350 of New York's General Business Law ("GBL"). (Manemeit Compl. ¶¶ 93–108.) Plaintiffs[2] also bring common-law claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation and unjust enrichment, based on Defendant's advertising and marketing of its "Good Start" line of infant formula (the "Infant Formula"). (Greene Compl. ¶ 14; Manemeit Compl. ¶ 14.) Plaintiffs allege that Defendant's advertising and marketing misrepresent that Defendant's Infant Formula reduces the risk that infants will develop allergies, and also misrepresent that the Infant Formula is the first and only infant formula that the Food and Drug Administration (the "FDA") endorses to reduce the risk of infants developing allergies. (Greene Compl. ¶¶ 2–3.) Plaintiffs seek actual, statutory and punitive damages, restitution and disgorgement, and injunctive relief. (Greene Compl. 38; Manemeit Compl. 33.)

1    The Court refers to the complaint in *Greene*, 16–CV–1153, as the "Greene Complaint," and to the complaint in *Manemeit*, 17–CV–93, as the "Manemeit Complaint." A separate class of plaintiffs from Wisconsin and Florida filed a nearly identical complaint against Defendant that is currently pending before this Court, is based on the same underlying facts and asserts similar claims under other state consumer protection laws. *See Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016).

2    The Court refers to the Greene and Manemeit Plaintiffs collectively as "Plaintiffs."

Defendant moves to dismiss or stay the *Greene* action, only, pursuant to the primary jurisdiction doctrine. Defendant also moves to dismiss Plaintiffs' claims for injunctive relief pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, strike the nationwide class allegations and dismiss the Greene Complaint and the Manemeit Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. [3]

[3]    (Def. Mot to Dismiss ("Def. Mot."), Docket Entry No. 22; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 23; Decl. of Geoffrey Castello in Supp. of Def. Mot. ("Castello Decl."), Docket Entry No. 24; Def. Reply in Further Supp. of Def. Mot. ("Def. Reply"), Docket Entry No. 26; Manemeit Def. Mot to Dismiss ("Manemeit Def. Mot."), Docket Entry No. 18; Mem. in Supp. of Manemeit Def. Mot. ("Manemeit Def. Mem."), Docket Entry No. 19; Decl. of Geoffrey Castello in Supp. of Manemeit Def. Mot. ("Castello Decl. Manemeit Mot."), Docket Entry No. 20; Def. Reply in Further Supp. of Manemeit Def. Mot. ("Manemeit Def. Reply"), Docket Entry No. 22.)

**\*2**  The Court consolidates the *Greene* and *Manemeit* actions for purposes of deciding this motion. For the reasons set forth below, the Court declines to dismiss or stay the Greene Complaint pursuant to the primary jurisdiction doctrine, grants Defendant's motion to dismiss Plaintiffs' claims under the OCSPA and ODTPA, and denies Defendant's motion to dismiss Plaintiffs' claims under the NCDTPA. As to the Manemeit Complaint, the Court denies Defendant's motion to dismiss the claims brought pursuant to sections 349 and 350 of the GBL. As to the Greene and Manemeit Complaints, the Court finds that Plaintiffs lack standing to seek injunctive relief; grants Defendant's motion to dismiss the unjust enrichment claims; denies Defendant's motion to strike the nationwide class allegations; and denies Defendant's motion to dismiss the fraudulent concealment, intentional misrepresentation and negligent misrepresentation claims.

## I. Background
The facts alleged in the Greene Complaint and Manemeit Complaint are assumed to be true for the purpose of this motion. [4]

[4]    Except as to the statutory claims in each, the Greene and Manemeit Complaints are nearly identical, and

the same facts are set forth in each. The Court cites to the Greene Complaint for ease of reference.

### a. Defendant's applications to FDA

Since at least 2011, Defendant has manufactured, distributed and sold the Infant Formula, and has advertised the Infant Formula through television, print media, product labeling and on the Internet. (Greene Compl. ¶ 32.) The Infant Formula contains partially hydrolyzed whey protein, which is the ingredient that is purportedly responsible for the Infant Formula's ability to reduce the risk of developing allergies. (*Id.* ¶¶ 5, 8–9.)

In June of 2005, Defendant petitioned the FDA for approval of a qualified health claim [5] to use in its marketing of the Infant Formula. (*Id.* ¶ 40.) Defendant sought approval to state that "emerging clinical research in healthy infants with family history of allergy shows that feeding a 100% Whey–Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash." (*Id.*) The FDA denied Defendant's petition on May 11, 2006, concluding that there was "no credible evidence to support the qualified health claim relating consumption of 100 percent partially hydrolyzed whey protein in infant formula to a reduced risk of food allergy." (*Id.* ¶ 41.)

[5]    The FDA can approve a "health claim" or a "qualified health claim" under certain circumstances, allowing companies to make certain health claims about their products in the labeling of said products. A "health claim" is "any claim made on the label or in labeling of a food ... that expressly or by implication ... characterizes the relationship of any substance to a disease or health-related condition." (Greene Compl. ¶ 33 (quoting 21 C.F.R. § 101.14(a)(1)).) Before a health claim can be used in labeling a product, the FDA must review and approve any such health claim. (*Id.* ¶ 36.) The FDA can approve a health claim if it determines that there is "significant scientific agreement" that the claim is supported by scientific evidence. (*Id.* ¶ 34.) "In the absence of 'significant scientific agreement' [as to a health] claim, the FDA may nevertheless allow a company to make a 'qualified health claim' if it is supported by less scientific evidence." (*Id.* ¶ 35.) When the FDA permits a company to make a qualified health claim, the FDA issues "a letter outlining the circumstances under which it intends to consider exercising its

enforcement discretion not to challenge the qualified health claim." (Def. Mem. 4); *see generally Fleminger, Inc. v. U.S. Dep't of Health & Human Servs.*, 854 F.Supp.2d 192, 200 (D. Conn. 2012) (explaining the FDA's process for analyzing and approving qualified and unqualified health claims).

In May of 2009, Defendant again petitioned the FDA to approve a qualified health claim, stating:

> **\*3**  emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey–Protein Partially Hydrolyzed infant formula instead of a formula containing intact cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy—atopic dermatitis—throughout the 1st year of life and up to 3 years of age.

(*Id.* ¶ 42.) The FDA determined that this claim mischaracterized the scientific evidence and was therefore misleading. (*Id.* ¶ 43.) The FDA instead proposed four alternative qualified health claims, over which it would consider exercising its enforcement discretion not to challenge the qualified health claim.[6] (*Id.* ¶ 45.)

---

[6]  The FDA proposed the following four alternative qualified health claims:

1. "Very little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey–Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age."

2. "Little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey–Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life."

3. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey–Protein Partially Hydrolyzed infant formula from birth up to 4

months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age. FDA has concluded that the relationship between 100% Whey–Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is very little scientific evidence for the relationship."

4. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey–Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life. FDA has concluded that the relationship between 100% Whey–Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is little scientific evidence for the relationship."

(Greene Compl. ¶ 45.) In addition, the FDA explained that the use of any of the four claims would have to be accompanied by the following statement:

Partially hydrolyzed formulas **should not be fed to infants who are allergic to milk or to infants with existing milk allergy symptoms**. If you suspect your baby is already allergic to milk, or if your baby is on a special formula for the treatment of allergy, your baby's care and feeding choices should be under a doctor's supervision.

(FDA Letter dated May 24, 2011 ("FDA 2011 Letter"), annexed to Castello Decl. as Ex. 1.)

### b. The alleged false and misleading representations

**\*4**  Plaintiffs allege that, "since at least 2011," Defendant has marketed and advertised the Infant Formula using false and misleading representations. (*Id.* ¶ 55.) Plaintiffs allege six examples of the allegedly false and misleading representations: a statement on the seal of the Infant Formula that it is the "1st & only routine formula to reduce the risk of developing allergies," (*id.* ¶ 56 (capitalization omitted); Ex. C, annexed to Compl.); a statement on the label of the Infant Formula that it is "the first and only formula brand made from 100% whey protein hydrolyzed, and that meets the criteria for a FDA Qualified Health Claim for atopic dermatitis," (Compl. ¶¶ 57, 59; Ex. D, annexed to Compl.); a television commercial stating in relevant part: "You want your Gerber baby to have your imagination ... your smile ...

your eyes ... not your allergies.... [I]f you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage," (Compl. ¶ 60 (alterations in original); Ex. E, annexed to Compl.); a print advertisement stating:

> The Gerber Generation says "I love Mommy's eyes, not her allergies."
>
> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber® Good Start® Gentle Formula, it's the Comfort Proteins® Advantage that is easy to digest and may also deliver protective benefits.

(Compl. ¶ 61; Ex. F, annexed to Compl.); and two additional print advertisements stating that it is the "the first and only infant formula that meets the criteria for a FDA Qualified Health Claim." (Compl. ¶¶ 62–63; Ex. G, annexed to Compl.; Ex. H, annexed to Compl.)

According to Plaintiffs, these statements can be categorized as making two deceptive representations: (1) that the Infant Formula reduces the risk that infants will develop allergies, and (2) that the Infant Formula meets the criteria for an FDA qualified health claim for atopic dermatitis. As to the representation that the Infant Formula "reduce[s] the risk of [infants] developing allergies," Plaintiffs allege that it is false because the FDA rejected this claim in May 2006, and the scientific evidence demonstrates that this claim is false. (Compl. ¶¶ 56, 60.) In support of this argument, Plaintiffs allege that several scientific studies have concluded that partially hydrolyzed whey protein does not lower the risk that infants will develop allergies. (*Id.* ¶¶ 46–52.) Plaintiffs cite to a June of 2011 study by Adrian Lowe, Ph.D., University of Melbourne and Melbourne Royal Children's Hospital ("the Lowe Study"), which concluded that "[t]here was no evidence that introducing pHWF [ (partially hydrolyzed whey formula) ] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema, asthma, and allergic rhinitis, in [a] study of high-risk infants." (*Id.* ¶ 47 (alterations in original) (quoting Adrian J. Lowe, *Effect of a Partially Hydrolyzed Whey Infant Formula at Weaning on Risk of Allergic Disease in High–Risk Children: A Randomized Controlled Trial*, 128 J. Allergy & Clinical Immunology 2, 360–65 (2011)).)

As to the representation that the Infant Formula meets the criteria for an FDA qualified health claim for atopic dermatitis, Plaintiffs allege that this representation is deceptive because it "implies that the FDA fully endorsed Defendant's atopic-dermatitis claims, despite the fact that the FDA's endorsement was strictly reserved to claims indicating that there was 'little' or 'very little' evidence supporting the link between Good Start and atopic dermatitis." (*Id.* ¶ 57.) In addition, by not including the language of one of the four qualified health claims and by using the FDA term of art "qualified health claim" to suggest that the Infant Formula was endorsed by the FDA for a particular purpose, Defendant "falsely or misleadingly implied that Good Start would *unqualifiedly* reduce the risk of atopic determatitis." (*Id.* ¶¶ 57–58.)

### c. FDA warning letter

**\*5** On October 31, 2014, the FDA sent a warning letter to Defendant's President and CEO "outlining various false and misleading representations made in the promotion of [the Infant Formula]" (the "FDA Warning Letter"). (*Id.* ¶ 68.) After reviewing the labeling on the Infant Formula that was sold as a 23.2 ounce milk-based powder, the FDA concluded that the labeling on the Infant Formula bore "health claims that were not authorized by FDA" and that "the labeling [was] misleading." [7] (FDA Warning Letter 1, annexed to Castello Decl. as Ex. 3.) The FDA also noted that it had "previously considered and denied" the statement on the label of the Infant Formula that it was the "1 [st] & only routine formula to reduce risk of developing allergies." (*Id.* at 2 (capitalization omitted).) The FDA acknowledged that consistent with the FDA's four proposed qualified health claims, Defendant's labeling and website both stated that there was "limited evidence" that partially hydrolyzed whey protein can reduce the risk of infants developing atopic dermatitis, (*id.* at 2–3), but nevertheless concluded that by failing to include the qualifying statement about the infants with existing milk allergies, as required by the FDA, Defendant failed to provide "essential information necessary to ensure the safety of consumers," (*id.* at 3–4). Because Defendant failed to include the qualifying statement on its website or on the labeling of the Infant Formula, the FDA concluded that Defendant's qualified health claim was misleading. (*Id.*)

7    Because both complaints cite to and quote extensively
     from the FDA Warning Letter, (*see* Compl. ¶¶ 68–
     71), the Court finds that the letter is incorporated
     by reference into the Greene Complaint and the
     Manemeit Complaint. *See DiFolco v. MSNBC Cable
     L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (noting
     that because the plaintiff referred in the complaint
     to certain e-mails, "the District Court could deem
     them incorporated in the complaint and therefore
     subject to consideration" on a 12(b)(6) motion);
     *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd.
     Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) ("To
     be incorporated by reference, the complaint must
     make 'a clear, definite and substantial reference to the
     documents.' " (quoting *Helprin v. Harcourt, Inc.*, 277
     F.Supp.2d 327, 330–31 (S.D.N.Y. 2003))) The Court
     also finds that because Plaintiffs repeatedly rely on
     the FDA Warning Letter in alleging their claims, the
     letter is integral to the Greene Complaint and the
     Manemeit Complaint. *See Goel v. Bunge, Ltd.*, 820
     F.3d 554, 559 (2d Cir. 2016) ("A document is integral
     to the complaint 'where the complaint relies heavily
     upon its terms and effect.' " (quoting *Chambers v.
     Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

### d. Litigation involving Defendant

On October 29, 2014, the Federal Trade Commission (the "FTC") filed a lawsuit against Defendant in the United States District Court for the District of New Jersey, alleging that the Product's labeling and advertising are false and deceptive (the "FTC Litigation"). (Compl. ¶ 66.); *Fed. Trade Comm'n v. Gerber Prods. Co.*, No. 14–CV–6771, 2014 WL 5510763 (D.N.J. Oct. 29, 2014). The FTC alleged that Defendant's representation that the Infant Formula reduces the risk of developing allergies is false or misleading and unsubstantiated. (*Id.* ¶ 67); *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 19–20. The FTC also alleged that Defendant's representation on the labeling and in its advertising that the Infant Formula qualified for or received approval for a health claim from the FDA is false or misleading. (Compl. ¶ 67.) *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 22–23.

Since the FTC filed its action against Defendant, four other cases regarding the Infant Formula have been filed against Defendant. (Greene Pls. Mem. of Law in Opp'n to Def. Mot. ("Pls. Opp'n") 5–6, Docket Entry No. 24; Def. Mem. 1); *see also Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016);

*Slocum v. Gerber Prods. Co.*, No. 16–CV–4120, 2016 WL 3983873 (W.D. Mo. Mar. 14, 2016); *Zakaria v. Gerber Prods. Co.*, No. 15-CV-200, 2015 WL 3827654 (C.D. Cal. June 18, 2015); *Nat'l Consumers League v. Gerber Prods. Co.*, No. 14–CA–8202, 2015 WL 4664213 (D.C. Super. Ct. Aug. 8, 2015). In all four cases the plaintiffs allege that Defendant's representations that the Infant Formula reduces the risk of developing allergies and their representations that the FDA approved Defendant's health claims are false and misleading, respectively. *See Hasemann*, No. 15–CV–2995, complaint at ¶¶ 42–53; *Zakaria*, 2015 WL 3827654, at *1; *Nat'l Consumers League*, slip op. at 3. 8

8    The courts in both *Zakaria* and *Nat'l Consumers
     League* denied Defendant's motions to dismiss the
     complaints in those actions. *See Zakaria*, 2015 WL
     3827654, at *2; *Nat'l Consumers League*, slip op. at 1.
     *Slocum* has been remanded to state court in Missouri.
     In *Hasemann*, which is before the Court, Defendant
     moved to dismiss the complaint. The Court granted
     the motion in part and denied it in part on September
     28, 2016. *See Hasemann*, 2016 WL 5477595, at *1.

### e. Plaintiffs' purchases

**\*6** Plaintiffs allege that they reviewed the representations on the label of the Infant Formula or on Defendant's website stating that the Infant Formula reduces the risk that infants will develop allergies and that the FDA has endorsed Defendant's qualified health claim. (Compl. ¶¶ 72–74; Manemeit Compl. ¶¶ 72–25.) Based on these representations, Plaintiffs purchased the Infant Formula in "canisters" for $18 in Ohio; for between $16 and $22 in North Carolina; and for $25 in New York. (Compl. ¶¶ 72–74; Manemeit Compl. ¶ 72.) According to Plaintiffs, Defendant "inflated" the price of the Infant Formula by approximately forty-one percent based on its false and misleading representations. (Compl. ¶ 77; Manemeit Compl. ¶ 77.) Plaintiffs assert that they would not have paid "these inflated prices" had they known that the Infant Formula does not reduce the risk that infants will develop allergies or that the FDA did not endorse Defendant's qualified health claim. (Compl. ¶ 78; Manemeit Compl. ¶ 79.)

### f. Proposed classes

Plaintiff Greene asserts his claims on behalf of a class of persons who purchased the Infant Formula in the state of Ohio from May 15, 2011 to the present (the "Ohio Class"). (Compl. ¶ 79.) Plaintiff Wilkerson asserts her claims on behalf of a class of persons who purchased the Infant Formula in the state of North Carolina from May 15, 2011 to the present (the "North Carolina Class"). (*Id.* ¶ 80.) Plaintiff Manemeit asserts her claims on behalf of a class of persons who purchased the Infant Formula in the state of New York from May 15, 2011 to the present. (Manemeit Compl. ¶ 80.) Plaintiffs collectively bring claims on behalf of all persons who purchased the Infant Formula in the United States from May 15, 2011 to the present (the "Nationwide Class"). (*Id.* ¶ 81; Compl. ¶ 81.)

## II. Discussion

### a. Standards of review

#### i. Rule 12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À .R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). The plaintiff has the burden to prove that subject matter jurisdiction exists, and in evaluating whether the plaintiff has met that burden, " '[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010).

#### ii. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assocs., L.P. v. Entm'l Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

#### iii. Rule 12(f)

**\*7** Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter" *sua sponte* or "on motion made by a party." Fed. R. Civ. P. 12(f); *see also Reynolds v. Lifewatch, Inc.*, 136 F.Supp.3d 503, 511 (S.D.N.Y. 2015) (applying same). Rule 23(c)(1)(A) of the Federal Rules of Civil Procedure "calls for a determination of 'whether to certify the action as a class action' at 'an early practicable time after a person sues ... as a class representative.' " *See id.* at 511 (internal quotation marks omitted) (quoting *Emilio v. Sprint Spectrum L.P.*, 68 F.Supp.3d 509, 514 (S.D.N.Y. 2014)). To succeed on a motion to strike class allegations, a defendant must "demonstrate from the face of the complaint that it would be impossible to certify the alleged

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

class regardless of the facts the plaintiffs may be able to obtain during discovery." *Mayfield v. Asta Funding*, 95 F.Supp.3d 685, 696 (S.D.N.Y. 2015) (alterations omitted); *cf. Calibuso v. Bank of Am. Corp.*, 893 F.Supp.2d 374, 388 (E.D.N.Y. 2012) ("[T]he court finds that ... it would be futile to allow [the] plaintiffs to conduct discovery because plaintiff's theory for class certification is simply foreclosed.").

"Motions to strike under Rule 12(f) are rarely successful." *Reynolds*, 136 F.Supp.3d at 511; *see also Belfiore v. Procter & Gamble Co.*, 94 F.Supp.3d 440, 447 (E.D.N.Y. 2015) ("Courts rarely grant motions to strike pursuant to [Rule] 12(f)."); *Emilio*, 68 F.Supp.3d at 514 ("Motions to strike are viewed with disfavor and infrequently granted." (alterations and internal quotation marks omitted)). This is particularly true in the class-action context because a Rule 12(f) motion "requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Belfiore*, 94 F.Supp.3d at 447 (internal quotation marks omitted); *see also Emilio*, 68 F.Supp.3d at 514 (same). As a result, "district courts in this Circuit have frequently found that a determination of whether Rule 23 requirements are met is more properly deferred to the class certification stage," when the court has before it a more complete factual record from which to make its determination. *Mazzola v. Roomster Corp.*, 849 F.Supp.2d 395, 410 (S.D.N.Y. 2012). Stated differently, "motions to strike class allegations are often denied as premature." *Reynolds*, 136 F.Supp.3d at 511; *Chen–Oster v. Goldman, Sachs & Co.*, 877 F.Supp.2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking ... motions [to strike class allegations] are deemed procedurally premature."); *cf. Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) ("It is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."). However, when a motion to strike "addresses issues separate and apart from the issues that will be decided on a class certification motion," the motion to strike may not be premature. *Chen–Oster*, 877 F.Supp.2d at 117 (internal quotation marks omitted).

### b. Primary jurisdiction doctrine

Defendant moves pursuant to the primary jurisdiction doctrine to either dismiss or stay the *Greene* action pending resolution of the FTC Litigation. (Def. Mem. 2.) Defendant argues that the FDA has promulgated "a complex and comprehensive regulatory scheme governing misbrand, and food and beverage labeling in particular," and that the FTC and FDA are both in a "far better position" to determine whether Defendant's representations are "improper." (*Id.* at 18, 19.) The Greene Plaintiffs argue that the primary jurisdiction doctrine is inapplicable here because the FTC Litigation does not involve technical issues within the agency's specialty and there is little risk that the FDA will issue guidance that conflicts with the current case. (Pls. Opp'n 20.) The Greene Plaintiffs also argue that the Court already rejected the primary-jurisdiction argument in its earlier decision in *Hasemann*, 2016 WL 5477595. (*Id.* at 19.)

**\*8** The Court decided the applicability of the primary jurisdiction doctrine to identical facts in *Hasemann*. In that case, as here, Defendant argued that the action should be dismissed or stayed pending the outcome of the FTC Litigation because the FTC and the FDA were in a "far better position" to determine whether Defendant's misrepresentations were "improper." *Hasemann*, 2016 WL 5477595, at \*5. In weighing the factors relevant to the primary jurisdiction doctrine in *Hasemann*, the Court determined that "only the fact that the FDA has discretion to regulate the Infant Formula weighs in favor of applying the primary jurisdiction doctrine, and this factor alone is insufficient to support such an outcome." *Id.* at \*7. Thus, for the reasons set forth in *Hasemann*, the Court denies Defendant's motion to dismiss or stay the *Greene* action pursuant to the primary jurisdiction doctrine. *See id.* at \*5–7.

### c. Standing to seek injunctive relief

Defendant argues that Plaintiffs are not entitled to injunctive relief because they fail to allege that they will purchase the Infant Formula in the future, and therefore fail to allege a likelihood of continuing or future injury. (Def. Mem. 20.) Plaintiffs argue that they have third-party standing, which enables them to sue

Case 3:17-cv-00772-RDM   Document 31-4   Filed 10/20/17   Page 48 of 100

to enjoin Defendant's false advertising practices even if they "lack individual standing to seek injunctive relief for [Defendant's] misleading advertising." [9] (Pls. Opp'n Mem. 21.)

[9]      In *Hasemann*, this Court observed that the Second Circuit has not directly addressed whether plaintiffs bringing claims of false or misleading advertising have standing to seek prospective injunctive relief when the challenged action is still ongoing but there is no threat of repeated injury to the plaintiffs. *See Hasemann*, 2016 WL 5477595, at *8. The Court concluded, however, that "the requirement that a plaintiff allege a risk of future injury in order to obtain injunctive relief is a constitutional requirement that all plaintiffs must satisfy." *Id.* at *9 (citing *Lyons*, 461 U.S. at 102, 103 S.Ct. 1660). Because the *Hasemann* plaintiffs did not allege and could not show that they continued to purchase the Infant Formula at that time or that they would purchase the Infant Formula in the future, they failed to allege a risk of future injury and therefore lacked standing to seek injunctive relief. *See id.*

As the Court explained in *Hasemann*, a plaintiff seeking injunctive relief "must show the three familiar elements of standing: injury in fact, causation, and redressability." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). "[T]o meet the constitutional minimum of standing" for injunctive relief, a plaintiff "must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (first citing *Lyons*, 461 U.S. at 111–12, 103 S.Ct. 1660; and then citing *Shain*, 356 F.3d at 215–16)); *Pungitore v. Barbera*, 506 Fed.Appx. 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm."). The alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. ——, ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014)); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court

has 'repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," ' and that "[a]llegations of *possible* future injury" are not sufficient.' " (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013))).

**\*9** A plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future." *Shain*, 356 F.3d at 215; *see also Nicosia*, 834 F.3d at 239 (stating that past injuries do not confer standing to seek injunctive relief); *Pungitore*, 506 Fed.Appx. at 42 (stating that, while past wrongs may be "evidence bearing on whether there is a real and immediate threat of repeated injury,' such evidence 'does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects' " (quoting *Lyons,* 461 U.S. at 102, 103 S.Ct. 1660)). "In establishing a certainly impending future injury, ... the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (collecting cases). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Although the Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,' " this rule is not absolute, and "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). These circumstances are "well-recognized, prudential exceptions to the 'injury-in-fact' requirement" that "permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d Cir. 2008) (citing *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564); *see also Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005)

("[A] plaintiff seeking third-party standing in federal court must ... demonstrat[e] a close relation to the injured third party and a hindrance to that party's ability to protect its own interests." (internal quotation marks omitted)); *cf. Camacho v. Brandon*, 317 F.3d 153, 159 (2d Cir. 2003) ("A plaintiff may assert the *constitutional* claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' " (emphasis added) (quoting *Campbell v. Louisiana*, 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998))). Thus, courts "historically have permitted trustees to bring suits to benefit their trusts; guardians at litem to bring suits to benefit their wards; receivers to bring suit to benefit their receiverships; assignees in bankruptcy to bring suits to benefit bankrupt estates; and executors to bring suit to benefit testator estates." *W.R. Huff*, 549 F.3d at 110 (alterations, citations and internal quotation marks omitted); *see also Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 841 n.44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (recognizing third-party standing for foster parents to raise due process claims on behalf of foster children).

The Supreme Court has "been quite forgiving with these criteria in certain circumstances," as in the context of the First Amendment or in allowing parties to litigate the rights of third parties "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564 (collecting cases, including *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); and *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)). In general, the Court has "permitted third-party standing only where more 'daunting' barriers deterred the rightholder." *Miller v. Albright*, 523 U.S. 420, 449–50, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (citing *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (criminal defendant challenging exercise of peremptory challenges on behalf of potential jurors); *Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (litigants asserting the rights of their deceased parents); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (vendor challenging law prohibiting distribution of contraception to minors)). The

Supreme Court has also accorded third-party standing "[w]here insurmountable procedural obstacles preclude a rightholder's own suit." *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564 (citing *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (physician asserting the rights of women seeking an abortion where privacy may deter women from bringing suit and their "claim[s] will soon become at least technically moot" if they are forced to forgo the abortion); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (alcohol vendor asserting equal protection challenge on behalf of 18–to–20–year-old males affected by beer-sale restriction where some males in class would have claims mooted by aging out of restriction)).

**\*10** "Beyond these examples," however, the Supreme Court "ha[s] not looked favorably upon third-party standing." *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564 (citing *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (rejecting an attorney's attempt to adjudicate the rights of a client)). To the extent that the Supreme Court's exceptions to classic standing doctrine rest on a unifying principle, the analytical distinction seems to be "between claims asserting private interests and those asserting public interests." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 67 (2d Cir. 2012) (Hall, J., concurring). This is because "[w]hen private rights are involved, it is easy to understand that one person cannot seek to recover on a claim that belongs to someone else"; however, "when a party properly in court seeks to sustain its own opposition to a *public act* by invoking the interests of others," courts will occasionally allow the party to do so. *Id.* (quoting Charles Alan Wright et al., Fed. Practice & Proc. § 3531.9 (3d ed. 2011)); *see also Barrows*, 346 U.S. at 257, 73 S.Ct. 1031 (permitting third-party standing to challenge racially restrictive covenant because "the reasons which underlie [the] rule denying standing to raise another's rights" were "outweighed by the need to protect the fundamental rights" that otherwise would have been denied).

Here, Plaintiffs cannot assert third-party standing "on behalf of individuals who are not yet aware that Gerber's advertisements are false," (Manemeit Pl. Mem. in Opp'n to Manemeit Def. Mot. ("Manemeit Opp'n") 23, Docket Entry No. 21). The Court acknowledges the persuasive value of Plaintiffs' argument that, without third-party standing, consumers could not enjoin false or deceptive advertising because (1) if they were unaware of the falsity

of the advertising and therefore at risk of future injury, they would not bring suit, and (2) once they become aware that a product is falsely or deceptively advertised, they cannot plausibly allege that they would re-purchase the product. (Manemeit Opp'n Mem. 24.)

However, the relationship between a class representative and would-be consumers "is not the type of close relationship courts have recognized as creating a 'prudential exception' to the third-party standing rules." *See W.R. Huff*, 549 F.3d at 110 (holding that an investment manager to whom investor-clients had given power-of-attorney and authority over investment decisions lacked standing to file a security fraud claim on the clients' behalf). In fact, the Supreme Court has made clear that it does "not look [ ] favorably upon third-party standing" except in certain circumstances when the challenged conduct would indirectly violate a third party's rights even if it were merely enforced against the primary litigant. *Kowalski*, 543 U.S. at 130, 125 S.Ct. 564.

In general, the Supreme Court's concern appears to be that "where a hindrance impedes the assertion of a claim, the right likely will not be asserted—and thus the relevant law will not be enforced—unless the Court recognizes third-party standing." *Miller*, 523 U.S. at 450, 118 S.Ct. 1428. In practice, almost without exception, the Supreme Court allows third-party standing only to preserve the constitutional rights of third parties who are unable to challenge the infringement of those rights. *See id.* (discussing specific examples of third-party standing); *see also Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (explaining that "a physician or other professional may raise the *constitutional* rights, but generally not the statutory rights, of his or her patients")

No constitutional rights are at risk here, Plaintiffs are adequately able to vindicate their own rights by seeking damages, and there is no risk that "the relevant law will not be enforced" if Plaintiffs are not able to seek prospective injunctive relief on behalf of a nebulous class of would-be Gerber consumers. *See Miller*, 523 U.S. at 450, 118 S.Ct. 1428. Basically, the injunctive relief Plaintiffs seek would not remedy the injury Plaintiffs allege they suffered, and the alleged injuries of would-be consumers are not sufficient to confer standing on Plaintiffs *See W.R. Huff*, 549 F.3d at 110 (denying third-party standing where "[t]he remedies sought in the

complaint ... would not redress either [of] the alleged injur[ies]"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.").

**\*11** Moreover, Plaintiffs have not demonstrated that the unidentified class of would-be consumers would *likely* be harmed. A speculative, outside possibility of harm is insufficient to confer standing even on the group that Plaintiffs contend would be affected by Defendant's ongoing deceptive advertising. *See Nicosia*, 834 F.3d at 239 ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (quoting *Lyons*, 461 U.S. at 111–12, 103 S.Ct. 1660)); *Knife Rights, Inc.*, 802 F.3d at 383 (holding that the alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical' " (citation omitted)). Plaintiffs make no allegations that the unidentified group on whose behalf they assert standing would be exposed to the same advertising, rely on it, or purchase the Infant Formula as a result. As the Supreme Court has made clear, where a plaintiff's standing is at issue, the Court is not at liberty to make inferences in the plaintiff's favor. *Spokeo, Inc. v. Robins*, 578 U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (May 16, 2016) ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing." (citations and internal quotation marks omitted)); *see also Warth*, 422 U.S. at 518, 95 S.Ct. 2197 ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *Morrison*, 547 F.3d at 170 ("Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."). The Court therefore finds that Plaintiffs lack standing to enjoin Defendants' alleged conduct.

### d. Ohio statutory claims

### i. OCSPA

In count one of the Greene Complaint, the Greene Plaintiffs allege that Defendant's false and misleading advertising constituted an "unfair or deceptive act or practice" under the OCSPA because Defendant falsely

claimed that the Infant Formula reduced the risk of an infant developing certain allergies, which ascribed to the Infant Formula performance characteristics and benefits that it did not possess, and because Defendant misleadingly suggested that the FDA had unqualifiedly approved of Defendant's atopic-dermatitis claim, which ascribed to the Infant Formula a particular standard, quality or grade that it did not possess. (Compl. ¶ 97.)

Defendant argues that the Court should dismiss the Greene Plaintiffs' class action claim under the OCSPA because the Greene Plaintiffs did not allege, as the OCSPA requires, "that [Defendant] had prior notice that its conduct was 'deceptive or unconscionable.' " (Def. Mem. 12.) The Greene Plaintiffs argue that the OCSPA's notice requirements are preempted by Rule 23 of the Federal Rules of Civil Procedure, and that, in any event, the Greene Plaintiffs have met the OCSPA's requirements. (Pls. Opp'n 10–12.) The Greene Plaintiffs alternatively argue that Defendant was on notice that the OCSPA prohibits false or misleading allergy claims because the state attorney general, pursuant to her authority under the OCSPA, has promulgated rules that prohibit individuals or companies from making "any representations" that lack "a reasonable basis in fact" and has made publicly available several consent decrees with companies that made unsubstantiated health claims. (Id. at 12.)

The OCSPA prohibits suppliers from engaging in either unfair or deceptive consumer sales practices or unconscionable acts or practices as set forth in the Ohio Revised Code ("ORC") sections 1345.02 and 1345.03. As relevant here, the OCSPA defines as "deceptive" any act or practice that represents "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses or benefits that it does not have," ORC § 1345.02(B)(1); "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not," id. § 1345.02(B)(2); or "[t]hat the supplier has a sponsorship, approval, or affiliation that the supplier does not have," id. § 1345.02(B)(9). The OCSPA states that in determining whether an act or practice is "unconscionable," a court should take into account several factors, including whether the supplier "knew at the time the consumer transaction was entered into" either that "the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by

like consumers," id. § 1345.03(B)(2), or that the consumer would be unable "to receive a substantial benefit from the subject of the consumer transaction," id. § 1345.03(B)(3). In general, the OCSPA "defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." McKinney v. Bayer Corp., 744 F.Supp.2d 733, 743 (N.D. Ohio 2010) (quoting Whitaker v. M.T. Automotive, Inc., 111 Ohio St.3d 177, 855 N.E.2d 825, 829 (2006)).

**\*12** Although the OCSPA permits both individual and class action claims, see ORC § 1345.09, a consumer can assert a class action claim under the OCSPA "only if the defendant's alleged violation of the Act is substantially similar to an act or practice previously declared to be deceptive by one of the methods identified in" ORC § 1345.09(B). See McKinney, 744 F.Supp.2d at 743; see also Marrone v. Philip Morris USA, Inc., 110 Ohio St.3d 5, 850 N.E.2d 31, 33 (2006). Under ORC § 1345.09(B), a consumer "may qualify for a class action only when a supplier acted in the face of prior notice that its conduct was deceptive or unconscionable." Philip Morris USA, 850 N.E.2d at 34. The notice must be in the form of (1) "an act or practice declared to be deceptive or unconscionable by a rule adopted [by the Ohio Attorney General]" or (2) "an act or practice determined by [an Ohio state court] to violate [the OCSPA] and committed after the decision containing the determination has been made available for public inspection." ORC § 1345.09(B); McKinney, 744 F.Supp.2d at 743; Philip Morris USA, 850 N.E.2d at 33–34. "Lack of prior notice requires dismissal of class action allegations." St. Clair v. Kroger Co., 581 F.Supp.2d 896, 901 (N.D. Ohio 2008); see also City of Findlay v. Hotels.com, L.P., 441 F.Supp.2d 855, 863 (N.D. Ohio 2006) (finding that "the City cannot bring an OCSPA class action claim because the two prerequisites set forth in [ORC § 1345.09(B) ] have not been alleged"); Volbers–Klarich v. Middletown Mgmt., Inc., 125 Ohio St.3d 494, 929 N.E.2d 434, 441 (2010) (holding that "appellant's claim seeking certification of a class action alleging a violation of the OCSPA fails to state a claim upon which relief can be granted" because the complaint did not "satisfy the notice requirement" of ORC § 1345.09(B)).

The Court considers whether Rule 23 preempts the OCSPA notice requirement and, if not, whether

the Greene Plaintiffs have met the OCSPA notice requirement.

### 1. Rule 23 and the OCSPA

The Greene Plaintiffs argue that the Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) abrogates the OCSPA's notice requirement because the notice requirement conflicts with Rule 23 of the Federal Rules of Civil Procedure. (Pls. Opp'n 10–11.) Defendant argues that most courts to consider the issue have found that because the OCSPA's notice requirement is a substantive requirement, Rule 23 does not preempt the notice requirement. (Def. Reply 4.)

In *Shady Grove*, the Supreme Court addressed whether Rule 23, which governs class actions, conflicted with New York Civil Practice Law section 901(b) ("section 901(b)"), which precludes class actions seeking penalties or statutory minimum damages. *Shady Grove*, 559 U.S. at 399, 130 S.Ct. 1431. A majority of the Court agreed that state class action provisions directly conflict with Rule 23, but the Court split on when Rule 23 preempts a conflicting state class action provision. *Id.* at 402–04, 130 S.Ct. 1431. The plurality opinion found that Rule 23 preempts all state class action provisions, and that "the substantive nature of New York's law, or its substantive purpose, *makes no difference.* A Federal Rule of Procedure is not valid in some jurisdictions and invalid in others—or valid in some cases and invalid in others—depending upon whether its effect is to frustrate a substantive state law (or a state procedural law enacted for substantive purposes)." *Id.* at 409, 130 S.Ct. 1431. Justice Stevens concurred in the narrow holding that Rule 23 and section 901(b) conflict, but agreed with the four-Justice dissent that "there are some state procedural rules that federal courts must apply in diversity cases because they function as part of the State's definition of substantive rights and remedies." *Id.* at 423, 130 S.Ct. 1431 (Stevens, J., concurring in part and concurring in judgment). Justice Stevens wrote a separate opinion holding that "[a] federal rule ... cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* To avoid such a result, Justice Stevens concluded that "[w]hen a federal rule appears to abridge, enlarge or

modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result." *Id.*

**\*13** The Greene Plaintiffs argue that the restrictions on class actions under section 1345.09(B) of the OCSPA are not applicable in federal court after *Shady Grove* because the restrictions conflict with Rule 23. In particular, the Greene Plaintiffs contend that the plurality opinion controls, and therefore *Shady Grove* stands for the proposition that any state law restricting class actions in federal court is invalid. (Pls. Opp'n 10–11.) As explained below, the Court disagrees.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). This rule applies where "one opinion can meaningfully be regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." *Id.* (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). When the narrowest opinion is not "the common denominator representing the position approved by at least five justices,"—that is, when "it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *Id.*; *see Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 764199, at \*12 (E.D.N.Y. Mar. 5, 2012) (quoting *Alcan Aluminum*, 315 F.3d at 189).

The Second Circuit has not directly addressed whether Justice Stevens' opinion controls. *See Retained Realty, Inc. v. McCabe*, 376 Fed.Appx. 52, 55 (2d Cir. 2010) (noting that the decision in *Shady Grove* "does not set forth a single test" that governs when a Federal Rule supersedes a state rule). However, the Court agrees with the majority of district and circuit courts that have found Justice Stevens' concurring opinion controls because it provides the "narrowest grounds" or the "common denominator" of the majority position. *See Abbott Labs.*, 2012 WL 764199, at \*12 (collecting cases); *Phillips v. Philip Morris Cos. Inc.*, 290 F.R.D. 476, 479–80 (N.D. Ohio 2013) ("[A]

clear majority of courts have applied Stevens's narrower holding as the controlling opinion for use in determining whether a federal rule may displace a conflicting state law." (collecting cases)); *Kline v. Mortg. Elec. Sec. Sys.*, No. 08-CV-408, 2010 WL 6298271, at *3 (S.D. Ohio Dec. 30, 2010) (noting that the district courts faced with this issue in Ohio "have concluded unanimously 'that Justice Stevens' concurrence ... is the controlling opinion by which [they are] bound.'" (quoting *McKinney*, 744 F.Supp.2d at 747)); *In re Wellbutrin XL Antitrust Litig.*, 756 F.Supp.2d 670, 675 (E.D. Pa. 2010) (finding that Justice Stevens' concurrence controlled because "although he found Rule 23 to conflict with [section] 901(b) along with the plurality, Judge Stevens' Rules Enabling Act analysis called for an analysis of the state's substantive rights and remedies that was consistent with the approach of the four members of the dissent"); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) ("Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion in *Shady Grove*."); *Godin v. Schencks*, 629 F.3d 79, 84 (1st Cir. 2010) (relying on Justice Stevens' concurrence to hold that a state statute was "so intertwined with a state right or remedy" that it could not be displaced by a Federal Rule of Civil Procedure).

**\*14** Although the Greene Plaintiffs do not address whether the class action notice prerequisite in the OCSPA is "intertwined" with the substantive right afforded by the statute, "every court in Ohio to address this issue has held that section 1345.09(B) is substantive in nature and therefore not preempted by Rule 23." *Leonard*, 2012 WL 764199, at *13. This is because section 1345.09(B) "is not a pan-substantive rule that applies to federal claims or to claims based on other states' laws. Rather, it applies only to 'a violation of Chapter 1345 of the [ORC]'—indicating its substantive nature." *In re Whirlpool Corp. Front–Loading Washer Prod. Liab. Litig.*, No. 08-WP-65000, 2010 WL 2756947, at *2 (N.D. Ohio July 12, 2010) (quoting ORC § 1345.09); *see also Phillips*, 290 F.R.D. at 480 ("[E]very court to reach the question has concluded that the [O]CSPA's notice requirement is not displaced by [Rule] 23." (collecting cases)); *Kline*, 2010 WL 6298271, at *3–4 (adopting the reasoning in *Whirlpool*); *McKinney*, 744 F.Supp.2d at 746–47 (adopting the reasoning in *Whirlpool*).

The Court follows the reasoning employed by those courts and concludes that the *Shady Grove* decision does not require Rule 23 to displace the OCSPA's class action notice requirement.

### 2. The Greene Plaintiffs have not satisfied the notice requirement

The Greene Plaintiffs argue that because the Ohio Attorney General has promulgated rules that prohibit companies from making "any representations" that lack "a reasonable basis in fact," Defendant was "on notice that making false or misleading allergy claims—and exaggerating FDA support for these claims—would be considered deceptive in Ohio." (Pls. Opp'n 12–13 (citing Ohio Adm. Code 109:4–3–10).) In addition, the Greene Plaintiffs argue that Defendant was on notice because of consent decrees entered into by the Ohio Attorney General with parties that allegedly made false health claims, which consent decrees were on the Attorney General's public website. (*Id.*) Defendant argues that the challenged statements relating to the Infant Formula "actually have a reasonable basis in fact because they are substantiated by numerous scientific studies," and that consent judgments by the Ohio Attorney General do not constitute sufficient notice under the OCSPA. (Def. Mem. 4–5.)

The Greene Plaintiffs first rely on Ohio Administrative Code 109:4–3–10, which states that it is a deceptive act or practice for a supplier to make any representations in the absence of a reasonable basis in fact. (Pls. Opp'n 12 (citing Ohio Adm. Code 109:4–3–10).) In interpreting this rule, the Ohio Supreme Court has held that the rule "is insufficient to provide prior notice under [ORC § 1345.09(B)] because it does not refer to any particular act or practice." *Volbers–Klarich*, 929 N.E.2d at 441 (quoting *Marrone*, 850 N.E.2d at 36). The Ohio Supreme Court has specified that "[a] general rule is not sufficient to put a reasonable person on notice of the prohibition against a specific act or practice. To permit a generic rule to constitute prior notice for purposes of [ORC § 1345.09(B)] would allow *any* previous determination of a deceptive act or practice to qualify as prior notice for any subsequent alleged deceptive act or practice." *Id.* (quoting *Marrone*, 850 N.E.2d at 36). Thus, the Court rejects the Greene Plaintiffs' argument that a general rule promulgated by the Ohio Attorney General can provide adequate notice for purposes of an OCSPA class action.

The Greene Plaintiffs next rely on various consent decrees into which the Ohio Attorney General entered with parties that allegedly made false health claims. (Pls. Opp'n 12–13.) Plaintiffs rely on *Charvat v. Telelytics, LLC*, No. 05-AP-1279, 2006 WL 2574019, at \*11 (Ohio Ct. App. Aug. 31, 2006), for the proposition that consent decrees constitute "court determinations" that provide sufficient notice under the OCSPA. *See* ORC § 1345.09(B) (stating that prior notice may be in the form of "an act or practice determined by [an Ohio court] to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection [by the Attorney General]").

 **\*15**  In *Charvat*, the court explained that a consent judgment is not a judgment on the merits, but rather a reflection of a settlement between the parties, and it therefore lacks precedential value. *Charvat*, 2006 WL 2574019, at \*6. The court reasoned that, nevertheless, "a consent judgment's precedential value is not determinative under [ORC section 1345.09(B) ] because the statute specifically refers to a court's determination, not a judgment." *Charvat*, 2006 WL 2574019, at \*11. Thus, according to the *Charvat* court, a court's approval of a consent judgment in which an entity is alleged to have violated the OCSPA constitutes a "determination" by that court that a particular practice is circumscribed under section 1345.09(B). *See id.* ("[E]ven within a consent judgment, 'an act or practice determined by a court' to violate the OCSPA is actionable under [section 1345.09(B) ].")

Since *Charvat* was decided, however, several federal courts in Ohio have questioned its ruling. These courts reason that the OCSPA requires the Attorney General to make available for public inspection "all judgments, including supporting opinions, by courts of this state that determine the rights of the parties ... determining that specific acts or practices violate" the OCSPA, and, reading that broad command together with ORC section 1345.09, "it is clear that the reference to a court's 'determination' in [section] 1345.09(B) is a reference to a court's final determination, *i.e.* a judgment with supporting reasoning." *Pattie v. Coach, Inc.*, 29 F.Supp.3d 1051, 1056 (N.D. Ohio 2014) (quoting *Gascho v. Global Fitness Holdings, LLC*, 918 F.Supp.2d 708, 715 (S.D. Ohio 2013)); *see also Ice v. Hobby Lobby Stores, Inc.*, No. 14-CV-744, 2015 WL 5731290, at \*4 (N.D. Ohio Sept. 29, 2015) (rejecting

*Charvat* ); *Gascho*, 918 F.Supp.2d at 715 ("Because the reasoning of a consent judgment is not necessarily that of the court, it has no precedential value, and cannot be considered the court's 'opinion.' "); *Robins v. Glob. Fitness Holdings, LLC*, 838 F.Supp.2d 631, 649 (N.D. Ohio 2012) (rejecting reliance on consent judgments for prior notice); *Kline*, 2010 WL 6298271, at \*8 (characterizing the *Charvat* decision as "isolated" and holding that it is "neither persuasive nor binding" on a federal district court), *report & recommendation adopted*, No. 08-CV-408, 2011 WL 1125346 (S.D. Ohio Mar. 25, 2011).

The Court is not persuaded that consent judgments reflect a court's "determination" that an act or practice violated the OCSPA. Indeed, as the *Charvat* court noted, "a consent judgment typically is not a judgment on the merits, but a contract between the parties that the court reduces to a judgment," *Charvat*, 2006 WL 2574019, at \*11. In addition, "when a court approves a settlement between the parties, the resulting consent judgment or decree, and the reasoning applied therein, does not reflect the considered judgment of the court. If it did, the determination would have precedential value." *Gascho*, 918 F.Supp.2d at 716. Accordingly, the Court finds that the consent judgments that the Greene Plaintiffs rely on as having provided prior notice under the OCSPA do not satisfy the notice prerequisite. The Court therefore dismisses the Greene Plaintiffs' OCSPA claim.

### ii. ODTPA

In count two of the Complaint, the Greene Plaintiffs allege that Defendant's "false or misleading advertising ... constitutes a deceptive trade practice under [the ODTPA]" because Defendant "represented that goods have characteristics, ingredients, uses, benefits or quantities that they do not have" and "represented that goods have sponsorship, approval, or characteristics that they do not have." (Compl. ¶ 107 (citing ORC § 4165.02 (alterations omitted)).) Defendant argues that "[t]he vast majority of Ohio district courts and lower state courts hold that 'the ODTPA is not available to consumers.' " (Def. Mem. 14 (quoting *Phillips*, 290 F.R.D. at 484).)

 **\*16**  The ODTPA authorizes actions by a "person who is likely to be damaged by a person who commits a deceptive trade practice" or a "person who is injured by a person who commits a deceptive trade practice."

Case 3:17-cv-00772-RDM  Document 31-4  Filed 10/20/17  Page 55 of 100

ORC § 4165.03(A)(1)–(2). A "person" is defined under the ODTPA to include "an individual, corporation, government, governmental subdivision or agency" or "any other legal or commercial entity." *Id.* § 4165.01(D).

"The Ohio Supreme Court has not yet addressed whether a consumer may pursue a claim under the ODTPA, and there is a split of authority between the Northern and Southern Districts of Ohio, and even within the Southern District, on the issue." *Terlesky v. Fifth Dimension, Inc.*, No. 15-CV-374, 2015 WL 7254189, at *2 (S.D. Ohio Nov. 17, 2015). However, the majority of courts to address the issue have reasoned that the ODTPA is substantially similar to section 43(a) of the Lanham Act, which confers standing on "any person who believes that he or she is likely to be damaged" by conduct prohibited under 15 U.S.C. § 1125(a). *Id.*; *see In re Porsche Cars N. Am., Inc.*, 880 F.Supp.2d 801, 874 (S.D. Ohio 2012); *Dawson v. Blockbuster, Inc.*, No. 86451, 2006 WL 1061769, at *4 (Ohio App. Ct. Mar. 16, 2006), *cert. denied*, 110 Ohio St.3d 1442, 852 N.E.2d 190 (2006). These courts have determined that, because "the ODTPA is substantially similar to Section 43(a) of the Lanham Act and the Lanham Act protects the interests of a purely commercial class that does not include individual consumers," the ODTPA does not confer standing on consumers. *Terlesky*, 2015 WL 7254189, at *2 (quoting *In re Porsche*, 880 F.Supp.2d at 874); *see, e.g.*, *Citimortgage, Inc. v. Crawford*, 934 F.Supp.2d 942, 950 (S.D. Ohio 2013) ("[A] consumer does not have standing to [s]ue under the [O]DTPA."); *Phillips*, 290 F.R.D. at 484 ("[T]he [c]ourt holds that consumers lack standing to bring claims under the [O]DTPA."); *Hamilton v. Ball*, 7 N.E.3d 1241, 1253 (Ohio App. Ct. 2014) (holding that consumers lack standing to file suit under the ODTPA).

The Greene Plaintiffs cite two cases that hold otherwise, and they are the only two the Court has located that hold that the plain language of the ODTPA is not so restrictive that it precludes a consumer from bringing an action under the statute. *See Schumacher v. State Auto. Mut. Ins. Co.*, 47 F.Supp.3d 618, 630–33 (S.D. Ohio 2014); *Bower v. Int'l Bus. Machs., Inc.*, 495 F.Supp.2d 837, 842–44 (S.D. Ohio 2007). However, where, as here, a state's highest court has not directly addressed an issue, the Court is bound by the decision of the state's appellate courts. *See V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) (holding that a federal court "is bound to apply the law as interpreted by a state's intermediate appellate

courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." (citing *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999))); *see also Greenberg v. Greenberg*, 646 Fed.Appx. 31, 31 (2d Cir. 2016) ("In the absence of any statement by the state's highest court," federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." (quoting *V.S.*, 595 F.3d at 432)).

In *Dawson*, the Ohio Court of Appeals held that consumers do not have standing to raise ODTPA claims because the ODTPA and the Lanham Act are "substantially similar" and because all federal courts of appeals to have considered the issue have held that consumers do not have standing to sue under the Lanham Act. *See Dawson*, 2006 WL 1061769 at *3–4. The Ohio Supreme Court declined to accept the appeal for review in *Dawson*. *See* 110 Ohio St.3d 1442, 852 N.E.2d 190 (2006).

*17 The Greene Plaintiffs have failed to present persuasive evidence that the Ohio Supreme Court would consider this issue differently than the Ohio Court of Appeals, particularly in view of several Ohio Supreme Court decisions that have recognized the substantial similarity between the ODTPA and the Lanham Act. *See, e.g.*, *Chandler & Assoc. v. Am.'s Healthcare Alliance*, 125 Ohio App.3d 572, 709 N.E.2d 190, 195 (1997) ("When adjudicating claims arising under the [ODTPA], Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law."); *Yocono's Rest., Inc. v. Yocono*, 100 Ohio App.3d 11, 651 N.E.2d 1347, 1350–51 (1994) (applying a Lanham Act analysis to claims under the ODTPA); *Cesare v. Work*, 36 Ohio App.3d 26, 520 N.E.2d 586, 589 (1987) ("Where claims are made under the [ODTPA], Ohio courts are to apply essentially the same analysis as that applied in assessing the law of unfair competition under the federal statutes."). Accordingly, the Court adopts the view of the Ohio Court of Appeals and the majority of district courts to consider the issue, and holds that the ODTPA does not confer standing upon consumers. *See Holbrook v. La.–Pac. Corp.*, 533 Fed.Appx. 493, 497 (6th Cir. 2013) (citing *Dawson* to affirm the district court's holding that consumers lack standing to bring claims under the ODTPA). The Court therefore dismisses the Greene Plaintiffs' ODTPA claim.

### e. North Carolina statutory claim

In count three of the Complaint, the Greene Plaintiffs allege that Defendant's health claims regarding the Infant Formula "had the tendency and capacity to mislead" and constituted deceptive acts or practices and unfair methods of competition under the NCDTPA. (Compl. ¶¶ 113–14 (citing N.C. Gen. Stat. Ann. § 75–1.1).)

Defendant argues that the Greene Plaintiffs' NCDTPA claim is not pled with particularity and should be dismissed pursuant to Rule 9(b) of the Federal Rules of Civil procedure because the Greene Plaintiffs "vaguely allege[ ] that [Plaintiff Wilkerson] purchased [the Infant Formula] after" reviewing a number of advertisements but "makes no allegation that [the annexed advertisement] was material to her decision to purchase" the Infant Formula. (Def. Mem. 15.) The Greene Plaintiffs argue that the Rule 9(b) pleading standard does not apply to NCDTPA claims, but that the Greene Complaint nevertheless satisfies Rule 9(b) because Plaintiff Wilkerson has alleged that Defendant's allergy claims informed her decision to purchase the Infant Formula and that she would not have paid a premium for the formula if she had known the allergy claims were false and misleading. (Pls. Opp'n 15.)

The parties identify divergent authority on whether NCDTPA claims [10] are subject to the Rule 9(b) standard. (*See id.* at 14 n.31 (citing *CBP Res., Inc. v. SGS Control Servs.*, 394 F.Supp.2d 733, 739 (M.D.N.C. 2005) (Rule 9(b) does not apply)); Def. Mem. 15 (citing *Hilco Transp., Inc. v. Atkins*, No. 14-CVS-8677, 2016 WL 197133, at *10 (N.C. Super. Jan. 15, 2016) (Rule 9(b) "may" apply)); Def. Reply 6 (citing *Topshelf Mgmt., Inc. v. Campbell–Ewald Co.*, 117 F.Supp.3d 722, 732 (M.D.N.C. 2015) (holding that "several of the reasons" that led the court not to apply Rule 9(b) in *CBP Res., Inc.* "either do not apply in the present case or can no longer be maintained in light of more recent developments")).) The Court declines to decide whether Rule 9(b) applies to NCDTPA claims because, even assuming it does, the Greene Plaintiffs have met the Rule 9(b) pleading standard.

[10] "Under North Carolina law, to establish a prima facie claim under the [NCDTPA], a plaintiff must show: '(1) defendant committed an unfair or deceptive act or practice, (2) the act[ ] in question is in or

affecting commerce, and (3) the act proximately caused injury to the plaintiff.' " *Bayer Cropscience LP v. Albemarle Corp.*, ——Fed.Appx. ——, ——, 2017 WL 2645547, at *3 (4th Cir. June 20, 2017) (quoting *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704, 711 (2001)). Because Defendant does not argue that the Greene Plaintiffs' NDTPA claim is otherwise deficient, the Court declines to consider whether the Greene Plaintiffs have stated a prima facie claim under the NDTPA.

**\*18** "Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.' " *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (alteration in original) (quoting Fed. R. Civ. P. 9(b)). "To satisfy this Rule, a complaint alleging fraud must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " [11] *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013); *see Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F.Supp.3d 370, 383 (S.D.N.Y. 2015) (quoting same); *U.S. ex rel. Bilotta v. Novartis Pharma. Corp.*, 50 F.Supp.3d 497, 508 (S.D.N.Y. 2014) (quoting same); *U.S. ex rel. Kester v. Novartis Pharma. Corp.*, 23 F.Supp.3d 242, 258 (S.D.N.Y. 2014) (quoting same); *see also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (discussing the purpose of the particularity requirement and emphasizing fair notice to the defendant).

[11] In determining whether Plaintiffs have satisfied the Rule 9(b) pleading standard, Second Circuit law governs. *See In re Ford Fusion & C–Max Fuel Econ. Litig.*, No. 13-MD-2450, 2015 WL 7018369, at *13 (S.D.N.Y. Nov. 12, 2015) ("In evaluating the applicability of Rule 9(b), the Court also notes that, as is always the case, it is bound by Second Circuit law pertaining to the applicability of Rule 9(b)." (citing *Nw. Mut. Life Ins. Co. v. Banc of Am. Sec., LLC*, 254 F.Supp.2d 390, 396–97 (S.D.N.Y. 2003))); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60

F.Supp.3d 331, 361 (E.D.N.Y. 2014) ("[B]ecause Rule 9(b) is a rule promulgated pursuant to a federal statute, this Court is required to follow the precedent of the Court of Appeals for the Second Circuit with respect to the interpretation and application of Rule 9(b)." (alteration in original) (quoting *Nw. Mut. Life Ins.*, 254 F.Supp.2d at 396)).

The Greene Plaintiffs specify in the Complaint and attach to the Complaint examples of the representations by Defendant that the Greene Plaintiffs allege are false and misleading, including the representations that the Infant Formula is the "1st & only routine formula to reduce the risk of developing allergies" and that the Infant Formula is the "first and only formula brand made from 100% whey protein hydrolyzed, and that meets the criteria for a[n] FDA Qualified Health Claim for atopic dermatitis." (Compl. ¶¶ 56–61 (capitalization omitted); Exs. A–F.) The Greene Plaintiffs allege that these representations were located in several places, including on a sticker placed on the Infant Formula, on the packaging in which the Infant Formula was sold, in a television commercial dated April 9, 2012, and in a magazine advertisement dated August 5, 2013. (Compl. ¶¶ 60, 63.) The Greene Plaintiffs also allege that the representations are false and misleading because the Infant Formula does not reduce the risk that infants will develop allergies and because Defendant failed to qualify its health claim regarding the Infant Formula's ability to reduce the risk of infants developing atopic dermatitis in accordance with the FDA's proposals. (*Id.* ¶¶ 56–64.) The Greene Plaintiffs further allege that they viewed and relied on these representations before purchasing the Infant Formula. (*Id.* ¶¶ 72–74.)

Based on these allegations, the Greene Plaintiffs have identified with particularity the allegedly deceptive representations, the speaker, what was stated, when it was stated and where the statements were made. The Greene Plaintiffs have also explained why they allege that the statements are deceptive and that the statements are material. (*See id.*) These allegations satisfy Rule 9(b). *See In re Ford Fusion & C–Max Fuel Econ. Litig.*, No. 13-MD-2450, 2015 WL 7018369, at *33 (S.D.N.Y. Nov. 12, 2015) (holding that the plaintiffs "sufficiently alleged the who, what, when, where, and why of the fraud at issue under Rule 9(b)" because the plaintiffs identified the "*specific ads* that made *specific promises*" regarding the products at issue); *Weisblum v. Prophase Labs, Inc.*, 88 F.Supp.3d 283, 298 (S.D.N.Y. 2015) (finding that

the plaintiff satisfied Rule 9(b) because the plaintiff alleged that the defendants "made personal guarantees in national media advertisements," that the plaintiff "heard [the] [d]efendants' media advertisements" and that the plaintiff "relied on these representations"); *In re Frito– Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *23–24 (E.D.N.Y. Aug. 29, 2013) (holding that the plaintiffs met the Rule 9(b) heightened pleading requirement because the plaintiffs "allege [d] that defendants PepsiCo and Frito–Lay (the 'who') falsely stated that the products are 'All Natural,' but in fact, are not ... (the 'what')," and further alleged "[w]hen the defendants labeled, and the plaintiffs purchased, the products between January 1, 2010 and the present (the 'when'), the plaintiffs relied on this representation, which was placed prominently on the products' packaging (the 'where')"); *cf. Amos v. Biogen Idec Inc.*, 28 F.Supp.3d 164, 172 (W.D.N.Y. 2014) (holding that the plaintiff did not satisfy the Rule 9(b) standard where the plaintiff "made only general allegations of fraudulent conduct," upon information and belief, and failed to identify the specific alleged misrepresentations).

**\*19** The Court therefore finds that the Greene Plaintiffs have identified the representations that they allege are false and misleading pursuant to Rule 9(b) and have pled that those representations were material with requisite particularity. The Court therefore denies Defendant's motion to dismiss the Greene Plaintiffs' NCDTPA claim.

### f. New York statutory claims

In counts one and two of the Manemeit Complaint, Plaintiff Manemeit alleges that Defendant violated sections 349 and 350 of the GBL by engaging in "consumer-oriented conduct" that falsely and misleadingly advertised the allergenic benefits of the Infant Formula. (Manemeit Compl. ¶¶ 93–108.)

Defendant argues that the GBL claims should be dismissed because Plaintiff failed to plead an injury from the alleged misrepresentation and because Plaintiff "freely admits that [Defendant's] use of the [qualified health claim] in its marketing materials was expressly permitted by FDA," so the safe harbor provisions of the GBL apply. (Manemeit Def. Mem. 2.) Plaintiff argues that she alleges, under a price-premium theory of injury, that she would not have paid as much as she did for the Infant

Formula had she known the allergy claims were false, and that the GBL's safe harbor provisions do not apply here. (Manemeit Opp'n 8–9.)

The Court first considers whether Plaintiff has sufficiently alleged an injury under GBL sections 349 and 350 and then considers whether the safe harbor provision under GBL section 349 provides a defense to Plaintiff's claims.

### i. GBL sections 349 and 350

GBL section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. GBL section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 350. To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675 (2012)); *see Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing the elements for a prima facie case under section 349).

Claims under GBL sections 349 and 350 are not subject to the pleading-with-particularity requirements of Rule 9(b). *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F.Supp.3d 331, 359 (E.D.N.Y. 2014) (quoting *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)); *see also Leonard*, 2012 WL 764199, at *19 (considering case law and discerning a categorical rule that New York GBL section 349 claims, "regardless of whether they 'sound in fraud,' or are premised on specific misrepresentations rather than an 'advertising scheme,' are not subject to the heightened pleading requirement of Rule 9(b)"). With an exception not relevant here,[12] "[t]he standard for recovery under ... [section] 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002).

[12] "To prevail on a claim under GBL [section] 350, a plaintiff must demonstrate reliance on defendants' false advertising. However [section] 349 does not

require proof of reliance." *Ackerman v. Coca–Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010) (first citing *Leider v. Ralfe*, 387 F.Supp.2d 283, 292 (S.D.N.Y. 2005); and then citing *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000)).

*20  "An actual injury claim under [s]ection 349 typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.' " *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016) (quoting *Orlander*, 802 F.3d at 302). This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, "by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations." *Ackerman v. Coca–Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010); *see also Orlander*, 802 F.3d at 302 (explaining that in some cases the price premium theory "show[s] that [the] plaintiff paid more than they would have for the good but for the deceptive practices of the defendant-sellers").

Here, Plaintiff alleges that if she had known Defendant's allergy claims were false, she would not have paid as much as she did for the Infant Formula, and further states that parents value a formula's ability to protect their children from developing allergies. (Manemeit Compl. ¶¶ 13, 53, 74–75, 100–01, 106, 135, 140.) Plaintiff also alleges that another formula named "Parent's Choice," which did not make allergy claims, is priced at a forty-one percent discount to the Infant Formula, and that Defendant suggested that Defendant's inability to make the allergy claims negatively affected sales. (*Id.* ¶¶ 77–78.) Plaintiff further alleges that she did not receive the benefit of her bargain because she paid for a benefit—the reduced risk of allergies—that the Infant Formula did not provide. (*Id.*) These allegations are sufficient to state an injury under GBL sections 349 and 350 because they "claim that [ ] [P]laintiff paid a premium for a product based on [Defendant's] inaccurate representations." *See Ackerman*, 2010 WL 2925955, at *23; *see also Koenig v. Boulder Brands, Inc.*, 995 F.Supp.2d 274, 288–89 (S.D.N.Y. 2014) (finding a sufficiently-pled section 349 injury where the plaintiff alleged that he would not have paid the price charged for "fat-free" milk had he known it contained fat); *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547 (S.D.N.Y. Dec. 11, 2013) (deeming the plaintiff's

allegations sufficient to state a claim under GBL 349 where "[t]he deception is the false and misleading label, and the injury is the purchase price"); *Lazaroff v. Paraco Gas Corp.*, 38 Misc.3d 1217A, 967 N.Y.S.2d 867 (N.Y. Sup. Ct. 2011) (finding a sufficiently-pled section 349 injury where the plaintiff alleged that he would not have paid the price charged for a "[twenty] pound" propane cylinder had he known it contained only fifteen pounds of propane).

Relying on *Izquierdo*, 2016 WL 6459832, at *7, Defendant argues that Plaintiff "must assert that she could have purchased a substitute infant formula that also was made from [partially hydrolyzed whey protein] but which does not contain the [qualified health claim] or other alleged misstatement." (Manemeit Def. Mem. 12.) Defendant argues that *Izquierdo* is instructive because, in that case, the plaintiffs brought a putative class action alleging that the defendant packaged its candy to give the appearance that the package contained more candy than it actually did, in violation of GBL section 349. *Izquierdo*, 2016 WL 6459832, at *1–2. The court dismissed the plaintiffs' claim, finding that "[c]omparing the Candy to Hot Tamales and Junior Mints is the saccharine equivalent of comparing apples with oranges. Such a comparison tells the [c]ourt nothing about the value of the Candy, or whether the cost of the Candy was inflated by [the defendant's] allegedly misleading packaging." *Id.* at *7. In addition, the court found that it was not clear that the price the plaintiffs paid "flowed from any act of [the defendant]" because the complaint did not allege that the defendant, as opposed to the movie theater where plaintiffs had purchased the candy, set the price of the candy and benefited from its price inflation. *Id.*

**\*21** To the extent that *Izquierdo* merely holds that plaintiffs cannot redress an injury under GBL sections 349 or 350 where they do not "allege [ ] that they paid a *higher* price for the [product] than they otherwise would have, absent deceptive acts," *see id.*, the Court finds that Plaintiffs' allegations satisfy *Izquierdo* because she has alleged that she paid a higher price for the Infant Formula than she would have paid absent the allergy claims. (Manemeit Compl. ¶ 77.) However, to the extent that *Izquierdo* holds, as Defendant suggests, that Plaintiff must identify a precisely comparable product in order to allege a GBL section 349 or 350 claim under a price premium theory, *Izquierdo* contradicts the weight of the law in this Circuit. Courts routinely allow complaints that

lack allegations of both cheaper and exactly comparable products to survive motions to dismiss. *See Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F.Supp.3d 467, 481–82 (S.D.N.Y. 2014) (explaining that courts "have found valid [section] 349 claims despite plaintiffs not identifying competitors or prices" and that "while identifying the prices of competing products in the [c]omplaint would strengthen [the p]laintiff's allegation of injury," the allegations are not necessary to state a claim); *see also Orlander*, 802 F.3d at 302 (reversing a district court and holding that the plaintiff had stated claims under GBL sections 349 and 350 because "[p]laintiff has alleged that he purchased a two-year 'Carry-in' Protection Plan but did not receive the services that [d]efendant misleadingly told [p]laintiff he was purchasing"); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *22 (E.D.N.Y. Sept. 22, 2015) (finding a sufficiently-pled section 349 injury where the plaintiffs alleged that "through the deceptive practice of marketing and selling their products ... [the defendants] have been able to command a premium price by deceiving consumers about the attributes of their yogurts and distinguishing themselves from similar products"); *Weisblum*, 88 F.Supp.3d at 292–93(finding a sufficiently-pled section 349 injury where the plaintiff alleged that he was damaged in the amount of the difference in value between the product as advertised and the product as actually sold); *Koenig*, 995 F.Supp.2d at 288 (finding a sufficiently-pled section 349 injury where the plaintiffs alleged that they paid price premiums based on the defendants' misrepresentations without identifying a specific comparable product).

In addition, to the extent that Defendant asks the Court to assess the actual comparability of the Parent's Choice formula or determine whether other characteristics of the Infant Formula justified its higher price, these are factual determinations that cannot be resolved on a motion to dismiss. *See Kardovich v. Pfizer, Inc.*, 97 F.Supp.3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility and the weight of the evidence are not properly considered on a motion to dismiss."); *see also Ebin*, 2013 WL 6504547, at *4–5 (finding a sufficiently-pled section 349 injury where the parties disputed the reason for price distinctions between the allegedly mislabeled product and a comparable product). The Court therefore denies Defendant's motion to dismiss the GBL claims for failure to state an injury.

### ii. Safe harbor provisions

Defendant also argues that the qualified health claims on the Infant Formula labels were approved by the FDA 2011 Letter, and therefore Plaintiff Manemeit's claims are barred by the safe harbor provisions of GBL sections 349 and 350. (Manemeit Def. Mem. 12–13.) Plaintiff argues that the FDA 2011 Letter was not a "regulation," such that compliance with it would provide safe harbor immunity, and that, even if the FDA 2011 Letter fell within the scope of the safe harbor provision, Defendant did not comply with the FDA 2011 Letter. (Manemeit Opp'n 10.)

GBL section 349(d) states:

> In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

N.Y. Gen. Bus. Law § 349(d). GBL section 350–d states:

> In any such action it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York.

N.Y. Gen. Bus. Law § 350–d.

Both safe harbor provisions require Defendant to identify a "rule" or "regulation" with which it has complied. However, the only rule or regulation Defendant identifies

is the FDA 2011 Letter, which applies only to Defendant's labels and not to its advertisements. (*See* FDA 2011 Letter at 2.) Furthermore, Defendant has not explained why or how the FDA 2011 Letter qualifies as a "rule" or "regulation" under the safe harbor provisions, and, absent any support, the Court is not convinced that it does. *See, e.g.*, *Carias v. Monsanto Co.*, No 15-CV-3677, 2016 WL 6803780, at *8 (E.D.N.Y. Sept. 30, 2016) (finding that the EPA's approval of a pesticide label did not fall within the GBL safe harbor in part because the approval lacked preemptive force); *In re Frito–Lay N. Am. Inc. All. Nat. Litig.*, 2013 WL 4647512, at *22 (denying a motion to dismiss based on safe harbor because "it is not clear that FDA's [non-binding] guidance on 'natural' labeling is a 'rule or regulation' within the meaning of [sections] 349(d) and 350–d"). Finally, even if the FDA 2011 Letter qualified as a "rule" or "regulation" under the safe harbor provisions, Plaintiff's claim is premised on the idea that the Infant Formula was *not* in compliance with the FDA 2011 Letter, which specified qualified health claims that Defendant could place on its labels and prohibited Defendant from asserting that the Infant Formula could reduce the risk of infant allergies. (*See* Manemeit Opp'n 11; Manemeit Compl. ¶¶ 11–12, 65–71.) Thus, it is not clear that Defendant's labeling "compl[ied] with" the FDA's guidance, even if that guidance qualifies as a rule or regulation under the safe harbor provisions. [13]

13    In addition, with respect to the safe harbor provision in section 350, Defendant has not identified a rule, regulation, or statute administered by the Federal Trade Commission or a state agency with which the Infant Formula complies. Based on the plain language of the statute, the FDA 2011 Letter does not provide Defendant with a defense against the allegedly deceptive and misleading claims because section 350 does not provide safe harbor for an entity's compliance with an FDA regulation—only for compliance with the regulations of "the Federal Trade Commission or any official department, division, commission or agency of the state of New York." N.Y. Gen. Bus. Law § 350–d. Defendant has not provided support to the contrary.

**\*22** Defendant cannot obtain safe harbor under sections 349 or 350 because Defendant has not argued—and the Court is not convinced—that the FDA 2011 Letter constitutes a "rule" or "regulation" under the safe harbor provisions and, even if the FDA 2011 Letter did constitute a "rule" or "regulation," the parties dispute

whether Defendant complied with the FDA 2011 Letter. Because neither safe harbor applies to Defendant's alleged conduct, the Court denies Defendant's motion to dismiss Plaintiff's GBL claims.

### g. Common law claims

In counts four through seven of the Greene Complaint and counts three through six of the Manemeit Complaint, Plaintiffs bring claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation and unjust enrichment. (Greene Compl. ¶¶ 118–49; Manemeit Compl. ¶¶ 109–40.) Defendant argues that Plaintiffs have failed to allege at least one element of each common law claim, but does not otherwise argue that Plaintiffs' common law claims are insufficient. [14] (*See* Def. Mem. 16) The Court accordingly analyzes the particular deficiencies that Defendant argues are fatal to each of Plaintiffs' claims.

[14] Defendant generally argues that Plaintiffs have not made particularized allegations of falsity, as required under Rule 9(b), and the Court addresses that argument in section II(g), *infra.*

### i. Fraudulent concealment

Defendant argues that Plaintiffs have not alleged a fiduciary or special relationship between the parties that would support a claim for fraudulent concealment. [15] (Def. Mem. 16.) Plaintiffs argue that New York courts do not require a fiduciary relationship where, as here, the defendant made a "partial or ambiguous statement" and "had superior knowledge that was not available to [the plaintiff]." (Pls. Opp'n 18.)

[15] Defendant analyzes the common-law claims under New York law for purposes of this motion. (Def. Mem. 15.) Plaintiffs do not object, (Pls. Opp'n 15 n.33), and the Court therefore applies New York common law to the claims.

"The elements of fraudulent concealment under New York law are: a relationship between the contracting parties that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance and damage." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005); *see*

*also De Sole v. Knoedler Gallery, LLC*, 974 F.Supp.2d 274, 314 (S.D.N.Y. 2013) (applying same elements); *Woods v. Maytag Co.*, 807 F.Supp.2d 112, 124 (E.D.N.Y. 2011) (applying same elements). "Although a cause of action for fraud may be predicated on acts of concealment, there must first be proven a duty to disclose material information." *Dembeck v. 220 Cent. Park S., LLC*, 33 A.D.3d 491, 823 N.Y.S.2d 45 (2006) (first citing *Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132 (App. Div. 2005); and then citing *Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (2003)).

"A duty to disclose arises in one of three circumstances: where the parties are in a fiduciary relationship; under the 'special facts doctrine,' where 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge'; or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *Aetna*, 404 F.3d at 582 (first citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984); and then citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

**\*23** Thus, with respect to the duty to disclose, "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *De Sole*, 974 F.Supp.2d at 314 (internal quotation marks omitted) (quoting *Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, 770 N.Y.S.2d 386, 391 (2003)); *Abrams v. Gen. Motors Corp.*, 120 Misc.2d 371, 466 N.Y.S.2d 124, (N.Y. Sup. Ct. 1983) ("If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and the silence would constitute fraud."). Although normally this duty to disclose arises in the context of "direct business transactions," courts also impose the duty on "a manufacturer who has exclusive knowledge of a product defect or danger." *Woods v. Maytag Co.*, 807 F.Supp.2d 112, 125 (E.D.N.Y. 2011); *see also Miele*, 770 N.Y.S.2d at 390–91 (finding that, where the plaintiff alleged that the tobacco company defendants suppressed and disregarded test results not favorable to the tobacco industry and failed to disclose the addictive and dangerous nature of cigarettes, the plaintiff's claim for fraudulent concealment was not preempted by the cigarette smoking

act); *Standish–Parkin v. Lorillard Tobacco Co.*, 12 A.D.3d 301, 786 N.Y.S.2d 13, 14 (2004) (same); *Stevenson Equip. v. Chemig Constr. Corp.*, 170 A.D.2d 769, 565 N.Y.S.2d 318, 320 (1991) (holding that a seller of machinery could be found liable for fraudulent concealment for failing to inform a purchaser of its knowledge that the machinery had been stolen), *aff'd* 79 N.Y.2d 989, 584 N.Y.S.2d 434, 594 N.E.2d 928 (1992).

Here, Plaintiffs have pled sufficient facts to support either the theory that Defendant made a "partial or ambiguous statement" or that Defendant "possesse [d] superior knowledge, not readily available to [Plaintiffs], and [knew] that [Plaintiffs were] acting on the basis of mistaken knowledge." *See Brass*, 987 F.2d at 150; *De Sole*, 974 F.Supp.2d at 314. Plaintiffs allege that Defendant "had a duty to disclose" but "intentionally concealed the fact that [the Infant Formula] did not in fact reduce the risk of infant allergies; that there was little scientific evidence supporting its atopic-dermatitis claims; and that the FDA had not, in fact, unqualifiedly endorsed these atopic-dermatitis claims." (Compl. ¶¶ 119, 121.) Plaintiffs allege that Defendant's representations that the Infant Formula "reduce[d] the risk of developing allergies" intentionally concealed the lack of evidence to support the relationship between hydrolyzed whey protein and infant allergies, (*id.* ¶ 56), and Defendant's representation that the Infant Formula "m[et] the criteria for a FDA Qualified Health Claim for atopic dermatitis" was partial or ambiguous because it implied that the FDA fully endorsed Defendant's claims and exploited consumers' lack of awareness about the "qualified health claim" term of art, (*id.* ¶¶ 57–58). The Court therefore denies Defendant's motion to dismiss Plaintiffs' fraudulent concealment claim.

### ii. Intentional misrepresentation

Defendant argues that Plaintiffs have not alleged specific facts to give rise to an inference of fraudulent intent, as is required to state a claim of intentional misrepresentation in New York. (Def. Mem. 17.) Plaintiffs argue that they have alleged fraudulent intent by alleging that Defendant sponsored and was aware of the Lowe Study, "was aware that there was little support for its atopic-dermatitis claims" and "was aware of the FDA's limited endorsement of its health claims." (Pls. Opp'n 17 (citing Compl. ¶¶ 51– 52, 130).)

In a claim for intentional or fraudulent misrepresentation in New York, "a plaintiff must allege 'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.' " *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)). Because intentional representation is predicated on some act of fraud, a plaintiff must plead scienter, or fraudulent intent. "As to scienter, conclusory assertions of intent are sufficient 'if supported by facts giving rise to a strong inference of fraudulent intent.' " *Aetna*, 404 F.3d at 579 (quoting *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)). Although "[g]reat specificity as to scienter is not required," plaintiffs "have the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F.Supp.2d 435, 453 (S.D.N.Y. 2007) (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)); *see also Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (holding that a reviewing court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

**\*24** A plaintiff may plausibly plead scienter "through allegations of a motive to deceive and access to accurate information." *Aetna*, 404 F.3d at 579 (internal quotation marks omitted) (quoting *Cohen*, 25 F.3d at 1173– 74); *see also Gabriele v. Am. Home Mortg. Serv., Inc.*, 503 Fed.Appx. 89, 97 (2d Cir. 2012) (explaining that a party can demonstrate a "strong inference of fraudulent intent by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" (alterations omitted) (quoting *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996))). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (citation omitted). However, "a pleading technique that couples a factual statement

with a conclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent." *Rombach*, 355 F.3d at 176 (citation omitted) (finding that the plaintiffs had not alleged facts to support an inference that the defendants knew of specific facts contrary to their public statements or that the defendants had a motive to defraud the plaintiffs).

Here, the Court does not consider whether Plaintiffs have adequately pled facts to support an inference of motive and opportunity because Plaintiffs have adequately pled facts to support an inference of "conscious misbehavior or recklessness." *See Gabriele*, 503 Fed.Appx. at 97; *see also Glidepath*, 590 F.Supp.2d at 456 n.8 ("However, [the p]laintiffs need not plead both 'motive and opportunity' *and* 'conscious misbehavior or recklessness' to prove scienter. One is sufficient."). Plaintiffs have alleged that Defendant was aware that its statements were false, not only because Defendant sponsored the Lowe Study, whose results did not support Defendant's health claims, but also because Defendant corresponded with the FDA about how to circumscribe and cabin the health claims to avoid deceiving consumers. (Compl. ¶¶ 48–51, 53, 129–30.) Plaintiffs allege that although Defendant was aware of the attenuated relationship between partially hydrolyzed whey formulas and allergy rates in infants and aware that the FDA considered Defendant's health claims to be "misleading" in the absence of certain heavy qualifiers, Defendant nevertheless marketed and advertised the Infant Formula without the necessary qualifiers. (*Id.* ¶¶ 42, 44, 53–55.) Viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, as required, Plaintiffs have sufficiently pled facts to support an inference of fraudulent intent. *See Hughes v. Ester C Co.*, 930 F.Supp.2d 439, 473 (2013) (finding that the plaintiffs adequately alleged scienter where the defendants were aware of lacking supporting scientific evidence for their claims); *Lawati v. Montague Morgan Slade Ltd.*, 102 A.D.3d 427, 961 N.Y.S.2d 5, 8 (2013) (finding that the plaintiff adequately alleged fraud where the defendant told one of plaintiff's investors about business operations in a local office that did not actually exist, "permit[ting] a reasonable inference that he knew the statements ... were false"); *cf. In re Frito–Lay North Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *26 (rejecting the plaintiffs' argument that the defendant had displayed "conscious misbehavior or recklessness" where the "plaintiffs never

allege[d] that Frito–Lay knew the products contained genetically modified corn" and, "[w]ithout knowledge of falsity, Frito–Lay could not have intended to defraud [the] plaintiffs"); *Edward Tyler Nahem Fine Art, L.L.C. v. Barral*, 136 A.D.3d 477, 24 N.Y.S.3d 634, 635 (2016) ( "Although [the] defendant's representations as to good title to the artwork all proved to be false, ... the record does not sufficiently establish the requisite scienter" because "[t]he evidence does not show that [the] defendant had reason to doubt the veracity of its representation that the artwork was imported lawfully but failed to investigate before making it"). The Court therefore denies Defendant's motion to dismiss the intentional misrepresentation claim.

### iii. Negligent misrepresentation

**\*25** As with Plaintiffs' claim of fraudulent concealment, Defendant argues that Plaintiffs' negligent misrepresentation claim fails because Plaintiffs have not alleged a fiduciary or special relationship between the parties. (Def. Mem. 16.) Plaintiffs argue that they have pled a special relationship because Defendant had information that undermined the scientific support for its representations and knew consumers would rely on those representations in purchasing the Infant Formula. (Pls. Opp'n 17–18.)

"A negligent misrepresentation is actionable under New York law where the defendant has been careless 'in imparting words upon which others were expected to rely and upon which they did or failed to act to their damage,' and whether the author of the statement has 'some relationship or duty ... to act with care' vis-à -vis the party at whom the statement is directed." *Aetna*, 404 F.3d at 583 (quoting *White v. Guarente*, 43 N.Y.2d 356, 401, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977)). The New York Court of Appeals has explained that:

> It is well settled that [a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect;

and (3) reasonable reliance on the information.

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 910 F.Supp.2d 543, 546 (S.D.N.Y. 2012) (quoting *Mandarin Trading*, 16 N.Y.3d at 180, 919 N.Y.S.2d 465, 944 N.E.2d 1104);; *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) ("[T]he elements of negligent representation are: ... carelessness in imparting words; ... upon which others were expected to rely; ... and upon which they did act or failed to act; ... to their damage ... to one whom the declarant is bound by some relation or duty of care.").

A duty of care may arise when "there is actual privity of contract between the parties or a relationship so close as to approach that of privity." *Aetna*, 404 F.3d at 584. The Second Circuit has noted that although some of its prior decisions "state that a negligent misrepresentation claim will not lie unless the parties share a fiduciary or otherwise 'special' relationship, [those decisions] cannot be read to preclude such a cause of action brought on grounds of privity or near-privity." *Id.* at 584 n.15. "Courts have reconciled the discrepancy in the caselaw by recognizing a fiduciary duty as one, but not the exclusive, basis for a negligent misrepresentation claim." *Id.* (citing *In re Leslie Fay Cos.*, 918 F.Supp. 749, 769 (S.D.N.Y. 1996) ("A fiduciary relationship may be a sufficient condition to support a claim for negligent misrepresentation absent the existence of actual privity; however, it is not a necessary condition....")). A relationship is considered "so close as to approach that of privity" if: (1) "the defendant makes a statement with the awareness that the statement was to be used for a particular purpose"; (2) "a known party or parties rely on this statement in furtherance of that purpose"; and (3) "there is some conduct by the defendant linking it to the party or parties and evincing [the] defendant's understanding of their reliance." *Id.* at 584. However, "where the statement at issue is directed at a 'faceless or unresolved class or persons,' no duty of care arises." *Id.* (citing *White v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 477, 372 N.E.2d 315 (1977)).

"Because 'casual' statements and contacts are prevalent in business, liability in the commercial context is 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.' " *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996)); *see also Dallas Aerospace, Inc.*, 352 F.3d at 788 ("[T]he law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified."); *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.*, 821 F.Supp.2d 616, 623–34 (S.D.N.Y. 2011) ("To state a claim for negligent misrepresentation in connection with a commercial transaction, a plaintiff must plead justifiable reliance."). When a plaintiff fails to allege the existence of a special relationship or the relationship is only "sparsely pled," the plaintiff must "emphatically allege [ ] the other two factors enunciated in *Kimmell*"—"whether the person making the representation held or appeared to hold unique or special expertise" and "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Eternity Glob.*, 375 F.3d at 188 (first quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001); and then quoting *Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450).

**\*26** Here, Plaintiffs have not alleged a special relationship between themselves and Defendant; they are a "faceless or unresolved class or persons" to whom Defendant owed no special duty of care. *See Aetna*, 404 F.3d at 584. Nevertheless, the Court finds that Plaintiffs have "emphatically allege[d] the other two factors enunciated in *Kimmell*," *see Eternity Glob.*, 375 F.3d at 188, because they have alleged that Defendant had unique expertise regarding the lack of scientific support for its representations about infant allergies and atopic dermatitis, and that Defendant intended that Plaintiffs and other consumers would rely on those representations in making purchasing decisions. (*See* Compl. ¶¶ 139–144.)

First, Plaintiffs sufficiently allege that Defendant's health claims, as advertised, were rejected by the FDA and that Defendant was in a unique position to know that. (*Id.* ¶¶ 6, 10, 40–45, 61.) Plaintiffs also sufficiently allege that Defendant was aware of at least one major study that "conclusively refuted" Defendant's health claim, and that Defendant in fact sponsored that study and provided it with staff and funding. (*Id.* ¶¶ 46–52.) These are not merely "knowledge of the particulars of the company's business," which would "not constitute the

type of 'specialized knowledge' that is required in order to impose a duty of care." *See Trainum v. Rockwell Collins, Inc.*, No. 16-CV-7005, 2017 WL 1093986, at \*4 (S.D.N.Y. Mar. 9, 2017) (citing *JP Morgan Chase Bank v. Winnick*, 350 F.Supp.2d 393, 402 (S.D.N.Y. 2004)). Instead, Defendant's representations suggested specific scientific information to which Plaintiffs would not have had access and on which they could reasonably have relied. *See Hughes*, 930 F.Supp.2d at 475 (inferring a special relationship between the parties because the defendants "held themselves out as holding a type of special expertise regarding the purported health benefits of Ester–C"); *Wells Fargo Bank Nw., N.A. v. Taca Intern. Airlines, S.A.*, 247 F.Supp.2d 352, 366–67 (S.D.N.Y. 2002) (finding that the lessee of an airplane had "made expert representations about maintenance costs" of the aircraft and "had unique expertise in the intended conversion of Airbus 300 aircraft from passenger to cargo use," which supported the lessor's argument); *cf. Dallas Aerospace*, 352 F.3d at 788–89 (finding as a relevant factor for dismissal of negligent misrepresentation claim the fact that the plaintiff held the relevant expertise with which to assess the representations at issue); *Eternity Glob.*, 375 F.3d at 189 (dismissing negligent misrepresentation claim where the plaintiff was sophisticated in the same area of expertise as the defendant and, thus, the plaintiff's reliance on the representation was unjustified); *Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F.Supp.3d 280, 294 (W.D.N.Y. 2014) (dismissing negligent misrepresentation claim against licensed fire alarm contractor because he lacked the specialized training and expertise to justify the plaintiff's reliance on his statement).

Furthermore, Plaintiffs have sufficiently alleged that Defendant knew that Plaintiffs would rely on those representations, as Defendant attempted to obtain FDA approval for the representations and placed them prominently on advertisements and on the Infant Formula itself. (Compl. ¶¶ 42, 45, 55–61.) Moreover, Plaintiffs have plausibly alleged that Defendant placed the advertisements in direct-to-consumer magazines, (*see id.* ¶¶ 62–63), and that Plaintiffs viewed those advertisements and considered the purported allergenic benefits of the Infant Formula in deciding to purchase it, (*id.* ¶ 144). *See Hughes*, 930 F.Supp.2d at 475 ("[D]efendants understood that the content of their labeling, packaging and website—indeed, all forms of their marketing and branding—would be used by consumers for the purpose of evaluating Ester–

C in comparison to the numerous other brands of vitamin supplements on the market.").

**\*27** The Court therefore concludes that although the parties engaged in a typical commercial transaction, Plaintiffs have pled facts sufficient to show that Defendant possessed special expertise and knowledge about the health claims on its Infant Formula advertisements and knew that Plaintiffs would rely on those claims. "Given that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations are sufficient to overcome a motion to dismiss." *Suez Equity*, 250 F.3d at 104; *see also Kimmell*, 89 N.Y.2d at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450 ("Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact."). Therefore, the Court denies Defendant's motion to dismiss the negligent misrepresentation claim.

### iv. Unjust enrichment

Defendant argues that Plaintiffs have failed to show "circumstances where equity and good conscience require the [D]efendant to make restitution," as required to support a claim for unjust enrichment under New York law, and that Plaintiffs' unjust enrichment claim is duplicative of their statutory and common-law tort claims. (Def. Mem. 18 (citation and internal quotation marks omitted).); (Def. Reply 7.) Plaintiffs argue that they have pled a claim for unjust enrichment because Defendant was "unjustly enriched by [its] sales of [the Infant Formula] through the use of false advertising," and that their unjust enrichment claim is not duplicative because it would "survive the dismissal of their other claims." (Pls. Opp'n 16.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). An unjust enrichment claim may be premised on deceptive conduct. *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147, 149 (2004) ("[P]laintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated

prices for its products state a cause of action for unjust enrichment."). However, "unjust enrichment is not a catchall cause of action to be used when others fail ... [and] [a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177 (2012). Unjust enrichment is available:

> only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.

*Id.* (dismissing unjust enrichment claim where it was based on same allegations as inverse takings claim grounded in trespass).

Plaintiffs have alleged violations of the NCDTPA, OCSPA and ODTPA, as well as several common-law torts. (Compl. ¶¶ 93–149.) Plaintiffs' unjust enrichment claim is based on the same allegations as those set forth in support of these other claims, and Plaintiffs have not shown how their unjust enrichment claim differs from their other claims. Plaintiffs' brief footnote addressing the issue merely argues that "fraudulent intent and a 'special relationship' are not elements of unjust enrichment, so Plaintiffs' unjust-enrichment claim would survive dismissal of their other common-law claims." (Pls. Opp'n 16 n.34.) However, as Defendant notes, unjust enrichment does require "a connection between the parties that [is] not too attenuated." (Def. Reply 6); *see Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 517–18, 950 N.Y.S.2d 333, 973 N.E.2d 743 (2012) (dismissing an unjust enrichment claim because "there is no claim that [the plaintiff] had anything other than arm's length business interactions with [the defendants]"); *Mandarin Trading*, 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (dismissing an unjust enrichment claim because of "the lack of allegations that would indicate a relationship between the parties, or at least an awareness by [the defendant] of [the plaintiff's] existence"); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16, 831 N.Y.S.2d 760,

863 N.E.2d 1012 (2007) (dismissing an unjust enrichment claim by a plaintiff who claimed to have purchased overpriced tires because, while "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," the parties must still have a relationship that is not "too attenuated").

**\*28** It is not clear that Plaintiffs' unjust enrichment claim would survive dismissal of their other common-law claims, and Plaintiffs' arguments fail to persuade the Court that the unjust enrichment claim is not duplicative of those claims. *See Buonasera v. Honest Co., Inc.*, 208 F.Supp.3d 555, 568 (S.D.N.Y. 2016) (dismissing an unjust enrichment claim where the plaintiff was "alleging tort causes of action and [ ] relying on the same set of facts for these causes of action as he [was] for the unjust enrichment claim"); *Goldemberg*, 8 F.Supp.3d at 483–84 (dismissing an unjust enrichment claim under New York law as duplicative of claims alleging violations of New York statutory law and breach of express warranty); *Koenig*, 995 F.Supp.2d at 290–91 ("Yet an unjust enrichment claim cannot survive 'where it simply duplicates, or replaces, a conventional contract or tort claim.' " (citing *Corsello*, 18 N.Y.3d at 790–91, 944 N.Y.S.2d 732, 967 N.E.2d 1177)). Accordingly, the Court dismisses Plaintiffs' unjust enrichment claim.

### h. Pleading with particularity

Defendant argues that Plaintiffs have failed to "allege any facts to demonstrate falsity" and instead "simply conclude that the statements are false," which is insufficient to state fraud-based claims under Rule 9(b). (Def. Mem. 7–9.) Plaintiffs argue that "large portions of the Complaint are dedicated to describing the false and misleading nature of [Defendant's] advertisements," and that the Court already considered and rejected Defendant's argument as to falsity in *Hasemann*. (Pls. Opp'n 8.)

As the Court explained in *Hasemann*, Plaintiffs have sufficiently alleged the falsity of Defendant's representation that the Infant Formula is the "1st & only routine formula to reduce the risk of developing allergies," and the misleading nature of Defendant's representation that the FDA had endorsed its qualified health claim regarding atopic dermatitis. *See Hasemann*, 2016 WL 5477595, at \*16. The Court declines to reconsider that holding here, where Plaintiffs' claims are predicated on

the same alleged conduct and where the allegations in both the *Hasemann* action and here, in *Greene* and *Manemeit*, are nearly identical. Accordingly, Plaintiffs have sufficiently alleged that Defendant's assertion that the Infant Formula reduces the risk of infant allergies is false and that Defendant's qualified health claim regarding atopic dermatitis is misleading.

### i. Motion to strike class allegations

Defendant argues that the Court should strike the nationwide class allegations from the Complaint because "individual issues of fact defeat commonality and predominance" and "differences among state laws with respect to Plaintiffs' common law claims preclude class certification as a matter of law." (Def. Mem. 22, 25 (capitalization omitted).) Plaintiffs argue that Defendant's motion to strike is premature, that they have plausibly alleged that they will be able to satisfy commonality and predominance, and that Defendant has "not identified any material conflicts between the state laws at issue here." (Pls. Opp'n 22.)

### i. Commonality and predominance

At this stage of the proceeding, the Court declines to strike the nationwide class allegations on commonality and predominance grounds. Defendant argues that Plaintiffs' common-law claims would require numerous individualized inquiries that preclude class certification. In particular, Defendant argues that "Plaintiffs' common law claims require a showing that Plaintiffs and the putative class relied on [Defendant's] marketing statements regarding infant allergies and atopic dermatitis. By definition, reliance is an individualized factual inquiry that will require a series of mini-trials for each putative class member." (Def. Mem. 23.)

It is possible that some of the putative class members did not rely on Defendant's marketing statements, and it is conceivable that the class as currently drawn will have to be narrowed in order to be certified. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) (decertifying a class where reliance element would require individualized inquiry); *see also Kottler v. Deutsche Bank AG*, No. 05-CV-7773, 2010 WL 1221809, at *3 (S.D.N.Y. Mar. 29, 2010)

(noting that fraud claims may be "unsuited for class action treatment"). However, the Second Circuit has made clear that it will not adopt a blanket rule barring reliance-based class actions and has noted that some actions involving individual reliance "do appear within the contemplation of Rule 23's drafters"—namely, those actions predicated on similar misrepresentations across class members. *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224–25 (2d Cir. 2008) (citing Fed. R. Civ. P. 23(b) (3) Advisory Committee Notes ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.")), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). Plaintiffs allege the use of similar misrepresentations through a handful of advertisements and commercials marketing the same product quality. (*See* Compl. ¶¶ 57–63.)

**\*29** Moreover, as courts in this Circuit have repeatedly held, "a determination of whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination." *Mazzola*, 849 F.Supp.2d at 410; *see, e.g., Chenensky v. N.Y. Life Ins. Co.*, No. 07-CV-11504, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011); *Ironforge.com v. Paychex, Inc.*, 747 F.Supp.2d 384, 404 (W.D.N.Y. 2010); *Cohen v. Gerson Lehrman Grp., Inc.*, 686 F.Supp.2d 317, 324 (S.D.N.Y. 2010); *Ruggles v. Wellpoint, Inc.*, 253 F.R.D. 61, 67 (N.D.N.Y. 2008). Defendant's motion to strike is premature because it is based on grounds that are not "separate and apart from the issues that will be decided on a class certification motion." *See Chen–Oster*, 877 F.Supp.2d at 117. Nor has Defendant persuaded the Court that "it would be impossible to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery." *Mayfield*, 95 F.Supp.3d at 696. Defendant may re-assert its arguments, if applicable, at the class certification stage.

### ii. Differences in state law

Defendant also argues that "[c]ourts routinely deny certification of a nationwide class when a trial would involve the application of the common law of the [fifty]

states." (Def. Mem. 24.) However, courts in the Second Circuit have recognized that "[w]hen a class action raises common issues of conduct that would establish liability under a number of states' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute." *Reynolds*, 136 F.Supp.3d at 518 (internal quotation marks omitted) (quoting *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 79 (E.D.N.Y. 2004)); *see also In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002) (quoting same). "The spectre of having to apply different substantive law does not warrant refusing to certify a class on ... common-law claims." *Reynolds*, 136 F.Supp.3d at 518 (quoting *In re LILCO Secs. Litig.*, 111 F.R.D. 663, 670 (E.D.N.Y. 1986)).

To the extent that the laws of various states differ, those concerns may be "lessened where the states' laws do not vary materially." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013); *see also Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). "Thus, the crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues." *In re. U.S. Foodservice Inc.*, 729 F.3d at 127.

Before discovery into the class, it is impossible for the Court to determine how many states' laws are implicated in this action, how many of those laws vary, and how many variances are material to the factors the Court will consider in deciding whether to certify the class. Nor has Defendant yet established that the standards of liability in relevant states are sufficiently different that they would raise insurmountable case management issues or render class issues insufficiently predominant.

Because Defendant has not demonstrated that "it would be futile to allow [P]laintiffs to conduct discovery" or that "[P]laintiffs' theory for class certification is simply foreclosed," *Calibuso*, 893 F.Supp.2d at 388, the Court denies Defendant's motion to strike the class allegations.

**III. Conclusion**

**\*30** For the foregoing reasons, the Court declines to dismiss or stay the Greene Complaint pursuant to the primary jurisdiction doctrine, grants Defendant's motion to dismiss the Greene Plaintiffs' claims under the OCSPA and ODTPA, and denies Defendant's motion to dismiss the Greene Plaintiffs' claims under the NCDTPA. As to the Manemeit Complaint, the Court denies Defendant's motion to dismiss the claims brought pursuant to sections 349 and 350 of the GBL. As to the Greene and Manemeit Complaints, the Court finds that Plaintiffs lack standing to seek injunctive relief; grants Defendant's motion to dismiss the unjust enrichment claims; denies Defendant's motion to strike the nationwide class allegations; and denies Defendant's motion to dismiss the fraudulent concealment, intentional misrepresentation and negligent misrepresentation claims.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2017 WL 3327583

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.          28

5

Harte v. Ocwen Financial Corp., Not Reported in F.Supp.3d (2014)
2014 WL 4677120
Case 3:17-cv-00772-RDM Document 31-4 Filed 10/20/17 Page 70 of 100

2014 WL 4677120
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Deborah C. HARTE on behalf of herself
and others similarly situated, Plaintiff,
v.
OCWEN FINANCIAL CORP. and Ocwen
Loan Servicing, LLC, Defendants.

No. 13–CV–5410 (MKB).
|
Signed Sept. 19, 2014.

**Attorneys and Law Firms**

Robert Ira Harwood, Benjamin Isaac Sachs-Michaels,
James Gerard Flynn, Harwood Feffer LLP, New York,
NY, for Plaintiff.

Brian M. Forbes, Robert Bruce Allensworth, Robert
W. Sparkes, K&L Gates LLP, Boston, MA, David S.
Versfelt, Kirkpatrick Lockhart Preston Gates Ellis LLP,
New York, NY, for Defendants.

*MEMORANDUM & ORDER*

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Deborah C. Harte commenced this action
in New York Supreme Court, Kings County, on
behalf of herself and a class of similarly situated
homeowners nationwide, alleging that Defendants Ocwen
Financial Corporation ("OFC") and Ocwen Loan
Servicing, LLC ("OLS") (collectively "Defendants"),
made misrepresentations to mortgage borrowers in
violation of New York statutory and common law. On
September 30, 2013, Defendants removed this action to
the Eastern District of New York. [1] On February 7, 2014,
Defendants moved to dismiss the Complaint for failure to
state a claim. For the reasons set forth below, the Court
grants in part and denies in part Defendants' motions.

1   This action was originally removed to the Eastern
    District of New York's Central Islip courthouse and
    assigned to Judge Leonard D. Wexler. The action was

transferred to the undersigned on May 28, 2014. (*See*
Minute Entry dated May 28, 2014.)

**I. Background**

**a. Parties**

Plaintiff is a resident of Brooklyn, New York. [2] (Compl.
¶ 6, annexed to Notice of Removal as Ex. A.) OFC is
organized under the laws of the state of Florida with
a principal place of business in Atlanta, Georgia. (*Id.* ¶
7.) OFC "is a financial services holding company which,
through its subsidiaries, engages in the servicing and
origination of mortgage loans." (*Id.*) OLS is a Delaware
corporation and a wholly owned subsidiary of OFC. (*Id.*
¶ 8.) OLS is licensed to service mortgages in all 50 states,
as well as the District of Columbia and two United States
territories. (*Id.*)

2
    In reviewing a motion to dismiss under Rule 12(b)
    (6) of the Federal Rules of Civil Procedure, the Court
    accepts all of the factual allegations in the Complaint
    as true. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129
    S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Matson v. Bd. of
    Educ.,* 631 F.3d 57, 63 (2d Cir.2011).

**b. Defendants' general loan modification scheme**

OLS [3] solicits modifications of home mortgage loans from
borrowers through mailings and customer service calls.
(*Id.* ¶ 3.) Through the solicitation of loan modifications,
OLS sought to increase its own fees through a "dual
tracking" scheme which involves the following steps: (1)
OLS solicits homeowners to apply for loan modifications,
which requires homeowners to submit documentation to
OLS, and falsely denies receiving homeowner documents,
(2) OLS then tells borrowers to withhold monthly
mortgage payments while modification applications are
pending knowing that such withholding would result in
fees, default and/or foreclosure, and (3) without sufficient
notice, OLS commences foreclosure proceedings against
borrowers with pending modification applications despite
statements indicating that it would not do so. (*Id.* ¶¶ 4, 14.)
OLS fails to make timely decisions on loan modifications,
resulting in a borrower "limbo" where OLS is able to
accumulate revenue through penalty fees, back interest
and other foreclosure-related fees. (*Id.* ¶¶ 14–16.) After
this "self-extended delay," OLS declares the borrower in
default, commences foreclosure and refuses to accept any
payment other than the entire amount overdue. (*Id.* ¶ 16.)

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   1

3     The Complaint does not distinguish between any specific actions taken by OFC or OLS. Instead, the Complaint states that all actions were taken by Ocwen collectively. However, the Complaint also makes clear that OFC is a parent company and only engages in the servicing of mortgage loans through its subsidiaries. (Compl.¶ 7.) The Complaint also makes clear that OLS is the entity licensed to actually service mortgages and that OLS is a subsidiary of OFC. (*Id.* ¶ 8.) The Court reads all specific allegations concerning actual contact between Plaintiff and "Ocwen," "Defendants" or the "Company" to refer to OLS. Such a reading is consistent with the position taken by OLS and OFC in their separate motions to dismiss and is the same approach taken by another court in this Circuit when faced with the same situation and same defendants. *See Dumont v. Litton Loan Servicing, LP,* No. 12–CV–2677, 2014 WL 815244, at *2 n. 1 (S.D.N.Y. Mar. 3, 2014) ("The TAC repeatedly refers to 'Ocwen' without distinguishing between the two Ocwen entities .... The Court therefore reads factual allegations about loanspecific interactions between Plaintiffs and 'Ocwen' to refer to interactions between Plaintiffs and OLS."). As the *Dumont* court noted, "[t]he alternative would be to summarily dismiss the claims against "Ocwen" for failure to distinguish between the respective Defendants' conduct." *Id.*

### c. Plaintiff's loan modification

On or about September 15, 2005, Plaintiff obtained a mortgage loan (the "Mortgage") from Federal Mortgage & Investment Corporation in the amount of $420,000. (*Id.* ¶ 18.) On March 13, 2008, Plaintiff's loan was modified, resulting in an increased principal balance of $463,810.37. (*Id.*) At some point between 2005 and 2010, OLS became the servicer of Plaintiff's mortgage. (*Id.* ¶ 19.) In October 2011, Plaintiff received "literature" from OLS regarding loan modification options. (*Id.* ¶ 20.) On October 21, 2011, OLS sent a letter to Plaintiff discussing "alternatives to foreclosure." (*Id.* ¶ 21.) By letter dated December 16, 2011, OLS sent Plaintiff a packet describing the documentation required in order to effectuate a modification of her loan. (*Id.* ¶ 22.) The packet, ("Modification Application"), included a "Borrower/Co–Borrower Acknowledgement and Agreement," which required the borrower's signature and set forth the terms governing the relationship between OLS and the borrower. (*Id.;* Modification Application dated Dec. 16, 2011, annexed to the Decl. of Brian M. Forbes as Ex. C.) Plaintiff also received a document titled "Important Information

Regarding Your Modification Application" ("Important Information Document"), which stated that "[w]hile we consider your request [for a modification], we will not initiate a new foreclosure action." [4] (Compl.¶ 84.) On December 28, 2011, Plaintiff returned this agreement form to OLS, along with an eleven-page modification form, an economic hardship letter, tax documents, pay stubs, certifications of rent payments and proof of receipt of monthly child support payments. (*Id.* ¶ 23.)

4     The Complaint does not state whether Plaintiff received the Important Information Document with the Modification Application on December 16, 2011, or at some later date.

**\*2** By letter dated December 30, 2011, OLS notified Plaintiff that they had received her documentation and that she had been assigned a "relationship manager" named Pradnya G. Naik. (*Id.* ¶ 24.) Plaintiff later spoke to Naik, who directed Plaintiff to stop submitting mortgage payments until Plaintiff's modification had been processed. (*Id.* ¶ 25.) By letter dated January 2, 2012, OLS requested additional information from Plaintiff. (*Id.* ¶ 26.) On January 5, 2012, Plaintiff faxed the additional information, which included a recent bank statement, photocopies of rent checks from Plaintiff's tenant, a signed statement from Plaintiff's tenant and a signed statement by Plaintiff and her child support provider concerning child support payments. (*Id.*) On January 10, 2012, OLS requested proof of receipt of child support, the lease agreement between Plaintiff and her tenant, and recent bank statements demonstrating rental income. (*Id.* ¶ 27.) On January 11, 2012, Plaintiff faxed the requested information to OLS although the documentation had already been provided. (*Id.* ¶ 28.) By letter dated January 16, 2012, OLS again requested information concerning child support payments, rental income and bank statements. (*Id.* ¶ 29.)

On at least one occasion between February 2012 and April 2012, Plaintiff contacted OLS expressing concern that her application had been pending for a long time during which mortgage payments were not being made. (*Id.* ¶ 30.) An OLS representative assured Plaintiff that OLS was still processing her modification and that during this period the monthly amount due under the mortgage was unknown. (*Id.*) By letter dated March 12, 2012, OLS notified Plaintiff that she had been assigned a new "relationship manager" named Angie Garcia. (*Id.* ¶ 31.) By letter dated April 3, 2012, OLS acknowledged that

Harte v. Ocwen Financial Corp., Not Reported in F.Supp.3d (2014)
Case 3:17-cv-00772-RDM   Document 31-4   Filed 10/20/17   Page 72 of 100
2014 WL 4677120

Plaintiff requested a modification to her mortgage and stated "[w]hile we consider your request, we will not initiate a new foreclosure action and we will not move ahead with foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements." (*Id.* ¶ 33.)

By letter dated April 10, 2012, OLS requested Plaintiff's lease agreement with her tenant, two bank statements and a form concerning "non-borrower income." (*Id.* ¶ 34.) Of the requested items, only the last had not been previously submitted. (*Id.*) By separate letter also dated April 10, 2012, OLS thanked Plaintiff for submitting her application and stated: "Based on our review of the information you provided, the Non–Borrower Verification form is required to complete the application process." (*Id.* ¶ 35.) Plaintiff faxed to OLS a letter regarding the amount of rent charged to her tenant, a signed statement from Plaintiff's tenant attesting to the amount of rent, the lease agreement and Plaintiff's 2011 schedule E taxes. (*Id.* ¶ 36.) By letter dated April 19, 2012, the Company again claimed that Plaintiff's application was incomplete and requested documents, all of which Plaintiff had previously submitted. (*Id.* ¶ 37.) A separate letter, also dated April 19, 2012, requested the same information of the other letter and, for the first time, a copy of Plaintiff's divorce decree and a separation agreement or other legal document specifying the amount, duration and frequency of child support payments. (*Id.* ¶ 38.) Plaintiff had already discussed with one or both of her "relationship managers" that her child support payments were not governed by any legal document. (*Id.*)

**\*3** By letter dated April 24, 2012, OLS informed Plaintiff that, based on the information Plaintiff had provided, she was not eligible for a HAMP modification.[5] (*Id.* ¶ 39.) The letter also stated that documents were still missing from Plaintiff's application. (*Id.*) Specifically, OLS needed proof that Plaintiff had been receiving regular child support and/or alimony payments, a copy of the lease agreement between Plaintiff and her tenant and two recent bank statements. (*Id.*) Plaintiff had previously provided all of this documentation. (*Id.*) A separate letter, also dated April 24, 2012, stated that Plaintiff was not eligible for a loan modification, that there were missing documents, that notification had been sent regarding these documents and that OLS had received no response from Plaintiff. (*Id.* ¶ 40.) By letter dated April 27, 2012, OLS again notified Plaintiff that she was not eligible for a

modification but claimed that this was due to Plaintiff's failure to provide income documents. (*Id.* ¶ 41.) On May 7, 2012, Plaintiff faxed OLS a recent bank statement and a letter by the child support provider attesting to his monthly child support payments. (*Id.* ¶ 42.)

5     The Home Affordable Application Program, known as HAMP, "is a U.S. Department of the Treasury program codified within the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201–5261." *Jordan v. Chase Manhattan Bank,* No. 13–CV–9015, 2014 WL 3767010, at *7 (S.D.N.Y. July 31, 2014). "In very general terms, HAMP is designed to lower the monthly mortgage payments of participating borrowers to an affordable level." *Dumont,* 2014 WL 815244, at *1.

On May 16, 2012, OLS filed a foreclosure action against Plaintiff in New York Supreme Court, Kings County. (*Id.* ¶ 43.) As of that date, Plaintiff had not received a notice of default. (*Id.*) On May 20, 2012, Plaintiff spoke with Garcia but Garcia never mentioned to Plaintiff that foreclosure proceedings had been initiated. (*Id.* ¶ 44.) On May 21, 2012, Plaintiff faxed OLS additional copies of paystubs. (*Id.*)

By letter dated May 24, 2012, OLS again thanked Plaintiff for submitting her application and claimed that additional documents were required in order to process the application. (*Id.* ¶ 45.) By letter dated June 1, 2012, OLS thanked Plaintiff for her application and enclosed a list of frequently asked questions. (*Id.* ¶ 46.)

In approximately the beginning of June 2012, Plaintiff began to receive correspondence and telephone messages from third parties claiming to help homeowners facing foreclosure. (*Id.* ¶ 47.) As a result of this correspondence, Plaintiff became aware of her foreclosure. (*Id.*)

By letter dated July 8, 2012, OLS notified Plaintiff that if it did not receive the outstanding documentation, Plaintiff's modification application would be denied. (*Id.* ¶ 48.) By letter dated July 9, 2012, OLS stated that it had sent Plaintiff a notice of default and that OLS wanted to assist Plaintiff in bringing her loan current. (*Id.* ¶ 49.) The letter suggested that Plaintiff attempt to modify her loan. (*Id.*) Plaintiff subsequently received a notice of default, dated July 11, 2012. (*Id.* ¶ 50.) Plaintiff also continued to receive letters concerning her modification application and outstanding documents. (*Id.* ¶¶ 51–52.)

On December 18, 2012, Plaintiff filed a Chapter 13 Petition for Bankruptcy Protection in the United States Bankruptcy Court for the Eastern District of New York. (*Id.* ¶ 54.)

#### d. OLS' similar conduct with other homeowners

**\*4** In 2010, OLS settled a multidistrict litigation consolidated in the Northern District of Illinois, which entailed allegations of unlawful and predatory behavior against borrowers. (*Id.* ¶ 55.) In 2005, a Texas jury found OLS liable to a pair of borrowers with damages amounting to $3,000,000. (*Id.* ¶ 56.) The Complaint lists five other court actions involving similar allegations against OLS, in addition to a number of consumer criticisms against OLS posted on internet messaging boards. (*Id.* ¶¶ 58–67.) The Complaint also discusses various state and federal agency investigations into OLS's loan servicing practices. (*Id.* ¶ 68.)

### II. Discussion

#### a. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 113 (2d Cir.2013) (quoting *Holmes v. Grubman,* 568 F.3d 329, 335 (2d Cir.2009)); *Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir.2011) (quoting *Connecticut v. Am. Elec. Power Co.,* 582 F.3d 309, 320 (2d Cir.2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson,* 631 F.3d at 63 (quoting *Iqbal,* 556 U.S. at 678); *see also Pension Ben. Guar. Corp.,* 712 F.3d at 717–18. "[W]here the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Pension Ben. Guar. Corp.,* 712 F.3d at 718 (alteration

in original) (quoting *Iqbal,* 556 U.S. at 679). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions." [6] *Iqbal,* 556 U.S. at 678.

[6]      When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) any documents deemed integral to the complaint, and (4) public records. *See Nielsen v. Rabin,* 746 F.3d 58, 65 (2d Cir.2014) (documents attached to the complaint and those incorporated by reference); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (public records).

#### b. Breach of contract

To establish a claim of breach of contract under New York law, a plaintiff must demonstrate "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 142 (2d Cir.2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir.2004)); *see also Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.,* 553 F. App'x 37, 38 (2d Cir.2014) (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)).

#### i. Breach of the Mortgage [7]

[7]      Count one of the Complaint, for breach of contract does not specify any particular contract and instead alleges that Defendants entered into "various contractual agreements" with Plaintiff and putative class members and that these agreements provided that Defendants would institute foreclosure proceedings in the event of Plaintiff's default. (Compl.¶ 80.) Moreover, as alleged in the Complaint, Plaintiff's claim is based on Defendant's breach of "the agreements by foreclosing on Plaintiff and Class Members when they were not in default and/or had not received notice of default." (*Id.*) However, in opposition to OLS' motion to dismiss, Plaintiff argues that her breach of contract claim is based only on OLS' violation of the "acceleration provision" of

Plaintiff's Mortgage. (Pl. OLS Opp'n 8.) It appears then that Plaintiff has abandoned any breach of contract claim based on any of the "various contractual agreements" except for the Modification Application discussed *infra,* Part II.b.ii.

**\*5** Plaintiff's breach of contract claim is based on a violation of her underlying Mortgage. OLS argues that Plaintiff's claim fails as a matter of law because OLS is not a party to the Mortgage. (OLS Mem. 8.) Plaintiff acknowledges that OLS was not a party to the Mortgage but argues that Plaintiff and OLS were in the "functional equivalent of privity." [8] (Pl. OLS Opp'n Mem. 9.) [9] For the reasons discussed below, the Court agrees with Plaintiff but grants OLS' motion to dismiss based on Plaintiff's failure to plead such a theory of liability in the Complaint.

[8]  The Complaint also states that Defendants "assumed the obligations of Plaintiff's and the Class Members' loan agreements when it took over servicing their loans." (Compl.¶ 79.) Such an assumption of the contract would be sufficient to satisfy the first prong of a breach of contract claim. *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.,* No. 12–CV–01416, 2014 WL 3874193, at \*12 (S.D.N.Y. Aug. 5, 2014) ("It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." (quoting *Crabtree v. Tristar Auto. Grp., Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991))); *Pereira v. Ocwen Loan Servicing, LLC,* No. 11–CV–2672, 2012 WL 1379340, at \*4 (E.D.N.Y. Mar.12, 2012) ("If the note was assigned to Ocwen, Plaintiffs have sufficiently pled a breach of contract."), *report and recommendation adopted,* No. 11–CV–2672, 2012 WL 1381193 (E.D.N.Y. Apr.18, 2012). However, Plaintiff's opposition brief does not argue that OLS assumed the Mortgage. Instead, Plaintiff argues that she and OLS were in the "functional equivalent or privity" under the Mortgage.

[9]  OLS and OFC, although represented by the same counsel, submitted separate motions to dismiss. The Court refers to Plaintiff's opposition to each as "Pl. OLS Opp'n" and "Pl. OFC Opp'n," respectively.

"It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *In re Cavalry Const., Inc.,* 428 B.R. 25, 30 (S.D.N.Y.2010) (quoting *Crabtree v. Tristar Auto.*

*Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991)), *aff'd sub nom. In re Cavalry Const.,* 425 F. App'x 70 (2d Cir.2011); *CDJ Builders Corp. v. Hudson Grp. Const. Corp.,* 67 A.D.3d 720, 889 N.Y.S.2d 64, 65 (App.Div.2009) ("Liability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." (quoting *Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.,* 64 A.D.3d 85, 878 N.Y.S.2d 97, 112 (App.Div.2009))). Courts in this Circuit, interpreting New York caselaw, have come to recognize an exception to this general precept for non-signatories who are in the "functional equivalent of privity." *In re Cavalry Constr., Inc.,* No. 07–22707, 2013 WL 5682741, at \*3–4 (Bankr.S.D.N.Y. Oct.18, 2013) (noting that the exception is "well established" in tort but recognizing that "several cases have applied the doctrine to *breach of contract* claims"); *Aktas v. JMC Dev. Co., Inc.,* 877 F.Supp.2d 1, 27 (N.D.N.Y.2012) ("Courts in New York have routinely, 'refused to dismiss breach of contract causes of action asserted by property owners against subcontractors who performed construction services on their property'." (quoting *Logan–Baldwin v. L.S.M. Gen. Contractors, Inc.,* 94 A.D.3d 1466, 942 N.Y.S.2d 718, 721 (App.Div.2012))), *aff'd,* 563 F. App'x 79 (2d Cir.2014); *Keywell L.L.C. v. Pavilion Bldg. Installation Sys., Ltd.,* 861 F.Supp.2d 120, 129 (W.D.N.Y.2012) ("New York law does recognize that, even in the absence of a formal signed contract, the 'functional equivalent of privity' may exist in construction situations under certain circumstances when a project's owner and a subcontractor engaged in direct dealings."); *see also Town of Oyster Bay v. Lizza Indus., Inc.,* 22 N.Y.3d 1024, 1030, 981 N.Y.S.2d 643 (2013) ("Even if the plaintiff is not a party to the underlying construction contract, the claim may accrue ... where the plaintiff is not a 'stranger to the contract,' and the relationship between the plaintiff and the defendant is the 'functional equivalent of privity'" (quoting *City Sch. Dist. of City of Newburgh v. Hugh Stubbins & Associates, Inc.,* 85 N.Y.2d 535, 538–39, 626 N.Y.S.2d 741, 650 N.E.2d 399 (1995)), *reargument denied,* 23 N.Y.3d 934 (2014).

**\*6** Two courts in this Circuit have suggested that the doctrine is applicable to breach of mortgage and note contracts against non-signatory loan servicers. In *In re Griffin,* the plaintiffs attempted to assert a breach of contract claim against their mortgage loan servicer for misapplication of certain payments due pursuant to the plaintiff's underlying loan. *In re Griffin,* No. 10–22431, 2010 WL 3928610, at \*1 (Bankr.S.D.N.Y. Aug.31,

2010). The court found that the loan servicer was not in contractual privity with the plaintiffs and therefore could not "be liable for breach of contract absent ... an allegation that it was acting as the agent for someone who was in privity and that privity can be imputed to it...."). In *Kapsis v. Am. Home Mortgage Servicing Inc.,* the plaintiff brought a breach of contract claim against his loan servicer for violations of the plaintiff's underlying mortgage and note. *Kapsis,* 923 F.Supp.2d 430, 450–52 (E.D.N.Y.2013). The *Kapsis* court explained that "New York law does allow privity to be imputed to an agent of the contracting party under certain narrow circumstances." *Id.* at 451. Although amenable to the imputation of privity to loan servicers, the court ultimately dismissed the claim, with leave to amend the complaint, due to the plaintiff's failure to allege that the mortgage loan servicer was acting "as the agent for one who was in privity of contract with plaintiff ...." *Id.* at 452. The court noted that this was "a pleading defect that can potentially be cured ...." *Id.* Both *Griffin* and *Kapsis* envision imputing privity in factual scenarios similar to that presented before the Court. [10]

[10]    The Court recognizes that other district courts, applying their respective state laws, have concluded that loan servicers that are not party to an underlying mortgage or note are not in privity with a homeowner-borrower. *See Perron v. JP Morgan Chase Bank, N.A.,* No. 12–CV–01853, 2014 WL 931897, at *4 (S.D.Ind. Mar. 10, 2014) ("The [h]omeowners have failed to cite to any case law, let alone Indiana case law, in which contractual privity between the borrower and the holder of a note was imputed to the loan servicer."); *Edwards v. Ocwen Loan Servicing, LLC,* ––– F.Supp.2d ––––, ––––, 2014 WL 861996, at *3 (D.D.C. Mar.5, 2014) ("Judges around the country ... have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract."); *Howard v. First Horizon Home Loan Corp.,* No. 12–CV–05735, 2013 WL 3146792, at *2 (N.D.Cal. June 18, 2013) ("Under California law, a mortgagor cannot bring a claim for breach of contract against a servicer premised on the deed of trust because a loan servicer is not a party to the deed of trust."); *James v. Litton Loan Servicing, L.P.,* No. 09–CV–147, 2011 WL 59737, at *11 (M.D.Ga. Jan. 4, 2011) ("The fact that a loan servicer, which has undertaken a contractual obligation to provide legal services for a lender, may appear in bankruptcy court to protect a claim relating to the debt it services does not mean that the servicer is considered in privity with a borrower for purposes of a breach of contract claim."); *Kehoe v. Aurora Loan Servs. LLC,* No. 10–CV–00256, 2010 WL 4286331, at *8 (D.Nev. Oct. 20, 2010) ("Plaintiffs assert that Aurora, as their loan servicer, assumed the duties of the lender under the deed of trust. However, courts have held that a loan servicer, such as Aurora, is not a party to the deed of trust.... Moreover, the fact that Aurora serviced Plaintiff's loan does not create contractual privity between Aurora and the Plaintiffs."); *see also Pereira v. Ocwen Loan Servicing, LLC,* No. 11–CV–2672, 2012 WL 1381193, at *3 (E.D.N.Y. Apr.18, 2012) ("The complaint does not allege that a contractual relationship ever existed between plaintiffs and Ocwen; at most, plaintiffs allege that Ocwen became the servicer of their mortgage loan ....").

OLS argues that the sole case cited by Plaintiff, *RLI Ins. Co. v. King Sha Grp., Inc.,* 598 F.Supp.2d 438 (S.D.N.Y.2009), concerns the imputation of privity in the construction context between an owner and a sub-contractor, and therefore "has no application here." (OLS Reply 2.) OLS is correct that *RLI* is inapposite, but this is because *RLI* involved a *negligence* claim whereas Plaintiff seeks to assert a *breach of contract* claim independent of any tort. [11] *See RLI,* 598 F.Supp.2d at 443–45 (finding that the plaintiff and the defendant were in the "functional equivalent of privity" for purposes of the plaintiff's negligence claim). Caselaw does support Plaintiff's position that, even absent formal privity, OLS can be held liable for breach of contract based on a relationship with Plaintiff constituting the "functional equivalent of privity." *But see Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York,* 734 F.Supp.2d 368, 382 n. 21 (S.D.N.Y.2010) (stating, in dicta, that "New York courts have also refused to allow a third party to recover for breach-of-contract under a 'functional equivalent of privity' theory" (citing *Hamlet,* 878 N.Y.S.2d at 112); *Hamlet,* 878 N.Y.S.2d at 112 (declining to adopt negligence law's privity imputation exception into contract law).

[11]    For a discussion of this doctrine's origin in tort law see *In re Cavalry Constr., Inc.,* No. 07–22707, 2013 WL 5682741, at *3 (Bankr.S.D.N.Y. Oct.18, 2013).

**\*7** Although the caselaw supports the conclusion that Plaintiff's argued theory of liability is viable, Plaintiff has failed to actually plead a breach of contract claim based on a relationship approaching the

"functional equivalent of privity." (*See* Compl. ¶¶ 77–81.) Accordingly, Plaintiff's breach of contract claim against OLS is dismissed. Assuming Plaintiff can support the arguments presented in her opposition brief concerning a privity-like relationship with OLS, Plaintiff may amend the Complaint to properly assert such a claim.

#### ii. Breach of the Modification Application

In opposition to OLS' motion to dismiss Plaintiff's breach of good faith and fair dealing claim, Plaintiff argues that OLS breached the terms of the Modification Application. (*See* Pl. OLS Opp'n 2 ("[T]he [Modification Application] itself is an agreement that OLS will—at a minimum—consider her request for a loan modification—which OLS clearly never did." (emphasis omitted)).) Therefore, the Court understands Plaintiff to also assert a breach of contract claim on the Modification Application.

OLS does not appear to argue against finding that the Modification Application constitutes a contract between the parties. [12] Therefore, Plaintiff satisfies the first element of her breach of contract claim. Plaintiff alleges that she submitted all the required documentation, thereby plausibly alleging performance under the Modification Application and satisfying the second element of a breach of contract claim. (*See, e.g.,* Compl. ¶¶ 23, 37, 89.) With respect to OLS' breach, the Complaint only states that OLS breached "the agreements" by foreclosing on Plaintiff when she was not in default and/or had not received a notice of default, foreclosed on Plaintiff while her loan modification was pending and that although Plaintiff was required to make payments in accordance with her mortgage agreement, she did not do so at the behest of OLS. (*Id.* ¶¶ 80, 878 N.Y.S.2d 97.) None of these alleged actions constitute breach of the Modification Application, which, at most, imposed a duty on OLS to "evaluate [Plaintiff's] eligibility for available relief options and foreclosure alternatives" and "make every effort to review and process [Plaintiff's] request as quickly as possible." (Modification Application at 11–12.) As OLS correctly points out, Plaintiff's theory that OLS breached the Modification Application by not considering her application at all, "is improperly introduced in her Opposition ...." (OLS Reply 3.)

[12]  It is not clear that the Modification Application is an enforceable contract. *See Arroyo v. PHH Mortgage Corp.,* 13–CV–2335, 2014 WL 2048384, at *8

(E.D.N.Y. May 19, 2014) (finding that the plaintiffs failed to plead the existence of a contract where the plaintiffs alleged "that, following the submission and review of a completed modification package, Plaintiffs would be given terms to make payments as part of a trial modification" and dismissing the plaintiff's breach of contract claim without prejudice); *Sholiay v. Fed. Nat. Mortgage Ass'n,* No. 13–CV–00958, 2013 WL 5569988, at *4 (E.D.Cal. Oct.9, 2013) (finding that although the defendant's letter stated that it would "determine plaintiff's eligibility and qualifications for a loan modification," the statement was "insufficiently definite to constitute an enforceable promise").

Because Plaintiff fails to allege in the Complaint that OLS failed to review Plaintiff's application, thereby breaching the Modification Application, Plaintiff's breach of contract claim based on the Modification Application is dismissed. However, Plaintiff is granted leave to amend the Complaint to properly assert a breach of contract claim based on the Modification Application if Plaintiff believes that she can allege facts sufficient to state a plausible claim.

#### c. Breach of implied contract

**\*8**  Plaintiff alleges that when she, and putative class members, agreed to apply for a loan modification, they signed agreements binding OLS and themselves "during the pendency of the loan modification application." (Compl.¶ 84.) The Complaint identifies the Modification Application, and another document, the Important Information Document, as the operative agreements. (*Id.*) In violation of these agreements, OLS commenced foreclosure proceedings on Plaintiff and putative class members. (*Id.*) OLS moved to dismiss all implied contract claims on a variety of grounds. (OLS Mem. 13–14.) Plaintiff failed to respond or even acknowledge OLS' motion to dismiss Plaintiff's breach of implied contract claims. Given Plaintiff's lack of opposition to this particular cause of action, the Court understands Plaintiff to have abandoned these claims. *See Silverman v. Household Fin. Realty Corp. of New York,* 979 F.Supp.2d 313, 317 (E.D.N.Y.2013) (dismissing eleven out of fifteen causes of action due to the plaintiff's failure to oppose the defendants' arguments); *Reid v. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim

should be dismissed." (quoting *Arma v. Buyseasons, Inc.,* 591 F.Supp.2d 637, 643 (S.D.N.Y.2008))); *Abbatiello v. Monsanto Co.,* 522 F.Supp.2d 524, 530 (S.D.N.Y.2007) (deeming a claim abandoned due to the plaintiffs' failure to oppose the defendants' motion); *Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) (dismissing "independent constitutional claims" arising from several alleged incidents due to the plaintiff's failure to respond to the defendant's motion to dismiss but reviewing the merits of the plaintiff's "pre-release strip search" because said claim "present[ed] an appalling abuse of the power afforded to corrections officers that [was] too serious an affront to a decent society to dismiss solely on the basis of a briefing failure"); *see also Jackson v. Fed. Exp.,* ––– F.3d ––––, ––––, 2014 WL 4412333, at *5 (2d Cir. Sept.9, 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

### d. Breach of covenant of good faith and fair dealing

Although the Complaint alleges that "Ocwen had a duty of good faith and fair dealing with respect to both its administration of borrower loans as a servicer and under the loan modification application *agreements,*" (Compl. ¶ 87 (emphasis added)), Plaintiff's opposition brief appears to only contemplate liability under the Modification Application, (Pl. OLS Opp'n 10–12 ("The [Modification] Application was in writing and expressly indicates that OLS has undertaken to at least review the [Modification] Application." (emphasis omitted)).[13] OLS argues that Plaintiff fails to state a claim of breach of the implied covenant of good faith and fair dealing because: (a) the Complaint does not identify any specific contract or agreement, (OLS Reply 3); (b) Plaintiff's claim is duplicative of her breach of contract claims, (OLS Mem. 14–15); (c) the Modification Application contains no promise to avoid the commencement of foreclosure proceedings, (d) Plaintiff's allegations to not state a plausible claim of bad faith, (e) Plaintiff offers only "threadbare and speculative recitations of damage ..." (OLS Reply 3–4). For the reasons discussed below, Plaintiff's claim is dismissed.

[13]    Based on Plaintiff's opposition brief, the Court understands Plaintiff to have abandoned all claims

for breach of the covenant of good faith and fair dealing based on any alleged agreement other than the Modification Application.

**\*9**   To establish a claim for breach of the duty of good faith and fair dealing: "(1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Champagne v. United States,* ––– F.Supp.2d ––––, ––––, 2014 WL 1404566, at *9 (N.D.N.Y. Apr.10, 2014); *In re Tremont Sec. Law, State Law, & Ins. Litig.,* No. 08–CV–11117, 2013 WL 5393885, at *8 (S.D.N.Y. Sept.26, 2013) (stating elements); *Washington v. Kellwood Co.,* No. 05–CV–10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (same). " '[T]he covenant of good faith and fair dealing is implicit in every contract' under New York law ...." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank,* 552 F. App'x 13, 16 (2d Cir.2014) (alteration in original) (quoting *Consol. Edison, Inc. v. Ne. Utils.,* 426 F.3d 524, 529 (2d Cir.2005)). "The implied covenant of good faith and fair dealing prevents any party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Gaia House Mezz LLC v. State St. Bank & Trust Co.,* 720 F.3d 84, 93 (2d Cir.2013) (quoting *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)). "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.' " *Gaia House Mezz,* 720 F.3d at 93 (quoting *Thyroff v. Nationwide Mut. Ins. Co. .,* 460 F.3d 400, 407–08 (2d Cir.2006)). "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.,* 310 F.3d 73, 80 (2d Cir.2002) (quoting *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–44 (S.D.N.Y.1997)).

### i. Existence of a duty

OLS argues that the Complaint does not identify any specific contract or agreement giving rise to a duty of good faith and fair dealing. (OLS Reply 3.) Although the Complaint errs on the side of generalization, Plaintiff's good faith and fair dealing cause of action does identify the "loan modification application agreements" as one of the sources of OLS' implied duty of good faith

and fair dealing, and further states that OLS "was obligated to comply with its contractual responsibilities both in servicing loans and in its *conduct while a modification application was pending.*" (Compl.¶¶ 87, 89.) These allegations are sufficient to put OLS on notice that Plaintiff has identified the Modification Application as one of the specific contracts or agreements at issue. As with Plaintiff's breach of contract claim, the Modification Application constitutes a contract between Plaintiff and OLS, and thus imparts upon OLS a duty to act in good faith and fair dealing.[14] Therefore, Plaintiff satisfies the first element of this claim.

[14]   As discussed above, *supra* Part b.ii, OLS appears to accept, at least for purposes of this motion, that the Modification Application is a contract.

**ii. Breach**
**\*10**  With respect to the second element, the Complaint alleges a variety of actions that constitute OLS' breach of their implied duty of good faith and fair dealing. Specifically, Plaintiff alleges that OLS violated its duty by: "(a) foreclosing on borrowers who had pending loan modification applications, even though it had expressly represented that it would not; (b) promulgating a script to its representatives directing them to tell borrowers to withhold payment while their modification application was being reviewed ...; (c) refusing to acknowledge receipt of documents in support of a loan modification application, even when such documents were in fact received; and (d) engaging in bad faith in and [sic] unfair pattern and practice of attempting to force borrowers into default and foreclosure in order to collect penalty fees." (Compl.¶ 89.) Although OLS is correct that the Modification Application contains no promise that OLS will forego the commencement of foreclosure proceedings during the pendency of the application's approval,[15] the rest of the allegations, taken as true, plausibly allege that OLS intentionally acted to prevent Plaintiff from receiving the benefit of her contract—the resolution of Plaintiff's "mortgage delinquency and avoid[ance] of foreclosure." (Modification Application at 2.) Plaintiff's claim is not duplicative of her breach of contract claim because each claim involves distinct predicate conduct. *Fleisher v. Phoenix Life Ins. Co.,* 858 F.Supp.2d 290, 299 (S.D.N.Y.2012) ("Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." (alteration in original) (quoting

*Deutsche Bank Sec. Inc. v. Rhodes,* 578 F.Supp.2d 652, 664 (S.D.N.Y.2008))); *Hosp. Auth. of Rockdale Cnty. v. GS Capital Partners V Fund, L.P.,* No. 09–CV–8716, 2011 WL 182066, at \*4 (S.D.N.Y. Jan. 20, 2011) (noting that a "plaintiff may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations"). Plaintiff's breach of contract claim is based on OLS' failure to review the Modification Application while Plaintiff's implied covenant claim is based on OLS' deception and misrepresentation, which ultimately deprived Plaintiff of the benefit of her desired loan modification.

[15]   Plaintiff's opposition brief continues to discuss OLS' alleged verbal and written representations that it would forbear foreclosure proceedings during the pendency of Plaintiff's application process and OLS' subsequent commencement of foreclosure against Plaintiff while her application was still under review. (Pl. OLS Opp'n 11–12.) However, it is unclear whether Plaintiff understands these representations to form independent contractual obligations, to amend the terms of the Modification Application or to circumstantially show bad faith under the Modification Application.

**iii. Causation and damages**
Turning to the final element of a breach of the implied duty of good faith and fair dealing, the Complaint only states that, "as a direct and proximate result of the foregoing wrongful conduct committed by Ocwen, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial." (Compl.¶ 92.) Plaintiff's opposition brief only states that OLS' actions caused her to "delay the exercise of her options." (Pl. OLS Opp'n 12.) Although the predicate acts constituting breach of contract and breach of the implied covenant of good faith and fair dealing, with respect to the Modification Application, are distinct, an implied covenant claim will still be dismissed where both claims seek identical damages. *See Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.,* No. 11–CV–4743, 2012 WL 3679319, at \*3 (E.D.N.Y. Aug. 22, 2012) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce,* 70 A.D.3d 423, 894 N.Y.S.2d 47, 49–50 (App.Div.2010)); *Deer Park Enterprises, LLC v. Ail Sys., Inc.,* 57 A.D.3d 711, 870 N.Y.S.2d 89, 90 (App.Div.2008) ("A cause of action to recover damages for breach of the implied covenant

of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract.' " (quoting *Canstar v. J.A. Jones Const. Co.,* 212 A.D.2d 452, 622 N.Y.S.2d 730, 731 (App.Div.1995))).

**\*11** The Court is unable to distinguish between Plaintiff's alleged damages based on OLS' failure to perform under the Modification Application and OLS' failure to adhere to the implied covenant of good faith and fair dealing under the Modification Application. *See Mendez v. Bank of Am. Home Loans Servicing, LP,* 840 F.Supp.2d 639, 653 (E.D.N.Y.2012) (finding that the plaintiff's alleged damages resulting from breach of a loan modification agreement and breach of the covenant of good faith and fair dealing implicit in the loan modification agreement—"the assessing of late fees, interest, and other delinquency related fees"—to be duplicative).

Plaintiff has failed to satisfy the final element of her implied covenant claim. Plaintiff's implied covenant claim is dismissed without prejudice.

### e. Promissory estoppel
Plaintiff alleges that OLS made the following promises: (1) that there would be no penalty for withholding loan payments while modification applications were pending, (2) that their homes would not be foreclosed on while modification applications were pending, and (3) that their applications would be considered once necessary documentation was received. (Compl.¶ 99.) Plaintiff also argues that she, and her putative class members, reasonably relied on these promises to their detriment, resulting in an inability to pursue other default and foreclosure strategies, default balances, forced home sale, degradation of credit score and other damages. (*Id.* ¶¶ 100–03.) OLS argues that Plaintiff fails to state a claim because: (1) Plaintiff has failed to plead the plausible existence of a "clear and unambiguous promise," (2) the alleged promises were in contravention of the clear language of the Modification Application and Mortgage, (3) OLS is not alleged to have foreclosed on Plaintiff's home until after her application was denied, (4) the statute of frauds bars Plaintiff's claim, and (5) a promissory estoppel claim cannot stand where the subject matter is governed by an express contract between the parties. (OLS Mem. 15–17.)

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000); *Cacchillo v. Insmed, Inc.,* 551 F. App'x 592, 594 (2d Cir.2014) (stating elements); *Dumont v. Litton Loan Servicing, LP,* No. 12–CV–2677, 2014 WL 815244, at \*9 (S.D.N.Y. Mar. 3, 2014) (same); *Picini v. Chase Home Fin. LLC,* 854 F.Supp.2d 266, 275 (E.D.N.Y.2012) (same). "A promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract." *Benefitvision Inc. v. Gentiva Health Servs., Inc.,* No. 09–CV–0473, 2014 WL 298406, at \*9 (E.D.N.Y. Jan. 28, 2014) (alteration and internal quotation marks omitted) (quoting *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.,* 2010 WL 2900048, at \*6 (S.D.N.Y. July 20, 2010)); *Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.,* No. 11–CV–6345, 2012 WL 3930112, at \*6 (S.D.N.Y. Sept. 10, 2012) ("[A] valid and enforceable contract precludes recovery in quasi-contract for all matters covered by the contract." (citing *Kwon v. Yun,* 606 F.Supp.2d 344, 368 (S.D.N.Y.2009))).

### i. Clear and unambiguous promise
**\*12** OLS argues that Plaintiff fails to allege a clear and unambiguous promise. Plaintiff responds by pointing to four allegations in the Complaint. (Pl. OLS Opp'n 13–14.) Each allegation is addressed below.

First, Plaintiff alleges that OLS promised to review Plaintiff's loan modification when she submitted all required documents. (*Id.* at 13 (citing Modification Application at 12).) However, as Plaintiff's citation makes clear, this promise is contained in the Modification Application itself. Consequently, its breach is duplicative of Plaintiff's contract claim based on the Modification Application.

Second, Plaintiff alleges that OLS promised to assist Plaintiff in attempting to modify her mortgage loan, and offer a HAMP modification if she qualified for one. (Pl. OLS Opp'n 12 (citing (Compl.¶ 21).) This promise falls within the scope of the Modification Application, which explicitly references the Making Home Affordable Program and Plaintiff's consent to the transmittal of personal information to the Department of Treasury,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Fannie Mae, Freddie Mac, and companies that perform support services in conjunction with the Making Home Affordable Program. (*See* Modification Application at 11.)

Third, Plaintiff alleges that her "Relationship Manager" Naik "directed Plaintiff to discontinue making payments on her mortgage" because "while the loan modification was in process, the correct amount of payment was unknown and Plaintiff should not make a payment until provided with the new payment amount." (Compl. ¶ 25; Pl. OLS Opp'n 14.) OLS argues that Plaintiff's allegation is "conclusory." (OLS Reply 6.) The Court disagrees. Drawing all inferences in favor of Plaintiff and accepting the allegations as true, Plaintiff has plausibly alleged that Naik, sometime shortly after December 30, 2011, and at least one other OLS representative, between February 2012 and April 2012, told Plaintiff to not make payments while her loan modification was pending because the amount due was unknown. (Compl.¶¶ 25, 30.) These allegations are sufficient to satisfy the first element of Plaintiff's claim.

Fourth, Plaintiff alleges that OLS represented that it would not initiate foreclosure proceedings while it considered Plaintiff's modification. (Pl. OLS Opp'n 14 (citing Compl. ¶¶ 33, 84).) [16] OLS argues that Plaintiff fails to plead "sufficient factually-supported allegations to demonstrate the plausible existence of a 'clear and unambiguous' promise by OLS that it would ... forebear from pursuing foreclosure ...." (OLS Mem. 16.) The Court disagrees. Plaintiff alleges that by letter dated April 3, 2012, Defendants expressly stated that "[w]hile we consider your request, we will not initiate a new foreclosure action and we will not move ahead with the foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements." (Compl.¶ 33.) The allegation is more than sufficient to state the plausible existence of a clear and unambiguous promise by OLS.

[16]     Plaintiff's opposition brief states that she was told at least ten times by OLS that it would not commence foreclosure during the loan modification process. (Pl. OLS Opp'n 12.) However, the Complaint only alleges the existence of two letters containing this promise. (Compl.¶¶ 33, 84.)

**ii. Reasonable and foreseeable reliance**

**\*13** OLS argues that Plaintiff's reliance on any alleged directive to cease mortgage payments and OLS' promise to not pursue foreclosure was unreasonable because these statements were in tension with the Modification Application's warning that "[d]uring this time, Ocwen will not delay or stop any collections or legal activity on your loan." (OLS Reply 5; Modification Application at 2.) The Court cannot hold, as a matter of law, that Plaintiff's reliance on OLS' statements was unreasonable. The Modification Application was returned to OLS on December 28, 2011. (Compl. ¶ 23.) On December 30, 2011, OLS informed Plaintiff that Naik would be "responsible for monitoring your account ... and carefully reviewing your situation." (*Id.* ¶ 24.) Shortly thereafter, Naik informed Plaintiff that she should stop her monthly mortgage payments until a new amount was determined. (*Id.* ¶ 25.) These allegations, taken together, sufficiently state that Plaintiff's reliance on OLS' directive to stop paying her mortgage was reasonable. Similarly, given the relationship between Plaintiff and OLS, Plaintiff's reliance on OLS' written promise to not pursue foreclosure through the pendency of her loan modification was reasonable.

The Court also rejects OLS' argument that, because the directive to not pay mortgage payments was in tension with the requirements of Plaintiff's Mortgage and Note, reliance on the directive was unreasonable. (OLS Mem. 17.) Although the Mortgage and Note both contained obligations that Plaintiff pay monthly mortgage payments, Plaintiff was working with OLS, her loan servicer, to modify her obligations under the Mortgage and Note. At the motion to dismiss stage, these are sufficient factual allegations which if proven true, could establish Plaintiff's reasonable reliance. *See Kapsis,* 923 F.Supp.2d at 453 (E.D.N.Y.2013) (finding that the plaintiff's reliance on her mortgage loan servicer's promise to send a forbearance agreement in return for $8,000 to be reasonable and foreseeable). In sum, given the nature of the relationship between the parties and the content of the statements, Plaintiff has plausibly alleged that her reliance on OLS' statements was reasonable and foreseeable.

**iii. Injury as a result of reliance**
OLS argues that Plaintiff's promissory estoppel claim is intended to circumvent New York's Statute of Frauds. [17] (OLS Mem. 17.) Plaintiff appears to accept OLS'

argument that the statute of frauds applies to her promissory estoppel claim.

17   *See* N.Y. Gen. Obl. Law § 5–703(3) ("A contract to devise real property or establish a trust of real property, or any interest therein or right with reference thereto, is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith, or by his lawfully authorized agent.").

Although a usual promissory estoppel claim need only plausibly allege an injury resulting from reliance, "[w]hen promissory estoppel is asserted to overcome a defense based on the Statute of Frauds, an 'unconscionable' injury is required under New York law. *Cacchillo v. Insmed, Inc.,* 551 F. App'x 592, 595 (2d Cir.2014); *KJ Roberts & Co. Inc. v. MDC Partners Inc.,* No. 12–CV–5779, 2014 WL 1013828, at *10 (S.D.N.Y. Mar. 14, 2014) ("Where promissory estoppel is invoked to 'trump the Statute of Frauds,' then the plaintiff 'must demonstrate 'unconscionable' injury, *i.e.,* injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement.' " (quoting *Merex A.G. v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir.1994))). "An unconscionable injury is an injury 'beyond that which flows naturally from the non-performance of the unenforceable agreement.' " *Ely v. Perthuis,* No. 12–CV–01078, 2013 WL 411348, at *7 (S.D.N.Y. Jan. 29, 2013) (quoting *Merex,* 29 F.3d at 826).

 *14 Plaintiff claims that her injury is unconscionable because Defendants, a large and sophisticated organization, intentionally "misled and delayed an unrepresented consumer in order to force her into foreclosure, driving her to bankruptcy." The Court finds that Plaintiff has at least plausibly alleged that her injury is beyond that which would flow naturally from the non-performance of the unenforceable agreement. Arguably, foreclosure would be the natural result of Plaintiff's reliance on OLS' directive to not pay her mortgage and OLS' promise to not foreclose on her home during the pendency of her loan application. However, Plaintiff alleges that her reliance on statements made by OLS also resulted in her bankruptcy. (Compl.¶¶ 4, 53–54.) Because bankruptcy is not an injury that flows naturally from the unenforceable agreement, Plaintiff has alleged an injury sufficient to overcome the Statute of Frauds.

In sum, the Court finds that Plaintiff has adequately alleged a promissory estoppel claim against OLS based on the directive from OLS to cease making payments under the mortgage and the promise by OLS to not initiate foreclosure proceedings until Plaintiff's loan modification had been decided. 18

18   OLS also argues that Plaintiff's claim fails because "the alleged foreclosure action was initiated more than three weeks after her [Modification] Application was denied and no longer pending." (OLS Reply 3 (emphasis omitted).) OLS ignores Plaintiff's allegations that subsequent to the commencement of foreclosure proceedings, OLS continued to communicate with Plaintiff as if her loan modification were still pending. (*See* Compl. ¶¶ 48–49, 51–52.) These allegations raise an issue of fact as to whether OLS actually complied with its alleged promise and precludes the granting of the motion to dismiss on this ground.

### f. Negligent misrepresentation

Plaintiff alleges that Defendants "misrepresented and/ or failed to disclose" various material facts about the loan modification application process. (Compl. ¶¶ 93–97.) Specifically, Plaintiff identifies Defendants' misrepresentation or failure to disclosure that: "(a) Ocwen had received and processed modification documents; (b) payments continue to come due while a loan application is pending ...; and (c) Ocwen would foreclose on borrower's [sic] homes while their modification applications were pending or they were making trial modification payments." 19 (*Id.* ¶ 94.) For the reasons discussed below, Plaintiff's negligent misrepresentation claim is dismissed without prejudice.

19   OLS argues that the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply to negligent misrepresentation claims. (OLS Mem. 19.) The Second Circuit has yet to hold that it does. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 188 (2d Cir.2004) ("Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation.... [T]his Court has not adopted that view, and we see no need to do so here ....." (citations omitted)); *see also Amos v. Biogen Idec Inc.,* ——F.Supp.2d ——, ——, 2014 WL 2882104, at *6 (W.D.N.Y. June 25, 2014) ("Although many district courts in the Second Circuit have held that Rule 9(b) applies to claims of negligent

2014 WL 4677120

misrepresentation asserted under New York law, the Second Circuit Court has *explicitly* declined to make such a finding."). The Court need not answer this question as, under either pleading standard, Plaintiff fails to state a claim.

Under New York law, in order to state a claim for negligent misrepresentation, "the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.' " *Anschutz Corp. v. Merrill Lynch & Co., Inc.,* 690 F.3d 98, 114 (2d Cir.2012) (quoting *Hydro Investors v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000)); *see also King County, Wash.,* 863 F.Supp.2d at 299 (quoting *Hydro Investors,* 227 F.3d at 20), *reconsideration denied,* 863 F.Supp.2d 317 (S.D.N.Y.2012). "[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might not ever come to fruition." *Hydro Investors,* 227 F.3d at 20–21.

### i. Special relationship

**\*15** "[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996). *Kimmell* directs courts to examine "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450. The Second Circuit has held that a " 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell.*' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 188 (2d Cir.2004) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001)).

Defendant argues that "it is well established law that the relationship between a mortgage lender or mortgage servicer and a borrower *ordinarily* does not rise to the level of a fiduciary or special relationship and does not create a duty to disclose." (OLS Mem. 19 (emphasis added).) Plaintiff concedes that a typical borrower-lender relationship will not support a negligent misrepresentation claim, *see Grimes v. Fremont Gen. Corp.,* 933 F.Supp.2d 584, 608 (S.D.N.Y.2013) ("[A] standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation." (quoting *Boniel v. U.S. Bank N.A.,* No. 12–CV–3809, 2013 WL 458298, at \*4 (E.D.N.Y. Feb.6, 2013))), but argues that she has alleged facts which show that her relationship with OLS exceeded that of a regular lender-borrower and constituted a special relationship. (Pl. OLS Opp'n 18–19.)

Plaintiff argues that the following allegations describe a special relationship: (1) OLS solicited Plaintiff to apply for a loan modification, (2) OLS stated that Plaintiff could be eligible for not only a HAMP modification, but also for Ocwen's own modification program, (3) OLS requested that Plaintiff send it various documents, and (4) OLS assigned Plaintiff two "relationship managers." (*Id.* at 19.) OLS argues that these allegations represent nothing more than the actions of a "typical loan servicer." (OLS Reply 9.) The Court agrees with OLS.

The first three allegations highlighted by Plaintiff do not suggest that OLS acted as anything other than as an arms-length loan servicer. Plaintiff's fourth allegation merits further discussion. The Court is only aware of only one court in this Circuit, and Plaintiff points to no other case, which has held that a loan servicer may be liable to a borrower under a negligent misrepresentation theory. In *Picini,* the plaintiffs, who had enrolled in a Temporary Payment Plan [20] with the defendants, alleged that the defendants had "special expertise," a "sophisticated understanding of servicing mortgage loans and of available loss mitigation options," that the defendants assigned the plaintiffs a "manager" from the "Resolutions Group to help guide them through the loan modification process," and that a number of the defendants' representatives provided the plaintiffs with conflicting information. *Picini,* 854 F.Supp.2d at 277. The *Picini* court appears to have placed great weight on the existence of an assigned "manager" to guide the plaintiffs through their loan application. However, the provision of such a representative does not strike the

Court as an act beyond that involved in an ordinary borrower-lender relationship. *See Green v. Wells Fargo Bank, N.A.,* 927 F.Supp.2d 244, 246 (D.Md.2013) (noting that the defendant-servicer provided plaintiffs with a "Home Preservation Specialist" but still finding that the relationship between the loan servicer and the plaintiffs was "contractual, not fiduciary, in nature"); *Goss v. Bank of Am., N .A.,* 917 F.Supp.2d 445, 447, 452 (D.Md.2013) (noting that plaintiffs were provided, *inter alia,* with a "Workout Negotiator" but still finding that the relationship between the loan servicer and the plaintiff did not establish a duty in tort), *aff'd sub nom. Goss v. Bank of Am., NA,* 546 F. App'x 165 (4th Cir.2013). Moreover, the *Picini* court failed to explain why the existence of a "manager" from the defendant's "Resolutions Group" converted an otherwise arm's-length borrower-lender relationship into a special relationship. *See Boniel v. U.S. Bank N.A.,* No. 12–CV–3809, 2013 WL 458298, at \*4 (E.D.N.Y. Feb.6, 2013) ("A standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation."), *reconsideration denied,* No. 12–CV–3809, 2013 WL 1687709 (E.D.N.Y. Apr.18, 2013), *appeal dismissed* (Oct. 28, 2013); *Dobroshi v. Bank of Am., N.A.,* 65 A.D.3d 882, 886 N.Y.S.2d 106, 109 (App.Div.2009) ("This court has repeatedly held that an arm's length borrower-lender relationship is not of a confidential or fiduciary nature and therefore does not support a cause of action for negligent misrepresentation." (citations omitted)); *cf. Gray v. One West Bank, Fed. Sav. Bank,* No. 13–CV–547, 2014 WL 3899548, at \*12 (D.Haw. Aug.11, 2014) ("This court has also 'recognized that a loan servicer does not owe a duty of care to a borrower in a loan it services, unless the loan servicer's activities exceed its traditional role.' " (quoting *Crilley v. Bank of Am., N.A.,* No. 12–CV–81, 2013 WL 1767704, at \*5 (D.Haw. Apr. 24, 2013))); *Casault v. Fed. Nat. Mortgage Ass'n,* 915 F.Supp.2d 1113, 1130 (C.D.Cal.2012) ("Numerous cases have characterized a loan modification as a traditional money lending activity." (collecting California cases)). Further undermining Plaintiff's reliance on *Picini* is her allegation that her "relationship managers" simply read from "uniform scripts." (Compl.¶ 73.) The fact that the "relationship managers" in question read from a script suggests that they held and imparted no special knowledge and further undermines Plaintiff's argument that her relationship with OLS was anything but ordinary. Finally, *Picini* is distinguishable in that the plaintiffs there had signed a Temporary Payment Plan with the defendants, arguably supporting the plaintiff's reliance on the defendants "sophisticated understanding of servicing mortgage loans and of available loss mitigation options." *Picini,* 854 F.Supp.2d at 277.

20    Under HAMP, a Temporary Payment Plan "typically last three months, during which time the borrower would have to make timely mortgage payments and provide certain financial documentation." *Picini v. Chase Home Fin. LLC,* 854 F.Supp.2d 266, 269–70 (E.D.N.Y.2012). A borrower under a Temporary Payment Plan may receive a permanent modification contingent upon the servicer's receipt of all requirement documentation and a signed modification agreement. *Id .*

**\*16** In finding that the plaintiffs had alleged the plausible existence of a special relationship, the *Picini* court cited to *Smith v. Ameriquest Mortgage Co.* 60 A.D.3d 1037, 876 N.Y.S.2d 447 (App.Div.2009). But *Smith* does not support the *Picini* court's special relationship conclusion. Of critical importance, *Smith* involved an allegation that the defendant personally visited Plaintiff twice, at her home, to "convince" her that the transaction in question was in the plaintiff's best interest. *Smith,* 876 N.Y.S.2d at 449–50. This allegation alone exceeds the scope of the standard lender-borrower relationship. Here, Plaintiff makes no similar allegation of unusual behavior on OLS' part. *Picini* also cited to *Fleet Bank v. Pine Knoll Corp.,* in which the Appellate Division of the Supreme Court of the State of New York denied the plaintiff's cross-motion for summary judgment due to the defendant's "heav[ ]y" reliance on the plaintiff's "relationship managers" who guided the plaintiff through "various financial transactions." *Fleet Bank,* 290 A.D.2d 792, 736 N.Y.S.2d 737, 741 (App.Div.2002). *Fleet Bank* is also distinguishable from the present case. In *Fleet Bank,* the relationship between defendant-borrower and plaintiff-lender involved the taking over of the defendant's "Small Business Administration loan" and, notably, included a concession from one of the bank's senior vice presidents that "[w]e need to be very careful in how we advise [small business customers]." *Id.* at 741–42. In contrast to the "particular circumstances" presented in *Fleet Bank, id.* at 742, Plaintiff has alleged that she received literature from OLS pertaining to a loan modification, subsequently applied for a loan modification, received repeated requests for documents and spoke to "relationship managers" who read from uniform scripts. These allegations, without more, do not

convince the Court that Plaintiff's interaction with OLS went beyond that expected of an arms-length lender-borrower/servicer relationship.

Unlike in *Picini,* Plaintiff never entered into any agreement with Defendants other than the Modification Application, unlike in *Smith,* Plaintiff had no unusual interaction with any representative of OLS, and unlike in *Fleet Bank,* OLS did not offer Plaintiff any particularized advice. For the reasons discussed above, the Court finds *Picini* distinguishable and dismisses Plaintiff's negligent misrepresentation claim for failure to plausibly allege the existence of a special relationship. If Plaintiff is able to allege additional facts supporting the existence such a special relationship, she may do so in an amended complaint.

**g. New York General Business Law §§ 349 and 350**
Plaintiff, largely by incorporating the allegations used in the already discussed causes of action, alleges that OLS violated §§ 349 and 350 of the New York General Business Law, which prohibits "unlawful deceptive acts or practices" and "false advertising" respectively in the conduct of any business. Defendants argue that Plaintiff presents "an isolated event between herself and OLS, and not a deceptive business practice aimed at the public" as required by the statute and Plaintiff therefore fails to plead a deceptive act or practice. (OLS Mem. 22–23.)

**\*17** To state a claim under either section of the New York General Business Law, "a plaintiff must allege that: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.,* 574 F.3d 64, 74 (2d Cir.2009) (§ 349) (citing *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir.2000) (per curiam)); *Dash v. Seagate Tech. (U.S.) Holdings, Inc.,* —— F.Supp.2d ——, ——, 2014 WL 2922658, at \*2 (E.D.N.Y. June 30, 2014) (both sections); *see also Krasnyi Oktyabr, Inc. v. Trilini Imports,* No. CV–05–5359, 2007 WL 1017620, at \*12 (E.D.N.Y. Mar. 30, 2007) ("The standards for deceptive business practices under section 349 of the General Business Law are substantively identical to those for false advertising under section 350."). To satisfy the first element, a plaintiff must "demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties ... would not fall within the ambit of the statute." *DiGangi v. Gov't Employers Ins. Co.,* No.

13–CV–5627, 2014 WL 3644004, at \*6 (E.D.N.Y. July 22, 2014) (quoting *James v. Penguin Grp. (USA) Inc.,* No. 13–CV–2801, 2014 WL 1407697, at \*9 (S.D.N.Y. Apr.11, 2014)).

Plaintiff alleges that OLS routinely engages in "dual tracking," where it purports to be processing a loan modification but actually intends to move the borrower toward foreclosure. [21] (Compl.¶ 14.) Although Plaintiff details only her particular experience with OLS, she has sufficiently alleged that this conduct is consumer-oriented. *See Pandit,* 2012 WL 4174888, at \*6 (finding that the plaintiffs adequately alleged a consumer-oriented practice where "Defendant routinely asks homeowners to resubmit financial information on pretextual grounds," "misleads homeowners over the phone," "and ignores completed loan modifications"); *M & T Mortgage Corp. v. White,* 736 F.Supp.2d 538, 571 (E.D.N.Y.2010) ("While the deceptive practices were aimed at particular individuals in these instances, nothing suggests that similarly vulnerable consumers could not—and did not—fall victim to similar practices, and there is nothing especially unique or unusual about these particular transactions."); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995) (denying a motion for summary judgment and finding that the plaintiff's § 349 claim was sufficiently "consumer-oriented" where "defendant Bank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the Funds with standard documents presented to customers upon the opening of accounts").

[21]    OLS argues that Plaintiff offers no allegations concerning any of OLS' actions that could plausibly constitute "false advertising." (OLS Mem. 23.) Although Plaintiff does not completely abandon her § 350 claim, (*see* Pl. OLS Opp'n 21 (stating that the elements of §§ 349 and 350 are identical)), she does not offer any argument to rebut OLS' motion to dismiss her § 350 claim. "The term 'false advertising' means *advertising,* including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350–a (emphasis added). The Complaint is devoid of any allegation concerning "advertising" by OLS. Therefore, the Court grants the motion to dismiss Plaintiff's § 350 claim.

Harte v. Ocwen Financial Corp., Not Reported in F.Supp.3d (2017)
Case 3:17-cv-00772-RDM   Document 31-4   Filed 10/20/17   Page 85 of 100
2014 WL 4677120

OLS argues that Plaintiff fails to plead any deceptive act or practice. Plaintiff alleges, *inter alia* and as discussed in detail above, that OLS promised to review her loan modification, directed Plaintiff to stop paying her mortgage, and promised that it would not commence foreclosure proceedings during the pendency of her loan application. (Compl.¶¶ 24–25, 33, 43.) OLS argues, as it did in opposition to Plaintiff's promissory estoppel claim, that it was unreasonable for Plaintiff to rely on these alleged statements. (OLS Mem. 23.) For the same reasons discussed above, *see* Part II.e.ii, the Court finds that Plaintiff's allegations are sufficient to cross the threshold of plausibility. OLS also argues that Plaintiff fails to show a sufficient injury because her foreclosure and the corresponding assessment of late fees were caused by her own failure to make timely mortgage payments. (OLS Mem. 24.) OLS ignores Plaintiff's allegation that OLS' actions proximately caused Plaintiff's bankruptcy and also deceived her into relying on OLS instead of pursuing other loss mitigation strategies. *See Pandit,* 2012 WL 4174888, at *6 (finding the plaintiff's allegation that the defendant's actions lulled them into "not pursuing other options for saving their home" to be sufficient to state an injury). Plaintiff has alleged a plausible claim under § 349 of New York's General Business Law.

**h. Claims against the corporate parent OFC**

**i. Direct liability**

 **\*18** OFC moves to dismiss all claims against it on the basis that the Complaint is devoid of any factual allegation pertaining to the actions of OFC. Plaintiff argues that "OFC has taken responsibility for controlling OLS's predatory mortgage servicing practices in order to settle claims brought by government entities" and that she was led to believe that there was no distinction between OFC and OLS. (Pl. OFC Opp'n 8–9.) The Complaint only states that OFC, "through its subsidiaries, engages in the servicing and origination of mortgage loans." (Compl.¶ 7.) The Complaint only refers to "Defendants," "Ocwen" or the "Company." Without any allegations speaking to the particular conduct of OFC, Plaintiff's claims of breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, negligent misrepresentation, and New York General Business Law §§ 349 and 350 against OFC based on direct liability are dismissed without prejudice. *See Dumont v. Litton Loan Servicing, LP,* No. 12–CV–2677, 2014 WL 815244, at *19 (S.D.N.Y. Mar. 3, 2014)

(dismissing all direct liability claims against OFC for lack of any specific allegations concerning the conduct of OFC and noting that the plaintiffs only alleged that "OFC directed, controlled, formulated and/or participated in the loan modification practices of OLS" (alteration and citation omitted)); *Gunther v. Capital One, N.A.,* 703 F.Supp.2d 264, 277 (E.D.N.Y.2010) ("Except for the plaintiff's use of the term 'Defendants' in plural and his allegation that Capital One Financial controls Capital One Bank, Capital One Financial is left almost entirely out of the story. In the Court's view, the plaintiff cannot avoid the fact that, when considered in full, the complaint at best states a claim against Capital One Financial for derivative liability.")

**ii. Indirect liability**

Absent any allegations supporting direct liability upon OFC, Plaintiff urges the Court to "pierce the corporate veil." (Pl. OFC Opp'n 9.) OFC argues that the Complaint does not allege sufficient allegations to hold OFC liable for the actions of OLS. (OFC Mem. 10.)

As a preliminary matter, the parties dispute whether the Court should apply the substantive law of New York or Delaware. "Under New York choice of law rules, the state of incorporation's law governs veil piercing." *OOO v. Empire United Lines Co., Inc.,* 557 F. App'x 40, 46 (2d Cir.2014) (citing *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995)), *as corrected* (Feb. 7, 2014). OLS is a limited liability company incorporated in Delaware, (Compl.¶ 8), therefore, Delaware veil piercing law applies.

"Under Delaware law, 'a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *VFS Fin., Inc. v. Falcon Fifty LLC,* ——F.Supp.2d ——, ——, 2014 WL 1744496, at *5 (S.D.N.Y. Apr.30, 2014) (quoting *Geyer v. Ingersoll Publ'n Co.,* 621 A.2d 784, 793 (Del.Ch.1992)). Absent an allegation of fraud, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,* 861 F.Supp.2d 344, 376 (S.D.N.Y.2012) (applying Delaware law) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1457 (2d Cir.1995)) (internal quotation marks omitted); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir.2008) ("To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual

fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness." (quoting *Harco National Insurance Co. v. Green Farms, Inc.,* No. CV–A–1331, 1989 WL 110537, at *4 (Del.Ch. Sept.19, 1989))). The factors to be considered are:

> **\*19** [W]hether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets,* 537 F.3d at 177 (quoting *Harco,* 1989 WL 110537, at *4).

The Complaint is almost completely devoid of any allegations speaking to the any of the factors relevant to the Court's veil piercing inquiry. Consequently, Plaintiff fails to provide factual allegations sufficient to support a veil piercing theory of liability. Therefore, actions by OLS cannot be imputed to OFC and all claims against OFC based on a piercing of the corporate veil are dismissed.

In an effort to circumvent dismissal, Plaintiff's brief in opposition to the motion to dismiss includes a "Statement of Facts" speaking to the relationship between OFC and OLS. (Pl. OFC Opp'n 2–6.) Plaintiff attempts to amend her Complaint through her opposition brief, but such an act is prohibited. The Court does not recognize the factual allegations asserted in Plaintiff's opposition brief. [22] *See U.S. ex rel. Siegel v. Roche Diagnostics, Corp.,* 988 F.Supp.2d 341, 342 (E.D.N.Y. Dec.30, 2013) (noting that a "[p]laintiff may not amend his complaint through motion papers" (citation and internal quotation marks omitted)); *Lazaro v. Good Samaritan Hosp.,* 54 F.Supp.2d 180, 184 (S.D.N.Y.1999) (stating that "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss"); *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 526 (S.D.N.Y.1977) ("[A] party is not entitled to amend his pleading through statements in his brief." (citation and internal quotation marks omitted)).

[22] Even if the Court were to recognize the allegations set forth in Plaintiff's brief in opposition to the motion to dismiss, Plaintiff still fails to satisfy the requirements of Delaware law as the brief contains

no argument or facts concerning the existence of an element of injustice of unfairness. This second element of Delaware's alter-ego test requires that "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Radiancy, Inc. v. Viatek Consumer Products Grp., Inc.,* No. 13–CV–3767, 2014 WL 1318374, at *5 (S.D.N.Y. Apr. 1, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,* 975 F.Supp.2d 392, 406 (S.D.N.Y.2013) (same); *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.,* No. 12–CV–7280, 2013 WL 5366373, at *7 (S.D.N.Y. Sept. 25, 2013) (same) (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood,* 752 A.2d 1175, 1184 (Del.Ch.1999)). "The fraud or injustice must consist of something more than the alleged wrong in the complaint and relate to a misuse of the corporate structure." *In re Frito–Lay N. Am., Inc. All Natural Litig.,* No. 12–MD–2413, 2013 WL 4647512, at *6 (E.D.N.Y. Aug.29, 2013) (quoting *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical, Fr.,* No. 19760–NC, 2004 WL 5366102, at *7 (Del.Ch. Mar.4, 2004)); *see also Nat'l Gear & Piston,* 975 F.Supp.2d at 406 (collecting cases). Although Plaintiff fails to show that the corporate veil should be pierced for failure to state factual allegations pertaining to both prongs of Delaware's test, as Plaintiff requests, (Pl. OFC Opp'n 8), the Court grants Plaintiff leave to amend the Complaint to properly assert a claim against OFC.

### iii. Agency liability

Under New York law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca–Cola Co.,* 675 F.3d 163, 175 (2d Cir.2012) (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.),* 266 F.3d 112, 122 (2d Cir.2001)). "A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient to demonstrate the existence of an agency relationship." *Bigio,* 675 F.3d at 175.

As with Plaintiff's veil piercing argument, the Complaint fails to allege any facts to support imposing liability upon OFC under an agency theory. The only allegation specific to OFC is that it acted "through" its subsidiaries. Such an allegation is insufficient. *See Dumont,* 2014 WL 815244, at *24 (rejecting an agency theory of liability because "the OFC-specific allegations in the TAC are limited to conclusory allegations of direction and control").

**III. Conclusion**

For the foregoing reasons Defendants' motions to dismiss are granted in part and denied in part. All claims against OFC are dismissed without prejudice. Plaintiff's claims against OLS based on breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and New York General Business Law § 350 are also dismissed. Defendants' motions as to Plaintiff's claims against OLS based on promissory estoppel and New York General

Business Law § 349 are denied. Plaintiff is granted thirty days to address the defects identified by the Court and to submit an amended complaint. The amended complaint, if any, shall be filed within 30 days of the date of this Memorandum and Order.

**\*20**  SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4677120

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**6**

2008 WL 4453223
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

INDIANAPOLIS LIFE
INSURANCE COMPANY, Plaintiff
v.
Deborah HENTZ, Trustee, et al., Defendants
Richard W. Wallace et al., Third-Party Plaintiffs
v.
Amerus Group Co. et al., Third-Party Defendants.

Civil Action No. 1:06-CV-2152.
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Amy L. Strachan, Funk & Bolton PA, Philadelphia, PA, Bryan D. Bolton, Funk & Bolton, PA, Media, PA, for Plaintiff/Third-Party Defendants.

Amy Evans, Cross & Simon, LLC, Wilmington, DE, Steven E. Grubb, Goldberg, Katzman & Shipman, Harrisburg, PA, for Defendants.

*MEMORANDUM*

YVETTE KANE, Chief Judge.

**\*1** Plaintiff and Counterclaim Defendant Indianapolis Life Insurance Company ("Indianapolis Life") is an Indiana corporation authorized to sell and issue insurance policies in the state of Delaware. Indianapolis Life is a subsidiary of Third-Party Defendant AmerUs Group Co. ("AmerUs Group"). Third-Party Defendant AmerUs Life Insurance Co. ("AmerUs Life") is also a subsidiary of AmerUs Group. Third-Party Defendant Frederick Saide ("Saide") worked as an agent for Indianapolis Life during the relevant time-period of the alleged conduct underlying the Third-Party Complaint.

Defendants, Counterclaim Plaintiffs, and Third-Party Plaintiffs Richard W. Wallace and Rebecca J. Wallace ("Wallaces") are residents of Newport, Pennsylvania whose lives were insured by consecutive life insurance policies issued by Indianapolis Life. Defendant,

Counterclaim Plaintiff, and Third-Party Plaintiff Laurie M. Mason ("Trustee") is trustee for Third-Party Plaintiff The Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust ("Trust"), which is an irrevocable trust formed under the laws of the State of Delaware. The Trust is formed for the benefit of the Wallaces, who are also its settlors. [1]

[1]     Defendant Deborah Hentz did not join in the Counterclaim and Third-Party Complaint.

Before the Court are motions to dismiss filed by Saide, Indianapolis Life, AmerUs Life, and AmerUs Group (collectively the "Movants") to dismiss counts I, III, IV, V, VI, VII, VII, IX, X, and XI of the counterclaim and third-party complaint ("Complaint") of the Wallaces, the Trustee, and the Trust (collectively the "Complainants"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(6). In addition, the motion seeks to completely dismiss the Trust from this action. This motion has been fully briefed and is ripe for disposition.

**I. BACKGROUND**

**A. Factual Background** [2]

[2]     The following facts, which are accepted as true for purposes of this decision, are taken from the Counterclaim and Third-Party complaint.

The allegations in the Complaint arise out of a series of insurance transactions that took place between early 2005 and May 2006. The Wallaces, a married couple, decided in the course of reviewing their estate plan and insurance portfolio to purchase a new life insurance policy. (Doc. No. 3 at 14 ¶ 8.) They contacted Saide, an agent for Indianapolis Life, who advised them to terminate an existing life insurance policy that the Wallaces had previously purchased and to transfer the proceeds into a new policy that would be issued to them by Indianapolis Life. (*Id.* at 15 ¶ 9.) Saide worked out an arrangement to finance the premiums on a $4.1-million policy through a loan from Credit Suisse, a financial services company. (*Id.* at 15 ¶ 10.) After a time, the loan could be paid off with the compounded cash value of the policy. (*Id.*) To demonstrate the viability of the policy and loan arrangement he had proposed, Saide and his employer Indianapolis Life provided the Wallaces with an illustration ("Initial Illustration") "of a policy to be

purchased from the Insurance Company." (*Id.* at 15 ¶ 11.) Saide explained that "if they overfunded the life insurance policy under the Initial Illustration ... it would give Mr. and Mrs. Wallace an ability to pay off amounts borrowed [from Credit Suisse] to finance the premiums of the policy." (*Id.* at 16 ¶ 11.) The Wallaces believed that they would be issued a policy in accordance with the Initial Illustration based on the representations of Saide and Indianapolis Life. (*Id.* at 16 ¶ 12.)

**\*2** The Wallaces decided to go forward with the proposed deal and purchase a life insurance policy in Pennsylvania. (*Id.* at 16 ¶ 13) Even though Saide knew that Credit Suisse was not able to provide premium financing on life insurance premiums in Pennsylvania, he recommended the Wallaces apply for the loan from Credit Suisse. (*Id.*) As it turned out, Credit Suisse was indeed not able to provide the loan. (*Id.*) At this point, some time had elapsed [3] since the Wallaces' initial application for insurance, and Saide warned them that they would not be able to lock in the policy under the terms of the Initial Illustration if any further delay occurred. (*Id.* at 16-17 ¶¶ 14-15.) To avoid this problem, Saide proposed that: Indianapolis Life issue the Pennsylvania policy immediately so the Initial Illustration would be effective on the policy, the Wallaces personally pay the first premium due on the policy, and that the Wallaces form a trust in Delaware so that the Trust could apply for the insurance in a state where Credit Suisse would not be prohibited from making loans to fund the insurance premiums. (*Id.*) After these steps, the Pennsylvania policy would be cancelled and the Initial Illustration would be effective as to the Delaware Policy. (*Id.*)

[3]    It is unclear from the Complaint exactly how much time passed up until this point, but it is alleged that the Wallaces initially contacted Saide and Indianapolis Life in "early" 2005 and that the first Pennsylvania policy was issued on March 14, 2005. (Doc. No. 3 at 14 ¶ 8.)

The Wallaces agreed to Saide's plan, and on March 14, 2005, Indiana Life issued the Pennsylvania policy. (*Id.* at 17 ¶ 16.) On November 16, 2005, the Trustee and the Wallaces formed the Trust. (*Id.* at 18 ¶ 17.) The Trust applied for the new Delaware life insurance policy on November 22, 2005, and executed the loan and security agreement with Credit Suisse on November 23, 2005. (*Id.* at 18 ¶¶ 17-18.) The loan and security agreement provided that the trust would assign its rights to any proceeds of

the policy to Credit Suisse and pledge collateral for the amounts borrowed, which would be based on the cash value of the Delaware policy as provided in the Initial Illustration. (*Id.* at 19 ¶ 19.) The Delaware policy was issued in December 2005, and sent directly to Credit Suisse, which paid the first premium on January 12, 2006. (*Id.* at 19 ¶ 21-22.)

Based on the foregoing statements of Saide and Indianapolis Life, The Wallaces and the Trustee believed "that the Trust had a ... policy ... in accordance with the Initial Illustration." (*Id* . at 20 ¶ 23.) Saide and Indianapolis Life knew the Delaware policy did not incorporate the Initial Illustration. (*Id.*) In January 2006, Indianapolis Life provided an illustration of the Delaware policy to Credit Suisse (but not to the Wallaces or the Trustee) that showed that the policy was worth less than the Initial Illustration, which meant that the Wallaces' pledged collateral was insufficient to cover the loan. (*Id.* at 21 ¶ 24.) Reacting to this insufficiency, Credit Suisse issued a notice of default to the Trust threatening to surrender the insurance policy unless the Trust paid additional collateral in the amount of $78,000 dollars. (*Id.* at 22 ¶ 27.) At this point, the Wallaces unsuccessfully attempted to secure a copy of the policy from Indianapolis Life. Rather than produce the policy itself, Indianapolis Life provided them another illustration showing the values of the Delaware policy, which were diminished in comparison to the Initial Illustration. (*Id.* at 23 ¶ 29.) After incurring significant expenses investigating the matter, the Wallaces directed the Trustee to surrender the policy to Credit Suisse. (*Id.* at 24 ¶ 30.) The present action commenced after the Wallaces refused to pay Indianapolis Life for amounts still due under the surrendered policy and demanded reimbursement for premiums and their expenses. (*Id.* at 24 ¶ 31.)

**B. Procedural Background**

**\*3** Indianapolis Life commenced the present action by filing a complaint for declaratory judgment on November 1, 2006. (Doc. No. 1 .) The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Defendants answered the complaint, made a counterclaim against Indianapolis Life, and brought AmerUs Life, AmerUs Group, and Saide into the action by way of a third-party complaint filed on November 22, 2006. (Doc. No. 3.) On January, 29, 2007, the present motion to dismiss pursuant to Rule 12(b)(6) was filed by Indianapolis Life, AmerUs Life, and AmerUs Group.

(Doc. No. 31.) Saide sought and obtained leave of the Court to join in this motion and file his own. (Doc. No. 36.) The motions have been fully briefed by all parties (Doc. Nos. 32, 39, 55, 59) and are ripe for disposition. For the reasons that follow, the motions will be granted in part and denied in part.

## II. STANDARD OF REVIEW AND CHOICE OF LAW

### A. Standard of Review

The Movants have brought this motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

The Supreme Court's recent opinion in *Bell Atlantic Corp. v. Twombly,* has altered the standard of review for a motion to dismiss pursuant to Rule 12(b)(6). *Phillips v. County of Allegheny,* 515 F.3d 224, 230 (3d Cir.2008). In construing the Rule 12(b)(6) standard generally, the Court required the plaintiff to provide more than a formulaic recitation of a claim's elements that amounted to mere labels and conclusions. *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007). Additionally, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

The Third Circuit has held that the language in *Twombly* applies generally to all motions brought under Rule 12(b)(6). *Phillips,* 515, F.3d at 232. Despite the seemingly altered standard from *Twombly,* it is still true that "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)).

### B. Choice of Law

When a federal court is exercising subject matter jurisdiction over an action with state law claims pursuant to 28 U.S.C. § 1332, it must apply the substantive law of the state to those claims. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). One aspect of this rule is that a federal court must apply the conflict of law principles of the state in which it sits. *Klaxon Co. v.*

*Stentor Electric Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Both parties agree that Delaware law should apply to the state law claims in this matter. (Doc. No. 32 at 3; Doc. No. 55 at 7.) Having considered the interests and contacts of Delaware applicable to the present dispute as required by Pennsylvania choice of law principles, the Court will apply Delaware substantive law to the state claims brought in the Complaint.

## III. DISCUSSION

**\*4** As an initial matter, the motion is unopposed on several points. Both parties agree that the Trust itself is not a proper party. (Doc. No. 31 ¶ 1; Doc. No. 55 at 5.) Having considered the arguments and authorities cited by Movants, the Court agrees that the trust is not a proper party and it will be dismissed from this action. Both parties also agree that Count X of the Complaint (Insurance Fraud) should be dismissed because Del.Code. Ann. 18 § 2407 does not provide a private right of action. (Doc. No. 31 ¶ 8; Doc. No. 55 at 5.) Considering the arguments raised in the Movants' brief and the agreement of the parties, the Court will grant dismissal of Count X of the Complaint.

Finally, the Complainants state that they will "withdraw the Count of bad faith breach of contract without prejudice." The Court takes this statement to mean that the motion to dismiss is unopposed as to Count VI.[4] A claim for bad faith breach of contract is only recognized by Delaware courts when an insurer delays or fails to process a claim without reasonable justification. *Tackett v. State Farm Fire and Cas. Ins. Co.,* 653 A.2d 254, 263 (1995) (citing *Casson v. Nationwide Ins. Co.,* 455 A.2d 361 (Del.Super.1982). The allegations in the Complaint do not suggest that there was any delay or failure to process a claim on the life insurance policy at issue in this case. As such, Count VI will be dismissed.

[4]      A dismissal pursuant to Rule 12(b)(6) is a summary disposition on the merits and is presumed to be with prejudice. *See Johnsrud v. Carter,* 620 F.2d 29, 32-33 (3d Cir.1980).

The remaining Counts challenged by the Movants are: I (Fraudulent Inducement), III (Negligence), IV (Common Law Fraud), V (Negligent Misrepresentation), VII (Breach of the Duty of Fair Dealing), VIII (Consumer Fraud), IX (Deceptive Trade Practices), and XI (Racketeer Influenced and Corrupt Organizations "RICO"). Since many of the Movants' arguments for

dismissal pertain to several Counts, they will be considered in groups based on the applicable argument for dismissal.

### A. Failure to Allege a Misrepresentation

Movants' argue that Counts I, IV, V, VIII, IX, and XI are insufficient because the complaint fails to allege a false representation, which is a common required element to all of the Counts. [5] (Doc. No. 32 at 5.) The Complainants contend that the Complaint, viewed as a whole, sufficiently alleges misrepresentations to support the common element of those counts. (Doc. No. 55 at 8.)

[5]    *See, e.g., Stephenson v. Capano Development, Inc.,* 562 A.2d 1069, 1074 (Del.1983) (listing "a false representation" as the first element of common law fraud); *E.I. DuPoint de Nemours & Co. v. Florida Evergreen Foliage,* 744 A.2d 457, 461 (Del.1999) (explaining that fraudulent inducement includes the elements of a common law fraud); *H-M Wexford L.L.C v. Encorp, Inc.,* 832 A.2d 129, 147 n. 44 (Del.Ch.2003) (an element of negligent misrepresentation is the supplying of false information); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) (fraud is an inherent element in a RICO claim alleging mail and wire fraud); Grand *Ventures, Inc. v. Whaley,* 632 A.2d 63, 65-66 (Del.1993) (finding that both the Deceptive Trade Practices Act and the Consumer Fraud Act were passed to protect consumers from deception on the part of businesses).

Paragraph 13 of the Complaint contains an allegation that "[e]ven though he knew at the time that Credit Suisse was not authorized to finance premiums for insurance policies in Pennsylvania, Saide assured the Wallaces that Credit Suisse would be able to provide premium financing on the Pennsylvania Policy." (Doc. No. 3 at 16 ¶ 13.) After Credit Suisse refused to issue the loan in Pennsylvania, Saide then informed the Wallaces that they could not delay any further and proposed an elaborate plan to lock in the Initial Illustration that required them to immediately purchase and personally pay for the Pennsylvania policy. (Doc. No. 3 at 16 ¶¶ 15, 16.) Even though the Wallaces immediately acquired the Pennsylvania policy, paid the premiums, and followed the other steps of Saide's plan, the resulting Delaware policy did not conform to the Initial Illustration despite Saide's representations to the contrary. (*Id.* at 17-20, ¶¶ 16-22; *id.* at 23 ¶ 29.)

**\*5**  While the allegations are vague and non-specific (a deficiency addressed below), a court must consider the complaint as a whole and also any fair inferences that can be drawn from the allegations. A fair inference here is that Saide (and through him, Indianapolis Life) supplied false information by advising the Wallaces to apply for a loan that he knew would not be available. Saide also misled the Wallaces into following the steps of his plan when he falsely represented that it would lock in a new Delaware policy under the terms of the Initial Illustration, which also turned out to be false. The Movants argue: "the words 'misrepresentation,' 'misleading' or 'false' do not appear in the factual allegations section of the counterclaim." Despite this, a fair inference from the stated allegations is that false and misleading representations were made to the Wallaces and the Trustee that could support the misrepresentation element inherent in the above causes of action.

### B. Economic Loss Doctrine

The Movants' contend that Counts I, III, IV, and V should be dismissed because of Delaware's Economic Loss Doctrine, which prohibits recovery in tort for purely economic losses, unaccompanied by bodily harm or property damage. (Doc. No. 32 at 8.) Complainants do not deny that they are only seeking recovery for economic loss, but argue instead that the tort claims should not be dismissed because they arise from a breach of duty independent of the contract at issue. (Doc. No. 55 at 20.) Further, they argue that Counts I and V should not be dismissed because Delaware provides exceptions to the economic loss doctrine for fraudulent inducement and negligent misrepresentation. (*Id.* at 23.)

### 1. Independent Duty

The economic loss doctrine began as a judicially created limitation in product liability actions prohibiting recovery in tort where a defective product damaged only itself and did not cause personal injury or damage to other property. *See Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992). The application of this doctrine has grown beyond its origin in products liability to cover any commercial transaction involving a contract where the alleged damages do not include injury to a person or to property other than the bargained-for item. *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg.,* No. 98C-02-217WCC, 2002 WL 1335360, at \*5 (Del.Super.Ct. June, 13, 2002). As such, for contract claims and tort

Indianapolis Life Ins. Co. v. Hentz, Not Reported in F.Supp.2d (2008)
2008 WL 4453223
Case 3:17-cv-00772-RDM  Document 31-4  Filed 10/20/17  Page 93 of 100

claims to co-exist in an action, the tort claims must arise from a duty that is independent of the duties imposed by the contract. *McKenna v. Terminex Intern. Co.,* No. 04C-02-022RBY, 2006 WL 1229674, at \*2 (Del.Super.Ct. March 13, 2006). The doctrine illustrates the judicial preference for application of contract law to disputes because it provides a better and more specific remedy than tort law. *Brasby v. Morris,* No. 05C-10-022-RFS, 2007 WL 949485, at \*6 (Del.Super.Ct. March 29, 2007).

**\*6** Here, the Complainants do not deny that the insurance contract contained the duties governing the relationship between the parties. Instead, the Complainants argue that Saide had independent duties beyond those "arising under *any* contract." (Doc. No. 55 at 19 (emphasis added).) Delaware law is clear that insurance companies do not owe any special duties to policy holders outside of the insurance contract itself. *Cross v. BCBSD, Inc.,* 836 A.2d 492, 493 (Del.2003). The Delaware Supreme Court has held that "the concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal in which the fiduciary is required to pursue solely the interests of the beneficiary in the property." *Corrado Bros. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (Del.1989). A typical insurance contract does not fit this standard because the interests of the insurance company and its policy holders will not always align. *Cross,* 836 A.2d at 495. Additionally, agents of the insurance company share the same contractual duty with the policy holders as the company; the legal consequences of the agent's acts are the same as if the insurance company had performed them. *See Thomas v. Harford Mut. Ins. Co.,* No. 01 C-01-046 HDR, 2003 WL 21742143, at \*1 (Del.Super.Ct. July 25, 2003).

Complainants do not deny that Saide was an agent for the insurance company and not their personal insurance broker, but contend that Saide had an independent common-law[6] duty of care in communicating information to the Wallaces. (Doc. No. 55 at 20.) Complainants further argue that Saide's breach of this duty is imputed to the insurance company by way of respondeat superior. (Doc. No. 55 at 20.) In support of this proposition, they cite *Guardian Const. Co. v. Tetra Tech Richardson, Inc.,* A.2d 1378, 1385-86 (Del.Super.Ct.1990), wherein the Delaware Superior Court adopted the Restatement (Second) of Torts §

552 ("RST 552").[7] The two plaintiffs in *Tetra Tech* were not in a contractual relationship with a design engineer that had supplied information to them, so no breach of contract action was available, and the economic loss doctrine would have precluded recovery in tort. *Id.* The court therefore adopted RST 522 as a limited exception to the economic loss doctrine solely for claims of negligent misrepresentation to avoid a situation where no remedy existed. *See Christiana,* 2002 WL 1335360, at \*6. This narrow application is evident in the court's express limitation that it did not intend to "state a general rule which applies to all professions in all situations." *Id.* As such, the Complainants cannot rely on *Tetra Tech* or the RST 552 exception to support the separate tort causes of action merely by suggesting it imparts an independent duty on all insurance agents.

6    Previously, counsel for the Complainants also argued an independent statutory duty existed in Delaware for insurance agents, but that argument has been withdrawn. (Doc. No. 66 at 1.)

7    The Restatement (Second) of Torts § 552 provides in relevant part:
     One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
     Restatement (Second) of Torts § 552.

Complainants also cite *Stuchen v. Duty Free International, Inc.,* No. 94C-12-194, 1996 WL 33167249, at \*11-12 (Del.Super.Ct. April 22, 1996), but there the court found no reason to impose independent duties on the agents at issue and dismissed the negligent misrepresentation claims. Further, the rest of the cases cited by the Complainants do not construe Delaware law and are otherwise unpersuasive considering the Delaware precedent discussed above.

**\*7** While RST 552 will be considered further in connection with the exception to the economic loss doctrine for negligent misrepresentation, it is clear that insurance companies and their agents do not have independent duties beyond the insurance contract under Delaware law. Given the express limitations of the *Tetra-*

*Tech* holding, the Court cannot construe § 522 as creating a general duty of care for all insurance agents, as proposed by the Complainants. The negligence and common law fraud claims relate directly to the performance of the contract underlying this dispute and merely recast the dispute in tort language. Thus, the economic loss doctrine bars Counts III and IV, and they will be dismissed.

### 2. Fraudulent Inducement

While the Court does not accept the Complainants' argument in defense of the common law fraud and negligence claims, this does not dispose of the fraudulent inducement claim. Under Delaware Law, there is support for the proposition that an independent duty exists not to engage in fraud to induce a contractual relationship. *See Brasby,* 2007 WL 949485, at *7 (holding that "allegations of fraud that go directly to the inducement of the contract, rather than its performance, would present a viable claim"). The fraudulent inducement necessarily arises before the contract even exists so the claim cannot rest on any duty contained in the contract. [8] *Id.*

[8]  The Court notes that there is some dispute about whether this reasoning is sound. *Compare Budgetel Inns, Inc. v. Micros Sys., Inc.,* 8 F.Supp.2d 1137 (E.D.Wis.1998) (concluding that fraudulent inducement claims are never barred by the economic loss doctrine because they must occur before the contract is formed), *with Huron Tool & Engineering Co. v. Precision Consulting Serv., Inc.,* 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995) (finding that fraudulent inducement claims were also blocked by the economic loss doctrine where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold).

The Complainants have alleged enough in their complaint to support the fraudulent inducement claim. (Doc. No. 3 at 17 ¶ 15.) As such, the motion to dismiss Count I will be denied.

### 3. Exception for Negligent Misrepresentation under RST § 552

As discussed above, RST 552 does not establish an independent duty of care for all professions, but Delaware courts have recognized it as a limited exception to the economic loss doctrine in claims of negligent misrepresentation. *Christiana,* 2002 WL 1335360, at *6. The RST 552 exception is limited to situations where

"the defendant supplied the information to the plaintiff for use in business transactions with third parties." *Id.* (quoting *Danforth v. Acorn Structures, Inc.,* No. 90C-JN-30, 1991 WL 269956 at *5 (Del.Super.Ct. Nov.22, 1991)). Additionally, the defendant must be in the business of supplying information. *Christiana,* 2002 WL 1335360 at *6.

The first requirement-that the defendant supplied information for use in business transactions with third parties-is met by the allegations in the Complaint. Saide and Indianapolis Life provided the Wallaces and Trustee with information regarding the value of a new insurance policy. (Doc. No. 3 at 15 ¶ 11.) The Wallaces and Trustee used this information to secure a loan from Credit Suisse, a third party to the insurance policy transaction at issue. (Doc. No. 3 at 19 ¶ 19.) It is also alleged that Credit Suisse calculated the loan collateral based on the cash value given in the Initial Illustration to the Wallaces. (*Id.*) As such, Indianapolis Life and Saide supplied information to the Wallaces for use in a business transaction with the third party Credit Suisse. Delaware courts have found the first requirement of the RST 552 exception met under similar circumstances involving a third-party loan agreement. *See Christiana,* 2002 WL 1335360, at *6.

 **\*8**  As for the second requirement, Delaware law does not delineate a list of businesses that are in the business of "supplying information." *Id.* The court is required to engage in "[a] precise, case-specific inquiry ... to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." *Id.* (quoting *Rankow v. First Chicago Bank,* 870 F.2d 356, 360-366 (7th Cir.1989)). Most businesses provide information, but a business will not be found to meet this requirement where that information is provided in connection with the sale of a product or services and relates the information relates only to those goods and services. *Id.* at 7 (quoting *Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 295 (Ill App.Ct.1999)). Because of the intensive factual nature of this inquiry, it not always clear whether or not the business is "supplying information." *Id.*

Neither the parties nor the Court's independent research have revealed a Delaware case analyzing the information provided by an insurance company for purposes of the RST 552 exception, but Delaware has relied to some

extent on Illinois precedent in this area. *Id.* at 6, 241 Ill.Dec. 427, 719 N.E.2d 288. Illinois courts have found that life insurance companies were "a difficult case," considered somewhere between pure information provider (such as accountants) and pure tangible good providers (such as manufacturers). *Tolan,* 241 Ill.Dec. 427, 719 N.E.2d at 297.

In this case, the allegations of the complaint are sufficient to sustain this second requirement. Indianapolis Life and Saide were trying to sell the Wallaces a life insurance policy, so the information was provided with the ultimate goal of selling a product. But, the information provided to the Wallaces did not relate only to the sale of the insurance policy. For instance, Saide advised the Wallaces to apply for loans from a specific third-party bank. (Doc. No. 3 at 16 ¶ 13.) Further, Saide contacted counsel in Delaware for the Wallaces to draw up a trust agreement. (Doc. No. 3 at 16 ¶ 17.) Because of the early stage of this case and the difficult nature of applying the RST 552 exception to life insurance companies in general, the Court finds that these allegations are enough to raise an inference that Indianapolis Life and Saide were in the business of supplying information for the guidance of the Wallaces.

As such, the negligent misrepresentation cause of action pleaded here satisfies the requirements of RST 552 and qualifies as an exception to the economic loss doctrine. The motion to dismiss Count V will be denied.

### B. Failure to Plead Fraud with Particularity

The Movants' argue that Counts I, IV,[9] VIII, and XI of the counterclaim are deficient because they are not plead with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. (Doc. No. 32 at 7.) They also contend that Count V is deficient because even though Rule 9(b) is not applicable to a claim of negligent misrepresentation, it still must be pled with a degree of specificity. (*Id.*) The Complainants argue that the claims for consumer fraud and negligent misrepresentation do not require any heightened pleading standard. (Doc. No. 55 at 11-12.) They also argue that, to the extent Rule 9(b) does apply, the allegations place the Movants on sufficient notice to satisfy the particularity requirements of the rule. (*Id.*)

9      The Court notes that Count IV was found to be barred by application of the economic loss doctrine

so consideration in this section is an alternative basis to dismiss the claim.

### 1. Rule 9(b) and Delaware's Consumer Fraud Act

**\*9** Rule 9(b)[10] is limited by its terms to claims of mistake and fraud, but it applies "to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Toner v. Allstate Ins. Co.,* 821 F.Supp. 276, 283 (D.Del.1993). The heightened requirements of Rule 9(b) are meant to protect defendants from frivolous suits that could potentially damage a defendant's reputation and goodwill. *See Seville,* 742 F.2d at 791. The particularity requirement accomplishes this goal by giving notice of the specific misconduct at issue so the defendant can prepare a defense to the claim. *Toner,* 821 F.Supp. at 284. The requirement of specificity also prevents fraud claims meant as a fishing expedition to obtain material facts by way of the discovery process. *Id.* As such, the heightened requirements of Rule 9(b) apply to claims of intentional misrepresentation. *See id.* They are also applicable to the fraudulent acts of mail fraud underlying a RICO cause of action. *Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004).

10      Rule 9(b) provides:
          In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.
      Fed.R.Civ.P. 9(b).

The Delaware Consumer Fraud Act[11] is designed to protect consumers from unfair or deceptive merchandising practices, including: fraud, misrepresentation, false promises, and omission of material facts with intent that others rely upon such concealment. *Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 65-66 (Del.1993). While the elements of a Consumer Fraud Act claim differ from common law fraud,[12] in all other respects the statute is interpreted in light of established common law concepts of fraud and deceit. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983). Accordingly, some courts have held that the Consumer Fraud Act is subject to the requirements of Rule 9(b). *Coleman Dupont Homsey v. Vigilant Ins. Co.,* 496 F.Supp.2d 433, 439-40 (D.Del.2007) (citing *Eames,* at 412 F.Supp.2d 431, 437 (D.Del.2006)).

11      The Delaware Consumer Fraud Act provides in
        pertinent part:
            [A]ny deception, fraud, false pretense, false
            promise, misrepresentation, or the concealment,
            suppression, or omission of any material
            fact with intent that others rely upon such
            concealment, suppression or omission, in
            connection with the sale, lease or advertisement
            of any merchandise, whether or not any person
            has in fact been misled, deceived or damaged
            thereby, is an unlawful practice.

        Del.Code. Ann. 6 § 2513(a).

12      The statute's elements depart from the common law in
        the following ways: (1) a negligent misrepresentation
        is sufficient to violate the statute, (2) a violation of
        the statute is committed regardless of actual reliance
        by the plaintiff, and (3) the plaintiff need not show
        intent by the defendant to induce action or inaction
        by the plaintiff. *Eames v. Nationwide Mut. Ins.
        Co.,* 412 F.Supp.2d 431, 437 (D.Del.2006) (quoting
        *Stephenson,* 462 A.2d at 1074)).

Complainants contend that Rule 9(b) does not apply
because the elements depart from common law fraud,
citing *State ex. rel. Brady v. Publishers Clearing House,*
787 A.2d 111, 116-17 (Del.Ch.2001), as authority for this
position. The court in *Brady* held that the Chancery Court
version of Rule 9(b) did not apply to a claim brought
under the Consumer Fraud Act by the Delaware Attorney
General. *Id.* at 112. This case is sufficiently distinguishable
so as to not control the disposition of the present issue,
however. The Attorney General of Delaware brought
the claim in *Brady,* and this was an important factor
in the court's rationale for not applying the heightened
requirements, as the court found:

            [T]he remedial goals of these two
            acts are inconsistent with the
            application of the particularized
            pleading requirements of Rule 9(b)
            to enforcement actions brought by
            the Attorney General to protect
            the consuming public .... [C]laims
            under the two acts do not involve
            charges of moral turpitude and are
            unlikely to be brought by the State
            for purposes of harassment .... [A]
            requirement that the State plead
            with particularity the "who, what,
            where, and when" of each and every

one of 750,000 violations alleged
would serve only to defeat the
legislative mandate to the Attorney
General in bringing actions such of
these on behalf of citizens of the
state.

 **\*10** *Id.* As such, the rationale relied on by the court
does not apply with as much force to this case where
private individuals are asserting the claim. *See Coleman,*
496 F.Supp.2d at 439 (holding that Rule 9(b) applied to
a private cause of action brought under the Consumer
Fraud Act and that *Brady* was inapplicable).

Given the fraud label on the Consumer Fraud Act, the
conduct that it is meant to curtail, and the allegations
relied on in the Complaint to support this cause of action,
the gravamen of this claim is quite obviously fraud. In
addition, application of Rule 9(b) here would further the
policy objectives of the rule. A false allegation under the
Consumer Fraud Act certainly has the same potential to
harm reputation and goodwill as an allegation of common
law fraud. Therefore, the Court finds that Rule 9(b) is
applicable and the Consumer Fraud Act must be plead
with particularity.

### 2. Negligent Misrepresentation

The parties agree that a claim of negligent
misrepresentation is not covered by Rule 9(b). (Doc. No.
55 at 10; Doc. No. 32 at 6). No consensus has emerged
on this issue, even among the district courts within this
Circuit. [13] Because there is no clear consensus, the Court
will accept the parties' agreement.

13      *Compare Toner* 821 F.Supp. at 283 (finding that Rule
        9(b) is applicable to negligent misrepresentation);
        *Breeden v. Richmond Cmty. Coll.,* 171 F.R.D. 189,
        199-202 (finding the same after exhaustive review
        of the authority and history of Rule 9(b)) *with
        Brandow Chrysler Jeep Co. v. DataScan Tech.,*
        511 F.Supp.2d 529, 537 (E.D.Pa.2007) (holding
        Rule 9(b) inapplicable to claims of negligent
        misrepresentation).

Despite Rule 9(b) being inapplicable, the Movants'
contend that a claim for negligent misrepresentation must
be plead with a degree of specificity, citing *Floyd v.
Brown & Williamson Tobacco Corp.,* 159 F.Supp.2d 823,
834 (E.D.Pa.2001) (citing *Southern Seafood Co. v. Holt
Cargo Sys., Inc.,* No. 96-5217 1997 WL 539763, *11 n. 23

Case 3:17-cv-00772-RDM Document 31-4 Filed 10/20/17 Page 97 of 100
Indianapolis Life Ins. Co. v. Hentz, Not Reported in F.Supp.2d (2008)
2008 WL 4453223

(E.D.Pa. Aug. 11, 1997)), as support for this proposition. *Floyd* involved a pro se Complaint against two cigarette manufacturers for injuries allegedly sustained as a result of smoking cigarettes. *Id.* at 826. In analyzing the joint motion to dismiss, the court devoted only a few sentences to the negligent misrepresentation claim holding that a degree of specificity was required and finding that the complaint contained no allegations concerning specific negligent misrepresentations. There was no discussion about the reasoning for this requirement or any standards for application of the holding, and the court solely relied on a footnote in *Southern Seafood,* an unreported case, as authority for the specificity standard it purported to apply. *See id.* The court in *Southern Seafood* also did not explain the authority or reasoning for requiring an extra degree of specificity in negligent misrepresentation claims, however, and seemingly applied the typical Rule 9(b) analysis to the claim. *See Southern Seafood,* 1997 WL 539763, at *11 n. 23.

Several cases in the Eastern District of Pennsylvania have relied on *Floyd* to require an extra degree of specificity for claims of negligent misrepresentation,[14] but the Court has not found (nor have the parties cited) any Third Circuit cases holding negligent misrepresentation claims to the same standard. Given the above history of the "degree of specificity" requirement relied on by the Movants, the Court does not find the reasoning in *Floyd* persuasive and will not adopt it for the purposes of this motion. A claim that does not fall under the special pleading requirements of Rule 9 is evaluated by the general rules set out in Rule 8(a). Fed.R.Civ.P. 8(a). As such, the negligent misrepresentation claim will not be further considered in this section of the opinion.

[14]    *See, e.g., Brandow,* 511 F.Supp.2d at 537; *Deverant v. Selective Ins. Co., Inc.,* No. 02-CV-3801 2003 WL 21282184 *3 (E.D.Pa. Jan. 07, 2003).

### 3. Application of Rule 9(b) to Counts I, IV, VIII, and XI

 **\*11** Rule 9(b) requires plaintiffs to plead the circumstances of fraud with particularity. *Seville,* 742 F.2d at 791. Despite this, an approach focusing exclusively on the "particularity" language of the rule is too narrow because it ignores the contemplated flexibility and simplicity inherent in the pleading system adopted by the Federal Rules. *Id.* Plaintiffs do not have to make allegations of date, place, or time to satisfy the notice aspect of the Rule 9(b) requirement, but may "use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (holding that an attached detailed list identifying the machines which were the subject of the alleged fraudulent transactions was an adequate alternative means to satisfy Rule 9(b)). The complaint also must include allegations detailing who made the misrepresentation, to whom, and the general content of the misrepresentation. *Lum,* 361 F.3d at 227.

One serious deficiency with the Complaint is that after identifying AmerUs Group, AmerUs Life, and Indianapolis Life as separate corporate entities (Doc. No. 3 at 13-14 ¶¶ 4, 5, 6), it goes on to group them together as the "Insurance Company" for all the substantive allegations of the complaint. (Doc. No. 3 at 14 ¶ 8 n. 2.) Typically, a plaintiff cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant. *Sandvik AB v. Advent Intern. Corp.,* 83 F.Supp.2d 442, 448 (D.Del.1999) (citing *Lachmund v. ADM Investor Services, Inc.,* 191 F.3d 777, 784 (7th Cir.1999)). In a case involving multiple defendants, each defendant is entitled to be apprised of the roles they each played in the alleged scheme, and absent a compelling reason, a plaintiff is not normally entitled to treat multiple corporate defendants as one entity. *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328-29 (7th Cir.1994) (citing *Vicom Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777-78 (7th Cir.1994)). Though it may be convenient to lump defendants together for ease of reference, as the Court has done in this opinion, it is a luxury that the plaintiff should avoid when alleging acts of fraud in a complaint. *See Jepson,* 34 F.3d at 1329. One exception to this general rule is that vicarious liability need not be plead with particularity, so the principal can be held liable for the fraudulent acts of its agents if the agency relationship is adequately alleged. *Sandvik,* 83 F.Supp.2d at 448; *see also Petro-Tech, Inc. v. Western Co. of N. Am.,* 824 F.2d 1349 (3d Cir.1987). But here, the Complaint contains no allegations as to how these grouped together companies relate to each other, noting only that Indianapolis Life is a subsidiary to AmerUs Group. (Doc. No. 3 at 13 ¶ 5.) Further, the Complaint does not contain any allegations that explain the connection of AmerUs Life to the facts of this case beyond lumping it together with the other Defendant insurance companies.[15]

15    Paragraph 6 contains the entirety of the allegations regarding AmerUs Life:

> Third-Party Defendant AmerUS Life Insurance Co., an Iowa corporation, is an insurance company authorized to sell insurance and issue insurance policies in the State of Delaware, with an address at 611 Fifth Avenue, Des Moines, Iowa 50309, and a registered agent of James A. Smallenberger, 611 Fifth Avenue, Des Moines, Iowa 50309.

(Doc. No. 3 at 14 ¶ 6.)

**\*12** Even if the Court assumes that these related corporations can sort out their own involvement in the scheme and prepare a defense, *see Jepson* 34 F.3d at 1329, the allegations are also deficient because they do not include the date, place, or time that any of the misrepresentations took place. The few alleged misrepresentations identified in the Complaint appear to have taken place between "early 2005" and "March 14, 2005," during which, the Complainants allege that Saide and the group of Defendants comprising "Insurance Company" took significant steps in the conduct underlying this action, such as: advising the Wallaces to terminate an existing life insurance policy, providing them with the Initial Illustration, advising them to apply for loans from Credit Suisse, and eventually devising the plan to create the Trust and have the Trustee apply for the policy again. (Doc. No. 3 at 14-16 ¶¶ 8-15.) The date and time of these alleged events are never identified with specificity. As discussed in the factual background section of this Memorandum, the lack of dates and times makes it difficult to construct a time line of the events that took place up until the first insurance policy was issued to the Wallaces. There is also no mention of the place or method by which the misrepresentations were made to the Wallaces so there is no way to know whether these misrepresentations were in person, by phone, or mail (which is especially problematic for the underlying acts of mail fraud required to sustain the RICO claim). Further, the Wallaces should have access to the dates and times of these misrepresentations because they were personally involved in all of the communications at issue.

Furthermore, the Complainants' brief in opposition does not attempt explain or account for the lack of these essential elements to the core allegations of the Complaint. Instead, to account for the deficiencies, the Complainants rely on *Seville* and claim that allegations of date, place,

or time are not required by Rule 9(b). (Doc. No. 55 at 14.) While this statement is generally true, the holding in *Seville* was based on the existence of some other means of injecting particularity into the complaint to satisfy the requirements of Rule 9(b). The Complainants do not point out any other allegations or information that inject precision or substantiation into the claims that are lacking the time, place, and dates. The brief in opposition also introduces further confusion by referring to the Wallaces and Trustee together as a single entity. [16]

16    For example, after lumping the Wallaces and Trustee together as "Wallaces," (Doc. No. 55 at 5 n. 1), the Complainants state in their brief in opposition that: "Saide ... represented to the Wallaces (an elderly couple with little knowledge of insurance) that he would obtain and the Insurer could provide a premium financed policy conforming to the Initial Illustration and with a commencement date of December 2005." (Doc. No. 55 at 9.)

Given the many vagaries of the Complaint and the goals of Rule 9(b) discussed above to provide notice to the Defendants and protect against frivolous lawsuits, it is clear that none of the misrepresentations or conduct underlying the fraud claims have been pled with sufficient particularity to meet even the somewhat relaxed Rule 9(b) standard articulated by the Third Circuit in *Seville.* As such, Counts I, IV, VIII, and XI will be dismissed.

### D. The Duty of Good Faith and Fair Dealing
**\*13** The Movants argue that while Delaware recognizes a cause of action for breach of the duty of good faith and fair dealing, it only applies if the conduct in question is without reasonable justification. (Doc. No. 32 at 10.) The Movants conclude that the Complainants have failed to allege "either a duty arising from any specific contractual relationship or any conduct that lacked reasonable justification." (Doc. No. 32 at 11.) In response, the Complainants argue that the duty extends beyond reasonable justification and that the allegations of the complaint taken as a whole are sufficient to sustain this cause of action. (Doc. No. 55 at 18.)

Under Delaware law, the implied covenant of good faith and fair dealing is best understood as a way of implying terms in the agreement, either to analyze unanticipated developments or to fill gaps in a contract's provisions. *Dunlap v. State Farm Fire and Cas. Co.,* 878 A.2d

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    10

434, 440-41 (Del.2005). The implied covenant attaches to every contract, including contracts of insurance. *Id.* at 441. Existing contract terms still control, so the implied terms cannot circumvent the parties' bargain to create a free-floating duty that does not exist in the underlying document or create a claim for breach on conduct authorized by the terms of the agreement. *Id.* The covenant requires that "a party refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 442. A party breaches the covenant if they frustrate the purpose of the contract by taking advantage of their position to control implementation of the agreement's terms. *Id.* at 442. To sufficiently plead a breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Anderson v. Wachovia Mortg. Corp.,* 497 F.Supp.2d 572, 582-83 (D.Del.2007) (quoting *Fitzgerald v. Cantor,* No. 16297-NC 1998 WL 842316 at *1 (Del.Ch. Nov. 10, 1998).

In an insurance contract, this covenant essentially requires "the insurer act in a way that honors the insured's reasonable expectations." *Id.* at 444. Unlike a bad faith claim in the insurance context, a breach of this implied covenant can occur from conduct that does not deal with failing to promptly process and pay claims. *Id.*

Here, the Complaint is sufficient to sustain a claim for breach of the implied covenant of good faith and fair dealing. The Complainants specifically allege that the insurance companies did not deal with the Wallaces fairly throughout this process. (Doc. No. 3 at 30 ¶ 67.) Unfair conduct in a contractual relationship prevents the other party from receiving the fruits of the bargain so the Complainants can rely on the concepts of reasonableness and fairness as a specific implied contractual obligation. *See Anderson,* 497 F.Supp.2d at 582. Additionally, a fair inference from several allegations within the Complaint is that there was a breach of this obligation. For example, it is alleged that Saide suggested the course of action and made all arrangements necessary to create the Delaware policy so that the Initial Illustration would apply. (Doc. No. 3 at 17 ¶¶ 15-16.) This conduct, if proved, could demonstrate that the insurer was taking advantage of their superior position to control implementation of the agreement's terms. The Complainants also allege that the movants "refused to produce a copy of the Delaware Policy, and never confirmed or denied the application of any illustration to the Delaware Policy." (Doc. No. 3 at 23 ¶ 29.) It is alleged that this refusal caused significant additional costs for the Wallaces in investigating the matter (Doc. No. 3 at 24 ¶ 30), which also would implicate the covenant of good faith and fair dealing because an insurance company cannot take advantage of its superior position such that it becomes a secondary source of injury to the insured. *Dunlap,* 878 A.2d at 444. Accordingly, the complaint is sufficient to sustain the claim for breach of the duty of good faith and fair dealing.

**E. Deceptive Trade Practices**

**\*14**  Count IX of the Complaint asserts a claim based on the Delaware Uniform Deceptive Trade Practices Act ("DTPA"). Del.Code. Ann. 6 § 2531 *et seq.;* (Doc. No. 3 at 31 ¶ 73.) In *Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 70 (Del.1993), the Delaware Supreme Court held that "a litigant has standing under the DTPA only when such person has a business or trade interest at stake which is the subject of interference by the unfair or deceptive trade practices of another." After reviewing the legislative history and intent behind the statute, the court found that the DTPA was designed to protect consumers from deceptive trade practices indirectly by ensuring fair conduct among businesses. *Id.* As such, the court concluded that the DTPA addresses unreasonable or unfair interference with horizontal relationships between various business interests while the Consumer Fraud Act (asserted in Count VIII of the Complaint) provided remedies for violations of the vertical relationship between a consumer and a producer or seller. *Id.*

Relying on *Brady v. Fallon,* No. 96A-12-010-RRC, 1998 WL 283438, at *4 (Del.Super.Ct. Feb.27, 1998), the Complainants contend that *Whaley* is no longer precedential because the Delaware General Assembly amended the DTPA after the case was decided.[17] (Doc. No. 55 at 26). This argument cannot survive scrutiny, however, because the terms of the amendment only give the Attorney General standing to bring suit for harm to individual consumers. Del.Code. Ann. 6 § 2533(d). As such, *Fallon* is inapplicable because the action in that case was brought by the Attorney General and not by a private consumer in his individual capacity. *See Johnson v. Geico Cas. Co.,* 516 F.Supp.2d 351 (D.Del.2007).

17    The amendment added subsection (d) to Del.Code.
      Ann. 6 § 2533 which provides: "[t]he Attorney General
      shall have standing to seek, on behalf of the State, any
      remedy enumerated in this section for any violation
      of § 2532 of this title that is likely to harm any
      person, including but not limited to individual retail
      purchasers and consumers of goods, services or
      merchandise." Del.Code. Ann. 6 § 2533(d).

Nothing in the Complaint suggests that the Complainants had a business or trade interest that was the subject of interference by unfair trade practices. Rather, the allegations show only that they were private consumers of the insurance policy at issue. Accordingly, the Court concludes that the Complainants cannot maintain a private cause of action under the DTPA and Count IX will be dismissed.

**F. Leave to Amend**

At the end of the brief in opposition, the Complainants state that, "[s]hould the Court determine that the claims have not been pled sufficiently, the Wallaces respectfully request that the Court grant leave to amend and replead pursuant to Federal Rule of Civil Procedure 15." (Doc. No. 55 at 29.)

Requesting leave to amend at the end of the brief in opposition is not the proper method to bring such a request before a court. *Ranke v. Sanofi-Synthelabo, Inc.,* 436 F.3d 197, 205-06 (3d Cir.2006). Instead, to request leave to amend, a draft amended complaint must be submitted to the district court along with a formal motion so that the court has a basis to exercise its discretion. *Id.* Failure to include the draft amended complaint is fatal to any motion to amend. *Id.* Accordingly, the Court will deny the Complainants request at this time, but would consider a subsequent, properly presented motion to amend. The Court notes, however, that leave to amend is typically granted for dismissal for failure to comply with Rule 9(b), but not for amendments that would prove futile. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434-35 (3d Cir.1997).

**IV. CONCLUSION**

**\*15**  For the foregoing reasons, the Court will grant in part Movants' motions to dismiss counts I, III, IV, V,

VI, VII, VII, IX, X, and XI of the counterclaim and third-party complaint. Counts I (fraudulent inducement), III (negligence), IV (common law fraud), VI (bad faith breach of contract), VIII (consumer fraud), IX (deceptive trade practices), X (insurance fraud), and XI (RICO) will be dismissed. Additionally, the Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust will be dismissed from this action. An order consistent with this Memorandum Opinion will follow.

*ORDER*

**AND NOW,** this 30th day of September, 2008, upon consideration of the Defendants' Motions to Dismiss (Doc. Nos.31, 38) the counterclaim and third-party complaint (Doc. No. 3) filed in the above-captioned matter, and for the reasons set forth in this Court's Memorandum Opinion filed herewith, **IT IS HEREBY ORDERED** that said Motions are **GRANTED IN PART** and **DENIED IN PART.**

As to Counts I (fraudulent inducement), III (negligence), IV (common law fraud), VI (bad faith breach of contract), VIII (consumer fraud), IX (deceptive trade practices), X (insurance fraud), and XI (RICO), the motions to dismiss are **GRANTED.** These Counts are

**DISMISSED.**  As to Counts V (negligent misrepresentation) and Count VII (breach of the duty of fair dealing) the motions are **DENIED.**

**IT IS FURTHER ORDERED** that the Counterclaim and Third-Party Plaintiffs request for leave to amend the counterclaim and third-party complaint is **DENIED** without prejudice to file a proper motion for leave to amend.

**IT IS FURTHER ORDERED** that Defendant The Richard W. Wallace and Rebecca J. Wallace Irrevocable Trust is **DISMISSED** from this action.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4453223

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.